**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE**

| | |
|---|---|
| NEW HAMPSHIRE INDONESIAN COMMUNITY SUPPORT, *et al.,*  *Plaintiffs*,  v.  DONALD J. TRUMP, President of the United States, in his official capacity, *et al.*,  *Defendants*. | Case No. 1:25-cv-38-JL-TSM |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

## INTRODUCTION

Birthright citizenship embodies America's most fundamental promise: that all children born on our soil begin life as full and equal members of our national community, regardless of their parents' origins, status, or circumstances. This principle has enabled generations of children to pursue their dreams and build a stronger America. Because the "priceless treasure" of citizenship is so vital, *Fedorenko v. United States*, 449 U.S. 490, 507 (1981), the framers of the Fourteenth Amendment specifically enshrined the principle of birthright citizenship into the Constitution's text to make sure that no one—not even the President—could take it away from children born on our shores. Over 125 years ago, the Supreme Court emphatically rejected the last effort to undercut birthright citizenship in *United States v. Wong Kim Ark*, 169 U.S. 649 (1898). Since then, even through countless immigration debates, the birthright citizenship principle has remained undisturbed constitutional bedrock and prevented the emergence of a hereditary underclass excluded from full participation in American life.

Until now. Flouting the Constitution's requirements, congressional direction, and longstanding Supreme Court precedent, Defendants attempt to upend one of the most fundamental American constitutional values by denying citizenship to babies based on their parents' lack of permanent immigration status. For Plaintiffs—organizations with impacted members—and for families across the country, this Order seeks to strip away the precious duties and benefits of U.S. citizenship while threatening U.S.-born children with deportation to countries they have never seen. But the Constitution and Congress—not President Trump—dictate who is entitled to full membership in American society. The Order is illegal and should be enjoined.

1

## BACKGROUND

On January 20, 2025, President Trump signed an Executive Order entitled "Protecting the Meaning and Value of American Citizenship" ("the Order"). The Order purports to declare that a child born in the United States is not a citizen if, at the time of their birth, (1) either their mother was "unlawfully present in the United States" or her "presence in the United States was lawful but temporary," and (2) their father was not a U.S. citizen or lawful permanent resident ("LPR"). The Order declares that "no department or agency of the United States government shall" either issue or accept government documents "purporting to recognize" the citizenship of such children, provided that the child is born on or after February 19, 2025. The Order directs the Secretary of State, the Attorney General, the Secretary of Homeland Security, and the Commissioner of Social Security to implement its terms, and directs all other agency heads to issue guidance regarding implementation of the Order.

Plaintiffs are three organizations whose members include noncitizens expecting children who will be covered by the Order because of their parents' immigration status. Accordingly, the Order will deprive their babies (when they are born) of their rights and status as natural born American citizens. Decl. of Pastor Sandra Pontoh ("Pontoh Decl.") ¶¶ 8-16; Decl. of Sienna Fontaine ("Fontaine Decl.") ¶¶ 11-28; Decl. of Juan Proaño ("Proaño Decl.") ¶¶ 11-19.

## STANDARD OF REVIEW

To obtain a preliminary injunction, the movant must show that: (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities is in their favor; and (4) an injunction is in the public interest. *Voice of the Arab World, Inc. v. MDTV Medical News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011).

**ARGUMENT**

**1. The Order Is Unconstitutional and Violates Federal Statute.**

The Order is illegal for two independent reasons: First, it violates the Citizenship Clause of the Fourteenth Amendment under the Supreme Court's definitive interpretation in *Wong Kim Ark*; and second, it violates 8 U.S.C. § 1401(a), which codified the longstanding constitutional rule as an additional statutory guarantee of birthright citizenship.

**a. The Order Violates the Fourteenth Amendment's Citizenship Clause.**

The Executive Order straightforwardly violates the Fourteenth Amendment's Citizenship Clause, which provides that "all persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States." U.S. Const. amend. XIV, § 1. The Supreme Court applied the Clause over 125 years ago to hold that all children born in the United States, with very narrow exceptions that are inapplicable here, are U.S. citizens. *Wong Kim Ark*, 169 U.S. at 652-53. The Executive Order flatly violates this bedrock constitutional principle.

