## **DECLARATION OF SIENNA FONTAINE, GENERAL COUNSEL, MAKE THE ROAD NEW YORK**

I, Sienna Fontaine, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I am General Counsel of Make the Road New York (MRNY). I am slated to become a co-Executive Director of MRNY as of April 1, 2025. As part of MRNY's Executive Leadership Team, I am responsible for shaping many of MRNY's organizational priorities; overseeing our staff; and fundraising. I have worked at MRNY since 2015.

2. MRNY is a nonprofit, membership-based community organization that integrates adult and youth education, legal and survival services, and community and civic engagement, in a holistic approach to help low-income New Yorkers improve their lives and neighborhoods. MRNY has five offices in the New York area, located in Brooklyn, Queens, Staten Island, and in Suffolk and Westchester Counties.

### **MRNY's Mission and Activities**

3. MRNY's mission is to build the power of immigrant and working class communities to achieve dignity and justice.

4. MRNY currently has over 250 staff members who provide services to thousands of individuals a year. To fulfill our mission, MRNY engages in four core strategies: Legal and Survival Services, Transformative Education, Community Organizing, and Policy Innovation.

5. MRNY's organizing team leads our advocacy work and campaigns. Each year, MRNY participates in dozens of actions around the state to advocate for policy and legislative changes that would impact our members and the communities we serve. The organization engages in a deliberative process with our staff and members to create an annual platform comprised of our legislative and policy priorities for the year and then dedicates significant resources to educating

1

and mobilizing our members to support those priorities. In the past, we have helped secure important legislative victories and reforms from expansion of eligibility for drivers' licenses in New York State to creation of a groundbreaking Excluded Workers Fund for workers unable to access unemployment and pandemic benefits because of their immigration status.

6. MRNY's organizing team facilitates standing committees in many areas of importance to our members. One of MRNY's longstanding committees is called "Familias en Acción" (Families in Action), formerly "Padres" (Parents). This committee is comprised of parents and family members of children who attend New York City public schools, and meets regularly in our Brooklyn and Queens offices. It has worked to ensure full funding for public schools at the state level and culturally responsive education in the New York City public school system. Two of our other most active committees are the Civil Rights and Immigrant Power Project ("CRIPP"), which works on campaigns for immigration reforms at the state and federal level, and BASTA, which works on campaigns for housing and environmental justice.

7. MRNY's services teams, which include legal, health, and adult education, are on the front line with immigrant communities in New York and serve thousands of immigrants each year. Our immigration legal team covers a wide range of cases, including affirmative applications such as adjustment of status, naturalization, DACA, TPS, and visas for survivors of violence, as well as removal defense before the immigration courts. Our immigration team also helps hundreds of clients annually understand and apply for citizenship, which may come in the form of representing them in their naturalization process or, if they have a legal claim to citizenship by operation of law, advising them on their eligibility for and securing proof of citizenship. In addition, the legal team assists other departments in advocacy, planning, and training related to pending laws or regulations and engages in impact litigation. Our housing legal team, which

represents many MRNY members, assists hundreds of families in housing court cases involving evictions, hazardous conditions, and housing discrimination. The team routinely supports tenants who owe back rent or who cannot afford either their existing rent or the cost of relocation in avoiding homelessness by obtaining financial assistance through New York City programs. These programs require that at least one member of the household have lawful immigration status.

8. MRNY's health team promotes the health and well-being of our community members, by providing health services to community members and advocating for improved access to healthcare for immigrants. The health team assists eligible individuals and families with applying for health insurance, including both Medicaid and New York State's Child Health First program, and other benefits including the Supplemental Nutrition Assistance Program ("SNAP"). Through its one-on-one assistance, the health team also provides information and referrals to community members, particularly individuals who do not qualify for health insurance through the New York State of Health program or who are facing food insecurity. The health team also administers a "promotora" program that trains community members to do outreach, screening, and referrals for SNAP and certain benefits programs and runs two food pantries and a community health worker asthma home visiting program. The health team also leads campaigns at the city and state level to increase access to health care and coverage for immigrants in New York.

9. Lastly, MRNY's adult education team provides English-language classes for hundreds of individuals for whom English is not their first language and assists immigrants with civics, adult basic education, and citizenship classes. In addition, MRNY provides classes that lead directly to greater employment opportunities such as computer classes and Bridge to Health Careers classes.

