# EXHIBIT 3



# SNAP Access and Participation in U.S.-Born and Immigrant Households

## A Data Profile

POLICY BRIEF

**MARCH 2023**

BY VALERIE LACARTE, LILLIE HINKLE, AND BRIANA L. BROBERG

## Executive Summary

Poverty can force individuals and families to make difficult choices between food and other survival needs. The resulting food insecurity leads to poor health outcomes and increased medical expenses, which further restrict households' ability to purchase nutritious food, generating a negative cycle. The federally funded Supplemental Nutrition Assistance Program (SNAP)—often called food stamps—was developed by the U.S. government to address this problem. Yet, despite SNAP's important health and developmental benefits for low-income families, and its role in mitigating food insecurity and related health-care costs for the communities in which they live, a significant number of adults and children are unable to access SNAP due to their immigration status. Since 1996, federal law has limited certain noncitizens' access to government funded public benefits, including SNAP. These restrictions, including a five-year waiting period before lawful permanent residents (also known as green-card holders) can access benefits, vary not only by immigration status but also by benefit program. Unauthorized immigrants remain ineligible for federally funded food assistance, as they were before the 1996 law.

SNAP is a household-level program. Whether a family can access the program and the level of benefits they receive depends on the household's income, size, and the immigration status of each household member. This issue brief explores the number and characteristics of individuals living in different types of poor households: households with all U.S.-born members and three types of households with one or more immigrant member (those where all noncitizens have an immigration status that makes them eligible for SNAP, those where all members have ineligible immigration statuses, and mixed-status households where some members are eligible and others are ineligible). Based on the Census Bureau data available, this analysis looks at poor households, defined as those with family incomes below the federal poverty level (FPL). Given the federal rules for SNAP require participants to have an income below 130 percent of the FPL, the population examined in this brief was likely in need of, and income eligible for, federal food assistance.

---

*Despite SNAP's important health and developmental benefits for low-income families, and its role in mitigating food insecurity and related health-care costs for the communities in which they live, a significant number of adults and children are unable to access SNAP due to their immigration status.*

Based on this analysis, 30.8 million individuals lived in poor all-U.S.-born households in 2019 and 13.0 million individuals lived in poor immigrant households (where at least one member was foreign born). Of those in immigrant households, a little more than half (6.6 million) were in households where all members were eligible for SNAP, meaning all noncitizens held an eligible immigration status. A much smaller number, 1.2 million, were immigrants in households where all members were excluded from SNAP benefits based on their immigration status. As many as 5.2 million people lived in households where at least one member was immigration-status eligible for SNAP and another was not. In these mixed-eligibility households, the government adjusts benefit amounts to the number of immigration-status eligible household members, meaning that these households receive a lower per capita amount of SNAP benefits than those where all members are eligible.

The long-term consequences of poverty and food insecurity for children's physical and mental development explain why federal assistance programs tend to focus on young children. This analysis found that 5.0 million children, including both U.S.-born and immigrant children, lived in poor immigrant households, and that the majority were Latino. Of the 5.0 million children, about half (2.5 million) lived in mixed-eligibility households, 2.4 million in all-eligible households, and approximately 125,000 in households where all members were ineligible for SNAP due to their immigration status.

Compared to individuals living in poor all-U.S.-born households, 50 percent of which received SNAP benefits in 2019, that share was slightly lower for individuals in all-eligible and mixed-eligibility immigrant households (47 percent and 46 percent, respectively). Looking just at households with children, SNAP participation varied more widely between household types. An estimated 62 percent of individuals in all-U.S.-born poor households with children participated in SNAP, compared to 51 percent of those in

poor immigrant households with children where all members were eligible and 47 percent in those with mixed eligibility.

This pattern held true among individuals of the same racial or ethnic group. For example, 63 percent of Latinos in all-U.S.-born households with children participated in SNAP, compared to 52 percent and 49 percent of Latinos in all-eligible and mixed-eligibility immigrant households with children. Further, across poor U.S.-born and immigrant households with children, participation in SNAP was the highest among Black people (as high as 73 percent for those living in all-U.S.-born households), while Asian and Pacific Islander children, whether U.S. born or immigrant, were much less likely to receive SNAP.

The largest number of people living in poor immigrant households in 2019 were in states that also have among the largest overall foreign-born populations: California, Texas, and New York. Nationwide, California was the only state where the number of people living in poor immigrant households (3.1 million) exceeded the number in poor all-U.S.-born households (2.4 million). SNAP eligibility and participation rates varied from state to state. For example, people in all-eligible immigrant households made up between 35 percent and 70 percent of all people in poor immigrant households (in Wyoming and Maine, respectively). And while 59 percent of people in all-eligible households in Oregon participated in SNAP, a much smaller 27 percent did so in Mississippi.

To estimate the impact of federal restrictions on immigrants' eligibility for federally funded SNAP, MPI simulated the restoration of benefits eligibility to the level in place prior to the 1996 change in law, when all lawfully present noncitizens were eligible. This exercise found that restoration to pre-1996 standards would mean that about 1.2 million more people in poor immigrant households would be in households where all members are immigration-status eligible for federally funded SNAP. In

total, 7.8 million people overall would have been in all-eligible immigrant households in 2019 under those pre-1996 standards, up from the estimated 6.6 million under federal restrictions (and not account- ing for state-funded programs that extend eligibility for some noncitizens). This includes an estimated 800,000 adults ages 18 to 59 years old, 282,000 chil- dren, and 76,000 older adults (ages 60 and older), all of whom lived in households where all members held lawful immigration statuses but either some or all were considered ineligible under current federal rules (e.g., green-card holders with fewer than five years in that status). Were the current restrictions on lawfully present noncitizens' eligibility to be lifted, as some in Congress have proposed, this would mean that these households could access SNAP benefits either for the first time or at a higher level, support- ing them in becoming more food secure.

# 1    Introduction

When an individual or a family cannot regularly afford enough nutritious food, the resulting food insecurity[1] perpetuates a cycle of negative conse- quences for both children and adults.[2] Among other things, hunger and poor nutrition can contribute to early onset learning deficits for children, declining mental health for adolescents, and long-term chron- ic physical health conditions for adults.[3] Because food insecurity is linked to many health issues and chronic diseases, it also leads to higher health- care utilization and costs and to poorer health and well-being for society at large.[4]  In 2021, 13,500,000 households—or 10.2 percent of all households in the United States—were experiencing food insecu- rity, in part a reflection of the increase in economic hardship brought on by the COVID-19 pandemic. Among households with children under 18 years old, the percentage experiencing food insecurity was even higher, at 12.5 percent.[5]

For populations already experiencing systemic bar- riers to meeting basic needs, the likelihood of being

food insecure is even higher. For instance, research shows that Black, Latino, and immigrant households were more likely to be food insecure both prior to and during the pandemic.[6] Moreover, mixed-status families in which parents are noncitizens and chil- dren are U.S. born have significantly higher rates of food insecurity than families in which all members are U.S. born.[7]

Participating in a nutrition program that reduces food insecurity can have long-term positive impacts throughout an individual's life. The Supplemen- tal Nutrition Assistance Program (SNAP), formerly known as the Food Stamp Program, is one of the largest federal safety net programs in the United States and aims to mitigate food insecurity and reduce hunger. Program participation for children between birth and the age of 5 is associated with a decreased likelihood of having chronic metabolic conditions such as diabetes and high blood pressure as adults.[8] Other studies have shown that SNAP par- ticipation strongly correlates with developmental benefits among youth, including higher academic test scores and decreased likelihood to repeat a grade.[9] Among adults and those over age 65, studies have shown that SNAP participation can reduce the risk of premature mortality and prevent unhealthy weight and depression, and their negative impacts.[10]

Notwithstanding SNAP's health and nutritional benefits, not all U.S. residents facing food insecurity can access the program. Since 1996, federal law has barred some immigrant families with incomes low enough to meet SNAP requirements, including many individuals with a lawful immigration status, from participating in the program. These exclusions affect both adults and children, have a particularly heavy impact on racial and ethnic groups that already ex- perience disproportionate socioeconomic challeng- es, and touch thousands of households made up of individuals with different immigration statuses.

This issue brief examines the size and characteristics of the population of immigrants who have incomes

low enough to qualify for SNAP and their eligibility for benefits, as determined by their immigration status. The brief begins with a description of the federal program, its benefits and requirements, and the state-funded food assistance programs available to certain groups of immigrants. Next, the brief presents national and state-level estimates of the number of foreign-born people who are eligible and ineligible for SNAP. It then takes a closer look at children's access to SNAP and their participation by eligibility status and race and ethnicity, highlighting the disproportionate impact of federal exclusions on immigrant children. The brief concludes with an exploration of the effect of current federal restrictions on lawfully present immigrants' SNAP eligibility and the potential impact of legislative proposals to remove these restrictions.

---

### BOX 1
### Learn More about Immigrants' Public Benefits Access and Participation

The Migration Policy Institute has published similar analyses of immigrants' eligibility for and participation in other major federal programs:

► Immigrant adults and Medicaid

► Immigrant children, Medicaid, and the Children's Health Insurance Program

---

## 2    Restrictions on Immigrants' SNAP Eligibility and Participation

Until 1996, noncitizens lawfully residing in the United States generally were eligible for means-tested public benefits such as SNAP under the same terms as U.S. citizens, with limited exceptions. That changed when Congress enacted the *Personal Responsibility and Work Opportunity Reconciliation Act* (PRWORA),[11] which barred noncitizens from receiving government-funded public benefits—such as SNAP, Temporary Assistance for Needy Families (TANF), Medicaid, the Children's Health Insurance Program (CHIP), and Supplemental Security Income (SSI)—unless they are in a qualified immigration status and meet other conditions that vary by benefit program. Broadly, PRWORA's definition of "qualified immigrants" includes lawful permanent residents (LPRs, also known as green-card holders), refugees, asylees, and certain other noncitizens in special circumstances.[12]

PRWORA also made LPRs ineligible for SNAP (at the time still called the Food Stamp Program) until they either became naturalized citizens or had 40 quarters (i.e., ten years) of qualifying work in the United States. Eligibility for federally funded SNAP was incrementally restored for some immigrant populations by the 1998 *Agricultural Research, Extension, and Education Reform Act* (AREERA) and the 2002 *Farm Security and Rural Investment Act* (also called the 2002 farm bill).[13] AREERA expanded eligibility to immigrant children, elderly adults, and disabled individuals in a qualified status if they were present in the United States prior to August 22, 1996, the date PRWORA was passed.[14] The 2002 farm bill expanded eligibility to certain qualified immigrants, most notably LPRs who have lived in the United States for five years and LPRs who are disabled or children, regardless of their length of residency.[15] This expansion of eligibility to qualified noncitizen children is particularly significant since, in many mixed-status families, parents or other adults may not be eligible for SNAP but children may be, since those in a qualified status are not subject to the five-year waiting period.[16] Unauthorized immigrants are ineligible for federally funded food assistance, and were so both before and after the passage of PRWORA.[17] Table 1 offers a full rundown of immigrants' eligibility for SNAP, as it now stands.

