# EXHIBIT 7




Insight

NATIONAL CENTER ON IMMIGRANT INTEGRATION POLICY

SEPTEMBER 2010

# The Demographic Impacts of Repealing Birthright Citizenship

By Jennifer Van Hook, Population Research Institute at The Pennsylvania State University
with Michael Fix, Migration Policy Institute

S U M M A R Y

Recently, debate has resurfaced over ending the grant of birthright citizenship to the US-born children of unauthorized immigrants. Much of this debate has turned on the meaning and intent of the 14th Amendment's citizenship clause and, in particular, whether US-born children of unauthorized immigrants are "subject to the jurisdiction" of the United States. Ending birthright citizenship for the children of unauthorized immigrants, which has been discussed in some circles as a means to reduce illegal immigration, would in fact significantly increase the size of the unauthorized immigrant population in the United States. Using standard demographic techniques, the analysis presented here reveals that if the 2009 Birthright Citizenship Act were adopted, the population of unauthorized immigrants would rise from 11 million today to 16 million in 2050. The share of all US children in 2050 who would be unauthorized would double, from 2 percent to 4 percent, under the proposed law. Alternative scenarios that would limit citizenship beyond the proposed Birthright Citizenship Act would generate even higher unauthorized immigrant population estimates.

Repeal of birthright citizenship would set in motion the creation of a self-perpetuating class of unauthorized immigrants who would be excluded from social membership for generations. According to this analysis, in 2050 there would be 4.7 million unauthorized immigrants who had been born in the United States, 1 million of whom would have two US-born parents. Again, alternate scenarios explored here generate higher estimates.

## I. Introduction

The 14th Amendment to the US Constitution provides that "[a]ll persons born or naturalized in the United States and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside." This language restored citizenship by birth (*jus soli*) under US law and reversed the 1857 Dred Scott decision by the US Supreme Court, which held that persons of African descent could never become US citizens. In 1898, the Supreme Court in *United States v. Wong Kim Ark* affirmed that the 14th Amendment applied to children born in the United States of non-citizen parents.

Recently, debate has resurfaced over ending the grant of birthright citizenship to the children of unauthorized immigrants. Much of this debate has turned on the meaning and intent of the 14th Amendment's citizenship clause and, in particular whether US-born children of unauthorized immigrants are "subject to the jurisdiction" of the United States. Ending birthright citizenship for the children of unauthorized immigrants via constitutional amendment would require approval by two-thirds of Congress and ratification by three-fourths of the state legislatures — a high hurdle. Though many believe repeal of birthright citizenship for the children of unauthorized immigrants would require a change to the Constitution, some argue that Congress could

MIGRATION POLICY INSTITUTE

act legislatively without need for a constitutional amendment. Legislation introduced last year in the House of Representatives, the 2009 Birthright Citizenship Act, would deny citizenship to US-born children when both parents are unauthorized.

The elimination of birthright citizenship for the children of unauthorized immigrants has been proposed as a way to reduce illegal immigration to the United States. Its proponents argue that unauthorized persons illegally migrate to the United States in order to give birth to children who can sponsor them for admission.[1] These proposals, then, raise the question: what would happen to the US unauthorized population if birthright citizenship were repealed? This *Insight* offers an answer by positing four possible scenarios involving the end of birthright citizenship in the future to US-born children of unauthorized immigrants.

We conclude that if birthright citizenship were no longer granted to US-born children of unauthorized immigrants, the unauthorized population likely would increase dramatically. An estimated 11 million unauthorized immigrants currently live in the United States;[2] many giving birth to US-born children.[3] And these children grow up to have children of their own. Under a constitutional repeal of the birthright citizenship language of the 14th Amendment or the proposed Birthright Citizenship Act of 2009,[4] these US-born descendents of unauthorized immigrants would be denied legal status in the United States, even though in all likelihood they would be thoroughly American in other respects. Their descendents, the third generation and higher, might have no claim to citizenship in the countries of their immigrant ancestors because they and their parents were not born in those countries. In short, the repeal of the 14th Amendment or enactment of the Birthright Citizenship Act would lead to the establishment of a permanent class of unauthorized persons.

