# EXHIBIT 12



# Ten Years After a Fateful Court Decision, the Dominican Republic Still Has a Statelessness Problem

Kevin Appleby
October 23, 2023



Share:   

# Related Content

 **Examining the Impact of Community Sponsorship on Early Refugee Labor Market Outcomes in the United States**

 **Keynote Address by Eric Schwartz, President of Refugees International – 2021 Virtual Academic & Policy Symposium**

 **The Texas Landscape: Accounting for Migrant Mortality and the Challenges of a Justice of the Peace Medicolegal System**

On September 23, 2013, the Constitutional Tribunal of the Dominican Republic issued a decision that would adversely impact as many as 245,000 Dominicans, depriving them of nationality and citizenship. The court decision (TC-168-13) overturned the principle of *jus soli,* or birthright citizenship, for the children of foreign-born parents and applied it *retroactively* to 1929.

The decision largely impacted Dominicans of Haitian descent—children of Haitian parents—who made up 86 percent of the persons affected. The decision also has impacted the children of the deprived Dominicans, making statelessness generational. Ten years later, as many as 130,000 Dominicans remain stateless and are unable to gain Dominican citizenship, despite the passage of a law in 2014 to correct the court decision and condemnation by the Inter-American Commission on Human Rights.

Public Law 169-14 provided a path to citizenship for the stateless, dividing the population into two groups—those who were registered at birth (Group A) and those without birth registration documents (Group B). The persons in Group A were only required to apply and take the citizenship oath, while the law set up a naturalization process for Group B.

At the same time, the Dominican government has increased the number of deportations of both Haitians and Dominicans of Haitian descent, with as many as 120,000 deported since November 2022. During this period, Dominican enforcement officials have conducted night time raids in local communities ("bateyes") and committed human rights abuses against Dominicans of Haitian descent and Haitians. After staying in detention, the deportees, including women and children, are "dumped"on the other side of the border in Haiti, where they face the danger of gangs and extreme poverty. Some of the deportees are the exact persons who qualify for Dominican citizenship under the 2014 law and have never been to Haiti.

Why is the Dominican government not addressing the statelessness problem in their country? In short, there is a lack of political will, due in part to opposition to it among Dominican citizens and some elected officials.

President Luis Abinader, who is up for re-election in 2024, has attempted to address migration issues during his presidency, including by issuing a presidential proclamation calling for the naturalization of certain cases and by attempting to pass an anti-human trafficking law, but has been met with strong opposition from right-wing political opponents.

Bending to the opposition and preparing for his re-election campaign, he has increased enforcement against Haitians and Dominicans of Haitian descent, as evidenced by the night time raids. Vulnerable women and children have been included in this sweep, with reports of children being separated from their parent(s). In response to international pressure, Dominican authorities only recently halted the raids in certain areas of the country.

Abinader also recently partially shut down the Dominican-Haitian border over a water dispute, preventing Haitians from entering the country. He also has stopped issuing visas to Haitians. Some observers have charged that the water dispute is a ruse for shutting down the border for the purpose of migration control.

The Dominican government has an incentive to correct this problem and naturalize Dominicans of Haitian descent, while also treating Haitian migrants with dignity. As with any democratic nation, they want to be viewed as a member in good standing in the international community that respects human rights. In early 2024, the UN Human Rights Council is expected to conduct a Universal Periodic Review of the Dominican Republic's human rights record, which is shared with the international community. A bad review would increase the criticism of the Dominican government in diplomatic circles.

Additionally, 2024 is the year that the United Nations High Commissioner for Refugees (UNHCR) has designated as the year to end statelessness. It would be embarrassing if the Dominican government had not made progress in this area. The nation also is scheduled to host the Summit of the Americas

And finally, the Dominican government would like to maintain strong diplomatic and economic relations with one of its biggest trading partners—the United States. During the recent spate of deportations, US citizens of color were part of the round ups, prompting the United States to issue a travel warning to African-Americans not to travel to the Dominican Republic. After agriculture, tourism is the largest industry in the country, and the Dominican economy would be hurt with a reduction in tourism from the United States.

