# EXHIBIT 13



European
Network on
Statelessness

# INVISIBLE
# KIDS

## Childhood statelessness in the UK



**July 2021**

**INVISIBLE KIDS**
Childhood Statelessness in the UK

# Acknowledgements

This report was drafted for the European Network on Statelessness (ENS) by Cynthia Orchard and edited by Andie Lambe and Nina Murray. Research for the initial phase of the project was conducted by Jessie Seal. The report forms part of a project coordinated by ENS and funded by the Paul Hamlyn Foundation. ENS is particularly grateful to the Paul Hamlyn Foundation for its support, and to its UK members who provided written evidence and informed the research through interviews and correspondence. We are also grateful to the many other professionals and parents of stateless children consulted through remote interviews and emails, all during the COVID-19 pandemic. All names attributed to case studies have been changed to protect anonymity.


European Network on Statelessness

# Contents

Glossary                                      4

1. Introduction                               5

2. Summary of key findings                    8

  2.1  Key groups of children affected by
  statelessness in the UK                     8

  2.2  Key causes of (risk of) childhood
  statelessness in the UK                     8

  2.3  Key emerging challenges relating
  to childhood statelessness in the UK        9

3. Previous research,
publications, and advocacy on
stateless children in the UK                 10

4. International, regional,
and domestic law and policy
framework                                    12

  4.1  International and regional law and
  standards                                   12

  4.2  UK law and policy                      15

    4.2.1 British Nationality Law           15

    4.2.2 Jurisprudence relating to
    stateless children's acquisition of
    nationality                             16

    4.2.3 Immigration routes for some
    stateless children in the UK            17

5. Challenges relating to
childhood statelessness in the UK            20

  5.1  Lack of data on stateless children
  in the UK                                   20

  5.2  Lack of awareness of
  statelessness                               23

  5.3  Uncertainty about how to resolve
  statelessness and routes to British
  citizenship                                 24

  5.4  Difficulties accessing competent
  legal advice and the difference it
  makes                                       24

  5.5  Difficulties proving nationality or
  statelessness                               25

  5.6  Barriers to registration with
  parents' country of nationality             26

  5.7  Practical barriers to British
  citizenship for stateless children          27

  5.8  The impact of poverty and hostile
  environment measures                        27

  5.9 The potential impact of Brexit          28

  5.10 Lack of focus on children's best
  interests                                   29

6. Good practices from other
countries                                    29

7. Recommendations                           31

8. Conclusions                               34

9. References                                36

**INVISIBLE KIDS**
Childhood Statelessness in the UK

# Glossary

## Stateless person

'Stateless person' has a legal definition in international law, which is 'a person not considered as a national by any State under the operation of its law'. Sometimes it is unclear whether a person is stateless, and statelessness may become evident over time. Being stateless is not the same as being undocumented (see also 'Undocumented').

## At risk of statelessness

'At risk of statelessness' does not have a legal definition. We use this term to refer to people who may not be stateless at present but may become stateless due to circumstances that can cause statelessness. Sometimes it is unclear whether a person is stateless, and statelessness may become evident over time.

## Undocumented

A person who does not fulfil the requirements established by a host country or country of destination to enter, stay, or exercise an economic activity is defined as an 'undocumented migrant'. The term 'undocumented' may also be used to refer to a person who lacks any documentary proof of their legal status in a country. Being undocumented is not the same as being stateless (see also 'Stateless Person').

## Indefinite Leave to Remain

Permission to stay in the UK, with no time limit (equivalent to permanent residence).

## Leave to Remain

Permission to stay in the UK (equivalent to temporary residence for a limited time).

## Nationality/Citizenship

We use these terms interchangeably in this report to mean the legal bond through which a person is considered to belong to a State.

## *Jus sanguinis*

Citizenship that is acquired by descent, through one's parents.

## *Jus soli* or birthright citizenship

Citizenship that is acquired automatically by birth on a territory.

## Registration

One of the processes by which a person becomes a British citizen. Registration applies mainly to children and a few adults and is sometimes by entitlement and sometimes discretionary (see also 'Naturalisation').

## Naturalisation

One of the processes by which a person becomes a British citizen. In the UK, naturalisation is always discretionary and applies only to adults.

### Separated children

Children under 18 years of age who are outside their country of origin and separated from both parents or their previous legal/customary primary caregiver.

### Unaccompanied children

Children under 18 years of age who have been separated from both parents and other relatives and are not being cared for by an adult who, by law or custom, is responsible for doing so.

### Minor

For the purposes of this report, unless otherwise stated, a minor is a child under 18 years of age.



**IN**VISIBLE KIDS
**Childhood Statelessness in the UK**

# 1. Introduction



[M]any [stateless] children born in the UK may have no idea they are stateless and not British citizens already. Unless and until they apply for a passport or need to prove their status in the UK, there is no reason why they would know.[1]



Many children would love to have the power to become invisible. It is a cool superpower. But ENS has documented the ways in which many children around Europe are invisible to much of society because they lack the nationality of any country.[2] They are not counted or accounted for. We do not know how many children in the UK are stateless or at risk of statelessness. Studies have estimated that more than 200,000 children are living in the UK 'irregularly', meaning they have no British citizenship or permission to remain in the UK,[3] but this does not tell us how many lack any citizenship.

Childhood statelessness in the UK is not currently adequately understood by government officials, legal practitioners, judges, politicians, policy advocates, frontline service providers, local authority staff, and others. Many people think that the UK has 'birthright' (or '*jus soli*') citizenship, meaning any child born in the UK is automatically a citizen at birth. However, this has not been the case since the *British Nationality Act 1981* came into effect in 1983.[4] Children born in the UK do not automatically acquire British citizenship unless they are born to at least one British citizen parent or at least one parent who was 'settled' at the time of their birth.[5] Many countries' nationality laws

do not provide for automatic acquisition of nationality for children born to their nationals abroad. Often, registration is required, and unless registration takes place, the child is not a national. This, and other circumstances explored in this report, can leave some children born in the UK stateless.

There are several routes to British citizenship for stateless children in the UK, but these are not widely known or understood. Even when stateless children or their families access legal advice this may be costly, not necessarily specialist, and may focus on securing Leave to Remain rather than citizenship, so statelessness may not be identified. Even when an entitlement to British citizenship is identified, the fees for a child to register as a British citizen – currently over £1,000 per child, with no exceptions or reductions – prevent some children from accessing British citizenship. One stateless man from Kuwait estimated that it would cost his family of two adults and seven children – all stateless – around £10,000 in Home Office fees to acquire British citizenship, which he would never be able to afford.[6]

In June 2020, with the support of the Paul Hamlyn Foundation, ENS set out with its UK

members[7] to better understand the causes of childhood statelessness in the UK, the children affected, the consequences for them and their families, and what action could be taken to help prevent and reduce childhood statelessness in the UK. The first phase of the project sought to identify key groups of children and young people who are stateless or at risk of statelessness in the UK (recognising the potential intersections between different groups), to learn more about the routes to British citizenship for stateless children in the UK, and to identify the main barriers to stateless children acquiring British citizenship. To do this, between June 2020 and May 2021, we undertook a literature review, conducted desk-based research, and consulted a range of stakeholders with expertise in issues relating to children's rights, migration, refugees, and stateless persons. This included legal and policy experts, frontline professionals, and representatives of communities affected by statelessness in the UK. We also commissioned case reviews from ENS members who provide legal advice to stateless children and families and circulated a survey via legal practitioners and community networks. It is worth noting that many organisations we approached for information have faced capacity difficulties during this period with a myriad of urgent issues arising due to the COVID-19 pandemic, which affected the research process.

This report is published soon after the *Nationality and Borders Bill* was laid before the UK Parliament on 6 July 2021 following publication of the UK Government's *New Plan for Immigration* in March 2021.[8] As introduced, the Bill proposes to amend aspects of British nationality law, including the provision entitling stateless children born in the UK to acquire British citizenship.[9] At this crucial time of immigration, asylum, and nationality law reform in the UK, this report presents the findings of our scoping work with the aim of contributing to the evidence base on childhood statelessness in the UK, raising awareness about who may be affected, supporting those working with children and young people to identify and respond to statelessness, and advocating for

evidence-based solutions to prevent and reduce childhood statelessness in the UK. Section 2 summarises the key themes and affected groups emerging from the research; Section 3 summarises previous research, publications, and advocacy relating to stateless children in the UK; Section 4 sets out relevant international, regional, and domestic law, policy, and jurisprudence; Section 5 presents the challenges relating to childhood statelessness in the UK identified in our research; Section 6 provides an overview of good practices from other countries; and the final sections present our conclusions and key recommendations for action to further prevent and reduce childhood statelessness in the UK.



**IN**VISIBLE KIDS
Childhood Statelessness in the UK

# 2. Summary of key findings

## 2.1 Key groups of children affected by statelessness in the UK

Some children in the UK are more commonly known to be stateless due to their parents belonging to recognised stateless populations (for example, Palestinians, Rohingya, Kuwaiti Bidoon, or some Kurds).[10] Their families may have been stateless for generations, or at least were stateless prior to arriving in the UK as refugees or migrants. However, our research indicates that there are also other groups of children in the UK who may be stateless or at risk of statelessness, but whose nationality issues are not well known. For example, some children in State care have been identified as being at risk of statelessness, particularly (but not always) where they have a migrant background. Issues may arise where parental cooperation is required for a child in care to acquire a nationality, but parents are unavailable or not cooperative, or where parents or children lack documentation proving family links or nationality. Our research also indicates that some children of Roma families from European countries may be stateless or at risk of statelessness, for example, where parents entered the UK prior to their country of origin joining the EU, their residence status remains insecure, and they are now unable to prove their links to that country. A nexus was also identified between (risk of) statelessness and children affected by domestic abuse, trafficking, and other forms of exploitation due to the inability to access proof of identity and/or nationality.

## 2.2 Key causes of (risk of) childhood statelessness in the UK

Some of the situations identified in our research as giving rise to (a risk of) childhood statelessness include:

- Children of parents who are stateless or who cannot evidence their nationality.

- Children of a mother who cannot transmit her nationality due to sex-discriminatory laws in her country of nationality where the father is stateless, absent, unknown, or deceased.

- Children in State care whose nationality is unclear or who cannot prove any nationality.

