# EXHIBIT 14

**42 Ga. L. Rev. 525**

**Georgia Law Review**
Winter, 2008

**Notes**
Sara Catherine Barnhart

Copyright (c) 2008 Georgia Law Review Association, Inc.; Sara Catherine Barnhart

# SECOND CLASS DELIVERY: THE ELIMINATION OF BIRTHRIGHT CITIZENSHIP AS A REPEAL OF "THE PURSUIT OF HAPPINESS"

**\*527 I. Introduction**

" 'Immigrants are dirty and lazy . . . . They will never be Americans like us.' " [1] Historically, anti-immigration backlashes have followed large waves of immigration to the United States. [2] Nativism [3] was evident in America [4] as early as the days of Benjamin Franklin even though, aside from the Native Americans, few Americans were truly "native." [5] Franklin's arguments in the quote below bear a striking similarity to complaints that today's anti-immigration organizations make about Hispanic immigrants:

> Those who come hither are generally of the most ignorant Stupid Sort of their own Nation . . . . [N]ow they come in droves . . . . Few of their children in the Country learn English; they import many Books; and . . . two [of the printing houses] are entirely German . . . . [T]he Signs in our Streets have inscriptions in both languages, and in some places only German: They . . . make all their Bonds and other legal Writings in their own Language, which (though I think it ought not to be) are allowed good in our Courts . . . . [U]nless the stream of their importation could be turned . . . they will soon so out number us, that all the advantages we have will not . . . be able to preserve our language, and even our Government will become precarious. [6]

**\*528** Although such fears of immigration have recurred throughout our history, many historians and demographers agree that the United States owes much of its economic resilience to replenishing waves of immigrants. [7] Immigration is one way this country makes and remakes itself, but anxiety about immigration, both legal and illegal, dates back to the earliest days of America's history. [8]

Although nativists often point to some underlying social issue to support their anti-immigrant attitudes, "successful nativist movements have almost always been linked to more general fears or uneasiness in American society." [9] Nativism is more likely to succeed when Americans do not have confidence in their future. [10] Conversely, "[w]hen most Americans are generally united and feel confident about their future, they seem to be more willing to share that future with foreigners." [11]

Economic forces swing the pendulum of anti-immigration attitudes. In times of labor shortage, the United States has welcomed immigrants to satisfy the increase in labor demand. [12] Even when U.S. law had fewer immigration restrictions, immigrants still faced discrimination and resentment from the American population. [13] Negative attitudes towards immigrants are even more exaggerated in times of economic struggle, with immigrants receiving blame for the country's economic woes. [14]

Some who blame immigrants for the country's economic problems have proposed a solution to solve the "immigration controversy": elimination of birthright citizenship. [15] This proposal may address **\*529** the perceived threat posed by an influx

of undocumented workers, but it also will have side effects on all foreigners who settle in the United States regardless of their immigration status. [16]  Over the years, a number of congressmen have proposed that the United States eliminate its doctrine of birthright citizenship and deny citizenship to children born in the United States if neither parent is a citizen or permanent resident. [17]

The primary argument proffered in support of the birthright citizenship repeal parallels the anti-immigrant rhetoric that has echoed since the time of Benjamin Franklin: immigrants result in a net economic cost to the United States. [18]  To support his 1991 proposal to limit birthright citizenship, Congressman Elton Gallegly of California asserted that although the United States is a nation of immigrants:

> [t]he United States is also a nation of finite resources and opportunities which must be available to and shared by all its citizens. Today, in many parts of this country our cities and towns are being overrun with immigrants, both legal and undocumented, who pose major economic  **\*530**  and law enforcement problems for local governments and place an added burden on their already strained budgets. [19]

Essentially all proponents for a repeal of birthright citizenship make the same argument: Repealing this benefit will eliminate the strain on social programs and crimes caused by undocumented workers. [20]  The proponents hypothesize that a denial of citizenship benefits to U.S. born children of undocumented workers will result either in less incentive for parents to immigrate here in the first place or, at a minimum, less demand on our finite resources by these "outsiders." [21]

Part II of this Note traces general nativist sentiment as exhibited throughout U.S. history from the days of our founders until the present. Special focus is given to the history of Mexican-American immigrants and guest workers, the development of U.S. immigration policy, and the development of the social construct "illegal alien."

Part III.a of this Note discusses the current proposed legislation, House Bill 133 and House Bill 1940. [22]  Both Bills propose to eliminate automatic birthright citizenship in the United States if neither parent is a U.S. citizen or permanent U.S. resident. [23] House Bill 1940 permits retention of birthright citizenship for a child whose parent is active in the U.S. armed forces. [24] Eliminating birthright citizenship in this way means that citizenship will be determined by the citizenships of one's parents, rather than by one's place of birth. Part III.a also documents the roots of the common law doctrine of jus soli, or birthright citizenship, and its impact on U.S. history and demography.

Part III.b demonstrates the role of American nativist attitudes in the passage of the Citizenship Clause of the Fourteenth Amendment  **\*531**  and the special protection for citizenship status that the amendment's framers envisioned. Part III.c covers the scholarly debate involving the application of the Citizenship Clause to undocumented workers and also traces relevant Supreme Court precedent over the last 150 years. Although the Supreme Court has not specifically ruled on the application of this clause to undocumented workers, past Supreme Court rulings are instructive on how the Supreme Court would rule were it presented with this direct question. [25]

Part III.d discusses the motivations behind a repeal of birthright citizenship and the policy arguments against such a decision. This Part rebuts the argument that birthright citizenship can be repealed by statute rather than by Constitutional Amendment. It examines the background of the seminal case, United States v. Wong Kim Ark, [26]  and asserts that the legislative backdrop to this decision necessarily demonstrates that the Citizenship Clause was meant to and should apply to both documented and undocumented immigrants. Thus, the analysis shows that birthright citizenship only can be repealed by a constitutional amendment.

Part IV concludes this Note and suggests that repealing birthright citizenship is a political and nativist tactic unrelated to addressing the real challenges presented in the current immigration situation. It discusses the negative consequences that would follow a repeal of birthright citizenship and posits that a repeal of birthright citizenship would be contrary to American traditrant ideals. Birthright citizenship furthers the dynamic nature of the United States, which gives everyone, regardless of race, color, or creed, a chance to start anew and the opportunity to be part of the colorful mosaic that comprises this great country.

**\*532  II. Background**

## A. IMMIGRATION AND HISTORICAL NATIVISM

1. Anti-Catholicism: A Threat to "American" Values. During most of the nineteenth century immigration remained largely unregulated by the government. [27] Most Americans believed it was necessary to fill up the country, and they welcomed foreigners who immigrated to the United States. [28] This welcoming period, however, was not without some anti-immigrant activity. Anti-Catholicism was the first phase of anti-immigrant fervor that swept the nation. [29] The precursor to extreme anti-Catholicism was a general dislike for Catholics, which stemmed from the perceived threat of Catholic French Canada and its Indian allies to America's northern cities. [30] As German and Irish Catholic immigration increased, many Americans saw Catholics as subversives who threatened the new republic and all of its ideals. [31] When a large immigrant population of Catholics, who were mainly poor, streamed into America, this influx resulted in violent reactions from Protestants, who lashed out against Catholic convents and churches. [32] A Catholic priest described his experience: "I have not considered myself safe to walk the streets after sunset. . . . I have been stoned by young men. . . . I am hissed and insulted . . . ." [33] Anti-immigrant rhetoric was rampant and included references to Catholic immigrants as "the outcast and offal of society, the vagrant and the convict-transported in myriads to our shores, reeking with the accumulated crimes of the whole civilized world." [34] This narrow prejudice soon gave way to more generalized racial antipathy.

 **\*533**  2. The Racial Element of Anti-Immigrant Activity. In the 1830s and 1840s, a new "Anglo-Saxon" ideology inspired the belief that the American Anglo-Saxons were destined to dominate the American continents and shape the destiny of other areas. [35] One of the inspirations for the adoption of these beliefs emerged from encounters between Americans and Mexicans in the American Southwest. [36] During this time, Americans proclaimed themselves an Anglo-Saxon race and, as this racial rhetoric gained momentum, they opposed the permanent presence of anyone who did not match this description. [37] Explaining his belief in the superiority of the Saxon people and in defense of overt racism against non-Anglo-Saxons, Horace Bushnell, a prominent theologian, declared in August 1837 that "[o]ut of all the inhabitants of the world . . . a select stock, the Saxon, and out of this the British family, the noblest of the stock, was chosen to people our country." [38] In contrast to Anglo-Saxons, Bushnell argued that the Mexican people began their civilization with "fundamental disadvantages" in their immigrant population. [39] Further, he suggests that if the "quality" of the Mexican people themselves evinced itself in another people, " 'five years would make [that country] a seat of poverty and desolation.' " [40]

Throughout U.S. history similar "xenophobic bigotry" has resulted in calls for anti-immigrant legislation, such as a measure to deny public services not only to school-aged immigrants but also to American citizen children of undocumented immigrants. [41] Nativist movements also have called for stricter naturalization laws. [42]

 **\*534**  During the 1850s and the years before the Civil War, a growing uncertainty about the future of the country led to an increase in nativist sentiment. [43] During the Civil War, however, concerns over immigration gave way and were replaced by the threat of Southern states seceding from the Union. [44] Because immigrants were one of the poorest segments of the population, they actually bore a huge burden of the military draft during the Civil War. [45]

Nativists did not immediately succeed in restricting naturalization laws. In 1868, in the wake of the Civil War, Congress proposed and the states ratified the Fourteenth Amendment of the Constitution, which for the first time established a uniform national citizenship. [46] The Fourteenth Amendment provides that "[A]ll persons born or naturalized in the United States . . . are citizens of the United States and of the State wherein they reside." [47] Although the passage of the Fourteenth Amendment was primarily intended to protect the rights of former slaves, through its broad terms it also embraced second generation immigrants born in the United States to non-citizen parents. [48]

After the Civil War, the next phase of anti-immigrant activity was anti-Asian, triggered by the large number of Chinese workers who immigrated to the United States in the early 1870s to the early 1880s. [49] In response, Congress altered the

federal naturalization statute to permit the naturalization of only "white persons and persons of African descent." [50] Congress deliberately chose not to use the broader language of "persons" in order to exclude Chinese individuals from the naturalization process. [51] For the next eighty years, Asians would be ineligible for citizenship under federal law. [52]