As *Wong Kim Ark* explains, the common law rule of "jus soli" has an ancient pedigree and was followed in the early years of the republic. *See Wong Kim Ark*, 169 U.S. at 693 (discussing "the ancient and fundamental rule of citizenship by birth within the territory").[1] Under this rule, it was widely understood that "every person born within the dominions and allegiance of the United States, whatever were the situation of his parents, is a natural born citizen." *Lynch v. Clarke*, 1 Sand. Ch. 583, 663 (N.Y. Ch. 1844) (cited in *Wong Kim Ark*). Specifically, a child born in the United States was a citizen regardless of their parents' citizenship. *See Inglis v. Trustees of Sailor's Snug Harbor*, 28 U.S. 99, 164 (1830) ("Nothing is

---

[1] *See also Calvin v. Smith*, 77 Eng. Rep. 377 (K.B. 1608); 1 William Blackstone, *Commentaries on the Laws of England* 354-55 (1765) ("Natural-born subjects are such as are born within the dominions of the crown . . . that is, within the ligeance, or . . . the allegiance of the king; and aliens, such as are born out of it.").

3

better settled at the common law than the doctrine that the children even of aliens born in a country . . . are subjects by birth.") (cited in *Wong Kim Ark*); *Lynch*, 1 Sand. Ch. at 583 (child born to noncitizen parents "during their temporary stay" in the United States was a citizen).[2]

However, the infamous case of *Dred Scott v. Sandford* held that, despite their birth in the United States, the descendants of enslaved people were "not included, and were not intended to be included, under the word 'citizens' in the Constitution." 60 U.S. 393, 404-05 (1857). After the Civil War, Congress repudiated *Dred Scott* and, in recognition that statutory protections alone might be insufficient, included the Citizenship Clause in the Fourteenth Amendment. *See Wong Kim Ark*, 169 U.S. at 692-93.

The text of the Citizenship Clause—confirming that "all persons born" in the United States and subject to its jurisdiction are citizens—unambiguously reflects both the longstanding principle of jus soli and the rejection of the shameful exclusion of African Americans from that rule. The proponents and opponents of the Citizenship Clause understood that it would constitutionalize the common law rule of universal birthright citizenship, including birthright citizenship for the children of noncitizens. *See* Cong. Globe, 39th Cong., 1st Sess. 2890-91 (1866) (statement of Sen. Edgar Cowan) (opposing amendment because it would mean citizenship for the children of a "flood of immigra[nts]" from China and of "Gypsies" who, he believed, "settle as trespassers where ever they go"); *id.* at 2891 (statement of Senator John Conness) (supporting amendment and agreeing with Sen. Cowan that the Citizenship Clause "declare[s] that the children of all parentage whatever, . . . should be regarded and treated as

---

[2] *See also McCreery's Lessee v. Somerville,* 22 U.S. 354, 356 (1824) (children born in the United States of Irish father were citizens); Blackstone at 361-62 ("The children of aliens, born here . . . are . . . natural-born subjects, and entitled to all the privileges of such."); William Rawle, A View of the Constitution of the United States of America 86 (1829) ("[E]very person born within the United States . . . whether the parents are citizens or aliens, . . . is a natural born citizen in the sense of the Constitution").

4

citizens of the United States"); *id.* at 3148 (statement of Rep. Thaddeus Stevens) (explaining that under the Clause "every person" born in the United States would be a citizen).

Accordingly, when the Supreme Court in *Wong Kim Ark* was asked to decide the citizenship of the child of two Chinese nationals—who at that time were barred by statute from becoming U.S. citizens themselves under the Chinese Exclusion Acts—the Court rightly held that because the plaintiff had been born in the United States, he was a U.S. citizen, regardless of his parents' situation. 169 U.S. at 693. The Court explained that the Fourteenth Amendment's requirement that children born in the United States must be "subject to the jurisdiction thereof" to qualify as citizens was crafted to exclude only children who were not subject to the United States' jurisdiction because they and their parents were not subject to criminal and civil enforcement under the United States' laws. 169 U.S. at 693. Wong Kim Ark and his parents were plainly subject to the enforcement of United States law; he, therefore, was a citizen.