**Harm to MRNY's Members From the Executive Order**

10. MRNY is a membership-based organization. Currently, we have over 28,000 members residing in New York City, Westchester County, and Long Island, and primarily in the boroughs of Queens, Brooklyn and Staten Island. Our membership is drawn primarily from Spanish-speaking immigrant communities. Although we do not collect immigration status information for our members, our long history engaging our members in the fight for immigration reforms and supporting them in sharing their personal stories with elected officials and others has shown that many of our members are neither U.S. citizens nor Lawful Permanent Residents.

11. Our members include thousands of parents and expectant parents. While we do not regularly seek or maintain information about our members' immigration or pregnancy status, as of this month we have over 12,000 members between the ages of 20 and 45, i.e. in the likely age range of expectant parents. I am aware of various members who are currently expectant parents.

12. Among MRNY members, some couples are both MRNY members. For others, only one person is a member. Although our members are primarily New York residents, some have moved out of state or have partners outside of New York.

13. MRNY maintains a database of its members. However, we do not have current contact information or a means of reaching all of our members, as individuals change phone numbers and addresses frequently. The frequency of these changes reflects the composition of our membership, which is drawn from low-income and working communities who often face financial hardship. While we strive to remain in contact with our members, these realities mean we cannot reliably reach all our members in a timely way.

14. Because of concerns for our members' privacy and the importance of their trust in MRNY as crucial to our mission and work, MRNY does not share our membership information with third parties including governmental agencies.

15. MRNY has members who are or may be directly impacted by the executive order ("the EO") regarding birthright citizenship challenged in this case.

16. "Faith" is a member of MRNY and a noncitizen who lives in New York.[1] Faith has lived in the U.S. for over two decades. She has DACA but no other immigration status and her partner is not a Lawful Permanent Resident or a U.S. citizen. She is pregnant with her first child and due in March 2025. She is concerned for her child's future educational and professional opportunities, particularly accessing higher education and a career, if he is not deemed to be a U.S. citizen. She also recalls her own fears and anxiety about immigration enforcement as a child in the U.S. without immigration status and does not want her son to experience that. "I don't want him to be scared," she says, especially not in the only country he knows.

17. "Gordon" is a member of MRNY and a noncitizen who lives in New York. He and his partner have both applied for asylum, but neither has Lawful Permanent Residence or U.S. citizenship. Gordon's partner is pregnant and due in March 2025. If born a U.S. citizen, their child will qualify for SNAP benefits which will provide crucial support. But without U.S. citizenship, the family will lose this access to food for their child. In addition, Gordon and his partner are only citizens of Venezuela. Venezuela does not offer consular services in the U.S. and Gordon cannot obtain a Venezuelan passport without leaving the U.S. Gordon is fearful that, if denied U.S. citizenship, his child will be rendered stateless and not have access to any passport or identity documents that would allow the child to travel or apply for immigration status. Gordon fears that, as a result, if he loses his immigration case and is deported from the U.S. or decides to leave the U.S. on his own, his child will be unable to travel with him and he will be separated from his child.

---

[1] To protect the privacy and security of our members, I am using fictitious names to identify them.

18. "Johnathan" is a member of MRNY and a noncitizen who lives in New York. Johnathan has lived in the U.S. for over 30 years. He and his partner are undocumented, and the couple is expecting their second child in April 2025. They are deeply fearful for their child's future if denied U.S. citizenship, knowing it will limit her access to education, employment and fundamental opportunities. Not only will she be wrongly treated as a noncitizen, but even those pathways available to other noncitizens under the immigration laws may be cut off. Johnathan is the beneficiary of an approved family petition and is pursuing adjustment of status to become a Lawful Permanent Resident. But it appears that under the EO, even once he has a green card, he will not be able to petition for his newborn child to adjust status as she would lack, according to the terms of the EO, any lawful immigration status and the necessary admission or parole for adjustment of status. For members like Johnathan, the EO creates an impossible situation where their child—physically present since birth on American soil—is barred from adjusting status specifically because she has always been here.

19. "Hector" is a member of MRNY and a noncitizen who lives in New York. Hector has lived in New York since the age of four. He and his partner both have DACA but no other immigration status. The couple is expecting their first child on February 26, 2025. With the issuance of the EO, they are fearful that their daughter will be born into immigration limbo, without a pathway to lawful status. Hector fears for her mental health, because under the EO she will live with the fear of deportation and separation from her family and without the certainty and stability that immigration status provides. He does not want her to experience "second-class citizenship," where like her parents she faces these threats despite growing up, going to school, working and contributing to the U.S.