**TABLE 1**

**Noncitizen Eligibility for Federally Funded SNAP**

| | |
|---|---|
| **Eligible without a Five-Year Bar** | • Noncitizen children under age 18 with a qualified immigration status, as defined by the 1996 *Personal Responsibility and Work Opportunity Reconciliation Act* (PRWORA)<br>• Refugees and holders of derivative visas*<br>• Asylees and holders of derivative visas*<br>• Immigrants whose deportation is withheld**<br>• Cuban/Haitian entrants<br>• Amerasians<br>• Victim of trafficking<br>• Iraqi and Afghan Special Immigrant Visa (SIV) holders<br>• Recipients of federal assistance for a disability, per Supplemental Security Income (SSI) standards, or blindness<br>• Immigrants born on or before August 22, 1931, and lawfully residing in the United States on or before August 22, 1996<br>• Members of a Hmong or Laotian tribe during the Vietnam era (August 5, 1964–May 7, 1975), when these tribes assisted the U.S. military, and their spouse or unremarried surviving spouse and unmarried dependent children<br>• Certain Native Americans born abroad<br>• Afghans granted humanitarian parole between July 31, 2021, and September 30, 2022, and their spouse or children<br>• Ukrainians granted parole between February 24, 2022, and September 30, 2023, and their spouse, children, parents, and some relatives, even if granted parole after September 30, 2023<br>• Veterans, active duty military members, and their spouse, unremarried widow, and children |
| **Eligible but Subject to Five-Year Bar** | • Lawful permanent residents (LPRs), except those who fall into one of the categories above<br>• Parolees if paroled into the United States for one year or more, other than the Afghans and Ukrainians above<br>• Certain domestic violence survivors, including *Violence Against Women Act* (VAWA) self-petitioners*** |
| **Ineligible Immigrants** | • Unauthorized immigrants<br>• Temporary Protected Status (TPS) beneficiaries, unless they also hold a qualifying status<br>• Deferred Action for Childhood Arrivals (DACA) beneficiaries<br>• People with pending asylum claims<br>• Citizens of Palau, Micronesia, and the Marshall Islands who lawfully reside in the United States under the Compacts of Free Association (COFA)****<br>• Lawfully present noncitizens without a qualified status (such as nonimmigrant visa holders, including most U-visa holders*****) |

* These immigrants' spouse or minor unmarried children (younger than age 21) may apply for derivative status.

** Those whose deportation is being withheld under §243(h) of the *Immigration and Nationality Act* (INA) as in effect before April 1, 1997, or whose removal is withheld under §241(b)(3) of the INA.

*** Depending on the circumstances, this can include a battered noncitizen spouse or child, noncitizen parent of a battered child, or a noncitizen child of a battered parent with a petition pending.

**** Individuals admitted under COFA are permitted to study, reside, and work in the United States indefinitely, but are not lawful permanent residents.

***** The U nonimmigrant status (U visa) is for victims of certain crimes who are helpful to law enforcement or government officials in the investigation or prosecution of criminal activity.

Sources: U.S. Department of Agriculture (USDA), Food and Nutrition Service, *Supplemental Nutrition Assistance Program: Guidance on Non-Citizen Eligibility* (Alexandria, VA: USDA Food and Nutrition Service, 2011); U.S. Citizenship and Immigration Services (USCIS), "Derivative Refugee/Asylum Status for Your Children," updated July 9, 2020; USCIS, "Victims of Criminal Activity: U Nonimmigrant Status," updated February 28, 2022; Emily McCabe and Leslye E. Orloff, "Comparison Chart of VAWA and U Visa Immigrant Relief" (chart, National Immigrant Women's Advocacy Project, American University, Washington College of Law, June 20, 2014); Office of Refugee Resettlement, "Benefits for Afghan Humanitarian Parolees" (fact sheet, October 2021); USDA, Food and Nutrition Service, "SNAP Provisions in the Additional Ukraine Supplemental Appropriations Act, 2022" (memorandum to All SNAP State Agencies, All Regions, June 7, 2022).

# 3    Income Eligibility Rules and SNAP Benefits

The Food Stamp Program was renamed the Supplemental Nutrition Assistance Program in 2008, and it goes by other names in some states.[18] SNAP is a household benefit program. It defines "household" as people who purchase and prepare meals together, regardless of age or family connection.[19] The program operates as a public-private partnership, with participants issued benefits on Electronic Benefit Transfer (EBT) cards to use for food purchases at authorized retailers, which range from supermarkets and independent grocers to corner stores, farmers markets, and online food retailers.

A household must meet certain income requirements to qualify for SNAP. Depending on the state in which the household is located and that state's choice among different federal options, gross income limits are between 130 percent and 200 percent of the federal poverty level (FPL); the overall net income limit, across all states, is 100 percent of the FPL.[20] A household's net income is determined by removing allowable deductions from its gross monthly income. As of fiscal year (FY) 2023, allowable deductions include a standard deduction ranging from $193–$258 per household, depending on the number of household members; a 20 percent deduction from earned income; and deductions for certain expenses, such as excess shelter costs, dependent care, and, for some households, medical costs.[21] Households with elderly or disabled members are not required to meet the gross income limit but must meet the net income limit.[22]

Most states have eliminated asset tests for the program (such tests can lead to applicants being denied access to SNAP if their assets exceed a set amount).[23] In the minority of states that still use asset tests, the FY 2023 limits are set by the federal government at $2,750 (or $4,250 for households with a disabled member or a member over the age of 60).[24] Assets include resources that could support the purchase of food, including investments or banked resources. Personal property, homes, and retirement savings are generally not counted as assets. Vehicles can be counted; however, all states have opted to relax vehicle asset rules, thereby reducing how much vehicles count towards maximum asset limits.[25]

The dollar amount participants receive from SNAP varies depending on their household size and income. As of FY 2023, the maximum monthly benefit varied from $281 for a single-person household to $1,691 for an eight-member household, and then $211 more per additional household member.[26] While the U.S. Department of Agriculture (USDA), which runs the program, periodically revises its benefits guidelines, some research suggests that current benefit amounts reflect outdated assumptions about food needs.[27]

---

*Benefit amounts are adjusted to match the number of eligible household members, which effectively reduces the per capita amount of SNAP benefits for households in which some members are eligible and others are not.*

In the case of mixed-eligibility families, individuals with an ineligible immigration status are treated as non-applicants, allowing those with an eligible status to still apply for benefits.[28] However, benefit amounts are adjusted to match the number of eligible household members, which effectively reduces the per capita amount of SNAP benefits for households in which some members are eligible and others are not.

## State Discretion: Flexible Requirements and State-Funded Programs for Federally Ineligible Immigrants

States have discretion over some aspects of SNAP eligibility rules, which introduces variations in income-eligible immigrants' program access and participation across the country.

### Work Requirements

To maintain eligibility, many SNAP participants must meet work requirements, which include registering for work, not voluntarily quitting a job or reducing hours, taking a job if offered employment, and participating in state-assigned employment and training programs.[29] Able-bodied adults ages 18 to 49 who do not have dependents may also be limited to receiving benefits for only three months every three years, unless they can document that they are working 80 hours per month or engaging in other qualifying activities. Studies suggest that time limits on SNAP eligibility lead to decreases in overall program participation.[30]

An individual can be exempt from general work requirements if they meet any of the following qualifications: working at least 30 hours per week; meeting work requirements for another federal benefit program; caring for an incapacitated adult or a child under age 6; being unable to work due to physical or mental limitation; participating in a substance treatment program; being pregnant; or being enrolled half time in school or a training program.[31]

Additionally, during periods of high unemployment, some work requirements may be waived. For example, many states applied for such waivers during the Great Recession that began in late 2007 and when the COVID-19 pandemic began in 2020. The *Families First Coronavirus Response Act*, passed in March 2020,

paused SNAP work requirements nationwide until the month after the U.S. Department of Health and Human Services lifts the public-health emergency declaration.[32]

### State-Funded Replacement Programs

Under PRWORA, states are allowed to extend SNAP eligibility to federally ineligible noncitizens by using state funding without a federal match.[33] Thus, some people who are ineligible for the federally funded program may still qualify for food assistance if their state's government has opted to fund a program that provides benefits to certain groups of federally ineligible immigrants.[34]

Six states have expanded food assistance eligibility to some federally ineligible noncitizens,[35] prioritizing those who would have been eligible prior to the passage of PRWORA:

► **California**, starting in 2023, became the first state in the nation to provide food assistance for all residents ages 55 and older, regardless of immigration status.[36] Prior to this change, the state program included lawful temporary residents (noncitizens in a lawful status who were ineligible for federal SNAP benefits based solely on their immigration status under PRWORA) and U-visa applicants and holders.

► **Connecticut**'s program makes certain federally ineligible immigrant groups eligible to receive benefits at 75 percent of the standard federal amount; this includes groups made ineligible by PRWORA, *Violence Against Women Act* (VAWA) self-petitioners with prima facie determinations, T-visa applicants with bona fide determinations, and Special Immigrant Juvenile (SIJ) status and U-visa grantees who have adjusted to LPR status but not yet met the standard five-year residency requirement. If those noncitizens entered

the United States on or after April 1, 1998, Connecticut requires them to have lived in the state for at least six months.