*How large would this unauthorized population be?*

To answer this question, we projected the size of the unauthorized population from 2010 to 2050, using standard demographic techniques and readily available data about immigrants. We describe the data and methods in greater detail in the Methodology section. To measure the impact of birthright citizenship, we made four different estimates. Each used identical methods, data, and assumptions, but differed in one respect: the rules for determining citizenship. We simulated the effects of four rules:

1) Birthright Citizenship: Grants citizenship to all US-born children
2) "Mother and Father" rule: Denies legal status to children only if both parents are unauthorized
3) "Mother" rule: Denies legal status to any child whose mother is unauthorized
4) "Mother or Father" rule: Denies legal status to any child whose mother or father is

unauthorized, even if one parent is a US citizen.

The first rule, birthright citizenship, embodies current law as codified in the 14th Amendment. The latter three represent possible alternatives.[5] The most recent legislative proposal to repeal birthright citizenship, the 2009 Birthright Citizenship Act, embraces the "Mother and Father" rule, denying legal status to US-born children when both parents are unauthorized.

**Figure 1. Projected Number of Unauthorized Persons Living in the United States if Birthright Citizenship Were Repealed, 2010-2050**




*Source:* Van Hook calculations, using Department of Homeland Security (DHS) estimates of the number of unauthorized foreign born and National Center of Health Statistics (NCHS) estimates of mortality and fertility; see Methodology for more detail.

## II. How Would Repeal Affect the Size of the Unauthorized Population?

According to our projections, if the US-born children of unauthorized immigrants were denied legal status, the unauthorized population would grow much larger under all three scenarios that contemplate changes to the law (see Figure 1).

Under current birthright citizenship law, the unauthorized population would remain constant at around 11 million. This number is not strictly a prediction of the future because it depends on a number of assumptions and doesn't consider factors such as changing economic trends and enforcement policies. But we can compare it with the other projections, which differ in their assumptions only with respect to the citizenship rule, to assess whether

alternative citizenship rules would lead to larger or smaller unauthorized populations.

The "Mother or Father" rule would generate the largest unauthorized population: 24 million by 2050, nearly 2.5 times larger than if birthright citizenship were retained. This is the harshest rule because it would deny citizenship to everyone with at least one unauthorized parent, even children with a citizen parent.

The "Mother" rule would lead to a slightly lower estimate: 19 million by 2050. This is 72 percent higher than the number under current law.

Finally, the "Mother and Father" rule (denying legal status only if both parents are unauthorized) would generate the smallest unauthorized population of the three alternatives: 16 million. Nevertheless, even this more restrained alternative would produce an unauthorized population that is 44 percent larger than would occur under current law.

## The Share of Unauthorized Children Would Rise

Repeal's impact (assuming the law would be applied only prospectively) would initially be felt exclusively by children. We compared the projected number of unauthorized children ages 0-17 with the total number of children projected by the US Census Bureau.[6] As shown in Figure 2, if birthright citizenship were repealed, a much larger share of US children would be unauthorized in the coming decades.

**Figure 2. Projected Percentage of Children Who Would Be Unauthorized if Birthright Citizenship Were Repealed, 2010-2050**




*Source:* Van Hook calculations, using DHS estimates of the number of unauthorized foreign born, NCHS estimates of mortality and fertility, and US Census population projections for children ages 0-17.

Under current law, the share of unauthorized children would decline from 2.1 percent in 2010 to less than 1 percent by 2050, largely because growth in the child population would be fueled by the births of Hispanic US-citizen children. However, the unauthorized share of the total child population would double to 4 percent under the most restrained "Mother and Father" rule. Under the strictest "Mother or Father" rule, the percentage would increase to 11.4 percent.