There are steps the Dominican government could take, both in the short-term and long-term, to reduce, if not eliminate, statelessness in their country:

**Halt the deportations of Dominicans of Haitian descent who would qualify for citizenship under the 2014 law, a goal which can be achieved by better screening deportees.** The Dominican government does not routinely employ due process procedures before an individual is deported, or apply a credible fear screening to those who may be fleeing persecution. If an individual has no documentation, then they can be deported. Even if an individual has some identification documents, Dominican authorities have, in some cases, confiscated them and still deported the individual. Using records on file, the government should establish a list of individuals who qualify for naturalization who should not be deported.

**Resolve the cases of Dominicans of Haitian descent who qualify for citizenship but have not been processed or have not yet applied.** There are an estimated 64,000 persons who may have qualified for citizenship but either were unable to complete the process or did not apply, likely because they were unaware of their eligibility. The Dominican government should reopen the naturalization process for those who did not apply and expedite the cases that were initiated and that have not yet finished the process. At a minimum, the government should resolve the 799 cases in Group B authorized for naturalization by presidential proclamations in 2020 and 2022.

**Provide relief for the children of stateless persons, who have no future in the Dominican Republic without it.** They are unable to obtain identification documents which allow them to access formal education and employment, thus hurting their development and future. Ideally, the Constitutional Court should reverse its 2013 decision, allowing birthright citizenship for the children of Dominican citizens, no matter the nationality of the parents. If it is not reversed, the country will continue to have a statelessness problem moving forward and have a two-tiered society.

In response to international criticism, the Dominican government has called the situation with Haiti as unique and challenging, arguing that a failed state on its border requires vigilance and migration laws which can protect its population. Dominican officials state that they cannot address the migration issue alone, arguing that the international community should do more to stabilize Haiti economically and politically. In addition, they claim that any positive movement on immigration, including naturalizing the stateless population, could create a magnet for Haitians to migrate to the Dominican Republic.

There are other steps the United States can take to assist both Haiti and relieve any pressure on the Dominican government, as follows:

**The United States should stop the deportation of Haitians from the United States to Haiti and again re-designate and extend Temporary Protected Status (TPS) for Haiti.** The first recommendation is to "do no harm," by not deporting Haitians back to Haiti until the country is stabilized. Deportations from the United States back to Haiti currently only contribute to the instability of the situation and place Haitians in harm's way. The United States also should re-designate TPS for Haiti so more recent arrivals may qualify for this status, and continue extending it until it is safe to return to the country.

**The United States should provide human rights training to immigration officers and police involved in deportations.** The United States and United Nations officials should help the Dominican government in training their enforcement officers on the proper use of force and other enforcement tactics, consistent with the Code of Conduct for Law Enforcement Officials, established by the UN Human Rights Council in 1979.

**The United States should consider the establishment of in-country processing for vulnerable Haitians and Dominicans of Haitian descent.** The US government should assist the Dominican government by resettling a certain number of Haitians and Dominicans of Haitian descent, or stateless persons in the Dominican Republic, with assistance from UNHCR and the International Organization for Migration (IOM). This would help the Dominican government better manage migration flows into their country. Such an action, however, would not relieve the Dominican government from its duty to improve its refugee protection system.

**The United States should provide the resources, where practicable, to help the Dominican government reform its immigration system to meet international human rights standards.** The reform of any immigration system, no matter the nation, requires financial resources to update processing systems, improve detention conditions, and train and support immigration personnel. The United States should provide targeted assistance to help the Dominican government undertake the reform of its system in these areas.

The Dominican Republic is at a crossroads in how it handles the situation of stateless Dominicans and Haitian migrants in their country. They can no longer ignore the problem. With the help of the United States, the Dominican government can make improvements in its system and improve their global standing in the area of human rights.

October 23, 2023

**Research and Policy**
Data
Reports
Briefings
International Migration Review
Journal on Migration and Human Security

**Latest Insights**
Migration Update
Dispatches and Reflections
Multimedia
Other Resources and Publications

**Events**

**About**
Initiatives
Board
Team
Careers
Archive
Contact

**The Center for Migration Studies (CMS)**
CMS is a member of the Scalabrini International Migration Network (SIMN).

     

Donate     Subscribe

Website designed and developed by **IndieTech Solutions**

**Privacy Policy**

© 2025 The Center for Migration Studies (CMS). All Rights Reserved.