- Children affected by domestic abuse where identity or nationality documents are inaccessible.

- Children of refugees from countries where nationality does not transmit automatically to children born abroad, whose parents cannot contact the authorities of their country for reasons relating to persecution.

- Children whose births were not registered (whether born in the UK or elsewhere).

- Children who are unable to register as nationals of their parents' country of nationality due to lack of access to parents' documents.

- Children whose parents were not married when they were born and where the parents' nationality could not be transmitted to children born out of wedlock.

- Children in migration born in transit (where their place of birth is neither the parents' country of nationality nor the country of current residence) where the country of birth has residence requirements for a child to acquire nationality and parents cannot transmit a nationality to the child.

- Children who have been trafficked, or who have a parent who was trafficked, where they do not have and cannot access documents of their own.

- Children whose parents or carers fail to register them as nationals of another country and the deadline to do so expires (for example, because they lack knowledge or literacy skills or finances to do so).

- Children whose parents entered the UK before their country of nationality joined the EU, where the family's status remains insecure and/or the child's nationality is unclear.

- Children who do not have another nationality and are unable to access British citizenship because their parents or carers cannot afford to pay the Home Office fee.

- Children of same-sex couples where one or both parents are nationals of a country that does not recognise same-sex partnership or marriage and refuses to issue the necessary documents to confirm or prove the child's nationality.

- Children born as a result of surrogacy arrangements where a parent is a national of a country that does not permit nationality to transmit through surrogacy.

It is important to note that many of these circumstances do not necessarily result in a child being stateless. However, when a child's nationality is unclear or undocumented, and their nationality status remains unaddressed, there is a risk that they are or could become stateless. Often, it is a combination of some of these circumstances that results in statelessness.

## 2.3 Key emerging challenges relating to childhood statelessness in the UK

Stakeholders identified several key challenges and concerns relating to childhood statelessness in the UK, which are explored in Section 5 of this report. These included a lack of awareness of statelessness among parents and professionals responsible for children and an uncertainty about how to resolve statelessness and routes to British citizenship. They also highlighted difficulties accessing competent legal advice, and the difference this makes when it is secured for children and families, as well as practical barriers to British citizenship such as very high registration fees. Some practitioners noted the difficulty and burden of proving statelessness in immigration and nationality procedures, although others felt that in the case of children, government officials may be more likely to exercise discretion. Several stakeholders identified barriers to registering children with parents' country or countries of nationality, including complex procedures, discrimination, lack of awareness of requirements, missing or flawed documents, and the need for parental consent where this is unavailable. Others noted the impact of poverty and 'hostile environment' measures on children with insecure legal status, the potential impact of Brexit to cause or exacerbate problems relating to childhood statelessness, and the need for more and better data relating to stateless children in the UK.

**INVISIBLE KIDS**
Childhood Statelessness in the UK

# 3. Previous research, publications, and advocacy on stateless children in the UK

At the heart of ENS's strategy is an understanding of the need to raise awareness about statelessness, support law and policy development and build civil society's capacity to act. Since 2014, ENS and its members have carried out research, awareness-raising, capacity-building, and law and policy development activities addressing childhood statelessness and advocating for every child's right to a nationality across Europe.[11] This has included a pan-European #StatelessKids campaign, and publishing several reports relating to childhood statelessness in Europe, including, No Child Should be Stateless,[12] No Child Should Be Stateless: Ensuring the Right to a Nationality for Children in Migration in Europe,[13] and Literature review and mapping study: risks of statelessness among the children of refugees in Europe.[14]

This is the first time ENS is coordinating a project specific to stateless children in the UK, but we have worked with our UK members on research and advocacy publications, including a 2016 report on the immigration detention of stateless people in the UK;[15] a joint submission on statelessness in the UK to the Universal Periodic Review in 2016;[16] and a joint submission to the UN Committee on the Rights of the Child on childhood statelessness in the UK in 2020.[17] ENS's most recent publication on childhood statelessness in the UK was its submission to the UK Government Home Office Consultation on its New Plan for Immigration.[18] We also cover issues relating to the prevention and reduction of statelessness, including childhood statelessness, in our Statelessness Index, which is an online comparative tool assessing European countries' law, policy, and practice on statelessness against international norms and good practice. Extensive resources and information on the UK are available in the Index,

which is updated annually.[19] Several blog articles relating to stateless children in the UK have also been published on the ENS blog.[20]

During the scoping phase of this project, we reviewed numerous publications by organisations working in the migrant, refugee, statelessness, and child rights sectors in the UK. This review confirmed that, to date, little attention has been paid specifically to childhood statelessness in the UK. There has been some research on the wider issue of statelessness in the UK. For example, the United Nations High Commissioner for Refugees (UNHCR) and Asylum Aid published a mapping study of statelessness in the UK in 2011.[21] In 2018, the University of Liverpool Law Clinic published a report on the implementation of the UK's statelessness determination procedure.[22] In 2020, UNHCR published a report on its audit of the UK's statelessness determination procedure,[23] and in 2021 a participatory study with stateless people in the UK.[24]

There have also been numerous research projects relating to undocumented migrants living in the UK, 'unreturnable' people who cannot leave or be removed from the UK, and children who have no immigration or residence status in the UK. Some of the resulting reports include reference to stateless children and/or children impacted by their parents' statelessness or unclear nationality, but the reports do not always identify statelessness per se.[25]

There are also various publications relating to children's right to British citizenship, including brief articles and fact sheets relating specifically to stateless children. For example, The Project for the Registration of Children

as British Citizens (PRCBC) and Amnesty International UK have published several reports and briefings relating to children's rights to British citizenship.[26] A short article, *No State to Be In*, gives a brief overview of the laws and policies relevant to stateless children in the UK.[27] Coram Children's Legal Centre fact sheets explain the rights of stateless children and children's entitlement to British citizenship.[28]



**IN**VISIBLE KIDS
Childhood Statelessness in the UK

# 4. International, regional, and domestic law and policy framework

## 4.1 International and regional law and standards

Article 15 of the *Universal Declaration of Human Rights* (UDHR) establishes the right of every individual to a nationality – a fundamental right which affects the ability to enjoy numerous other human rights.[29] This right is enshrined in various international and regional treaties to which the UK is a State party.[30] The UK has acceded to the two core UN treaties dealing with statelessness, the *Convention Relating to the Status of Stateless Persons* (1954 Convention)[31] and the *Convention on the Reduction of Statelessness* (1961 Convention).[32] However, it maintains some reservations or made declarations to these treaties, and neither convention has been fully incorporated into domestic law. The 1954 Convention provides the definition of a stateless person (which is also part of international customary law) and sets out the rights and standards of treatment for stateless persons.

Under Article 1(1) of the 1954 Convention, a stateless person is someone *'who is not considered as a national by any State under the operation of its law'*. The phrase 'under the operation of its law' means legislation, judicial interpretations, government directives and policies, and the way the law operates in practice. *UNHCR's Handbook on Protection of Stateless Persons* provides detailed guidance on how the 1954 Convention should be interpreted.

The 1961 Convention seeks to prevent statelessness from occurring, and to ensure remedies for it when it does exist. It sets out detailed rules and guidance for States parties to ensure their nationality laws contain full legal safeguards to prevent statelessness at birth and later in life.

Under Article 1(1) of the 1961 Convention, a contracting State is required to *'grant its nationality to a person born in its territory who would otherwise be stateless.'* The Convention provides two options for States either to grant nationality *'at birth, by operation of the law'* or *'upon an application'*. Article 1(2) provides an exhaustive list of the only conditions under which a State may reject such an application:

a) the State must allow a period of time during adulthood during which a nationality application can be made by a stateless child without parental consent but can impose a cut-off age by which applications must be made;

b) the State can require that the applicant has *'habitually resided'* in the State for a certain period of time, not more than five years immediately preceding the lodging of the application nor ten years in all;

c) the State can require that the applicant has not been *'convicted of an offence against national security nor has been sentenced to imprisonment for a term of five years or more on a criminal charge'*; and

d) the State can require that *'the person concerned has always been stateless'*.

The UK is also State party to the *Convention on the Rights of the Child (CRC)*,[33] which protects every child's right to a legal identity and a

nationality (Article 7) and requires States to consider children's best interests as a primary consideration in all actions concerning them (Article 3). In addition, Article 2 prohibits discrimination, including on grounds relating to the status of a child's parents, and Article 12 requires respect for the views of the child. The CRC requires that States give considerable weight to a child's views and best interests in relation to decisions about the nationality of a child and their family members.[34] The UN Committee on the Rights of the Child, which oversees compliance with the CRC, has issued many recommendations to States relating to a child's right to nationality.[35] The CRC is being incorporated into domestic law in Scotland,[36] but is not incorporated in other UK jurisdictions.

The UK is also State party to the *European Convention on Human Rights*,[37] which guarantees freedom from inhuman and degrading treatment or torture (Article 3), the right to respect for private and family life (Article 8), and the prohibition of discrimination (Article 14). The European Court of Human Rights has issued several judgments confirming that legal identity and nationality form part of a person's private life, and that statelessness is relevant to considerations of respect for private life. In addition, it is clear that in some situations, where it is linked to inhuman or degrading treatment, statelessness can implicate Article 3 rights.[38]

The United Nations General Assembly has given UNHCR a mandate to protect stateless persons around the world. Under that mandate, UNHCR issues guidelines and advises States how to interpret international law relating to stateless persons. *UNHCR's Guidelines on Statelessness No 4: Ensuring Every Child's Right to Acquire a Nationality through Articles 1-4 of the 1961 Convention on the Reduction of Statelessness* provide guidance on how the 1961 Convention should be interpreted with respect to children.[39] These guidelines should be given considerable weight, as they are issued in accordance with UNHCR's mandate to protect stateless persons.

Key points in UNHCR's Guidelines include (our emphasis throughout):

**(Paras. 18 & 21)**

*'The term 'would otherwise be stateless' means that the child would be stateless unless a Contracting State with which he or she has a link through birth in the territory or birth to a national of that State grants that child its nationality.'* To determine this, a decision-maker must assess all relevant evidence, including any statements of the child concerned and/or his or her parents or guardians, the laws and practices of the countries of possible nationality, and relevant documents such as birth certificates, identity documents, correspondence with diplomatic missions of other States, and interviews or testimony.