**\*535** The anti-Asian phase flourished during the 1870s and led to Congress's passage of the Chinese Exclusion Acts in 1882. [53] Notably, the rallying cry for the Chinese Exclusion Acts was similar to the arguments offered today for stricter immigration policy. [54] In the post-Civil War economic climate, American laborers wanted to restrict the immigration of Chinese workers for their own economic benefit by reducing competition for jobs. [55] Racism also played an important role in the desire to exclude Asians from the United States. [56] Although the constitutionality of barring a particular "class" of immigrants was challenged, the Supreme Court ruled through a series of decisions that the Exclusion Acts were constitutional. [57]

In the 1880s, anti-immigration sentiment shifted and soon was directed at all immigrant groups. [58] Many Americans in the early twentieth century considered the "immigrant invasion" a threat to their way of life. [59] Popular belief was that Europeans' willingness to work for any wage would depress overall wages and thus threaten American workers' standard of living. [60]

Nativists during this period did not muster only economic arguments in favor of immigration restrictions but also appealed to racist attitudes against non-whites and presumed inferior peoples of European origin. [61]

One such racist appeal was made by a group of outspoken Harvard students who asked "Americans to decide . . . whether they wanted their country 'to be peopled by British, German and Scandinavian stock, historically free, energetic, progressive, or by **\*536** Slav, Latin and Asiatic races historically down-trodden, atavistic and stagnant.' " [62] These sorts of beliefs were common and tolerated in American society during this time. [63]

3. The Beginning of Immigration Law. In the late nineteenth century, during a time of increasing popularity for nativist ideas, the United States implemented its first immigrant quota system. [64] For Nativists, a quota alone was insufficient; thus they pushed for even stricter measures, such as the institution of a literacy test to "improve the quality of the incoming immigrants." [65] Such quality control measures, however, were repeatedly rejected. [66]

In 1897, President Cleveland responded by calling quality control immigration restrictions un-American and noted that illiterate immigrants " 'seek among us only a home and an opportunity to work.' " [67] President Taft later recognized a fact often repeated even now: "[T]he natives are not willing to do the work which the aliens come over to do." [68] This attitude and approach reflected in century-old Presidential commentary has become a regular response to the nativists' chorus calls for quality control and assimilation plans including the "English as the official language" proposals. [69]

## B. IMMIGRATION LAW AND POLICY: THE HISTORY

1. "Illegal" Immigration As a New Construct. Although history demonstrates that immigration has not been a destructive force, today's advocates of stricter enforcement of U.S. immigration laws distinguish the immigrants who came a century ago from many **\*537** immigrants today because the former arrived "legally." [70] This distinction between legal and illegal immigration, however, is a fairly recent concept. [71] Before federal immigration regulation took hold, entry to U.S. shores was neither "legal" nor "illegal"; ships merely dropped people off at various ports throughout the United States. [72]

In 1819, a new law required immigrants to be counted at ports of arrival but created no agency to carry out the task and placed no limit on the number of arrivals. [73] Because there were not many native-born Americans to begin with, these immigrants were quickly integrated into American society. [74] Additionally, the government did not centrally regulate the grant of citizenship, and naturalization certificates were awarded casually by various agencies and individuals. [75] In contrast to the state of today's immigration law, immigrants who arrived during the country's infancy had few legal barriers to hurdle in order to become full, participating members of their local communities.

The popularized image of customs agents at New York's Ellis Island vigorously inspecting each immigrant and his papers is not altogether true. [76] Further, because the United States did not require passports until 1918, the term "illegal immigrant" had no meaning before then, and ninety-eight percent of the immigrants who arrived at Ellis Island were admitted into the country. [77]

Originally, the federal government exercised little to no direct immigration control. Instead, states played the primary role in regulating immigration by inspecting incoming ships to look for criminals and people with contagious diseases. [78] In 1875, the Supreme Court took this police power away from the states in **538** Henderson v. Mayor of New York, [79] holding that the federal government had exclusive jurisdiction to regulate immigration into the United States. [80] Even when federal agents took over the immigration process, however, they still did not set immigration quotas for individuals from countries in the Western Hemisphere. [81]

In 1891, following the passage of the Chinese Exclusion Acts several years before, Congress passed the next immigration act, which kept out several immigrant groups including "insane persons" and "idiots" whom "congressmen feared would become the responsibility of the states." [82] In response to pervasive anti-immigration sentiment, Congress also created a permanent superintendent of immigration and added further immigration restrictions. [83] Despite the increase in the number of restrictions imposed on new immigrants, only one percent of immigrants were actually excluded or deported in 1905. [84] By 1920, thirty-six million immigrants and their children comprised over one-third of the U.S. population. [85]

Attitudes about the extent to which immigrants do or should assimilate has influenced greatly the various approaches to immigration policy. Today's advocates of stricter immigration enforcement contend that "too many immigrants seek economic advantage and fail to understand democracy, . . . refuse to learn English, overcrowd homes and overwhelm public services" and "[drive] down working-class wages." [86] History, however, teaches a different lesson.

Although many Americans worried in the first part of the twentieth century that immigrants would never assimilate, "[b]y the 1950s, Germans, the Irish and Jews had abandoned immigrant **539** enclaves" and "most first-generation immigrants quickly shed native languages." [87]

Despite history's suggestion that eventual assimilation is inevitable, the same concerns held by Americans from the last century have resurfaced today. [88] Although some assert that today's immigration controversy is unique, the above quoted excerpt is nearly identical to the past concerns of many Americans, including Benjamin Franklin.

2. Relationship Between the History of Mexican Immigration and Modern Immigration Trends. While the general arguments today against immigration sound very similar to those of the last two centuries, the topic of Mexican immigration deserves separate consideration. In contrast to the previously discussed nativist rhetoric directed at the Irish, Germans, and Eastern Europeans, much of the anti-immigrant rhetoric today is directed at Hispanics and Mexican laborers in particular. Mexican immigration, however, is not a new phenomenon. Mexican laborers and immigrants have been present in the United States for most of American history and, like many other groups of non-Anglo Saxon stock, have experienced substantial discrimination. [89] The experience of Mexican immigrants is unique, however, because Mexico shares a border with the United States. [90] Therefore, the trends of welcoming immigrants in times of labor shortage and blaming them in times of economic hardship have had a particularly strong impact on immigrants from Mexico. [91]

Because Europe is such a great distance from the southwestern United States, European immigrants could not travel quickly enough to obtain the jobs that an immediate labor shortage would demand. [92] As a result of the Chinese Exclusion Acts and other "anti-Asian" policies, Mexico remained the only viable source for **540** labor. [93] Because of their proximity to Mexico, many immigrant workers never settled permanently in the United States, and for 150 years, Mexican workers have continued to make the trek back and forth between the two countries. [94]

The assimilation into mainstream American society experienced by many other immigrant groups has eluded Mexican immigrants and has led to the continued resentment of Mexicans by Americans, who generally are unaware of the historically

destructive policies of American businesses toward Mexican labor. [95]  These destructive policies included the U.S. repatriation programs during the Great Depression Era and "Operation Wetback" in the 1950s, where millions of Mexican immigrants, both legal and illegal, and Mexican-American citizens were deported back to Mexico, frequently without any formal deportation proceedings. [96]

Despite the seesaw in immigration policy over the last 150 years, various government programs have allowed American businesses to maintain access to Mexican labor. [97]  Businesses employing this labor pool have sought to use Mexicans for their labor while keeping them "in subordinate status so they could not afford to organize collectively or protest their conditions." [98]  This has had the effect of  **\*541**  "creat[ing] a reserve pool of temporary laborers who had few rights and no vesting of equities." [99]

Today workers and their families who have decided to remain in the United States face much adversity. [100]  They must either prove they are of legal status and authorized to work or find another way to live. [101]  Migrant workers in the United States already face many problems "that result from the creation of an uninsured, underclass of persons. [102]  Given the history of the Mexican labor supply plus the close proximity of Mexico to the United States, however, the stream of immigrating Mexicans is unlikely to slow anytime in the near future.

The grant of citizenship to all persons born in the United States under the Fourteenth Amendment acts as a limiting force on the growth of the undocumented population. Even when the parents of an American-born child are undocumented, their child will receive the full opportunities that America has to offer. As a result, the "underclass" status is not perpetuated for an entire social group. With the protection of the Citizenship Clause, the American Dream is at most one generation away.

### III. Analysis

### A. CURRENT LEGISLATION

1. Elimination of Automatic Birthright Citizenship. As tension rises in the debate over how to halt illegal immigration, various proposals have emerged. One proposal is the elimination of automatic birthright citizenship from American law. [103]  Currently  **\*542**  any person, regardless of his or her parents' national origin or legal status, obtains U.S. citizenship at birth just by being born in U.S. territory. [104]

On February 9, 2005, Georgia Congressman Nathan Deal proposed the Citizenship Reform Act of 2005 (2005 Reform Act), which sought to "deny automatic citizenship at birth to children born in the United States to parents who are not citizens or permanent resident aliens." [105]  On April 19, 2007, Congressman Deal again proposed the elimination of automatic birthright citizenship in the Birthright Citizenship Act of 2007 (2007 Citizenship Act). [106]  The 2007 Citizenship Act is similar in substance to the Citizenship Reform Act of 2005. The bill's purpose is to amend the Immigration and Nationality Act to give birthright citizenship to people "born in the United States of parents, one of whom is . . . a citizen or national of the United States; [or] . . . an alien lawfully admitted for permanent residence in the United States whose residence is in the United States; or . . . an alien performing active service in the armed forces." [107]  Although the two acts have similar goals, there are significant differences between them. Unlike the 2005 Act, the 2007 Act makes no distinction between children born in or out of wedlock. [108]  Further, the 2007 Act allows children of non-citizen members of the armed services to be granted birthright citizenship, whereas the 2005 Act does not create this special category. [109]

On January 4, 2007, Congressman Elton Gallegly proposed the Citizenship Reform Act of 2007 (2007 Reform Act), which sought to "deny citizenship at birth to children born in the United States of  **\*543**  parents who are not citizens or permanent resident aliens." [110]  The 2007 Reform Act is substantially similar to the 2005 Reform Act but distinguishable with regard to children born out of wedlock. Under the 2005 Reform Act a child born out of wedlock is only eligible for birthright citizenship if the child's mother is a citizen or permanent resident. [111]  The 2007 Reform Act includes the same language as the 2005 Reform Act but in addition to that language, it expands birthright citizenship to include a child born out of wedlock whose father is a citizen or permanent resident. [112]