Ever since, the government has unequivocally affirmed that the Fourteenth Amendment protects universal birthright citizenship. For example, in 1995, the Office of Legal Counsel explained that a proposal to deny birthright citizenship to children born to undocumented parents would be "unquestionably unconstitutional." *Legislation Denying Citizenship at Birth to Certain Children Born in the United States: Statement Before the Subcomms. on Immigr. and Claims and on the Const. of the H. Comm. on the Judiciary*, 104th Cong. (1995) (statement of Walter Dellinger, Former Assistant Att'y Gen. of the United States). And for decades, State Department guidance has correctly provided that a child born in the United States is a citizen no matter the immigration status of the parents. *See* Section I.B., *infra*.

Now, in a dramatic break with this long history, the Executive Branch has taken the position that the Fourteenth Amendment does *not* guarantee universal birthright citizenship.

5

Defendants claim—without any legal justification or even reasoning—that a child born in the United States to parents who lack permanent legal immigration status is not a citizen because they are not "subject to the jurisdiction" of the United States.  But, as noted, *Wong Kim Ark* already interpreted the phrase "subject to the jurisdiction" to include just a few specific, exceptional categories: "children of foreign sovereigns or their ministers, or born on foreign public ships, or of enemies within and during a hostile occupation of part of our territory . . . ." 169 U.S. at 693.[3]  None of those narrow exceptions applies to ordinary people like Plaintiffs and their members—and an examination of them thoroughly refutes Defendants' position.

For example, children of foreign ministers are beyond the United States' jurisdiction pursuant to the doctrine of consular immunity, which exempts foreign sovereigns and their ministers from criminal and civil law enforcement.  *See The Schooner Exchange v. McFaddon*, 11 U.S. 116, 138 (1812).  Under this doctrine, the foreign minister is considered to be standing in the place of their sovereign or "by a political fiction . . . to be extra-territorial." *Id.* at 138-39.  But this rationale does not extend to noncitizens like Plaintiffs' members who are not the representatives of a foreign government. *Id.* at 144.  Indeed, applying this doctrine to other noncitizens would have serious practical consequences, immunizing large numbers of people from civil and criminal liability. *See id.* (such a rule "would be obviously inconvenient and dangerous to society, and would subject the laws to continual infraction, and the government to

---

[3] *Wong Kim Ark* also identified a fourth category: "members of the Indian tribes owing direct allegiance to their several tribes."  169 U.S. at 693.  That exception is rooted in the unique relationship that Native Americans had to the national government. 169 U.S. at 681-83 (noting "the anomalous case of the Indian tribes").  Tribes were quasi-sovereign "alien nations, distinct political communities" within the United States but separate from it, and so a Native American born within the tribe's territorial authority was, "'although in a geographical sense born in the United States,'" not subject to jurisdiction of the United States any more "'than the children of subjects of any foreign government born within the domain of that government.'"  *Id*. at 681 (quoting *Elk v. Wilkins*, 112 U.S. 94, 102 (1884)).  Congress subsequently provided for Native American birthright citizenship.  Indian Citizenship Act, Pub. L. No. 68-175, 43 Stat. 253 (1924).

degradation"). Accordingly, this narrow exception has no bearing on the vast majority of noncitizens and their children. *See Wong Kim Ark*, 169 U.S. at 683, 688 (adopting Chief Justice Marshall's "clear and powerful train of reasoning" from *The Schooner Exchange*).[4]

Likewise, the exception for those children born "of enemies within and during a hostile occupation of part of our territory," *id.* at 693, has no application here. This exception applies only where military occupation has prevented the United States from exercising its authority over certain territory, such that residents who have submitted to the occupation are no longer "subject to the jurisdiction" of this country.[5] *Wong Kim Ark* explained that this exception applies to a situation like that presented in *United States v. Rice*, which involved a period during the War of 1812 in which, because of British military occupation, "[t]he sovereignty of the United States over the [Maine] territory was . . . suspended, and the laws of the United States could no longer be rightfully enforced there." 17 U.S. 246, 254 (1819); *see Wong Kim Ark*, 169 U.S. at 682-83 (discussing *Rice*). Defendants cannot credibly point to any such occupation today—the United States can apply its laws to all noncitizens, including undocumented noncitizens.