20. As these individuals demonstrate, the communities MRNY serves will be harmed by the EO.

21. Every day, hundreds of people come to MRNY's five community-based offices or directly contact a member of our staff seeking information and assistance on a range of issues, particularly in the aforementioned areas including immigration, housing, and healthcare. Our staff regularly hold committee meetings, community-education sessions, and one-on-one meetings with our members and the communities we serve. Because of this, we experience firsthand the very harmful impact of policy changes targeting immigrants, including the EO purporting to end birthright citizenship.

22. Even before the EO was issued, we began to observe the impact of rhetorical attacks on birthright citizenship several months ago. Community members we serve have expressed fear and confusion about this change. Members and clients, including pregnant women, have expressed a deep sense of injustice and loss that their children may be forced to live in fear and without stability and equal access to education, employment and civic opportunities in the only country they have ever known. They also express concern at the legal limbo their children will be thrown into, with consequences to the children ranging from an inability to access any nationality or travel documents to ineligibility to adjust status or derive asylum.

23. Members have also shared anxiety about loss of access to essential rights, nutrition services, and healthcare as a result of the EO. Members' concerns demonstrate that the EO's chilling effect extends far beyond its immediate impact, deterring even qualified individuals from accessing critical services due to fear and uncertainty. For instance, members have expressed heightened fears that they or their previously U.S.-born children could lose their U.S. citizenship and be deported and have asked for information from our staff on that risk.

24. Children born in this country but deemed not to be citizens under the EO will be rendered ineligible for SNAP, a program that ensures low-income families can afford essential groceries. Without this critical support, our member families with newborns and young children no longer eligible for SNAP will face severe food insecurity. This loss will strain alternative resources, like MRNY's own food pantries and other emergency-food banks in and around New York City. But even when families can access those emergency resources, they are no replacement for SNAP, which provides regular, reliable, and flexible access to critical early-childhood nutrition.

25. Our members and their families will also lose access to important housing programs, exacerbating challenges in securing stable and affordable housing in communities already struggling to afford New York City's extremely high rents. Our housing organizers and housing legal team work to prevent housing instability and homelessness through a combination of organizing and legal services. Programs like New York City's Family Homelessness and Eviction Prevention Supplement (FHEPS) are essential to these efforts. FHEPS provides financial assistance to keep families in their homes or allow them to relocate but eligibility requires that at least one member of the family have lawful immigration status. Many of our members live in mixed-status households and their U.S.-citizen children rely on stable housing environments supported by programs like the FHEPS. Under the EO, children born without U.S. citizenship and their families will lose access to this crucial program. The result will be increased homelessness and, even among those who are not homeless, fewer resources available for non-rent expenses such as food and clothing. This impacts not just those families but the entire community, which thrives when all New Yorkers thrive.

26. Our members and their families' healthcare will also be impacted. Although all children can access health insurance through New York State up to age 19, coverage is not as extensive as through federally-funded Medicaid. Therefore children born in this country but deemed to not be citizens under the EO will have less access to healthcare than they otherwise would. This will impact their health and wellbeing.

27. Children deprived U.S. citizenship under the EO may be unable to obtain passports altogether, due to either statelessness or the impossibility of accessing passports from a parent's country of nationality in the U.S. MRNY has hundreds of Venezuelan members, including almost 200 members in the age range of likely expectant parents, and our legal team also serves a large volume of Venezuelan clients. Venezuelan nationals in the U.S. currently cannot obtain or renew passports due to the absence of consular services. This means children born in the U.S. to Venezuelan national parents will be unable to access any proof of citizenship. The issue extends to children of MRNY members of other nationalities, such as an Afghan member who resides in New York, whose national government similarly lacks consular support in the U.S.

28. The EO also threatens the stability and long-term educational and professional opportunities for our members' children, which is deeply concerning to MRNY and to our members who are expectant parents. Not only will children denied U.S. citizenship face the possibility of immigration enforcement and removal, but their lack of access to documentation will mean it is harder to accompany or visit a parent who leaves the U.S. Looking to the future, our members are fearful their children will be unable to access advanced education and gainful employment due to their lack of U.S. citizenship or any other lawful immigration status, and will be denied their fundamental rights as citizens including the right to vote once they are 18. As

parents and grandparents, our members do not want their children to suffer from the fear, instability and lack of opportunity that the EO will create.

I hereby declare under penalty of perjury that the foregoing is true and correct.

_____

Sienna Fontaine

Executed this 20th day of January, 2025