▶ In **Illinois**, the state program is open to individuals preparing to file or awaiting a pending application for a T visa, U visa, or asylum.

▶ **Maine**'s state-funded program includes immigrant groups made ineligible by PRWORA, as long as individuals meet a certain measure of hardship. There are, however, exceptions to the hardship assessment for immigrants who are elderly, disabled, domestic violence survivors, awaiting work authorization, and those granted work authorization and seeking employment.

▶ **Minnesota**'s Food Assistance Program considers noncitizens eligible if they are lawfully present in the United States and over age 50.[37]

▶ In **Washington State**, the program includes immigrants in lawful immigration statuses (those who would be considered "qualified" under PRWORA but for their age, number of quarters of qualifying work, or the five-year residence bar); those considered to be Permanently Residing under Color of Law, or PRUCOL (i.e., their state of residence considers them to be legally in the United States, but they do not have an official status as a qualified immigrant with U.S. Citizenship and Immigration Services); survivors of trafficking or other serious crimes; and those who have filed or are preparing to file applications for a T or U visa or asylum.

The level of food assistance benefits offered varies across these six states, as does the language used to categorize eligible noncitizen populations. Some states, such as Washington, expand eligibility to noncitizens considered to be PRUCOL, but the definition of PRUCOL is different from state to state. Moreover, immigrants' eligibility for the programs in California, Minnesota, and Washington State may be affected by requirements that add the income and/or resources of an immigrant's sponsor to the immigrant's own when determining eligibility.[38]

---

**BOX 2**
**How Are SNAP Participants and Immigration-Status Eligibility Defined in This Analysis?**

This analysis looks at the population of adults and children in poor households, defined as those with household incomes below 100 percent of the federal poverty level (FPL), as indicated in the U.S. Census Bureau's 2015–19 American Community Survey (ACS). While the nature of SNAP's monthly income requirements and ACS data on annual income differ somewhat, this analysis assumes that households recorded in the ACS as living in poverty have incomes low enough to qualify for SNAP, given the program sets a maximum income threshold for participation that is higher (130 to 200 percent of the FPL, depending on state).

In the ACS, SNAP is a household variable with a 12-month reference period, meaning that if one person in a household received SNAP at any point in the year preceding the survey, all members of the household are marked as SNAP participants. This means that while it is not possible to ascertain whether a particular individual was a SNAP participant, it is possible to look at participating households and then examine the immigration status and characteristics of individuals in these households. To model households' SNAP eligibility, the analysis considers the eligibility of each household member based on immigration status under federal law (see Table 1); noncitizens' eligibility for state-funded SNAP-replacement programs in California and Washington State, which in the period during which the data were collected covered all immigrants with lawful status; and noncitizens' eligibility for Minnesota's program, which covers lawful immigrants ages 50 and older (see Section 3 for a discussion of state discretion). Because the data available were gathered before 2023, this analysis does not account for

**BOX 2 (cont.)**
**How Are SNAP Participants and Immigration-Status Eligibility Defined in This Analysis?**

California's recent extension of benefits to residents ages 55 and older, regardless of immigration status. Smaller immigrant groups covered by the state programs in Connecticut, Illinois, and Maine could not be identified in the ACS data.

To impute immigration status and determine immigrants' eligibility or ineligibility under PRWORA, the Migration Policy Institute (MPI) methodology applied in this analysis uses data from the 2015–19 ACS, pooled, and the 2008 Survey of Income and Program Participation (SIPP). Estimates could not be produced for certain smaller immigrant groups covered by federal law or state-funded replacement programs, such as parolees if paroled into the United States for one year or more, individuals with a deportation order withheld, T-visa applicants with bona fide determinations, and Special Immigrant Juvenile (SIJ) status grantees. While these populations are relatively small (given the particularity of their circumstances), these data limitations have likely resulted in an undercount of the total immigrant population eligible for SNAP based on immigration status.

In this brief, "immigrant households" are those with at least one foreign-born member. This includes households comprising a single person with no dependents, if that individual is foreign born. The brief discusses four types of income-eligible households:

►  **Immigrant Household: All Members Eligible.** All immigrant members of the household are either naturalized U.S. citizens, LPR adults with more than five years in that status, LPR children, disabled recipients of Supplemental Security Income (SSI), or holders of a humanitarian status (refugees, asylees, Cuban/ Haitian entrants, or Afghan/Iraqi SIV holders).

►  **Immigrant Household: All Members Ineligible.** All members of the household are immigrants and are either adult LPRs with fewer than five years in that status, nonimmigrants (such as visitors, students, or temporary workers), or unauthorized immigrants.

►  **Immigrant Household: Mixed Eligibility of Members.** At least one household member is eligible and at least one other is ineligible due to immigration status. Based on data from this analysis, MPI estimates that 85 percent of income-eligible households with mixed eligibility on the basis of immigration status included a U.S.-born member.

►  **U.S.-Born Households: All Members Eligible.** All individuals are U.S. born and thus eligible for SNAP.

Because all of the populations discussed in this brief are people living in poverty, "eligible" is used to refer to people who meet both income and immigration-status requirements, either under federal law or under a state replacement program, not to income eligibility alone. "Ineligible" refers to income-eligible people who hold an immigration status that makes them ineligible for both federal and state-funded SNAP.

Using ACS data on self-reported SNAP participation, and limiting the analysis to those who live in poverty, leads to estimated participation rates that are lower than the official SNAP participation rates produced by Mathematica, which combine modeling techniques to identify the SNAP eligible population and include SNAP administrative data from the U.S. Department of Agriculture (USDA) along with large public-use datasets. MPI's approach allows this study to explore how individuals' immigration status, and that of household members, affects the SNAP participation of people living in poverty.

Sources: For details on MPI's methodology to assign legal status to noncitizens in U.S. Census Bureau data, see MPI, "MPI Methodology for Assigning Legal Status to Noncitizen Respondents in U.S. Census Bureau Survey Data," accessed February 9, 2023. For details on Mathematica's methodology to calculate official SNAP participation rates, see Alma Vigil, *Trends in USDA Supplemental Nutrition Assistance Program Participation Rates: Fiscal Year 2016 to Fiscal Year 2019* (Alexandria, VA: USDA Food and Nutrition Service, 2022).

# 4    Poor Immigrant Households' Eligibility and Participation

According to a Migration Policy Institute (MPI) analysis of data from the U.S. Census Bureau's American Community Survey (ACS), close to 43.9 million people in the United States were living in poverty in 2019, meaning they had a family income below 100 percent of the FPL (equivalent to $25,750 for a family of four in 2019). This total included 30.8 million individuals living in households where all members were U.S. born, and 13.0 million individuals living in immigrant households where at least one member was foreign born. Based on SNAP's requirement that participants have an income that is at most 130

to 200 percent of the FPL, depending on the state, these individuals were likely in need of, and income eligible for, federal assistance to meet their nutritional needs.

Taking into account federal SNAP rules and the requirements of state replacement programs in California, Minnesota, and Washington State, which cover certain lawfully present immigrants not covered under federal law, MPI estimates that half of people living in poor immigrant households—6.6 million individuals—were immigration-status eligible for SNAP and lived with others who were all also eligible (see Figure 1). On the other hand, 1.2 million immigrants lived in households where all members were ineligible for SNAP benefits due to their immigration status.

FIGURE 1

**Estimated Number of People in Poor Immigrant Households, by Age Group and Household Members' Immigration-Status Eligibility for SNAP, United States, 2019**



Notes: In this analysis, "immigrant households" are those that include at least one foreign-born individual. Immigration-status eligibility was assessed based on federal SNAP rules and state program requirements in California and Washington State (which cover all immigrants with lawful status) and in Minnesota (which covers lawful immigrants ages 50 and older). See Box 2 for definitions of income and immigration-status eligibility.
Source: These 2019 estimates result from Migration Policy Institute (MPI) analysis of data from the 2015–19 American Community Survey (ACS), pooled, and the 2008 Survey of Income and Program Participation (SIPP), weighted to 2019 unauthorized immigrant population estimates provided by Jennifer Van Hook at The Pennsylvania State University.

Approximately 5.2 million people, representing 40 percent of all those living in poor immigrant households, were part of households where, based on immigration status, at least one member was eligible for SNAP and another was ineligible. In the majority of these mixed-eligibility households, at least one member was born in the United States and thus a U.S. citizen by birth (4.5 million people lived in this type of household in 2019).[39] Of the 5.2 million people in mixed-eligibility households, an estimated 2.5 million were children.

## A.  State-by-State Estimates of Poor Immigrant Households' SNAP Eligibility

The states of California, Texas, and New York had the largest populations of people living in poor immigrant households in 2019 (see Table 2). California was also the only state where the number of people living in poor immigrant households exceeded the

number living in poor households where all members were U.S. born (3.1 million vs. 2.4 million).

People in households comprised of all eligible members, all ineligible members, or members with mixed eligibility based on immigration status made up different shares of the total population of people in poor immigrant households from state to state. The states with the highest shares of people in all-eligible households in 2019 were Maine, Minnesota, Hawaii, Rhode Island, Michigan, and Florida, with shares between 70 percent and 60 percent). In contrast, New Hampshire, the District of Columbia, Massachusetts, Iowa, Connecticut, Indiana, and Louisiana had the highest shares of people living in households where all members were ineligible for SNAP due to their immigration status (from 18 percent to 16 percent of all people in poor immigrant households). People living in households whose members had mixed eligibility based on immigration status represented the largest shares—about half—of all those in poor immigrant households in Arkansas, North Carolina, Tennessee, and Alabama.