**Figure 3. Projected Percentage of Unauthorized Hispanics if Birthright Citizenship Were Repealed, 2010-2050**




*Source:* Van Hook calculations, using DHS estimates of the number of unauthorized foreign born, NCHS estimates of mortality and fertility, and US Census population projections for Hispanics.

## III. Prospects for Hispanic Incorporation

The Hispanic population is projected to make up more than one-quarter of the US population by 2050.[7] Currently, about three out of four unauthorized immigrants are Hispanic,[8] so Hispanics would be disproportionately affected by a change in the citizenship law.

According to our projections (see Figure 3), the number of unauthorized Hispanics would remain about the same, increasing slightly from 8.0 to 8.1 million, but the share of Hispanics who would be unauthorized would decline from about 17 percent to 7 percent over the next four decades under current law ("Birthright citizenship"). This decline is largely due to the fact that Hispanics (particularly Mexicans) have the highest fertility rates of any major racial-ethnic group,[9] and their future growth will be driven by the births of citizen children in the United States. But if birthright citizenship were




repealed, the number of unauthorized Hispanics would increase, and the share of unauthorized Hispanics would fall much less rapidly. If the more restrained "Mother and Father" rule were followed, the number would increase from 8.0 to 11.6 million, and the percentage would decline to about 10.5 percent (3.5 points higher than under current law). And if the strict "Mother or Father" rule were followed, the number would increase from 8.0 to 18.2 million, and the share would remain at about the same level as it is today (16.5 percent).

**Figure 4. Projected Unauthorized Population by Generational Status if Birthright Citizenship Were Repealed, 2050**

Unathorized Population (millions)
30
25
20
15
10
5
3rd+ Generation
2nd Generation
Foreign-born
6.3
7.2
10.8
2.8
4.9
10.8
1.0
3.7
10.8
10.8
Simulated Rule: Child Is Unauthorized if . . .
Either mother or father is unauthorized
Mother is unauthorized
Both mother & father are unauthorized
Current law: Birthright citizenship

*Source:* Van Hook calculations, using DHS estimates of the number of unauthorized foreign born and NCHS estimates of mortality and fertility.

## IV. Perpetuating Disadvantage across Generations

The repeal of birthright citizenship would clearly affect immigrants and their children. What is less commonly understood is that the effects of repeal would be suffered by future US-born generations — the descendents of today's immigrants — many of whom would have little to no connection with their ancestors' country of birth. We projected the number of unauthorized persons by generational status, comparing the foreign born with the second generation (US-born children of the foreign born) and the third-or-higher generation (US-born children of US-born parents).

As shown in Figure 4, under current law, the entire unauthorized population in 2050 would be foreign born. However, if the harshest "Mother or Father" rule were followed, 26 percent, or about 6.3 million

people, would be in the third-or-higher generation. Under the more moderate "Mother" rule, the share in the third-or-higher generation would be 15 percent (2.8 million). Finally, if the "Mother and Father" rule were followed, the share would still be 7 percent (1.0 million).

## V. Differing Assumptions

It is important to understand that our projections rest on the assumption that unauthorized immigrants will continue to behave as they do now: they and their descendents will continue to have children and die at the same rates as they do today. In addition, we assumed that the foreign-born unauthorized population will remain the same size as it is today — about 10.8 million.[10] That is, deaths and out-migration of unauthorized immigrants are balanced by new immigrant arrivals. By making this assumption, we ensure that the projected changes in the unauthorized population are entirely attributable to simulated changes in the citizenship rules rather than growth or decline in immigration.

*But how would our estimates change if we made different assumptions?*

Death rates tend to change slowly, but fertility rates are more unpredictable. One possibility is that unauthorized immigrants would have fewer children if birthright citizenship were repealed. Our projections assume that unauthorized women will continue to have about 3.1 births in their lifetimes (the same as Mexican women living in the United States). But what if this number declined to the level of non-Hispanic white women (1.9 births per woman)? We find that this would reduce the projected size of the unauthorized population, but not by as much as one might think. For example, such a change would reduce the number only by about 13 percent in the "Mother and Father" rule scenario.