**(Para. 19)**

Refusal to recognise a person as a national may occur either when a State explicitly declares that the person is not a national or if the State fails to respond to inquiries seeking to confirm whether the individual is a national.

**(Paras. 24-26)**

Under certain limited circumstances, a State is not required to grant its citizenship to children born on its territory, even if they would otherwise be stateless. If the child could acquire a nationality by declaration or registration with a parent's State of nationality, then the State in which the child was born is not required to grant its citizenship to the child if:

- *'the child concerned can acquire the nationality of a parent immediately after birth'*; and
- *'the State of nationality of the parent does not have any discretion to refuse the grant of nationality'*; and
- The child's parents are in fact able to register the child with the State of their nationality; and

**INVISIBLE KIDS**

**Childhood Statelessness in the UK**

---

- There are no good reasons why the parents of the child do not wish to register the child with the State of their nationality. State authorities must consider '*whether an individual could reasonably be expected to take action to acquire the nationality in the circumstances of their particular case.*'

**(Paras. 20-21)**

'*Because of the difficulties that often arise when determining whether an individual has acquired a nationality, the* burden of proof must be shared *between the claimant and the authorities of the State to obtain evidence and to establish the facts as to whether an individual would otherwise be stateless. The claimant and his or her parents/guardians have the responsibility to cooperate and to provide all documentation and information reasonably available to them while the relevant authority is required to obtain and present all relevant evidence reasonably available to it.*' Additional procedural and evidentiary safeguards for child claimants include the assumption of a greater share of the burden of proof by the State.

**(Para. 48)**

If a State requires that a child has 'always been stateless' to acquire its nationality, '*there is a presumption that the applicant has always been stateless and the burden rests with the State to prove the contrary.*'

**(Para. 21)**

A State's decision-makers must apply the CRC and '*adopt an* appropriate standard of proof, *for example, that it is established to a 'reasonable degree' that an individual would be stateless unless he or she acquires the nationality of the State concerned. Requiring a higher standard of proof would undermine the object and purpose of the 1961 Convention.*' States need to adopt special procedures to address the challenges faced specifically by children, especially unaccompanied children.

**(Paras. 27-28)**

Refugee parents must not be expected to register their children as a national of their country of nationality, owing to the very nature of refugee status which precludes refugee parents from contacting their consular authorities.

**(Paras. 53-54)**

Where a State's laws provide for stateless children born in the territory to be registered through an application procedure, the State is '*obliged to provide detailed information to parents* of children who would otherwise be stateless about the possibility of acquiring the nationality, how to apply and the conditions which must be fulfilled.*' This information must be provided directly to the parents – general information is not enough. States are encouraged not to charge a fee for applications to register a stateless child as a national, and an applicant's inability to pay a fee must not prevent an eligible stateless child from registering as a national of the State of their birth.

## 4.2 UK law and policy

### 4.2.1 British Nationality Law

There are six different types of British nationality. These are:

- British citizenship
- British overseas territories citizen
- British overseas citizen
- British subject
- British national (overseas)
- British protected person

If you hold British citizenship, you can live and work in the UK free of any immigration controls and get a UK passport. The other categories of British nationality have a variety of qualifying criteria and mean you can hold a British passport and get consular assistance and protection from UK diplomatic posts. However, unless you are also a British citizen, you are subject to immigration controls and do not have the automatic right to live or work in the UK.[40]

A child born in the UK will be a British citizen automatically at birth if at least one parent is a British citizen or 'settled' in the UK before the child is born. Any other child must either apply for British nationality or be able to acquire nationality of another State to avoid being stateless at birth. The main provision of British nationality law which, based on the 1961 Convention, entitles a child born stateless in the UK to register as a British citizen, is found in the British Nationality Act (BNA) Schedule 2 Paragraph 3,[41] which states that:

> A person born in the United Kingdom or a [British overseas territory] after commencement [of the BNA] shall be entitled, on an application for his registration under this paragraph, to be so registered if the following requirements are satisfied in his case, namely—
> (a) that he is and always has been stateless; and

> (b) that on the date of the application he was under the age of twenty-two; and
> (c) that he was in the United Kingdom or a [British Overseas Territory] at the beginning of the period of five years ending with that date and that (subject to paragraph 6) the number of days on which he was absent from both the United Kingdom and the [British Overseas Territories] in that period does not exceed 450.

In its March 2021 New Plan for Immigration (NPI) Policy Statement, the UK Government proposed to amend this provision and the new Nationality and Borders Bill laid before Parliament on 6 July 2021 seeks to do just that. In our submission to the NPI Consultation in May 2021, ENS recommended that no amendment is made to this provision without a further detailed, independent study and a comprehensive impact assessment of any potential amendment on children in the UK who are stateless or at risk of statelessness. We noted that the Home Office did not publish any evidence to justify its stated rationale for amending the provision, nor indicate that it had undertaken any assessment of the impact of such an amendment on stateless children. We are therefore concerned to see changes proposed in the new Bill, which would subject stateless minors born in the UK to additional obstacles to acquiring British citizenship.[42]

There are various other provisions of British nationality law through which a stateless child, who does not automatically acquire British citizenship at birth, may be entitled to British citizenship or registered as a citizen under discretionary powers, including (but not limited to):

1. **BNA Section 1(3):** Children (whether stateless or not) who were born in the UK are entitled to register as British if they have a parent who becomes British or 'settled' in the UK. The child must apply while still a minor.

2. **BNA Section 1(4):** Children (whether stateless or not) who were born in and lived

**INVISIBLE KIDS**
Childhood Statelessness in the UK

in the UK for the first 10 years of their lives are *entitled* to register as British citizens and there is no age limit under this provision.

3. **BNA Section 3(1):** Children (whether stateless or not) who were not born in the UK can apply to register as British citizens. Section 3(1) is not based on entitlement, but it gives the Home Secretary a *discretionary* power to register a child as British if the 'child's future is clearly seen to lie in the UK'.[43] This application must be made while the child is a minor.

4. **BNA Schedule 2, Paras. 4-5:** Children born outside the UK who are stateless and whose father or mother was a British Overseas/Territories Citizen/Subject are *entitled* to register as British citizens, if certain conditions are met.

Based on Article 3 of the CRC, the *Borders, Citizenship and Immigration Act 2009, Section 55* requires the Secretary of State to *'safeguard and promote the welfare of children who are in the United Kingdom'* in the exercise of immigration and nationality functions.[44] There is a substantial body of jurisprudence relating to this duty (primarily relating to immigration procedures rather than nationality), which requires that the Home Secretary takes into account the best interests of children as a *'primary consideration'* in all decisions affecting children.[45]

## 4.2.2 Jurisprudence relating to stateless children's acquisition of nationality

ENS's *Statelessness Case Law Database* contains summaries of national and regional case law covering Europe, as well as international jurisprudence. The cases either directly concern the rights of stateless people or address other connected human rights issues that impact on people without a nationality, including children's right to a nationality, determination of statelessness or nationality status, and barriers to birth registration. The following subsections of this report analyse some of the relevant case law in the UK.

### 4.2.2.1 Registration of a stateless child as a British citizen - MK India (2017)[46]

The provision for a stateless child to acquire British citizenship (BNA Schedule 2 Para. 3) was examined in a *2017 High Court case*, which concerned a child born in the UK in 2010 to parents who had Indian nationality and no leave to remain in the UK. In 2016, the parents applied to register MK as a British citizen under the statelessness provision of the BNA. The Home Office refused that application on the basis that MK could register as an Indian national and therefore should not be treated as stateless. Judicial review proceedings were brought on behalf of MK. The High Court held that there is no requirement in BNA Schedule 2 Para. 3 that a stateless child has no possibility of acquiring another nationality. So, a child born in the UK who is and always had been stateless, who had an entitlement to the nationality of her parents upon registration, but who had not in fact been registered, was entitled to British citizenship (at age five and if UK residency requirements were met).

The High Court Judge commented on the need for expert evidence of foreign law but found he could make findings relating to acquisition of Indian nationality which indicated that MK could be registered as an Indian national. MK's parents claimed they could not meet all the documentary requirements to register their child with the Indian authorities; but the Judge considered that they had not provided adequate evidence of what those requirements were or that they could not meet them. The Judge also found that although Indian law required permission of the Indian Central Government if the child's birth was registered after the child was one year-old, this was not material nor did it *'imply the exercise of a discretion'*, as permission was *'routinely given'*. The Judge found no evidence of barriers to *'registering a child whom the parents wanted to register'*. In the Judge's opinion, the child could have acquired Indian nationality, but this was not material to the outcome of the case, because there was no requirement in BNA Schedule 2 Para. 3 to show that the child could not

acquire the parents' nationality to be considered stateless.

The Judge confirmed that the key question in determining statelessness is whether the person holds another nationality at the time of determination of statelessness, not whether they could have acquired one had they tried, nor whether they could acquire one in future.[47] He also acknowledged that a person might have good reason for not wishing to acquire a nationality available to him.[48] The Judge also held that the UK Government *'is not entitled to impose requirements that make it impossible for an individual to obtain a benefit that is his by statute'*. This was in reference to a Home Office requirement to produce confirmation from the Indian authorities that a child's birth had not been registered and thus that the child was not a national of India. This could be impossible to prove, as there was no central registry of Indian birth registration or of Indian citizenship.[49] The Judge dismissed general arguments about British citizenship being in the best interests of the child, stating that it is not necessarily against a child's best interests to live in other *'civilised'* countries, nor to move from one place to another. There was no evidence that MK would suffer from not being granted British citizenship (as compared to being granted leave to remain in the UK).[50]

### MK India (2017)

The High Court held that for a stateless child to have an entitlement to British citizenship under BNA Schedule 2 Para. 3, there is no requirement that the child could not acquire another nationality. The child must meet only four requirements:

1. Birth in the UK (or a British overseas territory); and
2. Is (at the time of application) and has always been stateless; and
3. Under 22 years of age on the date of the application; and
4. Has been present in the UK or a British overseas territory for the preceding five years (and not absent for more than 450 days during that time).