2. Reasoning Behind the Acts. Proponents of a repeal of birthright citizenship argue that it allows undocumented immigrants to give birth to "anchor babies" who, once they reach adulthood, can legally sponsor their parents for legal permanent residency. [113] Further, repeal proponents believe that " 'undocumented aliens and their progeny represent a net expense to society, that they dilute the traditional ethnicity, that they foster disrespect for the law, and that they provide an incentive to avoid normal immigration procedures.' " [114]

In theory, the 2005 and 2007 Reform Acts as well as the 2007 Citizenship Act would end automatic birthright citizenship for children of undocumented immigrants and thus prevent parents from gaining citizenship when their adult children eventually sponsor the parents for residency. [115] In addition, the proposed Acts **544** would likely enable the U.S. government to deport the children of undocumented immigrants along with their parents. [116]

Proponents of repealing birthright citizenship assert that this proposal is not extreme because most westernized countries do not allow birthright citizenship regardless of an immigrant's legal status. [117] Prior to 2004, Ireland was the only country in the European Union that allowed birthright citizenship. [118] Irish voters, however, overwhelmingly voted in 2004 to remove the constitutional provision that afforded Irish citizenship to any child born in Ireland. [119] Ireland felt pressure from its neighbors to make this change to its immigration law and to close a "back door" to European Union residency. [120]

Concerns over anchor babies in the United States are comparable to concerns held by Irish officials who supported the elimination of birthright citizenship. Irish officials asserted that Ireland had "become a destination for pregnant mothers who immigrate here before giving birth so their children will be entitled to European Union residence and welfare benefits." [121] Proponents of repealing birthright citizenship in the United States give similar justifications, alleging that undocumented immigrants give birth to their children in the United States to take advantage of its public service programs. [122]

Although the Irish voters overwhelmingly supported the referendum, it sparked debate over the "essence of Irishness." [123] Ireland has a history of liberal citizenship regulation due to its record of emigration and depopulation. [124] Birthright citizenship has been permissible since the 1950s, and anyone of Irish descent with **545** a grandparent born in Ireland can become a citizen. [125] Birthright citizenship was incorporated into Ireland's Constitution in 1998 in order to give citizenship to people in Northern Ireland as part of the Belfast peace accord. [126] Similarly, birthright citizenship has been the common law in the United States for much of its history. [127] Although the United States and Ireland may have had different motivations for adopting and maintaining birthright citizenship, proponents of repealing birthright citizenship in both countries give similar reasons for its abrogation.

## B. LEGAL BASIS FOR BIRTHRIGHT CITIZENSHIP

1. The Constitutional Basis of Birthright Citizenship. Birthright citizenship is based on the Fourteenth Amendment to the Constitution, which guarantees that "[a]ll persons born or naturalized in the United States and subject to the jurisdiction thereof, are citizens of the United States." [128] The Supreme Court has interpreted this right to mean that "[e]very person born in the United States, and subject to the jurisdiction thereof, becomes at once a citizen of the United States, and needs no naturalization." [129] The Fourteenth Amendment is consistent with common law principles of jus soli, [130] namely that one's nationality is determined by his or her place of birth. [131] The alternative system, jus sanguinis, is employed by most European countries and grants citizenship by descent or blood, according to the citizenship of one's parents. [132]

 **546** The system of jus sanguinis alone could not have operated in the United States at its inception because, except for Native Americans, the inhabitants were all citizens of other countries. [133] In addition to jus soli, the United States also has incorporated some aspects of the jus sanguinis doctrine in order to give automatic citizenship to children of U.S. citizens who are born abroad. [134] By combining both jus soli and jus sanguinis, the United States has maintained a very expansive citizenship policy which protects both persons born inside U.S. borders and those born abroad.

Although the concept of jus soli is embodied in the Fourteenth Amendment as interpreted by the Supreme Court, those who support a repeal of Birthright Citizenship do not believe a constitutional amendment is necessary to eliminate birthright citizenship. [135] In the opinion of Congressman Nathan Deal, the Fourteenth Amendment was never designed to confer birthright citizenship to the children of undocumented immigrants and has been misinterpreted over the years. [136] Thus, according to Deal, birthright citizenship can be repealed by federal legislation without amending the Constitution. [137] There is good reason, however, to doubt the accuracy of this position on the constitutionality of such legislation. Walter Dellinger, former Assistant Attorney General, has stated that elimination of birthright citizenship by statute would be unconstitutional and a constitutional amendment to that effect would contradict the history and traditions of the United States. [138]

 **\*547**  2. History and Purpose of the Citizenship Clause of the Fourteenth Amendment. The Citizenship Clause of the Fourteenth Amendment did not further limit citizenship rights in the United States but instead restored the more expansive historical doctrine of jus soli. [139] This tenet of American law was temporarily restricted in 1857 by the Dred Scott decision, in which the Supreme Court denied birthright citizenship to the descendants of slaves. [140]

The Constitution does not specify any criteria for U.S. citizenship, and jus soli has always been followed as part of America's common law heritage. [141] The absence of any explicit citizenship language in the Constitution, however, made the Dred Scott decision possible. [142] The decision limited the application of jus soli to whites only on the ground that whites did not consider Africans "appropriate partners in the political community," thus excluding anyone of African descent. [143]

In response to Dred Scott and the Civil War, Congress enacted the Civil Rights Act of 1866. [144] The Civil Rights Act of 1866 provides that "all persons born in the United States and not subject to any foreign power, excluding Indians not taxed, are hereby declared to be citizens of the United States . . . ." [145] During the debates leading up to the passage of the Act, the Chair of the House Judiciary Committee, Representative James Wilson, cited the treatise of renowned constitutional scholar William Rawle to support his  **\*548**  contention that the Act encompassed the common law of jus soli. [146] In his widely respected constitutional law treatise, Rawle states: "Every person born within the United States, its Territories or districts, whether the parents are citizens or aliens, is a natural-born citizen in the sense of the Constitution, and entitled to all the rights and privileges pertaining to that capacity." [147]

When the Fourteenth Amendment was proposed, the Civil War had just ended. [148] The framers and supporters of the Fourteenth Amendment had "just overthrown a system founded [on the] denial of political membership in the country to a hereditary category of inhabitants." [149] Thus, the framers of the Amendment had a strong incentive to avoid the recurrence of this situation and sought to reaffirm, on a racially neutral basis, the same principles that had always governed American citizenship. [150]

The Citizenship Clause was intended to permanently overrule the Dred Scott decision and once again make jus soli the law of the United States. [151] The legislative history and judicial interpretation make clear that the purpose of the Fourteenth Amendment was to ensure that the right of citizenship by birth would be insulated from political pressures. [152] During the congressional debates over the Fourteenth Amendment, Senator Conness asserted: "[I]t is proposed to declare that [children of Chinese parents] shall be citizens. We have declared that by law; now it is proposed to incorporate the same provision in the fundamental instrument of the nation. I am in favor of doing so." [153] Therefore, even though the relevant text of the Civil Rights Act of 1866 was nearly identical to the proposed language in the Fourteenth Amendment, Congress  **\*549**  explicitly chose to provide citizenship rights in a constitutional amendment in order to ensure that it could not be overturned by statute. [154] "[The people] rejected the possibility of a permanent caste of aliens, generation after generation born in America but never to be among its citizens." [155]

The Supreme Court recognized this contextual importance in United States v. Wong Kim Ark, in which the Court noted that, shortly after passing the Civil Rights Act of 1866, Congress acted again and framed the Fourteenth Amendment, "evidently thinking it unwise, and perhaps unsafe, to leave so important a declaration of rights to depend upon an ordinary act of legislation, which might be repealed by any subsequent Congress." [156] This historical account undermines Representative Deal's interpretation that birthright citizenship can be eliminated by statute. [157] Further undermining Deal's position is the Supreme

Court's holding that "while [the Fourteenth Amendment] leaves the power, where it was before, in [C]ongress, to regulate naturalization, [it] has conferred no authority upon [C]ongress to restrict the effect of birth, declared by the [C]onstitution to constitute a sufficient and complete right to citizenship." [158]

In more recent decisions, the Supreme Court has repeatedly upheld the view that the framers' rationale for the Fourteenth Amendment was to provide special protection for citizenship rights. [159] Thus, Congress has no authority to rescind the constitutionally protected jus soli rights by statute. [160]

**\*550** 3. Applicability of the Citizenship Clause to Aliens. Legislative history makes clear that the Citizenship Clause was meant to apply to children of aliens. The Fourteenth Amendment, in its original proposed version, did not contain the Citizenship Clause. [161] Before its passage, Senator Jacob Howard of Michigan suggested that Congress include language in the amendment relating to citizenship rights. [162] After a vigorous debate in the Senate, the Citizenship Clause was added to the Fourteenth Amendment. [163]

The Clause was highly contentious because many senators were concerned about extending birthright citizenship to children of aliens who were not Caucasian. [164] In response to the Citizenship Clause, Senator Cowan asked whether it is "proposed that the people of California are to remain quiescent while they are overrun by a flood of immigration of the Mongol race . . . [and whether] they [are] to be immigrated out of house and home by Chinese?" [165]

In response to this concern, Senator Conness from California stated, "I voted for the proposition to declare that the children of all parentage whatever, born in California, should be regarded and treated as citizens of the United States, entitled to equal civil rights." [166] Thus, without question, the Fourteenth Amendment was to apply to alien children. [167]

Senator Cowan, who voted against the amendment, continued:

> I am unwilling . . . to give up the right . . . of expelling a certain number of people who invade [a state's] borders; who owe to her no allegiance . . . who pay no taxes; who never perform military service; . . . If the mere fact of being born in the country confers that right, . . . I think it will be mischievous. [168]

**\*551** Senator Howard, in contrast, persuaded members of the Senate to support the Citizenship Clause proposal by explaining that the Amendment "is simply declaratory of what I regard as the law of the land already, that every person born within the limits of the United States, and subject to their jurisdiction, is by virtue of natural law and national law a citizen of the United States." [169]

This statement demonstrates that the Amendment merely confirms the common law of jus soli and does not restrict common law citizenship principles. [170] Howard stated further: "[The amendment] will not, of course, include persons born in the United States who are foreigners, aliens, who belong to the families of ambassadors or foreign ministers . . . but will include every other class of persons." [171]