Other than these narrow exceptions, which do not apply here, *Wong Kim Ark* held that "the children born within the territory of the United States of *all* other persons" were citizens,

---

[4] On similar reasoning, foreign military ships permitted access to U.S. ports are deemed outside of U.S. jurisdiction because the "sovereign is understood to cede a portion of his territorial jurisdiction [] where he allows the troops of a foreign prince to pass through his dominions." *Wong Kim Ark*, 169 U.S. at 684 (quoting *The Schooner Exchange*, 11 U.S. at 138). Accordingly, children "born on foreign public ships" are not U.S. citizens. *Id.* at 693.

[5] As *Wong Kim Ark* explained, this was the longstanding common-law rule: "If a portion of the country be taken and held by conquest in war, the conqueror acquires the rights of the conquered as to its dominion and government, and children born in the armies of a state, while abroad, and occupying a foreign country, are deemed to be born in the allegiance of the sovereign to whom the army belongs. It is equally the doctrine of the English common law that during such hostile occupation of a territory, and the parents be adhering to the enemy as subjects de facto, their children, born under such a temporary dominion, are not born under the ligeance of the conquered." 169 U.S. at 664-65 (quoting 2 Kent, Comm. (6th Ed.) 39, 42).

7

explaining that (apart from immune foreign ministers) "an alien is completely subject to the political jurisdiction" of the United States "for so long a time as he continues within the dominions" of the United States. 169 U.S. at 693-94 (emphasis added). The Supreme Court has subsequently reaffirmed this conclusion, holding in *Plyler v. Doe* that undocumented noncitizens' "presence within the State's territorial perimeter" gives rise to "the full range of obligations imposed by the State's civil and criminal laws" and thus they are "within [a State's] jurisdiction" for the purposes of another provision of the Fourteenth Amendment. 457 U.S. 202, 211 n.10 (1982) (relying on *Wong Kim Ark*).[6] The same is true of Plaintiffs' members. They are subject to the laws (including the immigration and criminal laws) of the United States, and therefore they and their children are subject to its jurisdiction. As such, their children born on U.S. soil are natural born citizens. *See, e.g.*, *INS v. Rios-Pineda*, 471 U.S. 444, 446 (1985) (child "born in the United States" to couple that entered without inspection "was a citizen of this country"); *Mariko v. Holder*, 632 F.3d 1, 8 n.4 (1st Cir. 2011) ("Because [the child] was born in the United States, she—unlike her parents [who had entered unlawfully]—is a United States citizen."). Because the Order says otherwise, it is unconstitutional.

### b. The Order Violates 8 U.S.C. § 1401(a).

The Order is illegal for a second, independent reason: It violates the statutory guarantee to birthright citizenship in 8 U.S.C. § 1401, which provides that "person[s] born in the United States, and subject to the jurisdiction thereof" "shall be . . . citizens of the United States at birth[.]" Congress enacted this language in 1940 and reenacted it in 1952, codifying the prevailing understanding of the Fourteenth Amendment at the time—and specifically *Wong Kim*

---

[6] *Plyler* addressed the Equal Protection Clause and held that undocumented noncitizens are "within [a State's] jurisdiction." 457 U.S. at 215. Notably, *Wong Kim Ark* explained that courts should not "hold that persons 'within the jurisdiction' of one of the States . . . are not 'subject to the jurisdiction' of the United States." 169 U.S. at 687.

8

*Ark*'s authoritative interpretation. *See Nationality Laws of the United States: Message from the President of the United States*, 76th Cong., 1st Sess., at 418 (H. Comm. Print submitted to H. Comm. on Imm. and Naturalization 1939) (citing *Wong Kim Ark*, 169 U.S. at 674).[7] By that point, it was universally understood that *Wong Kim Ark* had interpreted the term "subject to the jurisdiction" to mean everyone who was subject to the legal authority of the United States—including temporary visitors and unauthorized immigrants. Thus quite apart from the Order's violation of the Fourteenth Amendment, and independent of Defendants' constitutional assertions, the Order violates the statute and should be enjoined on that basis.