TABLE 2

**Estimated Number of People in Poor Households, by U.S. State and Household Members' Immigration-Status Eligibility for SNAP, 2019**

| | Number of People in Poor Households with All U.S.-Born Members | Number of People in Poor Immigrant Households | Of Those in Poor Immigrant Households, Share in Each Type of Household: | | |
| | | | All Members Eligible | All Members Status Ineligible | Mixed Eligibility |
|---|---|---|---|---|---|
| **United States** | **30,813,000** | **13,042,000** | **51%** | **9%** | **40%** |
| Alabama | 737,000 | 79,000 | 41% | 11% | 49% |
| Alaska | 66,000 | 10,000 | - | - | - |
| Arizona | 684,000 | 397,000 | 50% | 8% | 41% |
| Arkansas | 451,000 | 62,000 | 40% | 10% | 50% |
| California | 2,364,000 | 3,148,000 | 50% | 7% | 43% |
| Colorado | 427,000 | 153,000 | 48% | 9% | 43% |
| Connecticut | 248,000 | 101,000 | 50% | 16% | 34% |
| Delaware | 90,000 | 26,000 | 45% | 12% | 43% |
| District of Columbia | 85,000 | 19,000 | 57% | 18% | 25% |
| Florida | 1,825,000 | 1,136,000 | 60% | 11% | 30% |
| Georgia | 1,231,000 | 352,000 | 43% | 9% | 48% |
| Hawaii | 84,000 | 49,000 | 61% | 10% | 30% |
| Idaho | 187,000 | 34,000 | 51% | 11% | 39% |
| Illinois | 1,143,000 | 457,000 | 51% | 9% | 40% |
| Indiana | 766,000 | 128,000 | 43% | 16% | 41% |

**TABLE 2 (cont.)**

**Estimated Number of People in Poor Households, by U.S. State and Household Members' Immigration-Status Eligibility for SNAP, 2019**

| | Number of People in Poor Households with All U.S.-Born Members | Number of People in Poor Immigrant Households | Of Those in Poor Immigrant Households, Share in Each Type of Household: | | |
|---|---|---|---|---|---|
| | | | All Members Eligible | All Members Status Ineligible | Mixed Eligibility |
| Iowa | 297,000 | 53,000 | 45% | 17% | 38% |
| Kansas | 282,000 | 68,000 | 42% | 13% | 45% |
| Kentucky | 686,000 | 68,000 | 45% | 13% | 43% |
| Louisiana | 810,000 | 73,000 | 42% | 16% | 42% |
| Maine | 140,000 | 12,000 | 70% | - | - |
| Maryland | 409,000 | 157,000 | 44% | 15% | 41% |
| Massachusetts | 448,000 | 236,000 | 54% | 17% | 29% |
| Michigan | 1,201,000 | 196,000 | 60% | 9% | 31% |
| Minnesota | 379,000 | 142,000 | 69% | 7% | 24% |
| Mississippi | 559,000 | 27,000 | 42% | 11% | 47% |
| Missouri | 727,000 | 75,000 | 50% | 15% | 35% |
| Montana | 126,000 | 5,000 | - | - | - |
| Nebraska | 163,000 | 54,000 | 48% | 10% | 43% |
| Nevada | 251,000 | 171,000 | 50% | 9% | 41% |
| New Hampshire | 85,000 | 11,000 | 58% | 18% | 25% |
| New Jersey | 483,000 | 421,000 | 51% | 12% | 37% |
| New Mexico | 304,000 | 104,000 | 53% | 5% | 42% |
| New York State | 1,561,000 | 1,164,000 | 59% | 9% | 32% |
| North Carolina | 1,204,000 | 337,000 | 40% | 9% | 50% |
| North Dakota | 70,000 | 8,000 | 46% | - | 36% |
| Ohio | 1,435,000 | 155,000 | 55% | 14% | 31% |
| Oklahoma | 517,000 | 94,000 | 42% | 10% | 48% |
| Oregon | 405,000 | 130,000 | 48% | 9% | 44% |
| Pennsylvania | 1,315,000 | 226,000 | 55% | 12% | 32% |
| Rhode Island | 86,000 | 39,000 | 60% | 9% | 31% |
| South Carolina | 658,000 | 93,000 | 41% | 13% | 47% |
| South Dakota | 96,000 | 6,000 | 39% | - | 30% |
| Tennessee | 879,000 | 145,000 | 42% | 9% | 49% |
| Texas | 2,411,000 | 1,976,000 | 45% | 9% | 46% |
| Utah | 227,000 | 83,000 | 43% | 11% | 46% |
| Vermont | 58,000 | 4,000 | - | - | - |
| Virginia | 699,000 | 195,000 | 47% | 14% | 39% |
| Washington State | 553,000 | 263,000 | 52% | 10% | 38% |
| West Virginia | 303,000 | 9,000 | 52% | - | 31% |
| Wisconsin | 538,000 | 86,000 | 55% | 12% | 33% |
| Wyoming | 57,000 | 6,000 | 35% | - | 48% |

Notes: In this analysis, "immigrant households" are those that include at least one foreign-born individual. Immigration-status eligibility was assessed based on federal SNAP rules and state program requirements in California and Washington State (which cover all immigrants with lawful status) and in Minnesota (which covers lawful immigrants ages 50 and older). See Box 2 for definitions of income and immigration-status eligibility. Numbers may not add up to the total due to rounding. Categories marked "-" have a sample size too small to generate statistically meaningful results.
Sources: These 2019 estimates result from MPI analysis of data from the 2015–19 ACS, pooled, and the 2008 SIPP, weighted to 2019 unauthorized immigrant population estimates provided by Van Hook.

FIGURE 2

**Estimated SNAP Participation Rates of People in Poor Households, by Household Members'
Immigration-Status Eligibility for the Program, United States, 2019**



Notes: In this analysis, "immigrant households" are those that include at least one foreign-born individual. Immigration-status
eligibility was assessed based on federal SNAP rules and state program requirements in California and Washington State (which cover
all immigrants with lawful status) and in Minnesota (which covers lawful immigrants ages 50 and older). See Box 2 for definitions of
income and immigration-status eligibility. For each household type, the participation rate is calculated by dividing the number of self-
reported SNAP participants in the ACS by the number of individuals living in poverty.
Source: These 2019 estimates result from MPI analysis of data from the 2015–19 ACS, pooled, and the 2008 SIPP, weighted to 2019
unauthorized immigrant population estimates provided by Van Hook.

## B.    *SNAP Participation of Poor Immigrant Households*

To understand the reach of SNAP, the next step is to consider whether poor immigrant households with an eligible member participate in the program. Because SNAP receipt occurs at the household level—either the household receives SNAP or it does not—this brief examines participation at the household level and then at the immigration status(es) of household members, rather than looking at the participation of people who are themselves eligible for SNAP. As discussed in earlier sections, in mixed-status households where some members are SNAP eli-

gible and others are ineligible, the dollar amount of benefits per household member is reduced.

This analysis finds that the share of the eligible population participating in SNAP in 2019—defined as the number of people who reported that their household received SNAP out of those living under 100 percent of the FPL—was only slightly higher for households where all members were U.S. born compared to immigrant households. While 50 percent of poor U.S.-born households received SNAP, the share was 47 percent for all-eligible immigrant households and 46 percent for those with mixed eligibility (see Figure 2).[40]

Participation trends for people in households with vulnerable members, such as children and older adults (ages 60 and older), differ from these overall rates (see Figure 2). For poor households where at least one child is present, the native–immigrant gap in SNAP participation is markedly greater—11 percentage points between U.S.-born and all-eligible immigrant households, and 15 percentage points between U.S.-born and mixed-eligibility immigrant households. The opposite is true when an older adult is present in the household. Although poor older immigrants represent a relatively small population (see Figure 1), among people living in poor households where an older adult is present, the share receiving SNAP is slightly higher in immigrant households than in those where all members are U.S. born.

## C.    *State-by-State Participation Rates*

A state-by-state analysis reveals that SNAP participation rates among poor households varied considerably across the country in 2019 (see Appendix Table A–1). Broadly, among the states with sample sizes large enough to generate statistically meaningful results, three states—Rhode Island, New Mexico, and Oregon—had SNAP participation rates of more than 50 percent for all three studied groups (individuals in households composed entirely of U.S.-born members, those in immigrant households where all members are eligible, and those in immigrant households with mixed eligibility). Conversely, SNAP participation rates were lower for all three groups in Colorado and Utah.

A closer look at state-level SNAP participation rates for U.S.-born and immigrant households indicates that:

▶ Among households with all U.S.-born members, SNAP participation rates ranged from a low of 28 percent in Wyoming to a high of 60 percent in the District of Columbia.

▶ For people in all-eligible immigrant households, SNAP participation rates ranged from 27 percent in Mississippi to 59 percent in Oregon.

→ Other high-ranked states were Minnesota, Rhode Island, Alaska, and Washington (see Figure 3).

→ In addition to Mississippi, SNAP participation rates for individuals in these households were relatively low in West Virginia, Arkansas, Colorado, Virginia, and Louisiana.

▶ Individuals in mixed-eligibility households had state-level participation rates ranging from 20 percent in Utah to 60 percent in Oregon.

→ Participation rates were also high in Rhode Island, New Mexico, Hawaii, and Wisconsin (see Figure 3).

→ After Utah, other low-ranked states included Kansas, Arkansas, Louisiana, and Oklahoma.

**FIGURE 3**

**Top Five States with the Highest Estimated SNAP Participation Rates for People in Poor Households, by Household Members' Immigration-Status Eligibility for the Program, 2019**



Notes: In this analysis, "immigrant households" are those that include at least one foreign-born individual. Immigration-status eligibility was assessed based on federal SNAP rules and state program requirements in California and Washington State (which cover all immigrants with lawful status) and in Minnesota (which covers lawful immigrants ages 50 and older). See Box 2 for definitions of income and immigration-status eligibility. For each household type, the participation rate is calculated by dividing the number of self-reported SNAP participants in the ACS by the number of individuals living in poverty.
Source: These 2019 estimates result from MPI analysis of data from the 2015–19 ACS, pooled, and the 2008 SIPP, weighted to 2019 unauthorized immigrant population estimates provided by Van Hook.

# 5    Profile and SNAP Participation of Children in Poor Households

Given the negative impact food insecurity has on children's physical and mental development, this analysis takes a closer look at the characteristics and SNAP participation of the population under 18 years old. Nationwide, most children in poor households, 9.4 million as of 2019, lived in households where all members were U.S. born. Another 5.0 million children lived in poor immigrant households. Of these children in poor immigrant households, 2.5 million were in households with mixed eligibility for SNAP, 2.4 million lived in all-eligible immigrant households, and close to 125,000 were in households where all members were ineligible for SNAP due to their immigration status (see Figure 1).