Another possibility is that a repeal of the 14th Amendment in combination with increased border, worksite, prison screening, and other immigration enforcement programs would effectively deter illegal migration. To account for this possible scenario, we examined the likely outcome if all new illegal immigration stopped as of 2010. This development would have a greater impact than any changes in fertility. For example, under the "Mother and Father" rule simulation, the projected number of unauthorized immigrants in 2050 would drop by 78 percent, from 15.5 million to 3.3 million. Nevertheless, most of this decline occurs among the foreign born. The projected number of unauthorized US-born persons would drop by 66 percent and the number in the third-or-higher generation would drop by only 37 percent. Thus, a decline — or even a complete halt — in new illegal immigration would not avert the establishment of a permanent unauthorized population living in the United States that would result from the repeal of birthright citizenship.

## VI. Conclusions

The standard demographic projections presented here bring home several important facts that have been largely absent from emotional debates over the repeal of birthright citizenship for the children of unauthorized immigrants. One is that rather than shrink the size of the unauthorized population in the United States, repeal would likely expand it — and expand it substantially. A second worrying finding is that repeal would set in motion a sizeable, self-perpetuating class of unauthorized immigrants for generations. This perpetuation of hereditary disadvantage based on the legal status of one's ancestors would be unprecedented in US immigration law.

*Rather than shrink the size of the unauthorized population in the United States, repeal would likely expand it.*

## Methodology

We used the cohort-component method to project the size and demographic characteristics of the unauthorized population. This methodology is described in a number of sources.[11] According to Preston, Heuveline, and Guillot,[12] the cohort-component method "is now nearly the only method used for population projections, representing a rare consensus for the social sciences." The cohort-component method starts with a "baseline" population as it is currently observed, broken down into age and sex groupings. It applies a set of fertility, mortality, and migration rates to this baseline population to calculate the expected number of births, deaths, and migrations occurring each year separately for each age and sex grouping. The population is projected forward five years by adding the expected number of births and new immigrants, subtracting the expected number of deaths and out-migrants, and aging the surviving population by five years. The resulting projected population then serves as the baseline population for the subsequent five-year projection period. To project the population forward from 2010 to 2050 (40 years), we repeat this procedure a total of eight times.

Like all population projections, our projections rest on a number of assumptions. These are described below.

Baseline Population: We assume that there were 10.8 million unauthorized immigrants living in the United States in 2010. This assumption is based on estimates produced by the Department of Homeland Security of the unauthorized foreign-born population in January 2009, the most recent year available.[13] We also assumed that the age-sex distribution of the 2010 population was identical to the age-sex distribution in January 2009.

Fertility: We assumed that unauthorized mothers have the same age-specific fertility rates as Mexican Americans.[14] In some

analyses, we used an alternative assumption, namely that the unauthorized population's fertility rates would decline to the level of non-Hispanic whites.[15] We assumed this decline would occur across generations, with the foreign-born having the fertility level of Mexican Americans, the third-or-higher generation having the fertility rates of non-Hispanic whites, and the second generation having fertility rates that fall between the two.

Mortality: We assumed that the unauthorized population has the same sex- and age-specific mortality rates as the general US population in 2009.[16] Our projections are relatively insensitive to assumptions about mortality.

Net Migration: We assumed that the foreign-born unauthorized population does not grow beyond its current level of 10.8 million (estimated as of 2009). This means that new immigration offsets any declines in the population due to foreign-born deaths and emigration. Foreign-born emigration rates were obtained from the estimates for Mexicans produced by Van Hook and Zhang.[17] In addition, we assumed that US-born children of immigrants emigrate at half the rate as unauthorized immigrants, and that the US-born children of US-born parents do not emigrate at all.