#### 4.2.2.2 The Home Office fee for children's British citizenship applications - PRCBC & O v SSHD (2021)[51]

A key barrier to acquiring British citizenship for some stateless children in the UK is the Home Office fee for such applications (over £1,000). Currently, there is no exemption or reduction for children who are stateless or who cannot afford the fee. There is a strong argument that any fee that prevents the acquisition of citizenship by children is unlawful but particularly where the child is stateless, a fee that prevents acquisition of citizenship does not comply with the 1961 Convention, as inability to pay a fee is not one of the exhaustively listed reasons for which citizenship can be refused a stateless child under the Convention. The Project for the Registration of Children as British Citizens (PRCBC) successfully challenged the fee through litigation and the fee was found to be unlawful for all children, whether stateless or not, because the Home Office had failed to consider children's best interests as a primary consideration when setting the fee. This litigation has been partly subject to further appeal to the Supreme Court, so at the time of writing the fee remains in place, but the Home Office is required to reconsider the fee with due regard to children's best interests.

### 4.2.3 Immigration routes for some stateless children in the UK

The UK Immigration Rules provide various ways for some stateless children to be granted leave to remain in the UK, with a consequent route to British citizenship. Part 14 of the Immigration Rules (the UK's Statelessness Determination Procedure (SDP)) and Para. 276ADE of the Immigration Rules are particularly relevant for some stateless children.

#### 4.2.3.1 The UK Statelessness Determination Procedure (SDP) (Immigration Rules Part 14)

The UK introduced an SDP through Part 14 of the Immigration Rules in 2013, allowing eligible stateless people to apply to be recognised as stateless, granted leave to remain in the UK, and

**INVISIBLE KIDS**

Childhood Statelessness in the UK

---

access to some of the rights guaranteed under the 1954 Convention. Stateless children (under 18) can apply as dependents of their parents or in their own right. Successful applicants are granted leave to remain (normally for five years), after which they can apply for indefinite leave to remain. After a year with indefinite leave to remain, adults can apply to naturalise as British citizens. Children whose parents obtain indefinite leave to remain or British citizenship while they are still minors are entitled to register as British citizens. However, there is a gap in the Immigration Rules for dependent children granted leave in line with their parents under the SDP. If such children turn 18 before their parents acquire indefinite leave to remain, there is no provision for them to apply for indefinite leave to remain without having had leave to remain as stateless persons themselves.[52] Depending on whether they were born in the UK and how long they have lived in the UK, they may be eligible to register as British citizens, but for those who are not, there is gap in the legal framework.

Although some stateless people have been granted leave to remain through the SDP, recognition rates are low and there are challenges for children seeking to be granted leave to remain as a stateless person in the UK.[53] The SDP generally applies to children without any child-rights-based adaptations from the general procedure, and the burden of proof remains with the child. The only child-friendly procedural adaptations of which we are aware are that 1) children who are separated from their parents are eligible for free legal assistance,[54] and 2) in theory, the Home Office expedites applications involving children. However, in practice, there have been delays of longer than 12 months in some cases involving children, and there are still significant barriers to accessing competent, free legal assistance for statelessness applications in England and Wales.[55] Further, there is no statutory appeal against refusal (only the more limited remedies of administrative review and judicial review).

**A child-rights-based approach to the determination of statelessness**

Stateless children and children at risk of statelessness should be referred to an SDP so that their statelessness is formally identified and determined, and they receive full protection and enjoyment of their rights. UNHCR's Handbook on the Protection of Stateless Persons states the need for additional procedural, substantive, and evidentiary safeguards for children in any SDP, including timeliness, non-discrimination with regards to residency status, child-sensitive procedures, and shared burden of proof. The principle of upholding the best interests of the child must be adhered to in any decision-making relating to their nationality status and stateless protection status.[56]

**4.2.3.2 The seven-year child provision (Immigration Rules Para. 276ADE)**

Under the Immigration Rules Para. 276ADE, children (whether stateless or not) who have lived in the UK for seven years can be granted leave to remain for up to 30 months (with the possibility of renewal), if it would be unreasonable to expect them to leave the UK. They must be under 18 when they apply. Their parents can be granted leave to remain in line with them in certain circumstances.[57] Litigation relating to this provision has relied on Article 8 of the *European Convention on Human Rights* and Article 3 of the CRC and found, for example, that: *'A child must not be blamed for matters for which he or she is not responsible, such as the conduct of a parent.'*[58]

**4.2.3.3 Children in care**

There is an immigration route specifically for children in care, through which they can be granted leave to remain for up to four years (if there is no realistic possibility of return to their parents' care and/or their parents' country of origin), and indefinite leave to remain after that, which may provide a route to British citizenship.[59]

# 5. Challenges relating to childhood statelessness in the UK

Through our scoping research and engagement with legal and policy experts, frontline professionals, and representatives of communities affected by statelessness in the UK, we have identified 10 key challenges relating to childhood statelessness in the UK, which we further explore in this section.

## 5.1 Lack of data on stateless children in the UK

There is very limited data available on stateless children in the UK. Available data on citizenship applications and grants shows that there has been some increase in the number of applications and grants of British citizenship to stateless children in recent years. The data is not fully disaggregated and there are discrepancies in how nationality status is recorded in different datasets, so there are gaps and unknowns. Which children are seeking to register as British and whether they are receiving legal assistance to do so, is also unknown. Legal advisors we spoke to for this research report having advised only a handful of applicants. Tables 1-3 show the numbers of applications to register as British by stateless persons in recent years, and the number of grants of British citizenship by registration to stateless children (under 18)(Table 2). The numbers in each table differ because different cohorts are measured.

**Table 1: Applications to register as British citizen by stateless\* persons (compared to all applicants for registration for British citizenship)[60]**

Data from Home Office statistics relating to all applications to register for British citizenship (which may include registration under other provisions of the BNA, where the person was recorded as being stateless). This data includes adults and minors.

|  | 2011 | 2016 | 2017 | 2018 | 2019 | 2020 | Q1. 2021 |
|---|---|---|---|---|---|---|---|
| **Stateless\* applicants** | 86 | 150 | 878 | 1,541 | 1,060 | 841 | 278 |
| **All applicants** | 53,389 | 41,158 | 41,927 | 47,762 | 49,092 | 44,773 | 12,887 |

\*Listed as 'stateless' in the Home Office 'Nationality' category

**IN**VISIBLE KIDS

**Childhood Statelessness in the UK**

---

## Table 2: Grants of British citizenship by registration to children (under 18) recorded as stateless* (compared to all grants of British citizenship by registration to under 18s)[61]

Data from Home Office statistics relating to grants of applications to register for British citizenship by children (under 18) recorded as being stateless.

|  | 2011 | 2016 | 2017 | 2018 | 2019 | 2020 | Q1. 2021 |
|---|---|---|---|---|---|---|---|
| **Stateless* children** | 52 | 90 | 163 | 1,869 | 1,103 | 944 | 181 |
| **All grants** | 42,150 | 40,108 | 31,918 | 42,503 | 38,758 | 30,656 | 8,150 |

*Listed as 'stateless' in the Home Office 'Nationality' category

## Table 3: Applications to register as British citizens by stateless* applicants by 'nationality' recorded in Home Office records[62]

Data published by the Children's Commissioner for England (from data collected by the Home Office but not published in its *Managed Migration Datasets*') relating to applications made under BNA Schedule 2 Para. 3 *('All applications, granted applications, and refused applications for children born in the UK who are, and always have been stateless (have no citizenship)').* This table shows additional detail listing 'nationalities' for some applicants, which likely means that the Home Office had previously recorded the applicant as having the nationality of a parent.

|  | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|
| **India** | ** | 19 | 489 | 303 | 256 |
| **Nigeria** | 0 | 0 | 7 | 23 | 9 |
| **Pakistan** | 0 | ** | 18 | 40 | 8 |
| **Sri Lanka** | 0 | 0 | ** | 10 | 37 |
| **Stateless*** | ** | 13 | 627 | 1,284 | 804 |
| **Total (as listed in source data)** | 0 | 35 | 1,165 | 1,710 | 38,758 |

* Listed as 'stateless' in the Home Office 'Nationality' category

** Less than 3 and not counted in data source

Several observations can be made based on the available data. First and foremost, there is clearly a need for more detailed, disaggregated data relating to stateless children in the UK. It is also important to note – in the context of the UK Government's stated rationale for amendments it is seeking to make to BNA Schedule 2 Para. 3 through the *Nationality and Borders Bill 2021* – that the increase in applications by stateless children to register as British from 2016 is unlikely to have been caused by parents *'choosing'* to keep their child stateless so as to register them as British. If the stateless children concerned were at least five years-old in 2017, they would have been eligible to register as British citizens in 2017 following *MK India*. However, any decision made by parents not to register their children as nationals of another country would likely have been made five or more years previously, around the time of the child's birth. Some parents may have learned about the option to register because of the decision in *MK India*, but their decision about whether to register their child as a national of another country would have been made prior to this.

Table 3 indicates that the number of applications by children recorded as ‹stateless› rose from 2016 to 2017 (more than the number recorded as ‹Indian› or any other nationality). A proportion of those recorded as stateless may have been able to acquire a nationality other than British, but how many is unknown. Even among those with a theoretical option to register for another nationality, there are often practical barriers to doing so (explored in Section 5.6). The overall numbers of all people (mainly children) registering as British citizens have consistently been in the 40,000-50,000 range from 2016-2020. Previously, as shown in Table 1, they were a little higher with 53,389 applications in 2011. The overall number of registration applications increased in 2019, but the number of *stateless* applicants *decreased*.

There are several other possible reasons for the increase in numbers of stateless children

registering as British in 2016-18, including that:

- the parents or carers of a pre-existing population of stateless children learned about the option to register them as British from 2016 onwards;
- there was an increase in the number of stateless children in the UK from 2011 onwards (who would have turned five in 2016 and later years), for example due to increased numbers of refugees or migrants from countries with pre-existing stateless populations;
- there is a link with the Brexit vote in 2016 and/or the introduction of a Statelessness Determination Procedure in 2013, and a consequent increase in awareness of statelessness and nationality issues more broadly.