Proponents of repealing birthright citizenship point to the language "will not, of course, include . . . foreigners, aliens" as supportive of their position that the Fourteenth Amendment does not apply to undocumented immigrants. [172] Others assert that this interpretation misreads Howard's comments by editing out the phrase "who belong to the families of ambassadors or foreign ministers," which describes the kinds of foreigners or aliens that are not included. [173] If the phrase is read as excluding two categories, both "foreigners" generally and "aliens, who belong to the families of ambassadors," it directly conflicts with existing law and tradition at that time. [174] Excluding all foreigners would mean that "no children of foreigners, not even children of permanent residents, would be U.S. citizens." [175] This interpretation is incorrect, as evidenced by the vigorous debate surrounding the Citizenship Clause before its passage; the debate centered on the understanding **\*552** that the Citizenship Clause "would confirm the citizenship of children born to Chinese immigrants and Gypsies." [176]

Thus, the traditional interpretation, that the phrase "who belong to the families of ambassadors" describes the words "foreigners, aliens," is the only plausible one. Senator Howard was merely restating the general rule that ambassadors and diplomats are not subject to the laws of the United States because they are agents of a foreign sovereign; thus, their children are ineligible for automatic birthright citizenship.[177] Although initially there were individuals who both supported and criticized the Citizenship Clause, there was no confusion as to the application of the Citizenship Clause to children of aliens.[178]

## C. APPLICATION OF THE CITIZENSHIP CLAUSE TO UNDOCUMENTED IMMIGRANTS

1. Legal vs. Illegal: A New Concept. Although some proponents of repealing birthright citizenship may concede that the Citizenship Clause applies to children of resident aliens, they claim that "illegal aliens"[179] were not intended to be included.[180] Congress did not address explicitly the distinction between legal and illegal immigration during the passage of the Fourteenth Amendment because "[u]ntil 1875 alien migration to the United States was unrestricted."[181] Proponents of repealing birthright citizenship assert that the absence of immigration law prior to the Civil War necessarily means that the framers could not have contemplated **553** conferring citizenship on children of undocumented immigrants.[182] Even though the federal government was not actively regulating immigration, however, the states were regulating it.[183] Further, the federal government itself had been trying to prohibit the international slave trade, then considered a form of involuntary immigration.[184] If the proponents' position is correct, then the children born to illegally imported slaves would not have been guaranteed citizenship by the Fourteenth Amendment.[185] This would contradict the purpose of the Fourteenth Amendment to overturn the Dred Scott decision and guarantee U.S. citizenship to persons of African descent born in the United States.[186]

2. Who Is "Subject to the Jurisdiction" of the United States?[187] Most of the debate concerning the applicability of the Fourteenth Amendment to undocumented immigrants surrounds the phrase "subject to the jurisdiction" of the United States.[188] The plain meaning of this phrase is: "to be subject to the authority of the U.S. government."[189] This phrase encompasses the majority of individuals inside the United States who must obey federal and state laws.[190] Despite the fact that undocumented immigrants have not sworn allegiance to the United States, they cannot immunize themselves from U.S. law solely by entering the country illegally.[191] **554** Thus, even undocumented immigrants are "subject to the jurisdiction" of the United States.[192]

Nothing in the language of the Citizenship Clause, its legislative history, or its traditional interpretation suggests that a child born in the United States to undocumented immigrants must be excluded from U.S. citizenship.[193] This interpretation would necessarily have the effect of also excluding any child born to a foreign visitor or temporary alien.[194] The Supreme Court and English common law treat temporary aliens as equivalent to resident aliens because they are both subject to the authority of the government.[195] Thus, "deportable aliens are subject to the jurisdiction of the United States-that is what makes them deportable, and often subject to criminal punishment as well."[196]

By process of elimination the only individuals not subject to the jurisdiction of the United States are persons who are formally immune from the law. This includes foreign diplomats who have the privilege of diplomatic immunity[197] and invading armies who are agents of a foreign sovereign.[198] Children born to these individuals are not entitled to birthright citizenship under the Fourteenth Amendment.[199] This is consistent with the common law of jus soli, which does not recognize as citizens children born to aliens who "entered under the auspices of their government, with legal or factual immunity from local law."[200]

Both proponents and opponents of eliminating automatic birthright citizenship cite to the legislative history of the Fourteenth Amendment to support their positions regarding who is "subject to **555** the jurisdiction" of the United States.[201] Those who support a more narrow interpretation of the Fourteenth Amendment argue that the legislative history makes clear the Amendment was never meant to apply to children of illegal immigrants; those who are opposed argue just the opposite.[202]

Proponents of the elimination of automatic birthright citizenship point to language from Senator Lyman Trumbull, Chairman of the Senate Judiciary Committee during the Fourteenth Amendment debate, to prove that to be "subject to the jurisdiction" of

the United States, one could not owe allegiance to any other country,[203] thus excluding undocumented immigrants who still owe allegiance to another country. Senator Trumbull explained that "subject to the jurisdiction" meant "[n]ot owing allegiance to anybody else."[204]

Opponents of the repeal, however, point to the Senate debate that shows this reference was made in a discussion about tribal allegiances and Native Americans, not immigrants.[205] Trumbull explained the uniqueness of the relationship between the U.S. government and Native Americans stating that "[w]e make treaties with them, and therefore they are not subject to our jurisdiction," and that the Citizenship Clause applies to "only those persons . . . who are subject to our laws."[206] The status of Native Americans was therefore "unlike alien immigrants and visitors, who became subject to the laws of the state and federal governments upon entry."[207] Thus, immigrants, even those that are undocumented, are still "subject to the jurisdiction" of the United States and within the purview of the Citizenship Clause of the Fourteenth Amendment.[208]

 **\*556**  3. Supreme Court Precedent, or Lack Thereof. The Supreme Court's interpretation of the Fourteenth Amendment suggests that all children born on U.S. soil, including those born to parents who are illegal immigrants, are given automatic U.S. citizenship.[209] The Supreme Court, however, has never explicitly held that the Fourteenth Amendment applies to children of illegal immigrants.[210]

Although the Court has not ruled on the narrow issue in question, there is some precedent that scholars have cited to support their arguments on both sides of the debate. In Elk v. Wilkins,[211] the Supreme Court rejected a claim to U.S. citizenship by a Native American who had been born on a reservation but denounced allegiance to his tribe.[212]

The Court took a different view, however, with regard to children of persons from a foreign country. In the seminal case of United States v. Wong Kim Ark, the Court reasoned that Wilkins applied only to Native Americans and did not "deny citizenship to children born in the United States of foreign parents."[213] Wong Kim Ark involved a child born in the United States to Chinese parents, who were still subjects of the emperor of China but were permanently domiciled in the United States. The Court held that, under the Fourteenth Amendment of the Constitution, the child was a citizen of the United States.[214] The majority opinion reasoned that the Fourteenth Amendment had adopted the common law definition of birthright citizenship, which permits "citizenship by birth within the territory," and its passage was not meant to narrow citizenship rights in the United States.[215] The Court stated:

>  **\*557**  As appears upon the face of the amendment, as well as from the history of the times, this was not intended to impose any new restrictions upon citizenship, or to prevent persons from becoming citizens by the fact of birth within the United States, who would thereby have become citizens according to the law existing before its adoption. It is declaratory in form, and enabling and extending in effect.[216]

The Court announced further that "[t]o hold that the Fourteenth Amendment of the Constitution excludes from citizenship the children, born in the United States, of citizens or subjects of other countries, would be to deny citizenship to thousands of persons . . . who have always been considered . . . citizens of the United States."[217] Using this language and reasoning, the Supreme Court's ruling in Wong Kim Ark is broad enough for children born to undocumented, temporary, and permanent resident immigrants in the United States to be included within the meaning of the Citizenship Clause.[218]

Another instructive case is Plyler v. Doe, in which the Court held that Texas could not deny free public school education to children of undocumented immigrants.[219] Although this case did not concern the Citizenship Clause, it was argued under the Equal Protection Clause, which requires states to give equal protection of the laws "to any person within its jurisdiction."[220] The Court ruled that the Equal Protection Clause extends to both legal and illegal immigrants because both are "subject to the jurisdiction" of the United States, which includes "all persons within the territory of the United States."[221]

**\*558**  Justice Brennan noted in Plyer that "no plausible distinction with respect to Fourteenth Amendment 'jurisdiction' can be drawn between resident aliens whose entry into the United States was lawful, and resident aliens whose entry was unlawful." [222] Even the dissent agreed that "the Fourteenth Amendment applies to aliens who, after their illegal entry into this country, are indeed physically 'within the jurisdiction' of a state." [223]

Currently all three branches of government agree that the Citizenship Clause applies to children of all aliens and citizens. [224] In the absence of a specific ruling by the Supreme Court on citizenship eligibility for children of undocumented immigrants, however, proponents of repealing birthright citizenship contend that it remains up to Congress to clarify the meaning of the Fourteenth Amendment. [225]  However, if the Supreme Court has an opportunity to rule on the application of the Fourteenth Amendment to illegal immigrants and affirms Wong Kim Ark and its progeny, it will be indisputable that a statute is not sufficient to eliminate birthright citizenship. Instead, proponents will need to amend the Constitution.