Section 1401 must be "interpret[ed] . . . in accord with the ordinary public meaning of its terms at the time of its enactment." *Bostock v. Clayton County*, 590 U.S. 644, 654 (2020). And at the time of § 1401's enactment, "subject to the jurisdiction" had a well-established meaning in the citizenship context, drawn from the Supreme Court's interpretation of the Fourteenth Amendment. *See* Section I.A., *supra*. Congress's choice to codify the contemporaneous meaning of the Fourteenth Amendment is unmistakable: It used language that matches the constitutional citizenship language verbatim. And the legislative history is clear that the language "[wa]s taken . . . from the fourteenth amendment to the Constitution." *To Revise and Codify the Nationality Laws of United States into a Comprehensive Nationality Code: Hearings Before the Comm. on Immig. and Naturalization on H.R. 6127 Superseded by H.R. 9980*, 76th Cong., 1st Sess., at 38 (1940); *see Nationality Laws of the United States*, 76th Cong. 1st Sess., at 418 ("It accords with the provision in the fourteenth amendment to the Constitution . . . .").

---

[7] 8 U.S.C. § 1401 was first enacted as section 201 of the Nationality Act of 1940. It was then reenacted as section 301 of the Immigration and Nationality Act of 1952. *See The Revision of Immigration and Nationality Laws*, S. Rep. No. 1137, 82nd Cong, 2d Sess. at 38 (1952) ("The bill carries forward substantially those provisions of the Nationality Act of 1940 which prescribe who are citizens by birth.").

Where, as here, "Congress employs a term of art obviously transplanted from another legal source, it brings the old soil with it."  *George v. McDonough*, 596 U.S. 740, 746 (2022) (cleaned up).  As a result, § 1401 imported "the cluster of ideas that were attached" to the Fourteenth Amendment by 1940 and 1952.  *Morissette v. United States*, 342 U.S. 246, 263 (1952).

Critically, by the time of § 1401's enactment, there was an unbroken consensus that the term "subject to the jurisdiction" in the Citizenship Clause simply meant subject to U.S. legal authority, which only excluded the limited and discrete set of groups the Supreme Court had identified in *Wong Kim Ark*.  *See* Section I.A., *supra*; *see Wong Kim Ark*, 169 U.S. at 693 (beyond the narrow common-law "exceptions or qualifications (as old as the rule itself)" like the children of foreign ministers, and "the single additional exception of children of members of the Indian tribes," the Fourteenth Amendment, "in clear words and in manifest intent, includes the children born within the territory of the United States of all other persons").

The understanding that children born to noncitizens "temporarily within the country, no matter how short their stay[,]" "awaiting admission[,]" "admitted under bond while awaiting deportation[,]" and "parents who have entered the country illegally . . . should not be refused [citizenship]" was widely echoed in the decades between *Wong Kim Ark* and 1952.  Note, *Citizenship by Birth*, 41 HARV. L. REV. 643, 644-45 (1928).  For example, in 1921, a State Department official who later drafted the 1940 Act wrote that "persons born in the United States of aliens who are *mere sojourners or transients* are citizens of this country."  Richard W. Flournoy, Jr., *Dual Nationality and Election*, 30 Yale L.J. 545, 552-53 (1921) (emphasis added) (noting *Wong Kim Ark*'s reliance on *Lynch v. Clarke*, where the citizen was born to "sojourner" parents); *see also* George S. Knight, *Nationality Act of 1940*, 26 A.B.A. J. 938, 938 (1940) (listing Flournoy as one of the drafters of the 1940 Act).  In 1930, the State Department clarified

that an individual "born at Ellis Island" to an "alien mother [who] was never admitted into the United States" was nevertheless a citizen at birth. 3 Green Haywood Hackworth, Digest of International Law, ch. 9, § 221, at 9-10 (1942) (explaining that child was citizen because mother did not "belong[] to any one of the classes of aliens referred to by [*Wong Kim Ark*] as enjoying immunity from the jurisdiction of the United States"). Similarly, in 1937, a federal court found that the three U.S.-born children of a deportable Mexican mother were U.S. citizens, even though the youngest child was likely born after the mother had "become a public charge," an excludable and deportable offense. *See In re Nunez*, 18 F. Supp. 1007, 1007-08 (S.D. Cal. 1937), *rev'd on other grounds*, 93 F.2d 41 (9th Cir. 1937); *see also, e.g.*, *Johnson v. Eisentrager*, 339 U.S. 763, 771 (1950) (recognizing that a noncitizen "alleged to be illegally here" can "become subject in all respects to [this country's] jurisdiction") (internal quotation marks omitted).