## A.    National and State Trends

As noted in Section 4.B., the differences in SNAP participation rates between households where all members are U.S. born and immigrant households are greater when focusing on households where children are present. Among poor households with children, 62 percent of individuals in U.S.-born households participated in SNAP in 2019, compared to 51 percent in immigrant households where all members were eligible and 47 percent in immigrant households with mixed eligibility (see Figure 2). These 11- to 15-percentage-point gaps support two important findings:

➤ U.S.-born and immigrant children who lived in poor immigrant households either with members who were all SNAP eligible or who had mixed eligibility—households in which the great majority of children held an immigration status that made them eligible

for SNAP—were significantly less likely to participate in the program compared to children in poor U.S.-born households.

► The fact that children's SNAP participation in mixed-eligibility households is significantly lower than that of children in U.S.-born households suggests that the presence of an ineligible household member (in many cases, the parent of a U.S.-born child) has a significant negative impact on children's participation.

Across the states for which data could be analyzed, SNAP participation rates in poor, all-eligible immigrant households with children ranged from 36 per-

cent in Arkansas to as high as 65 percent in Iowa in 2019 (see Figure 4). For individuals in mixed-eligibility households with children, the lowest participation rate was in Utah (23 percent) and the highest was in Oregon (62 percent) (see Appendix Table A–2 for a full state-by-state breakdown).

## B.    SNAP Participation by Race and Ethnicity

Consistent with general U.S.-born and immigrant population trends, the racial and ethnic makeup of children in poor U.S.-born and immigrant households is quite different. In poor households where all members are U.S. born, the largest racial and

**FIGURE 4**

**Estimated SNAP Participation Rates of People in Poor, All-Eligible Immigrant Households with Children, by U.S. State, 2019**



Notes: In this analysis, "immigrant households" are those that include at least one foreign-born individual. Immigration-status eligibility was assessed based on federal SNAP rules and state program requirements in California and Washington State (which cover all immigrants with lawful status) and in Minnesota (which covers lawful immigrants ages 50 and older). See Box 2 for definitions of income and immigration-status eligibility. For each household type, the participation rate is calculated by dividing the number of self-reported SNAP participants in the ACS by the number of individuals living in poverty. States in gray were excluded due to having a sample size too small to generate statistically meaningful results.
Source: These 2019 estimates result from MPI analysis of data from the 2015–19 ACS, pooled, and the 2008 SIPP, weighted to 2019 unauthorized immigrant population estimates provided by Van Hook.

ethnic group among children in 2019 was White (42 percent). In contrast, among the 5.0 million children in poor immigrant households, Latino children were the overwhelming majority (3.7 million). They made up 64 percent of children in all-eligible immigrant households, 75 percent of those in all-ineligible households, and 85 percent of those in mixed-eligibility households. White children were the second largest racial/ethnic group (410,000), and their share of all children in poor immigrant households varied between 5 percent and 12 percent, depending on household SNAP eligibility.

Black children and Asian and Pacific Islander children were the next largest racial/ethnic groups among children living in poor immigrant households (387,000 and 367,000 children, respectively). While

Black children represented the second largest group among children in poor U.S.-born households, with a share of 30 percent, they made up just 5 percent to 11 percent of those in poor immigrant households, depending on household SNAP eligibility. Asian and Pacific Islander children, who represented less than 1 percent of children in poor U.S.-born households, made up between 5 percent and 10 percent of those in poor immigrant households.

Within all racial and ethnic categories, individuals in poor U.S.-born households with children participated in SNAP at higher rates in 2019 than those of the same race/ethnicity in poor immigrant households with children (see Figure 5). The largest native–immigrant gaps were between people in households with children who identified as Black, as multiracial

FIGURE 5

**Estimated SNAP Participation Rates of People in Poor Households with Children, by Race and Ethnicity and Immigration-Status Eligibility for the Program, United States, 2019**



Notes: In this analysis, "immigrant households" are those that include at least one foreign-born individual. Immigration-status eligibility was assessed based on federal SNAP rules and state program requirements in California and Washington State (which cover all immigrants with lawful status) and in Minnesota (which covers lawful immigrants ages 50 and older). See Box 2 for definitions of income and immigration-status eligibility. For each household type, the participation rate is calculated by dividing the number of self-reported SNAP participants in the ACS by the number of individuals living in poverty. In this figure, all racial and ethnic categories are exclusive, and all Latinos are included in that category regardless of their race.
Source: These 2019 estimates result from MPI analysis of data from the 2015–19 ACS, pooled, and the 2008 SIPP, weighted to 2019 unauthorized immigrant population estimates provided by Van Hook.

or another race, or as Latino. For instance, while 63 percent of Latinos in all-U.S.-born households with children were SNAP participants, that share was 52 percent and 49 percent for Latinos in all-eligible and mixed-eligibility immigrant households with children. And, as in this example, individuals in all-eligible immigrant households with children were more likely than those of the same race/ethnicity in mixed-eligibility immigrant households with children to participate in SNAP.

Across households with all U.S.-born members and both all-eligible and mixed-eligibility immigrant households, Black individuals in households with children participated in SNAP at relatively high rates in 2019 (73 percent, 58 percent, and 51 percent, respectively). By contrast, participation rates of Asian or Pacific Islander individuals in households with children were the lowest for all three household types (45 percent, 42 percent, and 28 percent, respectively).

# 6 Gauging the Impact of Federal Restrictions on Lawfully Present Immigrants' SNAP Eligibility

Since the introduction of federal restrictions on lawfully present immigrants' access to public benefits in 1996, a number of legislators have suggested they be lifted, either partially or completely, because of the harms of limiting safety nets for low-income families.[41] One such congressional proposal is the *Lifting Immigrant Families Through Benefits Access Restoration Act of 2021*, or LIFT the BAR Act, which was introduced by U.S. Representative Pramila Jayapal (D-WA) and, as of February 2023, had 100 Democratic co-sponsors.[42] Under this proposed bill, immigrants holding a legal status would have access to public benefits, including SNAP, without a five-year waiting period, provided they meet other program-specific requirements.

Using a similar methodology to the one described in Box 2, MPI researchers were able to simulate immigrants' eligibility for federally funded SNAP, should benefits eligibility be restored to all immigrants in lawfully present statuses, as it was prior to PRWORA. To illustrate the full reach of federal restrictions, the estimates in this section of the eligible population do not take into account individuals who are ineligible for federally funded SNAP but qualify for a state replacement program. While based on population estimates from 2019, this exercise provides insight into how the current federal restrictions affect immigrant households' SNAP eligibility and how such a legislative change could reshape it. Were restrictions on lawfully present immigrants' eligibility to be lifted, this simulation finds:

**The number of people living in poor immigrant households where all members are immigration-status eligible for federally funded SNAP would have been greater in 2019, at 7,753,000, instead of the estimated 6,595,000 under PRWORA restrictions.** This increase of 1,158,000 people (equivalent to 18 percent) would have included:

► 641,000 people in households with mixed SNAP eligibility under PRWORA restrictions. While some individuals within these households were already eligible for benefits (including U.S.-born and naturalized citizens, LPRs with more than five years of U.S. residence), the removal of federal restrictions would mean that household members with other lawful immigration status would become eligible (e.g., LPRs with fewer than five years of U.S. residence, temporary workers). This would increase the SNAP benefit amount available to these household.

► 516,000 immigrants from households where all members were ineligible for SNAP due to their immigration status; these immigrants were lawfully present in the United States but were excluded from SNAP benefits under PRWORA.

► In terms of immigration status, an estimate of 427,000 LPRs (the majority, 374,000, with less than five years in that status) would transition from mixed-eligibility or ineligible immigrant households to all-eligible households. Moreover, 250,000 U.S.-born citizens and 68,000 naturalized citizens would transition from mixed-eligibility to all-eligible households.

► In terms of age, the people who would transition from mixed-eligibility or ineligible immigrant households to all-eligible households would include 800,000 adults ages 18 to 59 years old, 282,000 children, and 76,000 older adults (ages 60 and older).

**As 282,000 children transition into households where all members are eligible for federally funded SNAP, this would increase their chances of becoming more food secure.** The great majority (269,000) would come from households whose members currently have mixed eligibility. By removing restrictions on lawfully present noncitizens' eligibility that currently mean some mixed-eligibility household members are considered non-applicants, the dollar amount of benefits transferred to these children's households, should they participate in the program, would increase.

**The racial and ethnic groups most likely to gain from a change in legislation are Asian and Pacific Islanders, followed by Latinos.** Of the 1,158,000 people who would have been in all-eligible immigrant households, if not for PRWORA restrictions, 432,000 would have been Asian or Pacific Islander. This would represent a gain of 43 percent compared to the Asian and Pacific Islander population living in this type of household under federal legislation, ignoring state replacement programs. Many Asian and Pacific Islander immigrants are green-card holders with fewer than five years in that status, making them ineligible for SNAP.

► The second largest group that would benefit from this change in legislation is Latinos (324,000). Relative to the population federally eligible under PRWORA restrictions, this would represent a gain of 9 percent, the smallest percentage change of all racial and ethnic groups. One explanation is that, should restrictions on those in lawfully present statuses be lifted, unauthorized immigrants (roughly three-fourths of whom come from Mexico, Central America, or South America[43]) would continue to be excluded from public benefits.

► The number of White (242,000) and Black (122,000) individuals transitioning to all-eligible immigrant households would represent gains of 23 percent and 18 percent, respectively, relative to the numbers eligible under PRWORA federal restrictions.

**States with large immigrant populations would see the highest number of people in immigrant households transition to households where all members are eligible for federally funded SNAP.** These states are: California (211,000), Texas (121,000), Florida (102,000), and New York (120,000).

FIGURE 6

**Estimated Change in the Number of People in Federally Funded SNAP Eligible, Ineligible, and Mixed-Eligibility Immigrant Households Should Federal Restrictions on Lawfully Present Noncitizens' Eligibility Be Removed, United States, 2019**



Notes: In this analysis, "immigrant households" are those that include at least one foreign-born individual. Immigration-status eligibility was assessed in Scenario 1 based on federal SNAP rules only, omitting those who are eligible for state replacement programs that cover some immigrants with lawful status who are ineligible for federal support; doing so makes it possible to see clearly the effect of federal restrictions nationwide, even though current state efforts counterbalance some of this impact. For Scenario 2, eligibility was assessed based on all lawfully present immigrants being eligible without a five-year waiting period; unauthorized immigrants continue to be ineligible in this scenario. See Box 2 for definitions of income and immigration-status eligibility.
Source: These 2019 estimates result from MPI analysis of data from the 2015–19 ACS, pooled, and the 2008 SIPP, weighted to 2019 unauthorized immigrant population estimates provided by Van Hook.