Marriage Patterns: We assumed that unauthorized immigrant parents tend to marry other unauthorized persons (or at least, have children with them), but the rate declines across generations: 75 percent among the foreign born, 50 percent among the second generation, and 25 percent among the third-or-higher generation.

## Acknowledgments

The results and conclusions presented in this report are solely those of the authors and do not represent the views of The Pennsylvania State University, the Population Association of America, the US Census Bureau, nor any of Dr. Van Hook's research funders. The authors would like to thank Don Kerwin, Michelle Mittelstadt, and Randy Capps of MPI for their thoughtful contributions.



# ENDNOTES

1 As a factual matter, US- citizen children cannot petition for visas for their parents until they reach age 21.

2 Michael Hoefer, Nancy Rytina, and Bryan C. Baker, *Estimates of the Unauthorized Immigrant Population Residing in the United States: January 2009* (Washington, DC: Department of Homeland Security Office of Immigration Statistics, 2010), www.dhs.gov/xlibrary/assets/statistics/publications/ois_ill_pe_2009.pdf.

3 An estimated 340,000 of the 4.3 million babies born in the United States in 2008 were the offspring of unauthorized immigrants; Jeffrey S. Passel and Paul Taylor, *Unauthorized Immigrants and their U.S.-Born Children* (Washington, DC: Pew Hispanic Center, 2010), http://pewhispanic.org/files/reports/125.pdf.

4 The Birthright Citizenship Act of 2009, introduced in April 2009 by Rep. Nathan Deal (R-GA), would amend the Immigration and Nationality Act "to consider a person born in the United States 'subject to the jurisdiction' of the United States for citizenship at birth purposes if the person is born in the United States of parents, one of whom is: (1) a US citizen or national; (2) a lawful permanent resident alien whose residence is in the United States; or (3) an alien performing active service in the US armed forces."

5 These policies and proposals do not represent an exhaustive list of potential changes to birthright citizenship. Among the most exclusionary proposals debated include those that would apply retroactively (versus prospectively) to all US citizen children with one or more unauthorized parents. Presumably these proposals could also include the adult children of unauthorized immigrants. Among proposals that are somewhat less exclusionary are those that would be based on a combination of parents' unauthorized status and the length of time that their US-citizen children had lived in the United States.

6 US Census Bureau, Population Division, Table 2-C. Projections of the Population by Selected Age Groups and Sex for the United States: 2010 to 2050 Constant Net International Migration Series (NP2009-T2-C), December 16, 2009, www.census.gov/population/www/projections/2009cnmsSumTabs.html. Accessed August 23, 2010.

7 US Census Bureau, Population Division, Table 4-C. Projections of the Population by Sex, Race, and Hispanic Origin for the United States: 2010 to 2050 Constant Net International Migration Series (NP2009-T4-C), December 16, 2009, www.census.gov/population/www/projections/2009cnmsSumTabs.html. Accessed August 23, 2010.

8 Jeffrey S. Passel and D'Vera Cohn, *A Portrait of Unauthorized Immigrants in the United States* (Washington, DC: Pew Hispanic Center, 2009), http://pewhispanic.org/files/reports/107.pdf.

9 Joyce A. Martin, Brady E. Hamilton, Paul D. Sutton, Stephanie J. Ventura, T.J. Mathews, Sharon Kirmeyer, and Michelle J.K. Osterman, *National Vital Statistics Reports* 58, Births: Final Data for 2007, Table 8. Total fertility rates, fertility rates, and birth rates by age and Hispanic origin of mother and by race for mothers of non-Hispanic origin: United States, 1989-2007 (Atlanta: Centers for Disease Control and Prevention, 2010): 24, www.cdc.gov/nchs/data/nvsr/nvsr58/nvsr58_24.pdf.

10 See Hoefer, Rytina, and Baker, Estimates of the Unauthorized Immigrant Population Residing in the United States: January 2009.