The fact that nationalities other than stateless are listed in Table 3 raises a question about how the Home Office identifies and records children's nationality status. Our research revealed cases in which the Home Office has attributed a parent's nationality to a stateless child despite the child not being able to acquire this nationality. This points to the need for clear guidance on how to assess and record children's nationality and more thorough inquiry by the Home Office as to the nationality status of children, particularly where there are indicators of (risk of) statelessness, such as:

- the child's parents are from a country with a significant known stateless population (e.g. Kuwait, Syria, Iraq, Iran, Myanmar, Bangladesh, Palestine);
- the child's parents are from a country whose nationality laws do not permit automatic acquisition of nationality by children born outside that country;
- the child's mother is a national of a country which does not allow nationality to pass through women;
- the child does not have a birth certificate;
- the child's father is not recorded on birth certificate;
- the child is in State care and there is no clear evidence of nationality.

**INVISIBLE KIDS**
Childhood Statelessness in the UK

## 5.2 Lack of awareness of statelessness

Stakeholders we interviewed during the scoping phase expressed concern about a general lack of awareness about childhood statelessness and children's nationality rights in the UK. Children in State care were highlighted as a particular group where lack of awareness of immigration and nationality matters among those responsible for them contributed to a risk of statelessness in some cases. Interviewees reported that amongst social workers and other local authority support workers there is confusion between ethnicity, identity, immigration status, and nationality, with assumptions often being made that children and young people will know if they have nationality issues and take ownership of these matters themselves, despite evidence to the contrary. Some professionals cited a lack of capacity for longer-term follow up relating to nationality concerns.

### Zainab

Zainab believed, until she was almost 17, that she was a British citizen. She was born and grew up in Scotland. In theory, she has Pakistani nationality, but she had no means of accessing evidence of this. It was only after applying for a UK passport that she discovered she had no leave to remain in the UK and is not a British citizen. She had been in care for approximately two years when her social worker signposted her to legal advice on immigration and citizenship to try to resolve her legal status.

**JustRight Scotland** identified 22 children and young people they have worked with since 2017 who were not in the asylum process; had insecure immigration status in the UK or were undocumented; and could not access or prove any nationality. Most of these children and young people were in the care of a local authority. Many of the children had spent long periods of time in care before they were referred for legal advice on their immigration or nationality status. The average age at referral was 12 years-old, ranging from 7-17 years-old. JustRight Scotland noted that local authority staff often lacked awareness of British nationality law, immigration law, or the immigration impact of taking a non-British citizen child into care, for example, where a child is dependent on their family's limited leave to remain and taking them into care ends the child's leave to remain requiring a new application. Children in such situations often have little or no evidence relating to their nationality. They often face difficulties meeting the evidentiary requirements to prove nationality of the UK or another country, including, for example the inability to register their birth in another country or acquire nationality due to missing documents or because registration requires the consent of one or both parents.

## 5.3 Uncertainty about how to resolve statelessness and routes to British citizenship

Several interviewees observed that there is uncertainty about where to refer children, young people and families affected by statelessness. This was particularly highlighted by representatives of refugee, migrant, and/or stateless community organisations. Representatives of NGOs reported that they tended to refer 'obvious' statelessness cases to one of the few organisations perceived to have expertise and availability to provide legal advice on statelessness (Liverpool Law Clinic and Asylum Aid were cited). However, it was felt that statelessness sometimes goes undetected for many years, with the focus tending to be on immigration status and leave to remain, sometimes leaving the nationality aspects of cases unresolved leading to problems in the future. Some stakeholders mentioned that where local authorities are involved, legal assistance often ends after leave to remain is secured, resulting in a failure to address nationality issues.

## 5.4 Difficulties accessing competent legal advice and the difference it makes

Many stakeholders reported that barriers to accessing competent legal assistance prevent some stateless children from accessing either leave to remain in the UK as a stateless person or British citizenship. In recent years, there have been significant cuts to legal aid in England and Wales, and there are fewer providers of publicly funded legal advice on immigration and nationality matters. Although separated children in England and Wales are now eligible for legal aid with immigration and citizenship matters, this does not apply to children who remain with their parents, and for many children and families with complex immigration or

### Aisha

Aisha is six and was born in the UK. Her mother (a national of a country in the Middle East) and father (who is stateless) came to the UK more than 10 years ago. Aisha has a younger sibling who was born in the UK and an older one, who was born outside the UK. The Home Office has recorded Aisha and her older sibling as nationals of their mother's country of nationality, but Aisha and her siblings are stateless. They could not inherit a nationality from their mother because the law of her country does not permit women to confer nationality to their children and their father is stateless. Aisha and her younger sibling did not acquire British citizenship at birth, because, although born in the UK, neither of their parents had indefinite leave to remain at the time of their births. At present, no-one in the family has leave to remain. Aisha's father applied for leave to remain in the UK as a stateless person more than two years ago but is still waiting for a decision. Aisha's parents applied to register her as a British citizen before she was five years-old and took out a loan to pay the Home Office fee, but the application was refused because Aisha was not yet five so did not meet the eligibility requirements. Her parents did not know the rules and were unable to get legal advice (Aisha's father says solicitors would not take the case on legal aid and they could not afford to pay for legal advice). Aisha is now entitled to be registered as a British citizen, but the family cannot afford to pay the fee. Aisha has never met her uncle and grandmother and has noticed other things their family cannot do because they do not have British citizenship or leave to remain in the UK.

**IN**VISIBLE KIDS
**Childhood Statelessness in the UK**

nationality issues, it is extremely difficult to access quality legal advice. Even if they are eligible for Exceptional Case Funding, because of the way it is structured, this type of funding is not viable for many legal aid advisors unless they have other funding to supplement it. There are also areas of the UK where there are very few or no legal aid advisors. These challenges can exacerbate the lack of awareness of children's rights, legal requirements, documents needed to support an immigration or citizenship application, and make it very difficult to prepare a properly evidenced application for leave to remain or to register as a child as a British citizen.

Early access to competent legal advice on statelessness and nationality issues can make an enormous difference. It can avoid children and families living in poverty for extended periods due to lack of status or citizenship, and avoid families having to pay either legal fees to practitioners who are inexperienced and/or very high application fees for cases likely to be refused because they do not meet the eligibility requirements. It can ensure that the correct application is made, with sufficient evidence. It can also save government time wasted reviewing incorrect or poorly-evidenced applications and prevent costly and time-consuming judicial review proceedings that may have been unnecessary had a better-evidenced application been made in the first instance. Above all, it can save children and families the frustration and heartbreak that come with refusal.

## 5.5 Difficulties proving nationality or statelessness

Many stakeholders raised concerns about the challenges individuals face in proving their nationality or statelessness. In some cases, applicants simply do not know what evidence they need to provide to support their application. In other cases, the evidence that the Home Office demands is not available. In other cases, decision-makers do not adhere in practice to the standards set out in law and

guidance and do not assist applicants with obtaining evidence even when they are required to do so. In some cases, the difficulties of proving a child's or parent's entitlement to British nationality or leave to remain in the UK result in children or young people living in destitution or experiencing hardship for several years.

### Julia

Julia is a pre-teen child who was born in the UK and who has no recent family history of migration. Her mother and maternal grandmother (both deceased) were British citizens. However, the mother's name on Julia's birth certificate differs from the name on the mother's birth certificate, without any documentary explanation (such as a Deed Poll or marriage certificate). The grandmother's name on her birth certificate also differs to that on the mother's birth certificate without documentary explanation. The family has a chaotic history and are known to social services. Neither the Passport Office nor the Home Office have accepted the significant evidence from the local authority that the family connection has been established, and that Julia automatically acquired British citizenship at birth. As such, Julia has been treated as a non-citizen, even though she was a British citizen at birth and remains so. A legal advisor has assisted her in making British nationality applications, but her situation remains unresolved.

## Daniel

Daniel was born in the UK in unknown circumstances in the 1970s. He had no birth certificate and did not know whether his birth was registered. He had a difficult childhood and encountered numerous challenges as a teen and adult because he lacked the documents required for 'normal' life in today's world. He made several applications over a period of years, seeking to resolve his identity issues, but they were refused. Finally, a legal advisor assisted him to seek additional evidence of his identity and life-long residence in the UK and submit a nationality status application. In 2019, the Home Office finally acknowledged that Daniel was, and always has been, a British citizen.

## 5.6 Barriers to registration with parents' country of nationality

Several interviewees reported barriers to registering a child born in the UK as a national of another country. These included having to deal with complex procedures they did not understand, facing and/or fearing discrimination on the part of consular officials, not having the required documents, or needing parental consent where this was unavailable. In some cases, these barriers could be overcome after time and considerable effort, but in other cases, they could not. One legal advisor reported that *'many children'* they worked with faced *'numerous and complex difficulties'* accessing citizenship of another country.

## Kia

Kia's mother is Ethiopian, and her father is an Eritrean refugee. She was born in the UK at a time when neither of her parents had leave to remain. Her parents were never married, and her father is not involved in her life. Kia and her mother have no documentation proving that Kia has a nationality. Her mother is unlikely to be able to obtain documentation from Kia's father to prove Eritrean nationality and she would have difficulty acquiring Ethiopian nationality due to restrictions in Ethiopia's nationality law. Kia may have been entitled to British citizenship at age five, as a [possibly] stateless child born in the UK, but an application was never filed. Shortly after Kia's mother was referred to a legal advisor, Kia became eligible for leave to remain in the UK under the seven-year child route. It was relatively easy to evidence that Kia qualified for leave to remain under this provision, as it did not require documents relating to the absence of any nationality. Kia and her mother were both granted leave to remain for 30 months.

**IN**VISIBLE KIDS

**Childhood Statelessness in the UK**

## 5.7 Practical barriers to British citizenship for stateless children

There is ample evidence that the Home Office fee for children's citizenship applications prevents some children from accessing their entitlement to British citizenship. The high cost of the fees was raised by almost all stakeholders. The example of Aisha and evidence from community organisations, including the British Rohingya Association and Roma Support Group, indicate that this affects children who are stateless or at risk of statelessness, contrary to the UK's domestic and international legal obligations.

**The British Rohingya Association** reports that some children in their community are unable to access British citizenship because of the Home Office fees or due to parents' lack of awareness of the relevant laws and eligibility requirements. In addition, some adults from their community are also unable to access British citizenship due to the Home Office fees or because they are unable to pass the language test and the life in the UK test, which could exacerbate the issue of childhood statelessness if those adults have children in the future.