## D. NEGATIVE REPERCUSSIONS OF REPEALING BIRTHRIGHT CITIZENSHIP

1. Effect on Illegal Immigration. Repealing birthright citizenship will not eliminate the presence of children of undocumented immigrants in the United States. [226]  Regardless of the citizenship rules, these children will remain in the United States because the federal government will not make any meaningful attempt to remove them. "[T]he U.S. government will not want to expend the resources necessary to find, process and remove them and their **\*559** parents." [227]  Because so many will remain in the United States, the country will benefit by conferring citizenship rights on these children. [228]

2. Serfing USA. The benefit of jus soli is that the United States will continue to have no caste of hereditary aliens, which is consistent with the intent of the framers. [229]  By eliminating the "second generation problem" for immigrants, citizenship encourages assimilation and involvement in the political system. [230]  "[Immigrants] are thereby encouraged to embrace life here as full participants, not as half-hearted, standoffish 'guests.' " [231]  Further, if they are given citizenship rights, they will be treated equally in society rather than as second-class citizens. [232]  Assimilation and equality encourages social harmony and discourages conflict. [233]

Jus soli protects all persons born in the United States. [234]  In order to prove citizenship, one needs only to show evidence of his or her place of birth, which can be evidenced by a birth certificate. [235]  If birthright citizenship were eliminated, persons born in the United States would be required to "demonstrate the immigrant status of their parents at the time of their birth, or of their grandparents at the time of their parents' birth." [236]  This raises serious problems of proof. Hospital personnel would be required to make an immigration determination at the time of birth. Even if documents were available, someone's legal status on an exact day can be complex. [237]  In addition, the consequences of an error would be grave, especially if it ends in denying a child U.S. citizenship and all the benefits that status entails. [238]

**\*560**  3. Hereditary Criminals. If birthright citizenship were eliminated, it is unclear what status the children of undocumented immigrants would have. [239]  Neither the 2005 or 2007 Reform Acts nor the 2007 Citizenship Act addresses this complication, but most proponents of the repeal presume that the children would also be undocumented and thus deportable. [240]  There is no provision, however, in the proposed statute that provides a deportation ground for persons born as aliens in the United States because they have not entered the United States without permission and have not broken any laws. [241]  In addition, if birthright citizenship were eliminated, children born to parents whose nationality did not descend to them under foreign law would be stateless. [242]  Further, if parents themselves were stateless, then their children would be so as well. [243]  Because of its international treaty obligations, Congress would be forced to pass many additional laws in order to prevent this result. [244]

If, as many proponents desire, the children of undocumented immigrants become hereditarily undocumented at birth, then their lives will be impacted detrimentally. [245]  For example, these children will likely be subjected to abuse, exploitation or neglect by the state. [246]  However, even if birthright citizenship is eliminated, children of undocumented immigrants will still likely have a

right to government education. [247]  Aside from the benefit of education,  **\*561**  these children would endure much of the same exploitation as their parents due to the general trend of denying public benefits and services to undocumented immigrants. [248]

To Americans, this harsh result may seem palatable as applied to an adult who has entered the United States illegally who may not have contributed to society in the form of income taxes. However, denying U.S. born children access to government services while simultaneously branding them "illegal" not only condemns them to a life of poverty, but ensures these individuals will have no way out of that poverty. Although there may be some valid arguments to deny these children government benefits, labeling them "illegal" means there is little chance for them to attain economic sufficiency.

Undocumented or illegal immigrants may never receive official government aid such as food stamps, [249]  but an even bigger drain on public resources is created by having a population of millions who can never legally work. An individual who cannot legally work likely will never have health insurance, a valid driver's license, or even a social security number with which to pay income taxes. [250]

In contrast, retaining birthright citizenship gives every child of an immigrant, documented or undocumented, the ultimate opportunity to attain success. They will have the opportunity to become economically self-sufficient, law-abiding, tax-paying individuals-the perfect example of good Americans. In contrast, eliminating birthright citizenship will create a class of automatic "illegals," who will never pay taxes, will have almost insurmountable obstacles to economic independence, and surely will be treated with both contempt and disfavor by American citizens.

4. No Exemption for Immigrants of Legal Status. The 2007 Reform Act and 2007 Citizenship Act also will deny automatic  **\*562**  citizenship at birth to any child born in the United States to parents who are not either citizens or permanent resident aliens. [251]  Limiting citizenship to permanent resident aliens eliminates citizenship opportunities for children of other types of lawfully present aliens. [252]  Permanent resident aliens are only one of many categories of aliens that are legally permitted to reside in the United States; other categories "include asylees, parolees, aliens whose deportation has been withheld, or other recipients of discretionary relief." [253]  Permitting birthright citizenship only for permanent residents would give Congress the power to create hereditary classes of alien inhabitants who are lawfully present in the United States. [254]

Using the term "legal resident" may be broad enough to eliminate these problems. [255]  The term, however, may not be broad enough to include guest workers. [256]  Many proponents of repealing birthright citizenship disfavor allowing children of guest workers to become citizens and point to the potential difficulty of removing the parents of legal citizen children once their work permits have expired. [257]

5. The Gender and Family Dimension. The 2005 Act would have limited automatic citizenship at birth to children born in wedlock to at least one parent who is a U.S. citizen or lawful permanent resident, or to children born out of wedlock to a mother who is a citizen or lawful permanent resident. [258]  Congress is well aware of problems of spousal or domestic abuse in immigrant communities. [259]  In order to control their wives, citizen or lawful resident husbands  **\*563**  may intentionally keep them undocumented. [260]  Requiring that the mother be a citizen or legal permanent resident if the child is born out of wedlock only encourages a woman to stay with her abuser. [261]  This would affect detrimentally children who were born prior to the marital union of their father and mother or whose parents never marry. The 2007 Citizenship Act and the 2007 Reform Act do not include this limiting language. [262]

6. Potential for Violence. Countries that have adopted the caste approach of denying birthright citizenship have encountered serious problems as a result. For example, the country of Israel does not give citizenship to Palestinians born in Israeli occupied territory. [263]  While the Israeli government may have justifiable political and religious reasons for adopting this policy, it has created a class of stateless people. [264]  Their inescapable misery has allowed religious and political extremists to take hold of their communities and has led to unbelievable violence and bloodshed against Israelis and other Palestinians. [265]

Clearly, the relationship between the United States and Mexico or other Latin American countries is not the same as that between Israel and the Palestinians. For one, Mexican-U.S. relations lack the thousands of years of religious conflict that fuel the fire

between Israelis and Palestinians. The lesson, however, is that the pressure of being held under the thumb of another group has the potential to result in a violent release. [266]

 **\*564**  Elimination of birthright citizenship would create a variety of social, political, and economic problems that proponents have failed to anticipate.

## IV. Conclusion

Immigration has always been a controversial issue in the United States. Although continued immigration has contributed greatly to the dynamic nature of this country, during each period of our history, nativists have blamed immigrants as a cause of social ills. As a result, immigrants have continued to suffer as targets of legal, political, and social discrimination.

Many nativists believe that immigrants are responsible for draining American resources and social programs. In response to this perceived threat, Congressman Nathan Deal and his supporters do not focus on enforcing current immigration law or confronting the hundreds of thousands of persons who defy immigration laws by crossing the southern border. They focus instead on a repeal of birthright citizenship in a perverse twist of Reaganomics-esque theory. Supporters of eliminating birthright citizenship postulate that the pain caused by economic deprivation of immigrant-born children might "trickle down" to deter would-be parents from immigrating to the United States.

First, proponents of repealing birthright citizenship incorrectly assert that a change in citizenship doctrine may be accomplished by statute. Based upon the historical setting of the Citizenship Clause of the Fourteenth Amendment, the legislative history of its passage, and relevant Supreme Court precedent, such a radical change in American immigration policy can likely be effected only by constitutional amendment.

Second, elimination of birthright citizenship not only would exponentially increase the number of undocumented immigrants in this country, but also would fail to address the root of the problem: illegal immigration. Proponents argue that a repeal of birthright citizenship eliminates the motivation to immigrate to this country.  **\*565**  This is likely incorrect, however, at least as applied to the greatest percentage of U.S. immigrants who are from Mexico or other Latin American nations. History demonstrates that Mexicans have been immigrating back and forth across the border for economic and labor opportunities for hundreds of years, long before the existence of any structured immigration law. Thus, so long as the economic climate is better in the United States than in Mexico, Mexicans will continue to immigrate to the United States seeking labor opportunities regardless of their future children's possible citizenship status.

History also has documented that nativist legislation like House Bill 1940, House Bill 133 and House Bill 698 correlates more with the current political climate and the fear of people different from the "norm" than with a true concern about the sustainability of resources. Elimination of birthright citizenship will not prevent immigration from Mexico; it will only ensure that fewer Mexicans become citizens. A repeal of birthright citizenship necessarily will leave these children as undocumented persons, which will increase the overall number of undocumented immigrants present in this country and exacerbate the drain on resources described by those favoring repeal of the doctrine.

Birthright citizenship should be retained because it is part of our American tradition that values meritorious achievement and individual autonomy. The core of the Fourteenth Amendment was to ensure that slavery, a system that denied citizenship on the basis of who one's mother or father was, would never return. Slavery was based on the idea that the only way to maintain privilege was to deny it to someone else. This philosophy does not represent American values and contradicts our most prized ideals.

Additionally, elimination of birthright citizenship will create numerous practical difficulties. Evidentiary problems will create serious administrative challenges and may impact detrimentally the lives of many who may be unable to prove citizenship. Old laws will need to be rewritten and new laws will need to be enacted in order to address the new immigration issues that may arise.

Further, repealing birthright citizenship will have negative effects on society as a whole. It will generate a large group of individuals ineligible for both social-welfare benefits and gainful  **\*566**  employment, thus creating a permanently disenfranchised class. Creating a caste system is not only reminiscent of what the colonists fought to avoid, it also plants the seeds of social and political turmoil.

One key ideal among the bedrock of American democratic principles is that governments "deriv[e] their just powers from the consent of the governed."[267]  In the United States, while this "consent" is articulated through the franchise of the vote, never have all of the governed been allowed to vote. At various times some citizens governed by U.S. authority have retained power or privilege because, through their exercise of the right to vote, they denied privileges to other persons who were also governed but could not vote. Pre-Civil War southern whites justified their denial of the vote to the children of former slaves because, however far removed those children were from their immigrant ancestors, the children were not "citizens." With time, however, the country ultimately rejected the disenfranchisement of the underclass of former slaves and returned to the ideal that those governed deserve a voice in their government.

The country has moved consistently, albeit at an irregular pace, towards this ideal by increasing the extent to which the voices of those governed are heard. At each step, "the vote" encompasses more of the governed. The United States has expanded the scope of "the vote" several times, notably adding to its scope first former slaves,[268] then women,[269] then all persons regardless of ability to pay a "poll tax,"[270] and most recently to citizens eighteen years of age or older.[271]

Birthright citizenship is an important part of this ideal because, since those children born in the United States to undocumented parents and their descendants comprise more and more of the country's "governed," birthright citizenship is essential to guarantee that these people have the right to vote and provide their consent. Thus, however much deterrent effect might "trickle down" to would-be illegal immigrants, the withholding of citizenship status and the  **567**  resulting denial of the right to vote to generations of descendants is antithetical to one of our most important ideals.

Precisely because this ideal is so important, it is enshrined in our Constitution and can not be repealed without withstanding the scrutiny of the States. Such repeal would be as unwise and ineffective as it would be un-American, causing bureaucratic, social, and economic problems without providing a deterrent sufficient to overcome the economic pull of immigrant labor into the United States.

Whoever your father or mother was, whatever their race, from wherever they came, if you are born here, you are simply American. We are not separated as Sunni or Shiite, Protestant or Catholic, Lord or Serf. This country's diversity is its strength, and that is something that should never be repealed.

### Footnotes

1    Fernando Zapata, Immigrant Blame Game Nothing New in America, News-Press (Fort Myers, Fla.), Aug. 7, 2006, at 11B (quoting Benjamin Franklin's comment on German immigration during mid-1700s).