Accordingly, § 1401 provides an independent basis to enjoin the Executive Order. Defendants' argument for new exceptions to the Fourteenth Amendment is wrong for the reasons previously explained. *See supra* at I.A. But even if the government were right, a changed interpretation of the Fourteenth Amendment could not change the meaning of § 1401. *See, e.g.*, *New Prime Inc. v. Oliveira*, 586 U.S. 105, 113 (2019); *Loughrin v. United States*, 573 U.S. 351, 359 (2014); *United States v. Kozminski*, 487 U.S. 931, 944-45 (1988).[8] To the extent there is any doubt about the meaning of § 1401—and there should be none—at the very least it can and should be construed to embody the century-long tradition of universal birthright citizenship. *See Califano v. Yamasaki*, 442 U.S. 682, 692 (1979).

***

---

[8] Congress can provide citizenship beyond what the Fourteenth Amendment provides, as in the case of "citizenship by being born abroad of American parents[.]" *Rogers v. Bellei*, 401 U.S. 815, 830 (1971) (quoting *Wong Kim Ark*). But Congress cannot of course eliminate citizenship for those who fall under the Fourteenth Amendment's Citizenship Clause.

11

At bottom, the Order is an ultra vires form of lawmaking by the President. Like a statute, the Order delineates specific categories of immigrant mothers and fathers whose children are U.S. citizens, based on people's immigration status and date of birth. *Compare* 8 U.S.C. §§ 1401-1409; 1431-1433. But the Order cites nothing in the Constitution or statute to support these distinctions; it simply imposes them unilaterally. "[T]he framework of our constitution" "refutes the idea that [the President] is to be a lawmaker." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952). The President has no power to redefine who is a U.S. citizen. Citizenship rules come from the Constitution and Congress. *See City of Boerne v. Flores*, 521 U.S. 507, 532, 536 (1997) (even Congress cannot make "substantive change[s] in constitutional protections"). The Fourteenth Amendment and 8 U.S.C. § 1401 have already settled the question of birthright citizenship. The Order violates these fundamental principles and must be enjoined.

### 2. The Equities Strongly Favor an Injunction.

Plaintiffs and members and their children will suffer irreparable injury if the Order is not enjoined. The Order will strip the "priceless treasure" of citizenship from members' children, which the Supreme Court has described as "more serious than a taking of one's property." *Schneiderman*, 320 U.S. at 122; *see also Elrod v. Burns*, 427 U.S. 347, 373 (1976) (denial of constitutional rights "unquestionably constitutes irreparable injury").

Beyond the fundamental importance of citizenship, the loss of citizenship will immediately have "severe and unsettling consequences" for Plaintiffs' members and their families. *Fedorenko*, 449 U.S. at 505; *see also Trop v. Dulles*, 356 U.S. 86, 102 (1958) (loss of citizenship results in "a fate of ever-increasing fear and distress"). Under the Order these U.S.-born children are subject to immigration enforcement and even deportation to countries they have never even visited. Pontoh Decl. ¶ 11; Fontaine Decl. ¶¶ 16-19; Proaño Decl. ¶¶ 14-15.