# 7    Conclusion

Poverty forces households to choose between food and other vital survival needs, such as medical care. Food insecurity can, in turn, lead to significant and long-term consequences for physical and mental health as well as the ability to learn, work, and even sleep. These challenges affect the individuals who experience them, but also the broader society that is likely to incur higher health-care expenditure and become less healthy and productive. Yet because of federal restrictions on lawfully present noncitizens' access to SNAP, immigrant households are less likely to be eligible to participate in the program than U.S.-born families in the same income range. And among those who are eligible, take-up rates are lower for immigrant households than U.S.-born households.

This native–immigrant gap in SNAP participation is even greater among households with children.

Households with mixed SNAP eligibility represent an important segment of poor immigrant households. Of the 13.0 million individuals in poor immigrant households in 2019, an estimated 5.2 million (or 40 percent) lived in households where some members were eligible for SNAP and others were not. This population included 2.5 million children—a figure higher than the number of children living in immigrant households where all members were either immigration-status eligible (2.4 million) or ineligible (125,000) for the program. Many children in mixed-eligibility households are U.S.-born citizens, but due to a parent or other household member having an immigration status that makes them ineligible for SNAP, the benefit amount such families

receive if they participate in the program is pro-rated downwards and these children receive a lower per-person amount.

The racial and ethnic composition of people in poor U.S.-born and immigrant households with children also differs. While White and Black children represented the largest shares of children in poor households with all U.S.-born members, Latinos made up the majority of children in poor immigrant households. Looking at participation in households with children, the analysis shows that within all racial and ethnic categories, individuals in U.S.-born households have higher participant rates than those of the same race/ethnicity in poor immigrant households.

States varied widely in their immigrant households' eligibility for and take-up of SNAP. The states with the highest shares of people in immigrant households living in households where all members were immigration-status eligible in 2019 were: Maine, Minnesota, Hawaii, Rhode Island, Michigan, and Florida. For people living in all-eligible immigrant households, SNAP participation rates were highest in Oregon, Minnesota, Rhode Island, Alaska, and Washington State, and lowest in Mississippi, West Virginia, Arkansas, Colorado, Virginia, and Louisiana. To date, six states (California, Connecticut, Illinois, Maine, Minnesota, and Washington) provide state-funded food assistance to certain groups of immigrants who do not qualify for federally funded SNAP.

If federal legislation were to revert to the pre-PROWRA norm, as some in Congress have proposed, lawfully present immigrants would become eligible for public benefits and thousands living in poverty would have greater access to nutritional supports. Looking solely at federally funded SNAP (not state-funded programs), this analysis suggests that 641,000 individuals who in 2019 were in immigrant households with mixed SNAP eligibility would instead have been in households where all members were eligible. Another 516,000 immigrants in households where all members had an ineligible (albeit lawful) immigration status would also instead have been in all-eligible immigrant households. An estimated 374,000 of the total 1,158,000 people who would transition to all-eligible immigrant households would be green-card holders currently ineligible because they have not yet held that status for five years.

Restoring benefits eligibility to lawfully present immigrants would constitute a major step in supporting the nutritional needs of the nation's families experiencing poverty. At the same time, more than 1.0 million unauthorized immigrants in poor households—who were never eligible for these benefits—would remain ineligible. California's newly approved initiative to provide food assistance to all state residents ages 55 and older, including unauthorized immigrants, presents a new experiment in extending immigrant eligibility even beyond what existed before PRWORA, with likely benefits for the well-being of immigrant seniors in the state. Careful observation of state programs such as this one that extend food assistance to different populations, as well as thorough analysis of nationwide trends such as those presented in this brief, can help inform policy discussions at the national level.

# Appendix. Additional State-Level Data

TABLE A–1

**Estimated SNAP Participation Rates of People in Poor Households, by U.S. State and Household Members' Immigration-Status Eligibility for the Program, 2019**

| | Households with All U.S.-Born Members | Immigrant Households | |
| --- | --- | --- | --- |
| | | All Members Eligible | Mixed Eligibility |
| **United States** | **50%** | **47%** | **46%** |
| Alabama | 53% | 48% | 53% |
| Alaska | 48% | 57% | - |
| Arizona | 45% | 53% | 50% |
| Arkansas | 48% | 34% | 30% |
| California | 38% | 40% | 45% |
| Colorado | 35% | 36% | 33% |
| Connecticut | 55% | 44% | 38% |
| Delaware | 46% | 37% | 45% |
| District of Columbia | 60% | 38% | - |
| Florida | 49% | 53% | 49% |
| Georgia | 53% | 41% | 39% |
| Hawaii | 48% | 46% | 55% |
| Idaho | 39% | 46% | 37% |
| Illinois | 55% | 48% | 49% |
| Indiana | 46% | 39% | 38% |
| Iowa | 46% | 53% | 44% |
| Kansas | 39% | 38% | 26% |
| Kentucky | 54% | 51% | 45% |
| Louisiana | 54% | 36% | 31% |
| Maine | 52% | 54% | - |
| Maryland | 51% | 38% | 34% |
| Massachusetts | 51% | 55% | 38% |
| Michigan | 54% | 54% | 40% |
| Minnesota | 36% | 58% | 42% |
| Mississippi | 55% | 27% | 38% |
| Missouri | 50% | 43% | 38% |
| Montana | 42% | - | - |
| Nebraska | 40% | 55% | 50% |
| Nevada | 46% | 42% | 47% |
| New Hampshire | 39% | 49% | - |
| New Jersey | 44% | 43% | 43% |
| New Mexico | 56% | 54% | 58% |
| New York State | 55% | 53% | 46% |
| North Carolina | 52% | 42% | 48% |
| North Dakota | 31% | - | - |
| Ohio | 56% | 50% | 38% |
| Oklahoma | 52% | 41% | 32% |
| Oregon | 54% | 59% | 60% |
| Pennsylvania | 55% | 52% | 44% |
| Rhode Island | 58% | 58% | 58% |
| South Carolina | 52% | 41% | 39% |

**TABLE A–1 (cont.)**

**Estimated SNAP Participation Rates of People in Poor Households, by U.S. State and Household Members' Immigration-Status Eligibility for the Program, 2019**

| | Households with All U.S.-Born Members | Immigrant Households | |
| --- | --- | --- | --- |
| | | All Members Eligible | Mixed Eligibility |
| South Dakota | 49% | - | - |
| Tennessee | 55% | 47% | 44% |
| Texas | 48% | 50% | 52% |
| Utah | 36% | 38% | 20% |
| Vermont | 42% | - | - |
| Virginia | 46% | 36% | 40% |
| Washington State | 49% | 57% | 53% |
| West Virginia | 60% | 28% | - |
| Wisconsin | 47% | 50% | 54% |
| Wyoming | 28% | - | - |

Notes: In this analysis, "immigrant households" are those that include at least one foreign-born individual. Immigration-status eligibility was assessed based on federal SNAP rules and state program requirements in California and Washington State (which cover all immigrants with lawful status) and in Minnesota (which covers lawful immigrants ages 50 and older). See Box 2 for definitions of income and immigration-status eligibility. For each household type, the participation rate is calculated by dividing the number of self-reported SNAP participants in the ACS by the number of individuals living in poverty. Categories marked "-" have a sample size too small to generate statistically meaningful results.
Source: These 2019 estimates result from MPI analysis of data from the 2015–19 ACS, pooled, and the 2008 SIPP, weighted to 2019 unauthorized immigrant population estimates provided by Van Hook.

**TABLE A–2**

**Estimated SNAP Participation Rates of People in Poor Households with Children, by U.S. State and Household Members' Immigration-Status Eligibility for the Program, 2019**

| | Households with All U.S.-Born Members | Immigrant Households | |
| --- | --- | --- | --- |
| | | All Members Eligible | Mixed Eligibility |
| **United States** | **62%** | **51%** | **47%** |
| Alabama | 67% | 54% | 54% |
| Alaska | 61% | - | - |
| Arizona | 59% | 55% | 49% |
| Arkansas | 58% | 36% | 30% |
| California | 54% | 49% | 48% |
| Colorado | 51% | 38% | 36% |
| Connecticut | 65% | 46% | 41% |
| Delaware | 62% | - | - |
| District of Columbia | 80% | - | - |
| Florida | 64% | 58% | 50% |
| Georgia | 65% | 43% | 38% |
| Hawaii | 60% | 57% | - |
| Idaho | 55% | 52% | - |
| Illinois | 68% | 51% | 50% |
| Indiana | 58% | 42% | 41% |
| Iowa | 63% | 65% | 46% |
| Kansas | 51% | 42% | 26% |
| Kentucky | 66% | 56% | 44% |
| Louisiana | 63% | 41% | 30% |
| Maine | 66% | - | - |

**TABLE A–2 (cont.)**

**Estimated SNAP Participation Rates of People in Poor Households with Children, by U.S. State and Household Members' Immigration-Status Eligibility for the Program, 2019**

| | Households with All U.S.-Born Members | Immigrant Households | |
| --- | --- | --- | --- |
| | | All Members Eligible | Mixed Eligibility |
| Maryland | 66% | 40% | 33% |
| Massachusetts | 65% | 57% | 43% |
| Michigan | 65% | 60% | 43% |
| Minnesota | 49% | 58% | 42% |
| Mississippi | 65% | - | - |
| Missouri | 63% | 50% | 38% |
| Montana | 57% | - | - |
| Nebraska | 55% | 54% | 48% |
| Nevada | 55% | 45% | 49% |
| New Hampshire | 54% | - | - |
| New Jersey | 53% | 45% | 43% |
| New Mexico | 69% | 56% | 56% |
| New York State | 52% | 52% | 46% |
| North Carolina | 66% | 43% | 47% |
| North Dakota | 43% | - | - |
| Ohio | 67% | 57% | 43% |
| Oklahoma | 64% | 43% | 31% |
| Oregon | 67% | 62% | 62% |
| Pennsylvania | 67% | 57% | 46% |
| Rhode Island | 72% | 58% | 58% |
| South Carolina | 67% | 46% | 38% |
| South Dakota | 64% | - | - |
| Tennessee | 67% | 52% | 43% |
| Texas | 60% | 53% | 51% |
| Utah | 49% | 44% | 23% |
| Vermont | 59% | - | - |
| Virginia | 62% | 40% | 39% |
| Washington State | 58% | 60% | 54% |
| West Virginia | 73% | - | - |
| Wisconsin | 63% | 62% | 56% |
| Wyoming | 41% | - | - |

Notes: In this analysis, "immigrant households" are those that include at least one foreign-born individual. Immigration-status eligibility was assessed based on federal SNAP rules and state program requirements in California and Washington State (which cover all immigrants with lawful status) and in Minnesota (which covers lawful immigrants ages 50 and older). See Box 2 for definitions of income and immigration-status eligibility. For each household type, the participation rate is calculated by dividing the number of self-reported SNAP participants in the ACS by the number of individuals living in poverty. Categories marked "-" have a sample size too small to generate statistically meaningful results.