11 Samuel H. Preston, Patrick Heuveline, and Michel Guillot, Demography: Measuring and Modeling Population Processes, (Blackwell: Oxford, 2001).

12 Ibid: 119.

13 See Hoefer, Rytina, and Baker, Estimates of the Unauthorized Immigrant Population Residing in the United States: January 2009.

14 Martin et al, National Vital Statistics Reports 58 Births: Final Data for 2007, Table 8.

15 Ibid.

16 Elizabeth Arias, National Vital Statistics Reports 58, United States Life Tables, 2006 (Atlanta; Centers for Disease Control and Prevention, 2010): 21, www.cdc.gov/nchs/data/nvsr/nvsr58/nvsr58_21.pdf.

17 Jennifer Van Hook and Weiwei Zhang, "Who Stays? Who Goes? Selective Emigration Among the Foreign Born" in Population Research and Policy Review, April 24, 2010 www.springerlink.com/content/mvqx3h126702x152/.

## About the Authors



Jennifer Van Hook is Professor of Sociology and Demography and research associate of the Population Research Institute at The Pennsylvania State University. She conducts demographic research on the settlement and incorporation patterns of US immigrants, with one strand of her work focusing on illegal immigration. Her work also focuses on the social, economic, and health assimilation of immigrants and their descendents.

Dr. Van Hook received her Ph.D. in Sociology from the University of Texas at Austin, and has held positions at the Urban Institute and Bowling Green State University before joining the faculty at Penn State. She serves on the Board of Directors of the Population Association of America and the Census Scientific Advisory Committee. She is a Migration Policy Institute Nonresident Fellow



Michael Fix is Senior Vice President and Director of Studies at the Migration Policy Institute (MPI), as well as the Co-Director of MPI's National Center on Immigrant Integration Policy. His work focuses on immigrant integration, citizenship policy, immigrant children and families, the education of immigrant students, the effect of welfare reform on immigrants, and the impact of immigrants on the US labor force.

Mr. Fix, who is an attorney, previously was at the Urban Institute, where he directed the Immigration Studies Program from 1998 through 2004. He is a Research Fellow with IZA in Bonn, Germany.

Mr. Fix received a JD from The University of Virginia and BA from Princeton University. He did additional graduate work at the London School of Economics.

## M O R E F R O M M P I :

The Migration Policy Institute (MPI) is an independent, nonpartisan, nonprofit think tank dedicated to the study of the movement of people worldwide. The institute provides analysis, development, and evaluation of migration and refugee policies at the local, national, and international levels. It aims to meet the rising demand for pragmatic responses to the challenges and opportunities that migration presents in an ever more integrated world. MPI produces the Migration Information Source, at www.migrationinformation.org.

This Insight is the latest publication from the Migration Policy Institute's National Center on Immigrant Integration Policy.

The Center exists to:

- *Focus needed attention.* We work to bring often-overlooked issues of immigrant integration to the fore of national and local debates, promoting constructive solutions that will build stronger, more cohesive, and more successful communities.
- *Set the record straight.* We provide an unbiased look at the needs, costs, and contributions of immigrants and provide a balanced analysis of the integration policy options facing local communities and our nation.
- *Organize and strengthen a nascent field.* Groups and individuals tackling integration issues often work in isolation, unable to leverage their expertise and energy into more systemic outcomes. We connect them to one another, inform and nurture their efforts, and promote the entry of new actors into integration policy and its various subfields.
- *Identify and promote effective policies and practices.* The need for expertise has only grown with migration to "new destination" states, the continuing debate over illegal immigration, and more urgent concerns about the competitiveness of US workers and products in a globalized economy. We provide the research, data, and ideas that add value to stakeholders' own efforts and guide them toward effective policies and practices.

For more information, visit:

www.migrationpolicy.org/integration




1400 16th Street NW
Suite 300
Washington, DC 20036

202 266 1940
202 266 1900 (fax)

www.migrationpolicy.org
www.migrationinformation.org