**Roma Support Group** explained that many people they work with in the UK do not necessarily understand that a British birth certificate is not evidence of British citizenship. 15–25% of Roma children in the UK they engaged with did not have any identity documents - many are not registered as nationals of their parents' countries of origin for a variety of reasons. In one case, due to domestic abuse, a mother could not obtain Romanian nationality for her child because Romanian law requires that both the father and mother provide valid documents for their child to acquire Romanian nationality through registration, and the mother did not have access to the father's documents. Concerns were also raised about discriminatory treatment of Romani people by the authorities of countries of origin, including at consulates in the UK, which makes people very reluctant to approach the authorities to resolve documentation issues or register the births of children. Cases were reported of Romani people having tried to get documentation from their countries of nationality but found the procedures to do this were complicated, lengthy, and sometimes impossible to navigate.

## 5.8 The impact of poverty and hostile environment measures

Stakeholders expressed concerns about the impact of 'hostile environment' measures on stateless (and other) children. 'Hostile environment' measures are laws and practices that seek to deter irregular migration to the UK and encourage migrants without residence permits to leave – they are designed to make life hard and are known to have a harsh impact on many people with a migrant background, including children, as well as some long-settled minorities in the UK.[63] In some of the worst-case scenarios, such measures result in children ending up destitute and/or homeless because their parents cannot lawfully work or rent accommodation and are unable or do not know how to access support.[64] Where statelessness remains unidentified, children and families may have to endure unnecessary periods of hardship subject to hostile environment policies that could be avoided through improved access to legal advice, a reduction in barriers to recognition of statelessness, and facilitated acquisition of British citizenship.

## Tarek

Tarek's mother and father are stateless Palestinians. Tarek was born in the UK at a time when his parents had no leave to remain. One of his parents applied for asylum with the rest of the family as dependents, but the Home Office refused this application. The family later applied for leave to remain in the UK as stateless persons, under Part 14 of the Immigration Rules, and this was granted. The family lived in Home Office accommodation with very basic financial support for approximately two years. When he turned five, Tarek became eligible to register as a British citizen as a child born stateless in the UK.

## 5.9 The potential impact of Brexit

Stakeholders noted that the risk of childhood statelessness in the UK could be increased or exacerbated by Brexit, including for children of Romani families. Children born in the UK to parents from any EU country whose nationality cannot be verified or documented may face difficulties post-Brexit. Coram Children's Legal Centre highlighted the case of Gabi and Dora in their 2020 report, 'Children left out?', which shows how some children with an EU-citizen and a British parent may be unable to document their nationality of either country.[65] In Dora's case, due to significant domestic abuse and a non-molestation order being put in place before she was born, her British father could not be recorded on her birth certificate. As his participation would be required both to apply for a British passport and to apply for a Spanish passport or ID card, Dora is stuck in limbo, unable to prove her British nationality and unable to obtain the documentation of her Spanish nationality necessary to be able to apply under the EU Settled Status scheme. After Brexit, Dora no longer benefits from EU free movement rights as a family member of an EU national, and she may face considerable difficulties in seeking settled status, another immigration status, or British citizenship.

**Roma Support Group** report that many parents they work with did not know that they needed to apply to the EU Settled Status scheme [or for British citizenship] to ensure that their children did not fall into an irregular status after Brexit. Cases were reported of Romani people who had sought and been refused asylum in the UK prior to their country of origin joining the EU whose children have not been registered as either British citizens or nationals of another country, and who may have no status after Brexit. Some Romani children have applied for British citizenship but been refused on 'technicalities' such as a lack of identity documents. There is a lack of targeted and accessible information reaching the Roma community in the UK to explain relevant laws, policies, and procedures.



**INVISIBLE KIDS**

**Childhood Statelessness in the UK**

## 5.10 Lack of focus on children's best interests

Stakeholders noted that the UK Government's approach to decisions about children who are stateless or at risk of statelessness, exemplified by the stated rationale for amendments to BNA Schedule 2 Para. 3 in the *New Plan for Immigration*, indicate a failure to accord due weight to children's views and best interests. The UK Government's focus in the NPI proposals is on parents' status, actions, or failure to act, relating to a child's nationality. The UK Government has a clear duty, established in domestic and international law, to take children's best interests into account regardless of their parents' actions or inactions, as a primary consideration in all decisions concerning them, including those relating to statelessness and nationality. Some stakeholders identified welcome examples where the Home Office had used their discretion in a child's case, for example, where a parent refused to cooperate or provide consent for confirmation of nationality, and the decision-maker proceeded on the basis of other information to make a favourable decision.

# 6. Good practices from other countries

As illustrated in Section 4, British nationality law contains legal safeguards to prevent childhood statelessness, but the evidence we have gathered from practitioners and communities shows that there is clearly room for improvement. There are examples of good practices from other countries relating to acquisition of nationality and the prevention of childhood statelessness, which the UK Government could draw on in seeking to prevent and reduce statelessness.

The most comprehensive and simplest way to prevent childhood statelessness in any State is through *jus soli* acquisition of nationality, or 'birthright citizenship', which means that all children born on the territory of a State automatically acquire its nationality at birth. The UK had birthright citizenship until the BNA 1981 came into force. Many States around the world still operate a *jus soli* system for the acquisition of nationality, including most countries in the Americas (for example, Canada and the United States).

Other options include:

**Automatic acquisition of nationality at birth for children born on the territory whose parents are stateless or cannot transmit their nationality:**

- **France:** *'[A] child born in France of unknown or stateless parents or whose parents cannot transmit nationality to their child is automatically attributed French nationality at birth.'*[66]

- **Spain:** *'The Civil Code attributes Spanish nationality automatically at birth to all those born in Spain to foreign parents if both parents lack a nationality or if the legislation of both of their countries of origin does not attribute a nationality to the child.'* There is no legal requirement for children to prove they cannot access another nationality. The parents/guardians of the child must request confirmation of Spanish nationality. There is a rebuttable presumption that a child born in Spain to non-Spanish parents who lack a nationality or are unable to confer nationality to their child, is Spanish.*[67]

**Facilitated naturalisation for children of refugees born on the territory after one year of residence:**

- **Spain:** *'A child born in Spain to refugee parents may naturalise as Spanish after one year of residence in the country.'*[68]

**Automatic acquisition of nationality at age 18 for children born on the territory:**

- **France:** *'A person born in France whose parents are neither French nor were born in France will automatically become French at age 18 if he or she has lived in France for at least five years since the age of 11 and does not take steps to decline French nationality.'* This provision is accompanied by other safeguards for children who have lived on the territory for lengthy periods.[69]

**Free or low-cost acquisition of nationality for children:**

- Most other European countries have no or relatively low fees for children to acquire nationality and/or a fee waiver for children who cannot afford to pay any fees. For example, in Norway, a citizenship application is free of charge for children (under 18) and

**IN**VISIBLE KIDS

**Childhood Statelessness in the UK**

---

costs NOK 3,700 (360 EUR) for adults. In France, the naturalisation fee is 55 EUR. In Germany, the naturalisation fee is 255 EUR and can be reduced to 51 EUR for minors on the grounds of equity or public interest.[70]

It is important to note that even where a legal provision appears to be an example of good practice, much depends on how it is implemented. All States need fair, accessible procedures that offer flexibility in cases where a stateless child may not be able to meet all the formal requirements or provide requested documents to prove an entitlement to nationality.



# 7. Recommendations

Based on the information presented in this report, we make the following recommendations for action to further prevent and reduce childhood statelessness in the UK.

 **Strengthen legal safeguards in British nationality law to prevent childhood statelessness**

1.1. The UK Government should consider reintroducing birthright (*jus soli*) citizenship for all children born in the UK.

1.2. Alternatively, the UK Government should consider introducing automatic acquisition of British citizenship at birth for all children born in the UK who do not automatically acquire another nationality at birth; or, a (rebuttable) presumption that children born in the UK who do not acquire another nationality acquire British citizenship at birth with the burden on the UK Government to prove otherwise, and a time limit of one year from birth after which the presumption becomes fact if not disproven.

1.3. The UK Government should not limit or restrict the existing legal safeguard in British nationality law (BNA Schedule 2 Para. 3). Any amendments to the law must comply with international law, be evidence-based, drawing on the expertise of practitioners, community representatives, and others including ENS, its members, and UNHCR, and be subject to a full and transparent impact assessment.

 **Remove practical barriers to acquisition of British citizenship**

2.1. The UK Government should eliminate the fees for all children's citizenship applications.

2.2. The UK Government should also waive or reduce fees *'as far as possible'* for naturalisation applications by adult stateless persons to comply with its obligations to facilitate naturalisation for stateless persons under the 1954 Convention (Article 32).

2.3. The UK Government should provide comprehensive information in accessible formats on entitlements to British citizenship to all parents and carers of children born in the UK (for example at birth registration), including information about statelessness and relevant safeguards.

# **INVISIBLE KIDS**
**Childhood Statelessness in the UK**

 **3.** **Improve access to free, quality, legal advice on citizenship matters**

3.1. The UK Government and devolved administrations should take action to ensure that all children (including children who reside with their parents) are entitled to and can access free, competent, specialist legal assistance for any matters relating to immigration status or nationality.

3.2. All those in contact with children and young people - including local authorities, support workers, civil society organisations, the Home Office, and others - should ensure that where a child's nationality is unclear, they are referred for expert legal advice to determine their nationality status and examine their entitlement to British citizenship.

3.3. Lawyers and practitioners working on nationality, immigration and family matters should attend training to improve the identification and resolution of (childhood) statelessness across the UK.

 **4.** **Improve child rights-based safeguards in both nationality and immigration procedures concerning stateless children**

4.1. The Home Office should introduce guidance and protocols on child rights-based interviewing techniques and decision-making in both citizenship application decision-making and the Statelessness Determination Procedure (SDP) (Part 14 of the Immigration Rules) ensuring that every child's best interests are a primary consideration.

4.2. The UK Government should ensure that children who have been granted leave in line with a parent under the SDP are also granted indefinite leave before or upon reaching adulthood and do not have to go through the SDP in their own right to secure leave to remain and a route to British citizenship.

4.3. The Home Office should issue guidance for caseworkers on the appropriate burden and standard of proof in line with children's best interests in all applications for statelessness leave and for British citizenship made by children, and take steps to monitor and ensure this guidance is followed in all cases.

4.4. The UK Government should introduce a full right of appeal against refusal of statelessness leave under the SDP, and a full right of appeal against all refusals of British citizenship applications where the person would otherwise be stateless.