2    See Roger Daniels, Coming to America: A History of Immigration and Ethnicity in American Life 265 (2d ed. 2002) (summarizing anti-immigration reactions to waves of American immigration over last 150 years).

3    Nativism is defined as "a sociopolitical policy, especially in the United States in the 19th century, favoring the interests of established inhabitants over those of immigrants." The American Heritage Dictionary of the English Language (4th ed. 2000).

4    "America" in this context includes pre-Revolution colonies and the current boundaries of the United States of America.

5    See Daniels, supra note 2, at 109-10, 265 (discussing Franklin's fear of German language and culture taking over Pennsylvania).

6    Letter from Benjamin Franklin to Peter Collinson (May 9, 1753), available at http://www.historycarper.com/resources/ twobf2/letter18.htm.

7    Michael Powell, U.S. Immigration Debate Is a Road Well Traveled: Early-20th-Century Concerns Resurface, Wash. Post, May 8, 2006, at A1, available at http://www.washingtonpost.com/wp-dyn/content/article/2006/05/07/AR2006050700721.html.

8    See Lucinda Dillon Kinkead, Brouhaha Over Immigration Is Nothing New, Deseret Morning News (Salt Lake City), Oct. 15, 2005, at A7 (noting that Benjamin Franklin's quote sounds strikingly similar to 2005 comment of Minuteman Alex Segura who said that illegal immigration is causing America to lose its "common bonds" of culture and language).

9    Daniels, supra note 2, at 265.

10   Id.

11   Id. at 265-66.

12   Gilbert Paul Carrasco, Latinos in the Unites States: Invitation and Exile, in Immigrants Out!: The New Nativism and the Anti-Immigrant Impulse in the United States 190, 190 (Juan F. Perea ed., 1997).

13   Id.

14   Id.

15   See infra notes 103-09 and accompanying text. In this context and for purposes of this Note the term "birthright citizenship" derives from the Fourteenth Amendment which states "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside." U.S. Const., amend. XIV, § 1. Birthright Citizenship also is codified. See 8 U.S.C. § 1401 (2000) ("The following shall be nationals and citizens of the United States at birth: (a) a person born in the United States, and subject to the jurisdiction thereof.").

16   See Leo R. Chavez, Immigration Reform and Nativism: The Nationalist Response to the Transnationalist Challenge, in Immigrants Out!, supra note 12, at 61, 64 (noting that while these proposals claim to be directed at undocumented workers, their discussion makes little differentiation between legal and illegal immigrants).

17   See, e.g., Citizenship Reform Act of 2007, H.R. 133, 110th Cong. (1st Sess. 2007) (proposed by Congressman Elton Gallegly) (denying birthright citizenship if neither parent is a citizen or permanent resident); Birthright Citizenship Act of 2007, H.R. 1940, 110th Cong. (1st Sess. 2007) (proposed by Congressman Nathan Deal) (denying birthright citizenship if neither parent is citizen, permanent resident, or member of U.S. armed services); Citizenship Reform Act of 2005, H.R. 698, 109th Cong. (1st Sess. 2005) (proposed by Congressman Nathan Deal) (denying birthright citizenship if, inter alia, child is born to parents who are neither U.S. citizens nor permanent residents). For a similar plan proposed sixteen years ago, see Congressman Elton Gallegly's 1991 statement to the House of Representatives, 137 Cong. Rec. H8180-02 (daily ed. Oct. 22, 1991) (statement of Rep. Gallegly), available at 1991 WL 212388.

18   See Chavez, supra note 16, at 64 (discussing illegal immigrants' attraction to United States' social services).

19   Gallegly, supra note 17.

20   See infra notes 113-27 and accompanying text.

21    See infra notes 113-27 and accompanying text.

22    Citizenship Reform Act of 2007, H.R. 133, 110th Cong. (1st Sess. 2007); Birthright Citizenship Act of 2007, H.R. 1940, 110th Cong. (1st Sess. 2007).

23    Id.

24    Birthright Citizenship Act of 2007, H.R. 1940, 110th Cong. (1st Sess. 2007).

25    See infra notes 128-35 and accompanying text.

26    ⚑ 169 U.S. 649, 693 (1898).

27    Daniels, supra note 2, at 265.

28    Id.

29    Id. This wave was aimed mostly at Irish and German Catholics and was most prominent from the 1830s to the 1850s. Id.

30    Id. at 266-67 (explaining that, although Catholic France supported American Revolution, French association with Pope and monarchy was quite controversial).

31    Id. at 267.

32    Id.

33    Id. at 268.

34    Id. at 269.

35    Reginald Horsman, Race and Manifest Destiny 208 (1981).

36    Id.

37    Id. at 208-09 ("The Anglo-Saxon race . . . has never been contented to live in the same country with any other distinct race, upon terms of equality . . . [and] when placed in that situation, [it has] proceeded to exterminate or enslave the other race . . . or . . . abandon the country.").

38    Id. at 209.

39    Id.

40    Id.

41    Carrasco, supra note 12, at 190.

42    Daniels, supra note 2, at 269 ("The most common proposal was to require a twenty-one year period for naturalization and bar the foreign born from holding any but minor local offices.").

43    Id. at 270.

44    Id.

45    See id. (noting that, because upper or middle-class citizens could pay poor persons to take their place in draft, immigrants were greatly affected).

46    Id.

47    U.S. Const. amend. XIV, § 1.

48    See Daniels, supra note 2, at 271 (explaining that over one hundred years later, Fourteenth Amendment would give rights to descendants of Asian immigrants).

49    Id. at 265.

50    Id. at 271.

51    See id. (asserting that Congress intended "[w]hites and blacks could be naturalized, yellows could not").

52    Id.

53    Id. at 265. This attitude has never disappeared from American society and has continued to reemerge against Japanese immigrants in the early twentieth century and Filipinos in the 1920s and 1930s. Id.

54    See Powell, supra note 7 (stating "bitter arguments of the past echo loudly" in today's immigration debate).

55    Daniels, supra note 2, at 271. The act suspended Chinese labor immigration for ten years but still allowed the immigration of merchants. Id.

56    Id.

57    Id. at 272.

58    Id. at 265.

59      Id. at 275.

60      Id.

61      See id. at 275-76 (explaining that political leaders became convinced that immigration was "changing for the worse . . . the composition of the country").

62      Id. at 276 (quoting Prescott F. Hall, Co-founder of Immigration Restriction League (1956)).

63      See id. (stating "best and the brightest" minds in America were convinced some races were superior to others).

64      Kinkead, supra note 8.

65      Daniels, supra note 2, at 276-77. Although this bill passed the House and the Senate on multiple occasions, it was always vetoed by the President. Id.

66      Id. at 277 (documenting multiple presidential vetos of literacy requirements).

67      Id.

68      Id.

69      See Jeffrey Schmalz, Hispanic Influx Spurs 3 Ballots on Language, N.Y. Times, Oct. 26, 1988, at A1 (citing three state ballot initiatives to declare English as official language).

70      Powell, supra note 7.

71      Kinkead, supra note 8.

72      Id.

73      Daniels, supra note 2, at 266.

74      See id. (noting, for example, that some immigrants were given right to vote even before they attained citizenship).

75      See id. ("Federal courts, state courts, territorial courts, and even justices of the peace issued certificates . . . or, sometimes, simply declared persons to be citizens.").

76      See Powell, supra note 7 ("New arrivals were required only to prove their identity and find a relative or friend who could vouch for them.").

77      Id.

78    Kinkead, supra note 8.

79    ⚑92 U.S. 259 (1875).

80    See ⚑id. at 260, 273 (holding that "legislation [on immigration] is confided exclusively to Congress by [the Commerce
      Clause]" and "[i]t is equally clear that the matter of these statutes may be, and ought to be, the subject of a uniform
      system or plan").

81    Kinkead, supra note 8.

82    Daniels, supra note 2, at 274.

83    Kinkead, supra note 8.

84    Daniels, supra note 2, at 274.

85    Id. at 274-75.

86    Powell, supra note 7.

87    Id.

88    Id.

89    See generally Carrasco, supra note 12, at 190-200 (reviewing trends of Mexican immigration over last 150 years).

90    Id. at 190-91.

91    See id. (describing unique experience of Mexican immigrants due to shared border with United States).

92    See id. at 191 (noting that, during mid to late nineteenth century, most labor was typically needed in southwestern United
      States).

93    Id. at 191.

94    See id. (noting that proximity to Mexico enabled American employers to use Mexican laborers as disposable workforce).

95    See id. ("Mexican laborers have since become the United States' disposable labor force, brought in when needed, only
      to fulfill their use and be unceremoniously discarded, a trend that has been recurring for over 150 years.").

96    Id. at 194, 197. The U.S. government instituted the bracero program in 1917, which allowed entry of temporary workers
      to fill the labor shortage in the agricultural industry. Id. at 193. With the onset of the Depression, the labor demand
      ended, and "[b]y the end of the Depression, over 400,000 Latinos were 'repatriated' to Mexico without any formal

deportation proceedings, including thousands of [Mexican]-American citizens." Id. at 194. This was the first of many bracero programs, all of which ended in the early 1960s. Id. at 198. "Operation Wetback," a crackdown on illegal immigration and a deportation drive, began in 1954. Id. at 197. Many Americans of Mexican descent were deported. Id. Over 3.7 million Latinos were deported, the majority without formal deportation proceedings. Id. at 197-98.

97    Id. at 198. The McCarran-Walter Act established a bracero-like program. Id. The Immigration Reform and Control Act (IRCA) of 1986 provided legal status to migrant workers who had spent at least ninety days doing agricultural work on certain crops. Id. at 199. IRCA legalized millions of undocumented workers to fill the labor shortage caused by "Operation Jobs," the most recent immigrant expulsion. Id.

98    Michael A. Olivas, The Chronicles, My Grandfather's Stories, and Immigration Law: The Slave Traders Chronicle As Racial History, 34 St. Louis U. L.J. 425, 436 (1990).

99    Id. at 438.

100   See generally Berta Esperanza Hernandez Truyol, Building Bridges-Latinas and Latinos at the Crossroads: Realities, Rhetoric and Replacement, 25 Colum. Hum. Rts. L. Rev. 369, 404-12, 423-31 (1994).