12

Improperly threatening babies with arrest, detention, and deportation when they are U.S. citizens under longstanding Supreme Court precedent imposes grave harms on those families, who will live in constant fear that their U.S.-born children could be deported at any time. That fear is multiplied for parents who face further concern that their babies' removal would be to a country "where they are likely to face substantial harm." *Nken v. Holder*, 556 U.S. 418, 436 (2009).[9]

Likewise, Plaintiffs' members will not be able to obtain passports for their babies. This threatens to undermine Plaintiffs' members' family ties and prevent travel abroad to, for example, visit ailing relatives or celebrate a wedding. Fontaine Decl. ¶¶ 17, 22. *See Milligan v. Pompeo*, 502 F. Supp. 3d 302, 321 (D.D.C. 2020) ("[S]eparation from family members is an important irreparable harm factor."). Likewise, many families rely on passports as one of the only available forms of governmental photo identification for their babies, which can be vital for both practical purposes and as a way to prove the baby's identity and relationship to their parents in cases of contact with law enforcement or other government agencies. Pontoh Decl. ¶ 12; Fontaine Decl. ¶¶ 17, 27; Proaño Decl. ¶ 16. And babies could be rendered stateless as parents navigate the complex processes of transferring nationality to their U.S.-born children. Pontoh Decl. ¶ 13; Fontaine Decl. ¶¶ 17, 27; Junaid Decl., Exhs. 18-19.

The Order will also impair babies' access to critical early-life nutrition and healthcare. For example, Plaintiffs' members are expecting babies who will be deemed noncitizens under the Order. Pontoh Decl. ¶¶ 9-10; Fontaine Decl. ¶¶ 16-19; Proaño Decl. ¶¶ 13-14.[10] Some of those

---

[9] Even for children who would continue to qualify as citizens under the Order, the new two-tiered birthright citizenship analysis will impose harms and stigma—including the expense of proving not just that a child was born in the U.S., but also the citizenship and immigration status of the child's parents. *See* Declaration of Wafa Junaid ("Junaid Decl."), Exh. 17.

[10] These members are identified by pseudonyms out of concerns for their safety and privacy. Plaintiffs are prepared to provide identifying information for at least one member per organization to Defendants subject to an appropriate protective order.

babies would be eligible for early-life services including critical nutritional services as U.S. citizens, but risk being deemed ineligible because of the Order. *See, e.g.*, 7 U.S.C. § 2015(f); 7 C.F.R. § 273.4; Pontoh Decl. ¶¶ 14-16; Fontaine Decl. ¶¶ 17, 22-23, 25; Proaño Decl. ¶¶ 17-19.

Ensuring access to nutritious food is vital for children's physical and mental development, laying a foundation for future well-being. Junaid Decl., Exhs. 2-4. Likewise, access to medical care plays a critical role in improving life outcomes for children and leads to improved cognitive and physical growth; without it, children are at greater risk of avoidable hospitalizations and long-term health disparities that can further strain the public health system. *Id.,* Exhs. 5, 6, 8. Courts have long recognized that the denial of these kinds of benefits constitutes irreparable injury. *See, e.g.*, *Massachusetts Ass'n of Older Americans v. Sharp*, 700 F.2d 749 (1st Cir. 1983). Denying access to nutrition and medical care will force these families to choose between foregoing early-life medical care and paying for other necessities. *See, e.g.*, Pontoh Decl. ¶¶ 15-16; Fontaine Decl. ¶¶ 17, 23, 25; *Doe #1 v. Trump*, 957 F.3d 1050, 1060 (9th Cir. 2020) (finding irreparable harm where plaintiffs cannot afford health insurance).

By contrast, the government has advanced no substantial interest in denying citizenship to these babies. Indeed, granting a preliminary injunction would merely maintain the status quo that has been in place for well over a hundred years—while denying it would dramatically upend that constitutional status quo.

The government also has no legitimate interest in enforcing an unconstitutional order, or in exceeding the President's authority by defining American citizenship in a manner that is contrary to federal law, and "the public interest is harmed by the enforcement of [orders] repugnant to the United States Constitution." *Tirrell v. Edelblut*, No. 24-CV-251-LM-TSM, 2024 WL 3898544, at *6 (D.N.H. Aug. 22, 2024).