Source: These 2019 estimates result from MPI analysis of data from the 2015–19 ACS, pooled, and the 2008 SIPP, weighted to 2019 unauthorized immigrant population estimates provided by Van Hook.

# Endnotes

1   "Food insecurity" refers to households that were, at times, unable to acquire adequate food for one or more household members because they had insufficient money and other resources. See U.S. Department of Agriculture (USDA) Economic Research Service, "Food Security in the U.S.: Measurement," updated April 22, 2022.

2   Margaret M.C. Thomas, Daniel P. Miller, and Taryn W. Morrisey, "Food Insecurity and Child Health," *Pediatrics* 144, no. 4 (2019); Food Research and Action Center (FRAC), "The Impact of Poverty, Food Insecurity, and Poor Nutrition on Health and Well-Being" (white paper, FRAC, Washington, DC, December 2017).

3   Dessalegn Tamiru and Tefera Belachew, "The Association of Food Insecurity and School Absenteeism: Systematic Review," *Agriculture & Food Security* 6, no. 5 (2017); John Cook and Karen Jeng, *Child Food Insecurity: The Economic Impact on Our Nation* (Chicago: Feeding America, 2009); Christian A. Gregory and Alisha Coleman-Jensen, *Food Insecurity, Chronic Disease, and Health among Working-Age Adults* (Washington, DC: USDA Economic Research Service, 2017); Jason M. Nagata et al., "Food Insecurity Is Associated with Poorer Mental Health and Sleep Outcomes in Young Adults," *Journal of Adolescent Health* 65, no. 6 (2019): 805–811.

4   Thomas, Miller, and Morrisey, "Food Insecurity and Child Health"; FRAC, "The Impact of Poverty, Food Insecurity, and Poor Nutrition on Health and Well-Being."

5   USDA Economic Research Service, "Food Security in the U.S.: Measurement."

6   According to the USDA, in 2020 food insecurity was reported by 21.7 percent of Black households and 17.2 percent of Latino households, compared to 7.1 percent of White households. See Alisha Coleman-Jensen, Matthew P. Rabbitt, Christian A. Gregory, and Anita Singh, *Household Food Security in the United States in 2020* (Washington, DC: USDA Economic Research Service, 2021); Di Fang, Michael R. Thomsen, Rodolfo M. Nayga, Jr., and Wei Yang, "Food Insecurity during the COVID-19 Pandemic: Evidence from a Survey of Low-Income Americans," *Food Security* 14, no. 1 (2022): 165–183.

7   Allison Bovell-Ammon et al., "Trends in Food Insecurity and SNAP Participation among Immigrant Families of U.S.-Born Young Children," *Children* 6, no. 4 (2019).

8   Hilary Hoynes, Diane Whitmore Schanzenbach, and Douglas Almond, "Long-Run Impacts of Childhood Access to the Safety Net," *American Economic Review* 106, no. 4 (2016): 903–934; Gregory and Coleman-Jensen, *Food Insecurity, Chronic Disease, and Health*. Another study of immigrant children found evidence that an additional year of SNAP eligibility in early life is associated with improvements in health outcomes, health status as reported by their parents, overnight hospitalizations, and number of doctor's visits between ages 6 to 16. See Chloe N. East, "The Effect of Food Stamps on Children's Health: Evidence from Immigrants' Changing Eligibility," *Journal of Human Resources* 55, no. 2 (2020): 387–427.

9   Amanda Gassman-Pines and Laura Bellows, "Food Instability and Academic Achievement: A Quasi-Experiment Using SNAP Benefit Timing," *American Education Research Journal* 55, no. 5 (2018): 897–927; Nisha Beharie, Micaela Mercado, and Mary McKay, "A Protective Association between SNAP Participation and Educational Outcomes among Children of Economically Strained Households," *Journal of Hunger and Environmental Nutrition* 12, no. 2 (2017): 181–192.

10  Kirang Kim and Edward A. Frongillo, "Participation in Food Assistance Programs Modifies the Relation of Food Insecurity with Weight and Depression in Elders," *Journal of Nutrition* 137, no. 4 (2007): 1005–1010; Colleen Heflin, Samuel Ingram, and James Ziliak, "SNAP Participation Is Associated with Reduced Risk of Premature Mortality among U.S. Adults" (issue brief, Syracuse University, Lerner Center for Public Health Promotion and Population Health, Syracuse, NY, March 2020).

11  *Personal Responsibility and Work Opportunity Reconciliation Act* (PRWORA), Public Law 104–193, *U.S. Statutes at Large* 110 (August 22, 1996): 2105, Sect. 401(c).

12  Under PRWORA, "qualified immigrants" include lawful permanent residents (LPRs), refugees, asylees, certain domestic violence survivors and their family members, certain trafficking survivors and their family members, Iraqi and Afghan special immigrants, persons granted withholding of deportation or removal, certain Cuban/Haitian entrants, and certain conditional entrants. All other immigrants and are considered not qualified. See "Restricting Welfare and Public Benefits for Aliens—General Provisions—Definitions," 8 U.S. Code § 1641.

13  USDA ,"A Short History of SNAP," updated September 2018.

14  *Agricultural Research, Extension, and Education Reform Act of 1998*, Public Law 105–185, *U.S. Statutes at Large* 112 (June 23, 1998): 523, Sect. 504, 506, and 507.

15  *Farm Security and Rural Investment Act of 2002*, Public Law 107–171, *U.S. Statutes at Large* 116 (May 13, 2002): 134, Sect. 4401(a), 4401 (b), and 4401(c); Randy Capps et al., *Assessing Implementation of the 2002 Farm Bill's Legal Immigrant Food Stamps Restorations* (Washington, DC: Urban Institute, 2004).

16  Capps et al., *Assessing Implementation of the 2002 Farm Bill*.

17  Alma Vigil, *Trends in USDA Supplemental Nutrition Assistance Program Participation Rates: Fiscal Year 2016 to Fiscal Year 2019* (Alexandria, VA: USDA Food and Nutrition Service, 2022), Table F.3H: Selected Features of SNAP under Past Legislation—Treatment of Legally Resident Noncitizens. More than a decade after the expansion of immigrant eligibility, the *Agricultural Act of 2014* required states to establish a system that verifies immigration status and eligibility. The verification system ensures that SNAP applicants are eligible on the basis of immigrant classification and household income. See *Agricultural Act of 2014*, Public Law 113–79, *U.S. Statutes at Large* 128 (February 7, 2014): 649, Sect. 4015.

18  USDA, "A Short History of SNAP." For example, SNAP is referred to as "CalFresh" in California, "3SquaresVT" in Vermont, "Basic Food" in Washington State, and "FoodShare" in Wisconsin.

19   Ascend at the Aspen Institute, "The 2Gen Approach," accessed July 8, 2022.

20   As of February 2023, 22 states and the District of Columbia had gross income limits of 200 percent of the federal poverty level (FPL). See USDA Food and Nutrition Service, "SNAP Eligibility," updated October 1, 2021.

21   USDA Food and Nutrition Service, "SNAP Eligibility."

22   There are additional exceptions to SNAP income eligibility requirements under which certain groups may be considered eligible through broad-based categorical eligibility (BBCE). BBCE policies permit a state to confer immediate SNAP eligibility on the basis of gross income limit if a household is eligible for the federally funded Temporary Assistance for Needy Families (TANF) program or a state-funded maintenance-of-effort (MOE) program, under which states must contribute from their own funds for benefits and services to needy families with children; see Congressional Research Service (CRS), *The Temporary Assistance for Needy Families (TANF) Block Grant: A Primer on TANF Financing and Federal Requirements* (Washington, DC: CRS, 2017). Most individuals receiving Supplemental Security Income (SSI) are automatically eligible for SNAP if they live alone or in households with one or more disabled SSI recipients, since SNAP income restrictions are relaxed to account for expenses related to caregiving or medical need; see Brad Trenkamp and Michael Wiseman, "The Food Stamp Program and Supplemental Security Income," *Social Security Bulletin* 67, no. 4 (2007). BBCE policies may also allow families with higher gross incomes to qualify for SNAP if they qualify for TANF/MOE because the limits are higher than 130 percent of the FPL in most states; see USDA Food and Nutrition Service, "Broad-Based Categorical Eligibility (BBCE)," updated June 2022. If households are eligible under BBCE policies, they must still meet the federal net monthly income requirement (100 percent of the FPL). BBCE policies may also be used to relax asset limits beyond the federal standard of up to $2,250 of countable resources or $3,500 if a household member is over age 60 or disabled (countable resources are cash or banked funds, but do not include assets such as property, retirement funds, and most vehicles, depending on their value); see USDA Food and Nutrition Service, "SNAP Eligibility."

23   As of 2018, 34 states and the District of Columbia had utilized BBCE policies to eliminate SNAP asset limits for most program participants. See Jessica Gehr, "Eliminating Asset Limits: Creating Savings for Families and State Governments" (policy brief, Center for Law and Social Policy, Washington, DC, April 2018).