4.5. The Home Office should establish and adhere to reasonable time limits in accordance with UNHCR guidelines in all children's immigration (including SDP) and nationality procedures.

## 5. Invest in training and capacity-building on statelessness for Home Office decision-makers

5.1. The Home Office should invest in developing expertise on childhood statelessness within both the nationality directorate and statelessness decision-making teams through dedicated training and capacity-building that is integrated into foundation training and continuous professional development.

5.2. The Home Office should invest in developing tools to assist decision-makers to accurately identify and record children's nationality status and/or statelessness.

## 6. Improve data on childhood statelessness in the UK

6.1. The UK Government and devolved administrations should collect and publish accurate, disaggregated data on stateless children and children at risk of statelessness across the UK.

6.2. Further research should be carried out to explore the issues highlighted in this report in more depth. This could include research on:

- legal and practical barriers to acquisition of a parent's (non-British) nationality by children born in the UK;
- data relating to stateless children's applications for British citizenship (which children, where are they, age, sex/gender, family background, etc.)
- nexus areas identified in this report such as children in State care; children affected by domestic abuse; Romani children; refugee children; children affected by trafficking; children in rainbow (LGBTIQ+) families; children living in poverty.
- the impact of Brexit on children's nationality status and risk of statelessness;
- the mental health impact of childhood statelessness;
- the development of models of intervention for the delivery of advice, information, and awareness-raising on nationality rights and statelessness with children, parents, carers, civil society organisations, local authority staff, lawyers, and other relevant stakeholders.

**IN**VISIBLE KIDS
Childhood Statelessness in the UK

# 8. Conclusions

The evidence presented in this report indicates that granting British citizenship automatically at birth or very early in life is in the best interests of stateless children and children at risk of statelessness in the UK. Although the UK legal framework establishes important safeguards to prevent statelessness and to protect stateless children, it is evident that there are significant law, policy, and practice gaps and that some children are being failed by the UK Government. Many parents, carers and those working with children who are stateless or at risk of statelessness do not know or understand what the implications are of childhood statelessness nor the importance of resolving a child's nationality status, let alone the evidence required, or procedures available to them. It is vital that the new *Nationality and Borders Bill* does not create additional hurdles for stateless children to acquire British citizenship as soon as possible after birth. There must be effective legal and practical safeguards in place to ensure that no child living in the UK is left in limbo.

We want stateless children, who are invisible to some, to have the power to become visible. Our hope – and our challenge to Parliamentarians as the new Bill makes its passage through Parliament – is to help ensure that every stateless child born in or living in the UK is able to acquire British citizenship, without undue challenges, hardships, or delay. Children have no choice in their place of birth or residence. Whatever choices their parents may have made, or whatever actions their parents may have taken or not taken, for whatever reasons, children deserve to be citizens, have a sense of security and belonging, and be able to participate fully in all aspects of life in the country they call home. We should be seeking to ensure that all children in the UK are supported and empowered to achieve their full potential, starting by guaranteeing them British citizenship as early as possible in life. This is in children's best interests and the best interests of us all.



# 9. References

1. Solange Valdez-Symonds & Steve Valdez-Symonds (2017) *Barriers to Citizenship Facing Stateless Children Born in the UK*, ENS Blog: https://www.statelessness.eu/updates/blog/barriers-citizenship-facing-stateless-children-born-uk

2. ENS (2015) *No child should be stateless*: https://www.statelessness.eu/sites/www.statelessness.eu/files/ENS_NoChildStateless_final.pdf

3. See, e.g.: Nando Sigona & Vanessa Hughes (2012), *No Way Out, No Way In: Irregular Migrant Children and Families in the UK*, ESRC Centre on Migration, Policy and Society, University of Oxford: https://www.compas.ox.ac.uk/project/undocumented-migrant-children-in-the-uk/ ; Mayor of London (2020) *London's children and young people who are not British citizens: a profile, University of Wolverhampton*, https://www.london.gov.uk/sites/default/files/final_londons_children_and_young_people_who_are_not_british_citizens.pdf

4. British Nationality Act (BNA) 1981 (commenced 1 January 1983): https://www.legislation.gov.uk/ukpga/1981/61

5. Children born in the UK whose parents are British or settled (for example, holders of Indefinite Leave to Remain or EU Settled Status) automatically acquire British citizenship under BNA Section 1(1).

6. Cynthia Orchard (2017) *Citizenship for Sale – At a Cost Stateless People Can Ill Afford*, ENS Blog: https://www.statelessness.eu/updates/blog/citizenship-sale-cost-stateless-people-can-ill-afford

7. For more information about ENS and its members, see: https://www.statelessness.eu/about/members

8. UK Government (2021), *New Plan for Immigration: policy statement*, p.16: https://assets.publishing.service.gov.uk/government/uploads/system/uploads/attachment_data/file/972472/CCS207_CCS0820091708-001_Sovereign_Borders_FULL_v13__1_.pdf

9. *Nationality and Borders Bill*, 6 July 2021: https://publications.parliament.uk/pa/bills/cbill/58-02/0141/210141.pdf

10. For more information on common profiles of stateless refugees, see: https://statelessjourneys.org/resources/

11. For more on ENS's work in this area, see: https://www.statelessness.eu/issues/ending-childhood-statelessness

12. ENS (2015) *No child should be stateless*: https://www.statelessness.eu/sites/www.statelessness.eu/files/ENS_NoChildStateless_final.pdf

13. ENS (2020) *No child should be stateless: ensuring the right to a nationality for children in migration in Europe*: https://www.statelessness.eu/updates/publication/no-child-should-be-stateless-ensuring-right-nationality-children-migration

14. Alison Harvey (2020) *Literature review and mapping study: risks of statelessness among the children of refugees in Europe*, ENS: https://www.statelessness.eu/sites/default/files/2020-10/ARH-Literature%20review%20%26%20mapping-Final%20Report.pdf

15. ENS (2016) *Protecting Stateless Persons from Arbitrary Detention in the United Kingdom*: https://www.statelessness.eu/sites/www.statelessness.eu/files/ENS_Detention_Reports_UK.pdf

16. Migrants Resource Centre, University of Liverpool Law Clinic, European Network on Statelessness & Institute on Statelessness and Inclusion (2016) *Joint Submission to the Human Rights*

**INVISIBLE KIDS**
Childhood Statelessness in the UK

*Council at the 27th Session of the Universal Periodic Review - United Kingdom*: https://www.statelessness.eu/updates/publication/joint-submission-human-rights-council-27th-session-universal-periodic-review-0

17. University of Liverpool Law Clinic, European Network on Statelessness, Institute on Statelessness and Inclusion (2020) *Joint Submission to the Committee on the Rights of the Child at the 88th Pre-Sessional Working Group - United Kingdom*: https://www.statelessness.eu/updates/publications/joint-submission-committee-rights-child-88th-pre-sessional-working-group

18. ENS (2021) *Submission to the UK Government Home Office Consultation on its 'New Plan for Immigration'*: https://www.statelessness.eu/sites/default/files/2021-05/ENS%20Submission%20NPI%20May%202021.pdf

19. See: https://index.statelessness.eu/country/united-kingdom

20. See, e.g.: Solange Valdez-Symonds & Steve Valdez-Symonds (2017) *Barriers to Citizenship Facing Stateless Children Born in the UK*, ENS Blog: https://www.statelessness.eu/blog/barriers-citizenship-facing-stateless-children-born-uk; Cynthia Orchard (2018) *The Appalling Mistreatment of a Stateless Human Rights Activist, Barriers to British Citizenship, and the Power to Bring Change*, ENS Blog: https://www.statelessness.eu/blog/appalling-mistreatment-stateless-human-rights-activist-barriers-british-citizenship-and-power

21. Asylum Aid & UNHCR (2011) *Mapping Statelessness in the United Kingdom*: https://www.refworld.org/docid/4ecb6a192.html

22. Johanna Bezzano & Judith Carter (2018) *Statelessness in Practice: Implementation of the UK Statelessness Application Procedure*, University of Liverpool Law Clinic: https://www.ein.org.uk/news/liverpool-law-clinic-examines-implementation-uks-statelessness-application-procedure

23. UNHCR (2020) *Statelessness Determination in the UK: a UNHCR audit of the Home Office approach to decision-making in the Statelessness Determination Procedure*: https://www.unhcr.org/5fd893304.pdf

24. UNHCR (2021) *I Am Human*: https://www.unhcr.org/uk/publications/legal/6082ba4e4/i-am-human-a-participatory-assessment-on-the-situation-of-stateless-persons.html?query=I%20Am%20Human%20report

25. See e.g. CORAM Children's Legal Centre (2017) *This Is My Home: Securing Permanent Status for Long-Term Resident Children and Young People in the UK*: https://www.childrenslegalcentre.com/this-is-my-home/; British Red Cross (2017) *Can't Stay. Can't Go: Refused Asylum Seekers Who Cannot Be Returned*: https://www.refworld.org/docid/591965984.html; Gardner & Patel (2021) *We Are Here: routes to regularisation for the UK's undocumented population*, Joint Council for the Welfare of Immigrants: https://www.jcwi.org.uk/Handlers/Download.ashx?IDMF=5467543a-6e30-4e28-a39f-db48ffad6d3a

26. See: https://prcbc.org/information-and-resources/

27. Solange Valdez-Symonds & Steve Valdez-Symonds (2017) *No State to Be In*, Legal Voice Blog: http://www.legalvoice.org.uk/no-state-to-be-in/

28. CORAM Children's Legal Centre, (2020) *Fact Sheet: Stateless Children*: https://www.childrenslegalcentre.com/wp-content/uploads/2020/04/Statelessness-April-2020-FINAL.pdf & (2020) *Fact Sheet: Registration of Children as British Citizens*: https://www.childrenslegalcentre.com/resources/citizenship/

29. *Universal Declaration of Human Rights*, 1948: https://www.un.org/en/about-us/universal-declaration-of-human-rights

30. For an overview of the international legal framework relating to stateless children, see *No Child Should Be Stateless: Ensuring the Right to a Nationality for Children in Migration in Europe*

31. UN General Assembly, *Convention Relating to the Status of Stateless Persons*, 28 September 1954, United Nations, Treaty Series, vol. 360, p.117: https://www.refworld.org/docid/3ae6b3840.html