101   Id. at 425-26.

102   Id.

103   See, e.g., Citizenship Reform Act of 2007, H.R. 133, 110th Cong. (1st Sess. 2007) (limiting citizenship by status of parents); Birthright Citizenship Act of 2007, H.R. 1940, 110th Cong. (1st Sess. 2007) (limiting citizenship by status of parents); Citizenship Reform Act of 2005, H.R. 698, 109th Cong. (1st Sess. 2005) (limiting citizenship by parent(s)' legal and marital status).

104   See ⚑United States v. Wong Kim Ark, 169 U.S. 649, 693 (1898) ( "The Fourteenth Amendment affirms the ancient and fundamental rule of citizenship by birth within the territory."); see also ⚑Miller v. Albright, 523 U.S. 420, 423-24 (1998) (stating general proposition that "citizenship at birth can be acquired by being born in the United States").

105   H.R. 698 § 2. The proposed 2005 Act would have limited automatic citizenship at birth to: (1) children born in wedlock where at least one parent is a U.S. citizen, national, or lawful permanent resident and (2) children born out of wedlock to a mother who is a citizen, national, or lawful permanent resident. H.R. 698 § 3.

106   H.R. 1940.

107   H.R. 1940 § 2.

108   Compare H.R. 698 § 3 (distinguishing between children born in and out of wedlock), with H.R. 1940 § 2 (failing to make same distinction).

109   H.R. 1040 § 2.

110   Citizenship Reform Act of 2007, H.R. 133, § 2, 110th Cong. (1st Sess. 2007).

111    See Citizenship Reform Act of 2005, H.R. 698, § 3, 109th Cong. (1st Sess. 2005) ("[A] person born in the United States shall be considered 'subject to the jurisdiction of the United States' if . . . the child was born out of wedlock in the United States to a mother who is . . . a citizen . . . or . . . an alien who is lawfully admitted for permanent residence in the United States.") (emphasis added).

112    See Citizenship Reform Act of 2007, H.R. 133, § 3, 110th Cong. (1st Sess. 2007) (including "[a] child born out of wedlock in the United States . . . to a father who is a citizen . . . or an alien lawfully admitted for permanent residence in the United States" as eligible for birthright citizenship) (emphasis added).

113    Associated Press, "Birthright Citizenship" Debate Set to Begin, MSNBC.com, Dec. 26, 2005, http://www.msnbc.msn.com/id/10609068/; see also 8 U.S.C.S. § 1151(b) (Lexis 2008) (codifying rule that allows citizens who are at least twenty-one years of age to sponsor their parents for permanent resident status).

114    Natalie Smith, Developments in the Legislative Branch, 20 Geo. Immigr. L.J. 325, 327 (2006) (quoting Proceedings, Third Conference on Nationality, Eur. Parl. Ass. (Oct. 11-12, 2004)).

115    Id.

116    Id.

117    Smith, supra note 114, at 327.

118    Brian Lavery, Voters Reject Automatic Citizenship for Babies Born in Ireland, N.Y. Times, June 13, 2004, § 1.

119    Id.

120    Id.

121    Id.

122    See Smith, supra note 114, at 327 (describing belief that illegal aliens represent net expense to society); Powell, supra note 7 (discussing concern that immigrants overwhelm public services).

123    Lavery, supra note 118.

124    Id.

125    Id.

126    Id.

127    See United States v. Wong Kim Ark, 169 U.S. 649, 693 (1898) (reviewing common law tradition of birthright citizenship).

128    U.S. Const. amend. XIV, § 1. This law is also codified in the Immigration and Nationality Act. See 8 U.S.C. § 1401(a) (2000) (adopting language of Fourteenth Amendment that "[t]he following shall be nationals and citizens of the United States at birth: (a) a person born in the United States, and subject to the jurisdiction thereof").

129    Wong Kim Ark, 169 U.S. at 702.

130    Jus soli means "citizenship by place of birth." James C. Ho, Defining "American": Birthright Citizenship and the Original Understanding of the 14th Amendment, 9 Green Bag 367, 369 (2006).

131    See id. at 693 ("The Fourteenth Amendment affirms the ancient and fundamental rule of citizenship by birth within the territory . . . .").

132    Proposed Legislation to Deny Citizenship at Birth to Certain Children Born in the United States: Hearing Before the H. Comm. on the Judiciary, Subcomm. on Immigration and Claims, 105 Cong. 10 n.4 (1997) (statement of Dawn E. Johnsen, Acting Assistant Att'y Gen., Office of Legal Counsel, U.S. Dep't of Justice) [hereinafter Statement of Dawn E. Johnsen].

133    Id.

134    See Stephen H. Legomsky, Immigration and Refugee Law and Policy 1269, 1276 (4th ed. 2005) (discussing how doctrine of jus sanguinis allows "United States citizenship . . . [to] be transmitted to successive generations in perpetuity, even if none of the recent descendants had ever set foot in the United States").

135    Associated Press, supra note 113.

136    Id.

137    Id.

138    Legislation Denying Citizenship at Birth to Certain Children Born in the United States: Statement before the H. Comm. on the Judiciary, Subcomm. on Immigration and Claims (statement of Walter Dellinger, Assistant Att'y Gen., Office of Legal Counsel, U.S. Dep't of Justice) (Dec. 13, 1995), available at http://www.usdoj.gov/olc/deny.tes.31.htm ("[B]ecause the rule of citizenship acquired by birth within the United States is the law of the Constitution, it cannot be changed through legislation, but only by amending the Constitution. A bill . . . that purports to deny citizenship by birth to persons born within the jurisdiction of this country is unconstitutional on its face. [Further], the proposed constitutional amendments on this topic conflict with basic constitutional principles. To adopt such an amendment would not be technically unlawful, but it would flatly contradict our constitutional history and our constitutional traditions.").

139    Ho, supra note 130, at 369; see also Inglis v. Trs. of the Sailor's Snug Harbor, 28 U.S. 99, 164 (1830) (stating that jus soli is well-settled common law principle).

140    Ho, supra note 130, at 369.

141    The Constitutional Implications of H.R. 705, H.R. 1363, and Other Proposals to Amend the Citizenship Laws: Hearing Before the H. Comm. on the Judiciary, Subcomm. on Immigration and Claims & Subcomm. on the Constitution,

104th Cong. 9 (1995) (statement of Gerald L. Neuman, Professor of Law, Harvard Law School) [hereinafter Neuman Testimony].

142    Id.

143    Id. at 9, 15.

144    Statement of Dawn E. Johnsen, supra note 132.

145    Civil Rights Act of 1866, ch. 31, 14 Stat. 27 (codified as amended at ⚑42 U.S.C. § 1981 (2000)).

146    Cong. Globe, 39th Cong., 1st Sess. 1117 (1866) (remarks of Rep. James Wilson); see also Statement of Dawn E. Johnsen, supra note 132 (citing Representative Wilson's remarks).

147    Cong. Globe, 39th Cong., 1st Sess. 1117 (1866) (remarks of Rep. James Wilson) (quoting William Rawle, A View of the Constitution of the United States of America 86 (2d ed. 1829)).

148    Statement of Dawn E. Johnsen, supra note 132.

149    Neuman Testimony, supra note 141.

150    Id.

151    ⚑Saenz v. Roe, 526 U.S. 489, 502-03 n.15 (1999); see Ho, supra note 130, at 369 ("Congress approved the Citizenship Clause to overrule Dred Scott and elevate jus soli to the level of constitutional law.").

152    Statement of Dawn E. Johnsen, supra note 132.

153    Cong. Globe, 39th Cong., 1st Sess. 2891 (1866) (remarks of Sen. Conness).

154    See Statement of Dawn E. Johnsen, supra note 132 (explaining that in reaction to Dred Scott decision and "[i]n rebuilding our nation after [Civil] [W]ar, we pledged that we should never again trust to judges or politicians the power to deprive from a class born on our soil the right of citizenship").

155    Id. (emphasis added).

156    ⚑United States v. Wong Kim Ark, 169 U.S. 649, 675 (1898).

157    See supra notes 105-06 and accompanying text.

158    ⚑Wong Kim Ark, 169 U.S. at 703.

159  See Afroyim v. Rusk, 387 U.S. 253, 263 (1967) (noting that framers "wanted to put citizenship beyond the power of any governmental unit to destroy"); see also Rogers v. Bellei, 401 U.S. 815, 835 (1971) (stating that where citizenship is obtained by birth, "Congress has no 'power, express or implied, to take away an American citizen's citizenship without his assent' " (quoting Rusk, 387 U.S. at 257)).

160  See Statement of Dawn E. Johnsen, supra note 132 ("To have citizenship in one's own right, by birth upon this soil, save by one's own renunciation of it, is a foundational principle enshrined in our Constitution.").

161  See Cong. Globe, 39th Cong., 1st Sess. 2545 (1866) (quoting full text of originally proposed Fourteenth Amendment without Citizenship Clause).

162  Id. at 2890 (remarks of Sen. Howard).

163  Id. at 2890-97; see Ho, supra note 130, at 369 (discussing addition of Citizenship Clause and reviewing commentary of Senators).

164  Ho, supra note 130, at 370.

165  Cong. Globe, 39th Cong., 1st Sess. 2890-91 (1866) (remarks of Sen. Cowan).

166  Id. at 2891 (remarks of Sen. Conness).

167  Ho, supra note 130, at 373.

168  Cong. Globe, 39th Cong., 1st Sess. 2891 (1866) (remarks of Sen. Cowan).

169  Id. at 2890 (remarks of Sen. Howard).

170  See Ho, supra note 130, at 369 (confirming argument that language in Fourteenth Amendment restates common law rule).

171  Cong. Globe, 39th Cong., 1st Sess. 2890 (1866) (remarks of Sen. Howard).

172  Ho, supra note 130, at 372.

173  See id. (arguing that quote used by repeal proponents is not full reading of Howard's statement).

174  See Neuman Testimony, supra note 141 (noting that this reading "would mean that the Fourteenth Amendment had suddenly shifted U.S. citizenship law from the common law jus soli rule to the Continental jus sanguinis rule, and that Wong Kim Ark was wrongly decided").

175  Id.

176    Id.

177    Ho, supra note 130, at 369, 372.

178    Id. at 370.

179    Throughout this document, the term "undocumented immigrant" has been used rather than the term "illegal alien." The description "illegal alien" is arguably pejorative and technically incorrect because, even if a person participates in "illegal immigration," that person is not "illegal" but rather has committed an "illegal" act.

180    See Smith, supra note 114, at 326 (noting that repeal proponents argue that Fourteenth Amendment "excludes anyone present in the United States in violation of the law).