14

Further, if implemented, the Order would "promot[e] the creation and perpetuation of a subclass" of children who were born in the United States but lack fundamental legal recognition and face stigma as a result of their novel and uncertain status. *Plyler*, 457 U.S. at 230; *see* Fontaine Decl., ¶ 19.[11]  Indeed, countries that have restricted or eliminated birthright citizenship have seen the emergence of multigenerational undocumented populations and worsened social and economic inequities. Junaid Decl., Exhs. 12-13.  The Order would also "impose[] [this] discriminatory burden on the basis of a legal characteristic over which children can have little control," offending "fundamental conceptions of justice." *Id*. at 220; *see also* Junaid Decl., Exhs. 14-16 (abolishing birthright citizenship would establish a two-tier caste system among children).  Because of the Order, countless children born in the U.S. would grow up here and yet be unable to work, always at risk of removal to countries they've never known.  The Order would also eliminate the significant economic and social benefits of birthright citizenship, which fosters integration and improves educational outcomes. *Id., *Exhs. 1, 8-11.  The Order would cause the undocumented population to grow significantly and exacerbate generational inequities. *Id., *Exhs. 7-11.  And it would deny numerous children citizenship access to critical nutritional services and medical care.  Thus, the balance of equities and the public interest both strongly favor an injunction.

## CONCLUSION

The Court should grant a preliminary injunction.

---

[11] Indeed, the Order threatens to create stigma that will impact even children whose citizenship remains formally recognized under the Order, such as the children of U.S. citizens and permanent residents.  By attacking the principle that all children born in this country are citizens, the Order will invite persistent questioning of the citizenship of children of immigrant communities—particularly children of color.

Dated: January 21, 2025

Cody Wofsy
Hannah Steinberg
Stephen Kang
Spencer Amdur
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
425 California Street, Suite 700
San Francisco, CA 94104
T: (415) 343-0770
cwofsy@aclu.org
hsteinberg@aclu.org
skang@aclu.org
samdur@aclu.org

Noor Zafar
Wafa Junaid
Grace Choi
Lee Gelernt
Omar Jadwat
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad St., 18th Floor
New York, NY 10004
T: (212) 549-2660
nzafar@aclu.org
wjunaid@aclu.org
gchoi@aclu.org
lgelernt@aclu.org
ojadwat@aclu.org

Morenike Fajana*
Ashley Burrell*
Elizabeth Caldwell*
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
40 Rector St., FL 5,
New York, NY 10006
(212) 217-1690
mfajana@naacpldf.org
aburrell@naacpldf.org
bcaldwell@naacpldf.org

Respectfully submitted,

/s/ SangYeob Kim
SangYeob Kim (N.H. Bar No. 266657)
Gilles R. Bissonnette (N.H. Bar. No. 265393)
Henry R. Klementowicz (N.H. Bar. No. 21177)
Chelsea Eddy (N.H. Bar No. 276248)
AMERICAN CIVIL LIBERTIES UNION
OF NEW HAMPSHIRE
18 Low Avenue
Concord, New Hampshire 03301
T: 603.224.5591
sangyeob@aclu-nh.org
gilles@aclu-nh.org
henry@aclu-nh.org
chelsea@aclu-nh.org

Norm Eisen†
Tianna Mays†
STATE DEMOCRACY DEFENDERS FUND
600 Pennsylvania Avenue SE, #15180
Washington, D.C. 20003
T: (202) 594-9958
norman@statedemocracydefenders.org
tianna@statedemocracydefenders.org

Christopher M. Lapinig
Kimberly Wei Leung
Winifred Kao
ASIAN LAW CAUCUS
55 Columbus Ave
San Francisco, CA 94111
T: (415) 896-1701
christopherl@asianlawcaucus.org
kimberlyl@asianlawcaucus.org
winifredk@asianlawcaucus.org

Carol Garvan (N.H. Bar. No. 21304)
Zachary L. Heiden
AMERICAN CIVIL LIBERTIES UNION OF MAINE
FOUNDATION
P.O. Box 7860
Portland, Maine 04112
T: (207) 619.8687
cgarvan@aclumaine.org

16

heiden@aclumaine.org

Morgan Humphrey*
Mide Odunsi*
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
700 14th Street NW, Suite 600
Washington, DC 20005
(202) 249-2193
mhumphrey@naacpldf.org
modunsi@naacpldf.org

Adriana Lafaille*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF MASSACHUSETTS, INC.
One Center Plaza
Suite 850
Boston, MA 02108
T: (617) 482-3170
alafaille@aclum.org

*Counsel for Plaintiffs*
†*Counsel for LULAC only*
\* *Application for admission pro hac vice forthcoming*