24   USDA Food and Nutrition Service, "SNAP – Fiscal Year 2023 Cost-of-Living Adjustments" (memorandum to all state agencies, April 9, 2022).

25   Center on Budget and Policy Priorities (CBPP), "A Quick Guide to SNAP Eligibility and Benefits" (issue brief, CBPP, Washington, DC, January 2023).

26   See Table 4 in the section How Much Could I Receive in SNAP Benefits? From USDA Food and Nutrition Service, "SNAP Eligibility." As of October 2021, most SNAP participants saw an increase in benefits; however, this represents a temporary increase due to pandemic-related emergency allotments (e.g., the American Rescue Plan of 2021). Note that slightly higher SNAP allotments are allowed for Alaska, Hawaii, Guam, and the U.S. Virgin Islands. See USDA Food and Nutrition Service, "SNAP – Fiscal Year 2023 Cost-of-Living Adjustments."

27   Stacy Dean, "Thrifty Food Plan Re-Evaluation Puts Nutrition in Reach for SNAP Participants," USDA Food and Nutrition Service, August 30, 2021.

28   USDA Food and Nutrition Service, *Supplemental Nutrition Assistance Program: Guidance on Non-Citizen Eligibility* (Alexandria, VA: USDA Food and Nutrition Service, 2011), 24.

29   In some instances, the only member of a household who is federally eligible for SNAP is a child under the age of 18. In this case, the child is not required to meet the work requirements. The child's guardian is also not required to meet these requirements because the guardian is not enrolled in the program. See USDA Food and Nutrition Service, "SNAP Work Requirements," updated May 29, 2019.

30   Erin Brantley, Drishti Pillai, and Leighton Ku, "Association of Work Requirements with Supplemental Nutrition Assistance Program Participation by Race/Ethnicity and Disability Status, 2013-2017," *JAMA Network Open* 3, no. 6 (2020): e205824. A 2020 report asserted that racist stereotypes that Black people do not want to work have fueled work requirements for decades and that work requirements have been implemented so that they disproportionately harm Black families and undervalue their contributions to the economy and their communities. See Elisa Minoff, *The Racist Roots of Work Requirements* (Washington, DC: Center for the Study of Social Policy, 2020).

31   USDA Food and Nutrition Service, "SNAP Work Requirements."

32   *Families First Coronavirus Response Act*, Public Law 116–127, *U.S. Statutes at Large* 134 (March 18, 2020): 178; USDA Food and Nutrition Service, "Supplemental Nutrition Assistance Program (SNAP) – Extension of COVID-19 Administrative Flexibilities January 2022 and Beyond" (memorandum to all SNAP state agencies, all regions, December 8, 2021); USDA Food and Nutrition Service, "Supplemental Nutrition Assistance Program (SNAP): Students—COVID-19 Temporary Update," March 25, 2021. Due to the pandemic, college students became eligible to receive SNAP benefits if they have an Expected Family Contribution (EFC) of 0 in the current academic year, or if they are eligible to participate in state of federally financed work study during the regular school year. Current guidance does not require student to participate in work study, just to meet the eligibility criteria.

33   *PRWORA*, Sect. 411(d).

34   National Immigration Law Center, "Table 12: State-Funded Food Assistance Programs," updated April 2020; FRAC, *State Food Assistance Programs: Addressing Gaps in SNAP* (Washington, DC: FRAC, 2021).

35   FRAC, *State Food Assistance Programs.*

36   Nourish California, "Food4All Campaign," accessed December 15, 2022. This new rule is not reflected in the data analysis because it took place after the study period.

37   Minnesota Department of Human Services, "Combined Manual—Chapter 11: Technical Eligibility—0011.03.09: Non-Citizens-SNAP/MSA/GA/GRH," updated June 2021.

38   Sponsors promise to provide financial support to the sponsored noncitizens, at an annual income that is not less than 125 percent of the FPL. See USDA Food and Nutrition Service, *Supplemental Nutrition Assistance Program: Guidance on Non-Citizen Eligibility*.

39   Migration Policy Institute (MPI) analysis of data from the 2015–19 American Community Survey (ACS), pooled, and the 2008 Survey of Income and Program Participation (SIPP), weighted to 2019 unauthorized immigrant population estimates provided by Jennifer Van Hook at The Pennsylvania State University.

40   These percentages describe the number of people living in poverty who participate in SNAP, based on ACS data, as described in Box 2. Note that these estimates differ from the official SNAP participation rates produced by Mathematica, which use administrative SNAP data from the USDA, among other sources, to identify the program's eligible population. See Vigil, *Trends in USDA Supplemental Nutrition Assistance Program Participation Rates*.

41   *LIFT the BAR Act of 2021*, HR 5227, 117th Cong., 1st sess. (September 10, 2021); Tanya Broder, Gabrielle Lessard, and Avideh Moussavian, "Overview of Immigrant Eligibility for Federal Programs," National Immigration Law Center, June 2022. Other recent bills introduced by the 117th Congress that have language that would expand immigrants' SNAP eligibility include: *HOPE Act of 2021*, S 1181, 177th Cong., 1st sess. (April 15, 2021) and companion house bill *HOPE Act of 2021*, HR 2336, 117th Cong., 1st sess. (April 1, 2021); *Climate Resilience Workforce Act*, HR 6492, 117th Cong., 2nd sess. (January 25, 2022); *Health Equity and Accountability Act of 2022*, HR 7585, 117th Cong., 2nd sess.

42   *LIFT the BAR Act of 2021*.

43   MPI, "Profile of the Unauthorized Population: United States," accessed February 22, 2023.

# About the Authors



### VALERIE LACARTE

Valerie Lacarte is a Senior Policy Analyst with the Migration Policy Institute (MPI) U.S. Immigration Policy Program, where she contributes to research design and conducts data analysis on a range of issues, including native-immigrant gaps in socioeconomic outcomes and access to public benefits for vulnerable immigrant and humanitarian populations. Prior to joining MPI, Dr. Lacarte was a postdoctoral fellow at the Institute for Women's Policy Research. She has also worked at the Organization of American States and the Inter-American Development Bank.

Dr. Lacarte earned a PhD in economics from American University. For her dissertation, she used a mixed-methods approach to study the integration of Caribbean immigrants into the U.S. labor market and the intersectionality of race, ethnicity, and cultural gender norms.



### LILLIE HINKLE

Lillie Hinkle is an Associate Policy Analyst with MPI's National Center on Immigrant Integration Policy, where they work on issues including refugee resettlement, unaccompanied children's services, and access to benefits and services for immigrant families. Prior to joining MPI, Mx. Hinkle worked with the International Rescue Committee in employment placement and family mentorship, providing services to newly arrived refugee families in Richmond, Virginia.

Mx. Hinkle holds a master's degree in refugee and forced migration studies from the University of Oxford, where they focused on the intersections of trauma and refugee service provision in the United States. During their graduate studies, they provided research assistance to the Rights in Exile Program, recruiting country-of-origin experts for an online legal aid resource network. They hold a bachelor's degree in anthropology and philosophy from Virginia Commonwealth University.



### BRIANA L. BROBERG

Briana L. Broberg was a Research Intern with MPI's Human Services Initiative, where she contributed to research and policy analysis on topics including access to public benefits and access to humanitarian protection for vulnerable immigrants.

While in law school, Ms. Broberg completed internships with nonprofit immigration legal service providers, was awarded a Rappaport Fellowship through which she was a Public Policy Fellow with the Boston Mayor's Office for Immigrant Advancement, and managed an Afghan Refugee Support Project that provided legal services to Afghan asylum seekers. She earned her bachelor's degree in history at The City College of New York and her Juris Doctor from New England Law | Boston, where she was awarded the Dean Arthur W. MacLean Founders Award for outstanding academic achievement and significant contributions to the law school community.

# Acknowledgments

The authors thank the W.K. Kellogg Foundation, the Annie E. Casey Foundation, and the David and Lucile Packard Foundation for their support of this research. This brief completes a three-part series of publications by the Migration Policy Institute (MPI) that study immigrants' access to and participation in federal means-tested public benefits in the United States.

The authors thank former colleagues Mark Greenberg, Randy Capps, and Essey Workie, who during their time at MPI provided guidance on this research project. The authors also thank MPI colleagues Julia Gelatt and Michael Fix for their detailed review of the analysis and comments on several drafts, and former MPI intern Shiyue Cui for her research support. In addition, the authors thank MPI colleagues Lauren Shaw for her reliable and patient editing and Michelle Mittelstadt for her strategic outreach efforts.

The authors are grateful to the experts from the Food Research and Action Center (FRAC) and the Center on Budget and Policy Priorities (CBPP) who took the time to provide comments on an earlier draft of this brief, namely: Ellen Vollinger and Alexandra Ashbrook of FRAC, and Shelby Gonzales, Ed Bolen, Joseph Llobrera, and Louise Pocock of CBPP.

MPI is an independent, nonpartisan policy research organization that adheres to the highest standard of rigor and integrity in its work. All analysis, recommendations, and policy ideas advanced by MPI are solely determined by its researchers.

© 2023 Migration Policy Institute.
All Rights Reserved.

Design: Sara Staedicke, MPI
Layout: Liz Hall

No part of this publication may be reproduced in any form by any means, electronic or mechanical, or included in any information storage and retrieval system, without permission from the Migration Policy Institute. A full-text PDF of this document is available for free download from www.migrationpolicy.org.

Information for reproducing excerpts from this publication can be found at www.migrationpolicy.org/about/copyright-policy. Inquiries can also be directed to communications@migrationpolicy.org.

Suggested citation: Lacarte, Valerie, Lillie Hinkle, and Briana L. Broberg. 2023. *SNAP Access and Participation in U.S.-Born and Immigrant Households: A Data Profile*. Washington, DC: Migration Policy Institute.



www.migrationpolicy.org

The Migration Policy Institute is an independent,
nonpartisan think tank that seeks to improve immigration and integration
policies through authoritative research and analysis, opportunities for
learning and dialogue, and the development of
new ideas to address complex policy questions.

  

1275 K St NW, Suite 800, Washington, DC 20005
202-266-1940