32. UN General Assembly, *Convention on the Reduction of Statelessness*, 30 August 1961, United Nations, Treaty Series, vol.989, p.175: https://www.refworld.org/docid/3ae6b39620.html

33. *UN Convention on the Rights of the Child 1989*: https://www.ohchr.org/en/professionalinterest/pages/crc.aspx

34. Institute on Statelessness and Inclusion (ISI) (2016) *Addressing the Right to A Nationality through the Convention on the Rights of the Child*, p.10: https://files.institutesi.org/CRC_Toolkit_Final.pdf

35. *Ibid.* p.13

36. Scottish Government (2020) *United Nations Convention on the Rights of the Child (Incorporation) (Scotland) Bill*: https://www.gov.scot/publications/united-nations-convention-rights-child-incorporation-scotland-bill-leaflet/

37. Council of Europe, *European Convention for the Protection of Human Rights and Fundamental Freedoms*, as amended by Protocols Nos. 11 and 14, 4 November 1950: https://www.refworld.org/docid/3ae6b3b04.html

38. See e.g. *Genovese v Malta*, Application no. 53124/09, European Court of Human Rights, 11 October 2011; *Mennesson v France*, Application no. 65192/11, European Court of Human Rights, 26 June 2014; *Hoti v Croatia* (Application no. 63311/14) European Court of Human Rights, 26 April 2018. See also Dr. Hélène Lambert (2018) *Nationality and Statelessness Before the European Court of Human Rights: A landmark judgment but what about Article 3 ECHR?* Strasbourg Observers Blog: https://strasbourgobservers.com/2018/05/16/nationality-and-statelessness-before-the-european-court-of-human-rights-a-landmark-judgment-but-what-about-article-3-echr/

39. UNHCR (2012) *Guidelines on Statelessness No. 4: Ensuring Every Child's Right to Acquire a Nationality through Articles 1-4 of the 1961 Convention on the Reduction of Statelessness*: https://www.unhcr.org/uk/protection/statelessness/5465c9ff9/guidelines-statelessness-nr-4-ensuring-childs-right-acquire-nationality.html

40. For more information, see: https://www.gov.uk/types-of-british-nationality

41. See also guidance for Home Office decision-makers: Home Office (2017) *Registration as a British Citizen: Stateless Persons*: https://www.gov.uk/government/publications/stateless-persons-nationality-policy-guidance

42. Emma Harris (2021) *Briefing: the Nationality & Borders Bill*, Part 1 (citizenship reforms), Freemovement Blog: https://www.freemovement.org.uk/nationality-and-borders-bill-analysis-part-1-nationality-citizenship-reforms/#Registration_of_stateless_children

43. Home Office (2020) *Registration as British Citizen: Children* (v 6.0, 2020), p.28: https://assets.publishing.service.gov.uk/government/uploads/system/uploads/attachment_data/file/879763/registration-as-a-british-citizen-children-v6.0ext.pdf

44. *Borders, Citizenship and Immigration Act 2009*, Section 55: https://www.legislation.gov.uk/ukpga/2009/11/section/55

45. For summaries, see e.g. Enna Choudhury (2019) *Briefing: the Best Interests of Children in Immigration Cases*, Freemovement: https://www.freemovement.org.uk/best-interests-of-children-in-immigration-cases/; CORAM Children's Legal Centre (2017) *Fact Sheet: Best Interests of a Child*: https://www.childrenslegalcentre.com/resources/best-interests/; Greater Manchester Immigration Aid Unit (2013) *Children's Best Interests: A Primary Consideration?*: https://miclu.org/assets/uploads/2017/04/8ChildrensBestInterests.pdf

46. *MK (A Child By Her Litigation Friend CAE), R (On the Application of) v SSHD* [2017] EWHC 1365 (Admin): https://www.bailii.org/ew/cases/EWHC/Admin/2017/1365.html ('*MK India*')

47. *MK India*, Paras. 26-27

48. *MK India*, Para. 26, quoting the Supreme Court judgment in SSHD v Al Jeddah [2013] UKSC 62 (at Para. 32)

**INVISIBLE KIDS**
Childhood Statelessness in the UK

49. *MK India*, Para. 40
50. *MK India*, Paras. 42-46
51. *PRCBC and O v SSHD* [2021] EWCA Civ 193: https://prcbc.org/news-updates/
52. See *Immigration Rules Part 14*, Para. 407: https://www.gov.uk/guidance/immigration-rules/immigration-rules-part-14-stateless-persons
53. See the UK country profile, *Statelessness Index, Statelessness Determination and Status*: https://index.statelessness.eu/country/united-kingdom (updated March 2021)
54. The provision of legal aid is devolved in the UK so legal aid entitlements differ between the different UK jurisdictions (England and Wales, Northern Ireland, and Scotland).
55. University of Liverpool Law Clinic, European Network on Statelessness, Institute on Statelessness and Inclusion (2020) *Joint Submission to the Committee on the Rights of the Child at the 88th Pre-Sessional Working Group - United Kingdom*, para.16: https://www.statelessness.eu/updates/publications/joint-submission-committee-rights-child-88th-pre-sessional-working-group
56. ENS (2020) *No child should be stateless: ensuring the right to a nationality for children in migration in Europe*, p.11: https://www.statelessness.eu/updates/publication/no-child-should-be-stateless-ensuring-right-nationality-children-migration; UNHCR (2014) *Handbook on Protection of Stateless Persons*, p.43: https://www.unhcr.org/dach/wp-content/uploads/sites/27/2017/04/CH-UNHCR_Handbook-on-Protection-of-Stateless-Persons.pdf
57. Colin Yeo (2018) *Can Children and Parents Apply to Remain after 7 Years Residence?*, Freemovement Blog: https://www.freemovement.org.uk/can-children-and-parents-apply-to-remain-after-seven-years-residence/
58. Summarised in *Zoumbas v SSHD [2013] UKSC 74*, Para. 10: https://www.bailii.org/uk/cases/UKSC/2013/74.html
59. Home Office (2011&12) *Immigration Directorate Instructions*, Chapter 8, Section 5A, Annex M, July 2011 (and Chapter 8, Section FM3.2, July 2012): https://assets.publishing.service.gov.uk/government/uploads/system/uploads/attachment_data/file/274510/annex-m.pdf
60. Home Office, *Statistical data set: Managed migration datasets*, Table Cit_D01, published 27 May 2021: https://www.gov.uk/government/statistical-data-sets/managed-migration-datasets#citizenship
61. Home Office, *Statistical data set: Managed migration datasets*, Table Cit_D02, published 27 May 2021: https://www.gov.uk/government/statistical-data-sets/managed-migration-datasets#citizenship. Applicants whose nationality is listed in Home Office records as Occupied Palestinian Territories or Other/Unknown are not shown in this table but are included in the source data.
62. Data published by the Children's Commissioner for England, *Routes to citizenship, 'Data gathered by the Children's Commissioner's Office on children's routes to British citizenship, in order to fill the gap in evidence on the outcomes of their applications for citizenship'*, Table 8.1: https://www.childrenscommissioner.gov.uk/report/routes-to-citizenship/
63. Colin Yeo (2018) *Briefing: what is the hostile environment, where does it come from, who does it affect?* Freemovement Blog: https://www.freemovement.org.uk/briefing-what-is-the-hostile-environment-where-does-it-come-from-who-does-it-affect/
64. See e.g. Russell Taylor(2018) *Impact of 'Hostile Environment' Policy Debate* on 14 June 2018, House of Lords Library Briefing: http://researchbriefings.files.parliament.uk/documents/LLN-2018-0064/LLN-2018-0064.pdf; Chloë Darlington (2019) *Making Life a Misery: The Hostile Environment is Making Life Impossible for Migrant Children, Children England Blog*: https://www.childrenengland.org.uk/blog/making-life-a-misery
65. Lagrue et al (2020) *Children left out? Securing children's rights to stay in the UK beyond Brexit*, Coram Children's Legal Centre, p.7: https://www.childrenslegalcentre.com/wp-content/uploads/2020/06/CCLC-Children-left-out_July-2020_final.pdf

66. UNHCR (2017) *Good Practices Paper - Action 2: Ensuring that No Child is Born Stateless*, p. 8: https://www.refworld.org/docid/58cfab014.html

67. ENS, *Statelessness Index, Spain*: https://index.statelessness.eu/country/spain

68. *Ibid.*

69. UNHCR (2017) *Good Practices Paper - Action 2: Ensuring that No Child is Born Stateless*, p. 8: https://www.refworld.org/docid/58cfab014.html

70. ENS (2021) *Statelessness Index, Norway, Country Survey Data* (2020), SDS.15.a: https://index.statelessness.eu/sites/default/files/ENS_Statelessness_Index_Survey-Norway-2020.pdf; *Statelessness Index, France, Country Survey Data* (2020), SDS.8.c: https://index.statelessness.eu/sites/default/files/ENS_Statelessness_Index_Survey-France-2020.pdf; *Statelessness Index, Germany, Country Survey Data* (2020), SDS.15.a: https://index.statelessness.eu/sites/default/files/ENS_Statelessness_Index_Survey-Germany-2020.pdf

## European Network on Statelessness

The European Network on Statelessness is a civil society alliance of over 170 organisations and individual experts in 41 countries. We are committed to ending statelessness and ensuring that everyone living in Europe without a nationality can access the rights they are entitled to under international law.

At the heart of our strategy is an understanding of the need to raise awareness about statelessness, support legal and policy development and build civil society's capacity to act. We are dedicated to working alongside stateless people and their communities to strengthen their voices and together advocate for full respect of their human rights.

For more information visit **www.statelessness.eu**

## Thanks

We would like to acknowledge the support of Paul Hamlyn Foundation for our work to evidence and promote the reduction of childhood statelessness in the UK.

 

**General: +44 2045 266653**
**Media: +44 7522 525673**

**info@statelessness.eu**
**www.statelessness.eu**

**London, United Kingdom**
**Charity Number 1158414**

The European Network on Statelessness is a registered Charitable Incorporated Organisaton in England. This report is licenced under a Creative Commons Attribution-NonCommercal-Share Alike 4.0 International licence. With appropriate credit, this report can be copied, redistributed and adapted for non-commercial purposes.