181    Kleindienst v. Mandel, 408 U.S. 753, 761 (1972); see also Ho, supra note 130, at 373-74 (arguing that members of Congress "may not have specifically contemplated extending birthright citizenship to the children of illegal aliens" but that "text and history confirm that the Citizenship Clause reaches all persons who are subject to U.S. jurisdiction and laws, regardless of race or alienage").

182    Neuman Testimony, supra note 141.

183    See Gerald L. Neuman, The Lost Century of American Immigration Law (1776-1875), 93 Colum. L. Rev. 1833, 1834 (1993) (discussing antebellum state immigration law).

184    Neuman Testimony, supra note 141.

185    Id.

186    Id.

187    Before the passage of the Fourteenth Amendment and in criticism of the Dred Scott decision, President Lincoln's Attorney General wrote to the Secretary of Treasury and noted that " '[a]s far as I know . . . you and I have no better title to the citizenship which we enjoy than the 'accident of birth'-the fact that we happened to be born in the United States' "). Statement of Dawn E. Johnsen, supra note 132 (quoting Citizenship, 10 Op. Att'y Gen. 382, 394 (1862)).

188    See Ho, supra note 130, at 368 ("Repeal proponents contend that this language does not apply to the children of aliens.").

189    Id. (quoting Black's Law Dictionary 867 (8th ed. 2004) (defining "jurisdiction" as "[a] government's general power to exercise authority")).

190    See id. (noting that regardless of one's legal or illegal status, all persons within United States must obey laws).

191    See id. at 369 ("[A]liens cannot immunize themselves from U.S. law by entering our country in violation of Title 8.").

192    See id. ("[I]llegal aliens are such because they are subject to U.S. Law.").

193    Neuman Testimony, supra note 141, at 12.

194    See id. (noting such children have no immunity from U.S. laws).

195    See id. (describing common law). Supreme Court language in Wong Kim Ark supports this proposition. See, e.g., United States v. Wong Kim Ark, 169 U.S. 649, 655, 658, 674, 687, 688, 693 (1898) (applying common law and holding the Fourteenth Amendment affirms the rule of citizenship by birth).

196    Neuman Testimony, supra note 141.

197    See, e.g., Abdulaziz v. Metro. Dade County, 741 F.2d 1328, 1329-31 (11th Cir. 1984) (applying diplomatic immunity to dismiss civil suit).

198    See Wong Kim Ark, 169 U.S. at 693 (noting traditional exception to common law rule).

199    Ho, supra note 130, at 369.

200    Neuman Testimony, supra note 141.

201    See Ho, supra note 130, at 369-74 (analyzing history and comparing arguments of proponents and opponents of birthright citizenship).

202    See id. (arguing that history supports birthright citizenship).

203    See Edward Erler, Citizenship, in The Heritage Guide to the Constitution 384, 384 (Edwin Meese III et al. eds., 2005) (describing Senator Trumball's remarks stating American Indians' allegiance to their tribes meant they were not eligible for U.S. citizenship under language of Fourteenth Amendment).

204    Cong. Globe, 39th Cong., 1st Sess. 2893 (1866) (remarks of Sen. Trumbull).

205    Ho, supra note 130, at 373.

206    Cong. Globe, 39th Cong., 1st Sess. 2893 (1866) (remarks of Sen. Trumbull) (emphasis added) (declaring also that to control Native Americans, lawmakers must broker treaties rather than pass laws because Native Americans are not subject to U.S. courts).

207    Neuman Testimony, supra note 141 (emphasis added).

208    Id.

209   See United States v. Wong Kim Ark, 169 U.S. 649, 682 (1898) (discussing prior Supreme Court decisions interpreting Fourteenth Amendment and stating that they "had no tendency to deny citizenship to children born in the United States of foreign parents"). This rule still excludes children born to foreign diplomats and children born to invading armies on U.S. soil. Id.; see also Smith, supra note 114, at 327 (explaining significance of Wong Kim Ark).

210   Erler, supra note 203, at 385; see also Smith, supra note 114, at 325-26 (noting that because U.S. Supreme Court has not decided this issue specifically, there has been much debate over whether or not Fourteenth Amendment applies to children of illegal immigrants).

211   112 U.S. 94 (1884).

212   Id. at 109.

213   Wong Kim Ark, 169 U.S. at 682.

214   Id. at 649.

215   See id. at 693 ("The amendment, in clear words and in manifest intent, includes the children born, within the territory of the United States, of all other persons, of whatever race or color, domiciled within the United States.").

216   Id. at 676.

217   Id. at 694.

218   Erler, supra note 203, at 385. Erler notes that although proponents of repealing birthright citizenship might concede this fact, they argue there is room for legislative action on the subject. Id. at 385-86.

219   457 U.S. 202, 202 (1982) (declaring such action violation of Equal Protection Clause).

220   U.S. Const. amend. XIV, § 1.

221   Plyler, 457 U.S. at 212.

222   Id. at 211 n.10.

223   Id. at 243 (Burger, C.J., dissenting); see also Ho, supra note 130, at 376 (noting that although Court was split on application of analysis to public education, no dispute existed as to threshold determination of jurisdiction over undocumented immigrants).

224    Ho, supra note 130, at 377.

225    See id. (discussing possibility that Congress may repeal birthright citizenship); Erler, supra note 203, at 385-86 (noting certain individuals favor Congress exercising its Section 5 powers to prevent automatic citizenship for children of illegal immigrants).

226    Neuman Testimony, supra note 141.

227    Id.

228    Id.

229    Id.

230    See id. (examining problem of European second generation aliens).

231    Id.

232    See Joseph H. Carens, Who Belongs? Theoretical and Legal Questions about Birthright Citizenship in the United States, 37 U. Toronto L.J. 413, 413 (1987) (noting opportunities available to children of illegal aliens born in United States).

233    See Neuman Testimony, supra note 141 ("The assimilative advantages of birthright citizenship forestall social conflict.").

234    See id. (reviewing advantages of jus soli to children born to U.S. citizens).

235    Id.

236    Id.

237    Id.

238    Id. For instance, someone's citizenship could be challenged decades later with no means of rectifying a clerical error made either by the hospital or Immigration and Customs Enforcement. A national identity card or centralized registry of individuals may lessen these errors; however, these solutions are the subject of a separate political debate and are publicly disfavored because they are considered characteristic of a police state. Id.

239    See generally Brooke Kirkland, Limiting the Application of Jus Soli: The Resulting Status of Undocumented Children in the United States, 12 Buff. Hum. Rts. L. Rev. 197 (2006) (discussing consequences to undocumented children of limiting jus soli).

240    See id. (assuming that most proponents assume this to be true).

241    Id. Children of foreign diplomats, one of the few groups that are not privileged to birthright citizenship, are considered legal permanent residents. Id.

242    Id.

243    Id.

244    Id. Article 24(3) of the International Covenant on Civil and Political Rights requires "the United States [to be] internationally committed to respect the right of every child to acquire a nationality." Id.

245    Id.

246    Id.

247    See generally &#9873;Plyler v. Doe, 457 U.S. 202 (1982) (preventing Texas from excluding children of undocumented immigrants from its public schools).

248    See Neuman Testimony, supra note 141 (noting that disqualifying illegal aliens from benefits and services available to general populace is current trend).

249    See, e.g., DC Hunger Solutions: Food Stamp Program, http:// www.dchunger.org/Programs/Federal/Food_Stamps/ Immigrants.html (last visited Mar. 16, 2008) (describing food stamp eligibility); Food Stamps: General Eligibility, http:// www.massresources.org/pages.cfm? contentID=12&pageID=3&subpages=yes&dynamicID=418 (follow "General Eligibility" hyperlink) (last visited Mar. 16, 2008) (indicating undocumented persons and illegal immigrants are not eligible for food stamps).

250    Anna Gorman & Jennifer Delson, Policies on Illegal Immigrants at Odds, L.A. Times, Nov. 27, 2005, at B1.

251    See Birthright Citizenship Act of 2007, H.R. 1940, 110th Cong. (1st Sess. 2007) (restricting birthright citizenship to children of citizens, permanent resident aliens, and aliens in military). The Act would apply prospectively to aliens born on or after the date of its enactment. H.R. 1940; Citizenship Reform Act of 2007, H.R. 133, 110th Cong. (1st Sess. 2007) (restricting birthright citizenship to children of citizens or permanent residents).

252    Neuman Testimony, supra note 141.

253    Id.

254    Id.

255    Id.

256    See id. (explaining that "legal resident" may not apply to guest workers because they work in United States for one year increments).

257    Id.

258    Citizenship Reform Act of 2005, H.R. 698, 109th Cong. § 3 (1st Sess. 2005). Common law marriages are not considered wedlock for the purposes of the proposed Act. Id.

259    Neuman Testimony, supra note 141 (asserting that Congress has modified immigration laws in response to concern over spousal abuse).

260    See generally Janet M. Calvo, Spouse-Based Immigration Laws: The Legacies of Coverture, 28 San Diego L. Rev. 593, 593-96 (1991).

261    A woman who knows her child will be denied U.S. citizenship because of her legal status may stay with an abusive husband rather than risk deportation of both herself and her child if she divorces him.

262    See Birthright Citizenship Act of 2007, H.R. 1940, 110th Cong. (1st Sess. 2007); Citizenship Reform Act of 2007, H.R. 133, 110th Cong. (1st Sess. 2007).

263    See generally Israel and the Occupied Territories Torn Apart: Families Split by Discriminatory Policies, Amnesty Int'l (July 2004), available at http://web.amnesty.org/library.pdf/MDF150632004English/$F:6/MDE1506304.pdf.

264    See Abbas Shiblak, Stateless Palestinians, 26 Forced Migration Rev. 8 (2006), available at http://www.fmreview.org/FMRpdfs/FMR26/FMR2603.pdf (describing impoverished existence of those denied citizenship).

265    See id. at 9 ("[T]he effect on host societies, the region and the world cannot be ignored. Impoverished [refugees] . . . notably the Palestinians . . . constitute the major destabilising factor in the Middle East.").

266    See, e.g., The Declaration of Independence para. 2 (U.S. 1776) ("The history of the present King of Great Britain is a history of repeated injuries and usurpations, all having in direct object the establishment of an absolute Tyranny over these States.").

267    Id.

268    U.S. Const. amend. XV.

269    U.S. Const. amend. XIX.

270    U.S. Const. amend. XXIV.

271    U.S. Const. amend. XXVI.

42 GALR 525

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.