# EXHIBIT 15



GEORGE MASON UNIVERSITY | Institute for Immigration Research

# *PLYLER V. DOE*:  IMPLEMENTATION, CHALLENGES AND IMPLICATIONS FOR THE FUTURE

By Amanda Warner



AUGUST 2022



# Table of Contents

Introduction                                                                                2

*Plyler v. Doe*: Background                                                                  3

Unequal Education Chances: Challenges of Undocumented Children in K-12
Education                                                                                   7

    Barriers to Education Caused by Continued Marginalization                          8

    Local and State School Administration Defiance to Plyler                           10

    Past Challenges in Higher Education                                                12

    The Second-Generation Advantage: Immigration as a Possible Educational
    Advantage                                                                         13

*Plyler* Under Fire: Current Challenges to *Plyler*                                         14

    *Plyler's* Dissenting Opinion                                                     14

    Federal Challenges                                                                15

    State Challenges                                                                  16

    Non-Profit and Nongovernmental Resistance to Plyler                               17

Conclusion: A Nation Without *Plyler* and Implications for the Future                       19

References                                                                                  21

About the Institute for Immigration Research                                                25

## INTRODUCTION

The current political climate has caused the country to become even more polarized than usual over a number of issues, especially those regarding the rights and status of marginalized groups. Immigration is one such issue that has been vigorously debated throughout the past several decades. Tensions have arisen between the rights that immigrants should have and the threat that many Americans think that rising immigration poses to the country.

The tensions evoked by the polarity surrounding immigration issues tend to come to a head around questions of access to public services and benefits for undocumented immigrants.  Increasingly, some state and local governments have become frustrated by federal failure to act on what they see as an overwhelming need for increased resources caused by rising immigration. Resultantly, some state and local governments have attempted to take immigration enforcement into their own hands by legislating policies that restrict immigrant access to important public services.

Just a little over 40 years ago, the Texas Legislature attempted to do just that by denying free public-school education to undocumented school children. The Supreme Court, in *Plyler v. Doe,* struck down this law, thereby ensuring a free K-12 public education for all students regardless of immigration status.  Not only did *Plyler* extend important constitutional rights to undocumented immigrants, but *Plyler* further became the seminal ruling against systematically relegating children to the lowest socioeconomic rung merely on account of their lack of immigration status (Larsen 2007). Moreover, *Plyler* protected the country's own economic and social self-interests by ensuring that all children, regardless of immigration status, would be afforded the opportunity to become educated, integrated, fully functioning, and economically productive members of society (Larsen 2007).  Nonetheless, the anti-immigration platform of the Trump administration that still resonates with so many Americans may potentially threaten *Plyler's* authority.  It  was rumored that overruling *Plyler* was just one of many nativist policies that Trump wished to implement during the tenure of his administration (Shamsian 2019). More recently, Texas Governor Greg Abbott made headlines for expressing his wish to see *Plyler* be one of the next overturned Supreme Court cases in light of the leaked draft of a Supreme Court opinion revealing their intent to overturn *Roe v. Wade*. Indeed, some scholars believe that the official opinion overturning *Roe v. Wade*, *Dobbs v. Jackson Women's Health Organization*, laid a foundation for an impending *Plyler* challenge. *Dobbs'* emphasis on interpreting the Constitution under an 'originalist' doctrine as opposed to a 'living document' doctrine is seen as particularly problematic.

The majority in *Dobbs* embraced "originalism" which is a legal theory that argues that the Constitution should be interpreted on its face and as the founders intended (Cole 2022).  Opponents of originalism contend that this theory ignores the fact that there have been fundamental changes in our society and that we should not defer to the intent of founders from an era where only adult White males were afforded the full rights and privileges that the Constitution offered. Importantly, while Constitutional provisions have been used to protect the rights of many groups,  there is no explicit text in the constitution that secures the rights of many marginalized groups including women, minorities, LGBTQ+ individuals, and immigrants (Goettel 2022). Nonetheless, the majority in *Dobbs* reasoned that, because abortion was not explicitly protected when the 14th Amendment was adopted in 1868, it is not protected today (Cole 2022). As discussed below, while the *Plyler* Court did find that a Texas law denying free K-12 public education to undocumented immigrants violated the 14th Amendment's guarantee of equal protection, the Court did acknowledge that education is not a fundamental right and that undocumented persons are not a "suspect class" whose interests warrant the utmost protection. This language in *Plyler,* buttressed by *Dobbs'* endorsement of originalism in constitutional interpretation, likely means that *Plyler* is more vulnerable than it has ever been.

Importantly, *Plyler* has faced numerous challenges even prior to the Trump administration. However, President Trump successfully ran a campaign contingent upon unmistakably nativist and xenophobic sentiments that paint undocumented immigrants as quintessential boogeymen responsible for a number of societal ills (Driver 2018). The success of these sentiments as one of the bases of presidential objectives, and the lasting impact of these sentiments post-Trump administration, exerts a powerful force throughout the country that presents a threat to the continued validity of *Plyler* unlike what has come before.

In attempting to address the implications for a *Plyler* reversal, this paper will review *Plyler's* impacts since its implementation and the prevailing literature surrounding the education of undocumented students. This review will center on 1) whether barriers to education remained despite *Plyler's* enactment; 2) an overview of the challenges that *Plyler* has received over the years; 3) the potential impacts should the holding of *Plyler* be reversed; and 4) implications for future research. Through such a review, this paper will determine the impact (economic, social, and otherwise) that free public K-12 education has had on undocumented children in America and the society at large.

### *PLYLER V. DOE*: BACKGROUND

In 1975, the Texas Legislature enacted Texas Education Code §21.031 (Vernon Supp. 1981) which authorized school districts to withhold funds for the education of children not legally admitted into the United States (*Plyler*, 457 at 205). This statute also authorized school districts to deny enrollment to children not legally admitted to the country (*Id.*). As a result of §21.031, The Mexican American Legal Defense and Education Fund (MALDEF) filed a class action on behalf of certain school-age children of Mexican origin residing in Smith County, Texas, who could not prove lawful status against the Texas Board of Education in the name of the Tyler Independent School District superintendent, James Plyler. Other school districts were included in the lawsuit, and the State of Texas intervened as a party-defendant. The class action challenged the constitutionality of the Texas statute's policy of excluding children who are unable to show proof of legal status from free public education and of charging them tuition. In defending against the suit, the State of Texas argued that §21.031 was a necessary financial measure aimed to avoid the financial drain on the State due to the increased public-school population resulting from the increased immigration of Mexican nationals. The state claimed that this population surplus created problems for school districts, which were especially exacerbated by the special education needs of immigrant Mexican children (*Id* at 207).

The United States District Court for the Eastern District of Texas granted the Plaintiffs' motion for permanent injunctive relief and the Court of Appeals for the Fifth Circuit upheld the District Court's injunction.[1] The Defendants appealed to the United States Supreme Court. The majority opinion of the Supreme Court, delivered by Justice Brennan, upheld the decision of the lower court for four reasons: 1) undocumented people are "persons" within the meaning of the Equal Protection Clause; 2) §21.031 is fundamentally unconstitutional and does not survive intermediate scrutiny; 3) §21.031 establishes poor public policy with far-reaching ramifications; and 4) §21.031 violated the Supremacy Clause.

---

[1] A number of other actions filed in Federal district Courts in Texas were consolidated into a single action against state officials to be heard before the United States District Court for the Southern District of Texas which also struck down §21.031 as unconstitutional. This decision was also by the Court of Appeals and further appealed to the U.S. Supreme Court. The U.S. Supreme Court consolidated this case with *Plyler*.

**Are undocumented students "persons"?** In adjudicating the case before it, the Supreme Court first tasked itself with deciding whether undocumented persons were entitled to constitutional protection. The State argued that, because of their lack of lawful immigration status, undocumented persons were not "persons within the jurisdiction"[2] of the State of Texas under the Fourteenth Amendment, and therefore were not entitled to equal protection under Texas law (Plyler, 457 at 210). The Court rejected this argument. In doing so, the Court reaffirmed the holdings of *Yick Wo v. Hopkins* (118 U.S. 356 (1886)), which stated that immigrants, even unlawful ones, are "persons" within the meaning of the Fourteenth Amendment and are entitled to due process as guaranteed by the Fourteenth and Fifth Amendments. The Court reasoned that allowing the State of Texas to use the constitutional phrase "within its jurisdiction" as a basis to "deny a subclass of people the guarantees of the Equal Protection Clause would directly undermine the very purpose of the clause, since the Fourteenth Amendment was designed to ensure that the laws are applied equally to all persons" (Ofer 2012:193).

**What level of scrutiny is necessary?** Once the Court reasoned that the undocumented were a class of people who were entitled to due process under the Constitution, the Court next identified the level of scrutiny that should be applied to the Texas law. When considering the constitutionality of legislation that disproportionately affects a distinct group of persons, the Court applies a level of scrutiny that is dependent on the nature of the group affected, and the type of right or privilege that is potentially burdened. The Court applies strict scrutiny to laws that disproportionately disadvantage the most historically disadvantaged groups of persons (i.e. racial minorities) or that burdens a fundamental right (i.e. First Amendment right to free speech) (Hess 2010). Legislation falling into this category must promote a compelling government interest and be narrowly tailored to achieve that interest in order for the proposed legislation to be deemed constitutional (*Adarand Constructors v. Pena*, 515 U.S. 200 (1995); *Fisher v. University of Texas*, 470 U.S. 297 (2013)). Intermediate scrutiny is the standard of review that Court's use to review policies that disproportionately affect "quasi-suspect" classes. Currently, gender and illegitimacy of birth have been deemed by the Court to constitute quasi suspect classes (Strauss 2011). To survive under intermediate scrutiny a law needs to promote an important government interest and be substantially related to achieving that interest (*United States v. Virginia*, 518 U.S. 515, 533). With the lowest level of scrutiny, rational basis review, the potentially discriminatory regulation need only be "rationally related to a conceivable and legitimate state end." (*Tuan Anh Nguyen v. INS*, 533 U.S. 53, 77 (2001).

The Court determined that the Texas legislation did not need to be afforded strict or intermediate scrutiny because undocumented persons are not a suspect class under equal protection analysis because of their unlawful presence in the country, and public education is not a fundamental federal constitutional right (Ofer 2012). Rationalizing that the Texas legislation was not worthy of the stricter scrutiny standards, the court applied the rational basis test.[3] The State argued that the funding to be potentially saved on its overburdened education budget, that can be used for benefits for lawful residents of the State, is a sufficient rational basis to support the denial of free public education to undocumented children (*Plyler*, 457 at 224.)

---

[2] The Fourteenth Amendment states that "[no] State shall . . . deprive any person of life, liberty, or property, without due process of law; nor deny to any *person within its jurisdiction* the equal protection of the laws" (U.S. Constitution, Amendment XIV, Section 1) [emphasis added].

[3] A number of scholars argued that, although the *Plyler* court stated that it applied a rational basis review, the Court actually applied a heightened standard of review that is stronger than the traditional rational basis test which utilized variations of the intermediate scrutiny test (Ofer 2012:191; Lopez 2005:1388).

The Court disagreed.  In applying the rational basis test, the Court agreed with the findings of the lower Court that the financial strain born by the state due to a substantial increase in enrollment was primarily attributable to the increased enrollment of lawful resident children. Moreover, there was no evidence that undocumented children cost substantially more to educate than legal immigrant children (Baczynski 2013). Accordingly, any savings to the state would be minimal and unlikely to improve the quality of education overall (*Plyler* 457 at 207).  Therefore, the discriminatory effects of §21.031 were not rationally based to further the State's goal.

**Is it good policy?** More importantly, the Court struck down Texas' discriminatory regulation because it represented extremely poor public policy.  The Supreme Court repeatedly emphasized that the cost to the nation and to innocent children were considerations of the utmost import in striking down §21.031. Much emphasis was placed on the potential impact of §21.031 in creating a socially handicapped class of illiterates with severely limited chances for socio-economic advancement. The Court explained that:

> [E]ducation prepares individuals to be self-reliant and self-sufficient participants in society. Illiteracy is an enduring disability. The inability to read and write will handicap the individual deprived of a basic education each and every day of his life (*Plyler,* 457 at 222).

The Court did not find it possible to rationalize the inestimable toll on the children of a disfavored class that would be caused by the deprivation of basic education with the cost-savings or the principle of status-based denial of education proposed by the state under the framework of equality embodied by the Equal Protection Clause of the Constitution (*Id*).

It is important to note that while the Court found it unfavorable to deny a free K-12 public school education to children based on immigration status in this instance, the court did hold that education itself is not a fundamental right granted by the Constitution (*Id* at 221).  However, the court did note that education is not a minor government benefit, but an important social institution, the denial of which would have lasting ramifications to persons and the nation.

In addition to the significance of education to undocumented children, the Court noted that American values regard education as a matter of utmost importance, and rightly so due to its importance in maintaining basic American institutions (*Plyler* 457 at 221). The Court stressed the social costs that would be potentially borne by the country when targeted groups are denied the means to imbibe the values and skills upon which the social order of the Nations rests. (*Id* at 221).  Texas's promotion of the creation and perpetuation of a subclass of illiterates within its own boundaries would certainly have an impact on the costs of unemployment, welfare, and crime that would undermine any potential education costs it would save (*Id* at 230).

These social costs are made even more significant considering the fact that many undocumented children remain in the country throughout most of their lives and there is "no assurance that a child subject to deportation will ever be deported" (*Id* at 226).[4]

---

[4] Recent data confirms the validity of these sentiments. Data from the Pew Research Center report that about two-thirds, or roughly 66 percent of unauthorized immigrants have lived in the U.S. for more than a decade (Krogstad, Passel, and Cohn 2019).

Accordingly, §21.031 effectively proposes the implementation of a caste system, where undocumented residents remain an underclass to be exploited while simultaneously denying the benefits made available to citizens and lawful residents, and who would be denied virtually any opportunities for upward social and economic mobility. In light of the potential for such glaring inequalities, the Court reasoned that legislation like §21.031 is  "[l]egislation imposing special disabilities upon groups disfavored by virtue of circumstances beyond their control suggests the kind of "class or caste" treatment that the Fourteenth Amendment was designed to abolish" (*Plyler* 457 at n. 14).

**Who had jurisdiction?** Finally, the Court reasoned that §21.031 violated the Supremacy Clause which gives Congress the ultimate power with respect to foreign and international affairs. Constitutional pronouncements and judicial jurisprudence have consistently affirmed that the States have no power with respect to the classification of aliens, and that this power rests solely with the Federal Government (*Plyler* 457 at 225).  The Court did acknowledge, however, that "states do have some authority to act with respect to illegal aliens, at least where such action mirrors federal objectives and furthers a legitimate state goal" (*Id*). Nonetheless, the Court found that the disabilities and limitations imposed by §21.031 did not correspond to any identifiable congressional policy nor was it harmonious with any federal immigration program (*Id* at 226).

While *Plyler* represents the landmark champion of educational rights for undocumented children, a review of the potential challenges to *Plyler* appropriately begins with *Plyler* itself.  The *Plyler* decision was a close 5-4 split with four Justices joining the majority opinion authored by Justice Brennan, and three Justices joining in the dissent authored by Chief Justice Burger. The dissent agreed with the majority in the bad public policy presented by Texas' §21.031 and that undocumented immigrants were entitled to Equal Protection Clause of the Fourteenth Amendment.  However, Chief Justice Burger asserted that the majority opinion was an overstep of judicial power. The dissent opined that the decision of whether undocumented children should be afforded free public K-12 educational access should be left to Congress because the decision is a policy issue and not a constitutional one.

Nonetheless, *Plyler's* majority opinion contextualized the inherent inequality of §21.031 and the potential costs and burdens the legislation would impose upon a distinct class of persons, the State of Texas, and the Nation.  Despite the inherent discrimination of the legislation and the numerous crippling negative effects that denying undocumented children access to free public-school education would have, there has been substantial resistance to *Plyler's* holdings. Moreover, undocumented children face substantial challenges to educational achievements despite *Plyler's* mandate that they not be excluded from free public primary and secondary education.  This paper looks at what the implications might be if *Plyler* were to be reversed in light of the challenges that undocumented school children still face, and the push back to *Plyler* from national and state politicians.

> *The inability to read and write will handicap the individual deprived of a basic education each and every day of his life.*
>
> - Majority opinion in Plyler

## UNEQUAL EDUCATION CHANCES: CHALLENGES OF UNDOCUMENTED CHILDREN IN K-12 EDUCATION

*Plyler* is one in a series of federal mandates that confirm American public policy that public education must be available and unhindered to all school children within America's boundaries.  When it comes to elementary and secondary public education, federal law mandates that all school children receive a "free and appropriate education" (FAPE).  "FAPE" is a term of art commonly used throughout the Nation's secondary education school systems amongst school faculty and administrators because states receiving federal educational funds are mandated by federal law to provide FAPE to all school-aged children residing in its borders.[5]  *Plyler* was undoubtedly the most profound federal policy that protects the rights of undocumented immigrant children and mandated that they not be left out of entitlement to FAPE (Sulkowski and Wolf 2020).  The *Plyler* case is easily one of the most important protectors of the rights of school-aged children to K-12 education and on par with the passage of section 504 of the Rehabilitation Act which sought to eradicate barriers to education for children with disabilities by mandating that all school districts receiving federal funds must provide FAPE to disabled school children.  In the same vein as Section 504, *Plyler* ensured that children were not to be denied a free public education on the basis of the "disability" of being undocumented. Federal law stresses the importance of all children receiving FAPE despite any disabilities, and that the education received by children with disabilities must be equivalent to the education received by children without disabilities. In the case of undocumented children and U.S. citizen children with one or more undocumented parent ("undocumented children" or "undocumented students"),[6] the literature overwhelming demonstrates that undocumented status serves as a barrier that prevents undocumented children from receiving an education that equivalent with their peers who are United States citizens or Legal Permanent Residents ("LPRs").

Despite the pronouncements of Plyler, the literature reveals that normative practices and policies surrounding education and immigration still prevent undocumented school children from receiving FAPE (Sulkowski and Wolf 2020).

> The *Plyler* case is easily one of the most important protectors of the rights of school-aged children to K-12 education

---

[5] 34 CFR 300.101(a) states in pertinent part that: "A free appropriate public education must be available to all children residing in the State between the ages of 3 and 21, inclusive, including children with disabilities."

[6] For ease of reference, references to "undocumented children" or "undocumented students" throughout this text refer both to children and/or students who are themselves undocumented in the United States, in addition to those children and/or students who may be U.S. Citizens or possess some kind of legal status, but live in a household where at least one parent or caregiver are undocumented. Importantly, the number of U.S. citizen children with one or more undocumented parent outnumber the number of children who are themselves undocumented. The challenges outlined throughout this paper are just as applicable to undocumented children as they are to children with one or more undocumented parent.

### *Barriers to Education Caused by Continued Marginalization*

The lack of legal immigration status places a layer of persistent stress on school children that is not experienced by their citizen and legal resident peers.  This stress has a profound effect on both their performance in school and their ability to continue in school.  Despite *Plyler's* mandate that children not be excluded from free public secondary education solely on the basis of their undocumented status, their "illegality" still operates as a master status that serves as a barrier to full participation in elementary and secondary public-school education.  This master status serves to outweigh and overpower other social characteristics of students' lives (Enriquez 2017).  This master status is multidimensional in its restriction of social mobility and life chances.  The prevailing research suggests that the negative impacts of illegality create "bureaucratic, financial, social and health-related challenges that might interfere with students' ability to stay in school" (Terriquez 2015:1306). For instance, undocumented immigrants face restrictions in routine, but necessary functions that their legal resident or citizen peers take for granted, such as obtaining health insurance, applying for a credit card or loan,  or opening a bank account (Gonzales and Ruszczyk 2021). Accordingly, the continued existence of the undocumented as an extremely vulnerable underclass has rendered *Plyler's* holding a lackluster catalyst for educational gains for undocumented school children in America (Lopez 2004).

The lack of legal status of the undocumented renders them an extremely vulnerable class of people. Justice Brennan notes in the *Plyler* opinion that illegal migrants exist in the country as a shadow population "whose presence is tolerated, whose employment is perhaps even welcomed, but who are virtually defenseless against any abuse, exploitation, or callous neglect" (*Plyler*, 457 U.S. at 219). Studies confirm that undocumented immigrants are susceptible to unreported violent crimes because their status makes them less willing to report crimes to authorities for fear of exposure (Zatz and Smith 2012). The pervasive looming threat of deportation leaves the undocumented "vulnerable to abuse and exploitation by spouses, common criminals, corrupt government officials, border vigilantes, unscrupulous employers, and others" who oftentimes use the threat of deportation as a tool for exploitation (Zatz and Smith 2012:147).

Menjívar and Abrego's (2012) ethnographic research revealed that the perpetual fear of deportation among certain undocumented Latino immigrants leads to the avoidance of mainstream institutions that offered important social services, including schools. Even where school attendance is not wholly avoided, fear of deportation, whether for the deportation of themselves or their undocumented parents, causes mental and emotional strain that affects academic performance (Ee and Gándara 2019).

The stressors that come from living with the "undocumented" label are caused just as much by the limited socio-economic opportunities that comes with this status as it does with constant fear of deportation. Because they cannot legally work in the country, many undocumented people are resigned to accepting jobs with substandard working conditions and sub-minimum wages, adding hardships less likely to be endured by U.S. citizens and legal permanent residents (Terriquez 2015). The tendency of children of undocumented parents to assume more financial responsibilities than their native-born and LPR peers has been seen as a possible explanation to the higher stop-out rate of undocumented children and children with undocumented parents (Terriquez 2015). Despite *Plyler*, only 60 percent of undocumented students aged 18 to 24 graduate from high school compared to 85 percent of legal immigrants and 92 percent of U.S. born students of the same demographic (Punti 2018). Of those who do graduate, only about one-fourth go to college (Hsin and Reed 2020).

There is a documented correlation between the undocumented status of school children and low performance. Despite the fact that increased minority enrollment in elementary and secondary schools is attributable to the increased enrollment of Latinos, Latino students still have a higher drop-out rate and lower high school completion rate than African-Americans or white-Anglo students (Lopez 2004:1379). A longitudinal study of eight grade students across the United states reflected that Latino students are overrepresented in educational achievement risk factors in many areas including low family income, having siblings who have dropped out of school, being held back, teenage pregnancy, and having a "C" or lower grade point average (Lopez 2004).  It should be seen as no coincidence that undocumented people are disproportionately Latino. Survey research by Ee and Gandara (2019) revealed that educators often reported that even their best students, who are undocumented, show a tendency to quit school to get a job to help to financially support their families. Additionally, school districts that service high numbers of undocumented students tend to be in high poverty, low funded areas with fewer economic resources, less qualified teachers, high teacher turnover, and inadequate facilities and learning materials (Gonzales, Heredia, and Negrón-Gonzales 2015).

The United States has a long history of racialized stratification where institutionalized social hierarchies  "bestow low status and prevent full social participation within the state" (Radoff 2011:445). Legal status operates on a similar level where citizenship is a determinant of who does and does not belong.  Legal immigration status is intrinsically tied to negative perceptions. In the minds of some U.S citizens, undocumented immigrants are a despised "out-group" commonly associated with a laziness and criminality that renders them not quite "fully human at the most fundamental neural level of cognition, thus opening the door to the harshest, most exploitative, and cruelest treatment that human beings are capable of inflicting on one another" (Menjívar and Abrego 2012:1390).  "Not only does undocumented status catalyze fear of legal repercussions, but fear of ridicule, shame, and vulnerability looms daily" (Radoff 2011).

The stressors caused by this kind of pervasive stigmatization has been confirmed by numerous studies to have psychological and physiological consequences that pervade all aspects of life for marginalized minorities, including health, mental well-being, and capacity for learning (Goosby et al. 2018). By the age of three, infants of undocumented parents have a tendency to exhibit a lower cognitive development due to their parents' working conditions leaving little time and energy to devote to the stimulation of their children, and little resources to pay for child care (Drouhot and Nee 2019). Survey data regarding children of two undocumented parents in Los Angeles demonstrates that these children "have, all else equal, a one- to 1.7-year deficit in terms of years of school completed compared with similar children in families with one or no undocumented parent" (Drouhot and Nee 2019:186). Undocumented status stigmatization is congenitally linked to lower performance. This is demonstrated by research indicating that children, whose parents entered without documentation, show an enormous capacity to completely catch-up academically with their peers who grew up in legally stable families once their parents legal status is later normalized (Drouhot and Nee 2019). Further, studies document that exclusion from full mainstream social membership severely impacts the academic achievement of immigrant children (Radoff 2011).  In other words, once the stigmatizing condition is removed, undocumented status, school children have a greater capacity to academically compete on par with their peers.  The emotional and mental health undocumented children face because of pervasive fear of deportation and separation from family members, and from the stigmatization of their legal status can and does extend all the way to the school gate (Lopez 2004).

*Plyler* sought to effectively eradicate discriminatory practices that would bar school-aged children from obtaining a free public K-12 education on the sole basis of legal status.   Nonetheless, discriminatory practices against undocumented children continued despite *Plyler's* holdings.  This has been attributable to both ignorance of and wanton disregard for *Plyler's* edicts.

### Past Local and State School Administration Defiance of Plyler

*Plyler* outlined clear restrictions against denying access to public school education to undocumented school children.  In addition, U.S. Department of Education ("DOE") and the U.S. Department of Justice ("DOJ") collaborated to issue guidelines that instruct school administrators on implementing policies that would not violate *Plyler*, or chill education access based on enrollment practices. Nonetheless, *Plyler* violations amongst local and state administrations remain widespread. School administrations continued discriminatory practices have been most pronounced in their documentation and enrollment practices. Schools require documentation to confirm children's identity, age, and residency. While these things can be proven without disclosing immigration status, many school districts have imposed identification requirements that disclose children's and/or their parents' immigration status.  Too many of these policies are in direct violation of federal law, particularly, the holdings of *Plyler*. Some school districts have made proof of legal status a requirement for enrollment, in obvious violation of *Plyler*.  A 2008 study by the ACLU of New Jersey found that twenty percent of New Jersey school districts illegally requested information disclosing immigration status of children and parents during the enrollment process (Brenner, Leach, and Tulloch 2014).  Twenty-six school districts were among the worst offenders in directly requiring disclosure of citizenship or immigration status as a prerequisite for enrollment.  Cease and desist letters from ACLU-New Jersey were followed up by intervention from State's Department of Education mandating an end to these practices (Ofer 2012).

In a 2008 study, the Education Law Center (ELC) found that 162 of the 501 school districts employed enrollment practices that violated *Plyler* (Ofer 2012).  In some of the more egregious cases, some of these school districts required passport, visa, green cards, and even special approval as a "resident alien" from the school superintendent for school enrollment (Ofer 2012).  This case was made even more egregious considering that Pennsylvania is one of the few states in the country with laws providing guidance to school districts on the proper inquiries on immigration status that can be made during the enrollment process. Yet, these practices were widespread despite the state's added protections (Ofer 2012).

In 2009, the New York Civil Liberties Union (NYCLU) initiated a similar study after receiving a complaint about a local school district requesting proof of a child's immigration status as a part of the enrollment process (Ofer 2012). A cursory review revealed that at least five other school districts had the same practices.  An extensive investigation revealed that at least twenty percent of school districts in the state had policies in place mandating proof of lawful immigration status upon school enrollment (Ofer 2012). New York's Department of Education initially refused to intervene in the illegal practices of these school districts upon request that they do so by the NYCLU. However, after NYCLU publicized the school districts' practices in numerous national media publications, including *The New York Times,* the state's Department of Education issued a guidance to all school districts explaining that "school districts may not deny resident students a free public education on the basis of their immigration status' (Ofer 2012:209).

These two examples illustrate a troubling pattern of defiance to *Plyler* that has been evinced across the country. Even more widespread than the blatantly unlawful policies requiring documentation of immigration status are policies requiring the disclosure of Social Security numbers (SSN) for enrollment. For a large number of adults and children in America, holding an SSN is a nominal feat. However, undocumented persons who do not possess proper papers or work authorization are not eligible for an SSN. Accordingly, the inability to disclose an SSN as required for school enrollment raises suspicions that can inevitably lead to exposure of undocumented status. It must be acknowledged that school districts have overriding, non-discriminatory, needs for proper documentation from parents and children. These reasons include, but are not limited to, ensuring identity, ensuring compliance with residency requirements, maintaining proper contact in the event of emergencies, confirming authorization for child pick-up, and proving vaccine and public health records (Olivas 2012). Even when school districts take necessary precautions to comply with federal and local privacy laws and exhibit adequate cultural sensitivity, the unavailability of driver's licenses and other documentation from the undocumented can create challenges with legitimate documentation concerns. Nonetheless many school districts and colleges routinely and improperly require the disclosure of SSN's to meet these legitimate interests. It is a compelling argument to be made that requiring SSNs and documents intrinsically tied to legal status (like driver's licenses) violate both *Plyler* and the Equal Protection Clause (Ofer 2012). The requirement of documents that can lead to exposure of illegal status has a chilling effect by discouraging families from accessing public education for their undocumented children or children with undocumented parents or caregivers (Ofer 2012). Many parents will see it as an extremely risky endeavor to enroll their children in school if such enrollment would require admitting, or alluding to, unlawful presence in the United States, fearing that such a revelation would lead to arrest or deportation. With these risks in mind, parents would avoid the enrollment process altogether if the process requires disclosure of an SSN, greatly limiting children's participation in educational programs and activities. It is, therefore, the children who suffer when schools "innocently, casually, and routinely employ these numbers for their own uses, as simple registration or identification of school children" (Olivas 2012:48). Nevertheless, the requirement of disclosing SSNs for public school enrollment has been pervasive. In the 2008 ELC study previously referenced, the ELC found that 57 Pennsylvania school districts required SSNs as a prerequisite for public school enrollment, with two of the districts also requiring the parents possess an SSN (Ofer 2012).

These *Plyler* violations were so widespread and pervasive that the DOE and the DOJ were prompted to issue nationwide guidelines to school districts notifying them of *Plyler's* mandates and the correct ways in which these mandates should be implemented. In a 2014 "Dear Colleague" Letter, the DOE and the DOJ explicitly informed nationwide school districts that:

> Under Federal law, State and local educational agencies (hereinafter "districts") are required to provide all children with equal access to public education at the elementary and secondary level. Recently, we have become aware of student enrollment practices that may chill or discourage the participation, or lead to the exclusion, of students based on their or their parents' or guardians' actual or perceived citizenship or immigration status. These practices contravene Federal law. Both the United States Department of Justice and the United States Department of Education (Departments) write to remind you of the Federal obligation to provide equal educational opportunities to all children residing within your district and to offer our assistance in ensuring that you comply with the law… As *Plyler* makes clear, the undocumented or non-citizen status of a student (or his or her parent or guardian) is irrelevant to that student's entitlement to an elementary and secondary public education.

The letter goes on to advise school districts on proper documentation policies to employ that would not run afoul of the mandates of *Plyler* and other federal laws prohibiting discriminatory practices.

The 2014 letter served as an update and a re-confirmation of May 6, 2011 "Dear Colleague" letter that had reprimanded pervasive state and local education authority practices that chill or discourage the participation, or lead to the exclusion, of students based on their or their parents' or guardians' actual or perceived citizenship or immigration status.

### Challenges in Higher Education

The barriers faced by undocumented school children do not end for those who do manage to successfully complete a K-12 public education. *Plyler's* guarantee of educational access for undocumented children ends at the secondary school level. Undocumented college-aged students no longer have the protections of *Plyler*, but are still exposed to the same barriers as they were during the K-12 years. Accordingly, the legal, economic, and social barriers that tend to plague this demographic become even more glaring as they transition into adulthood and attempt to pursue higher education (Terriquez 2015).

The literature reveals clear trends in the pursuit of higher education by undocumented students. Undocumented students are less likely to finish high school and less likely to enroll in college (Drouhot and Nee 2019).  Because legal status functions as a master status that controls many aspects of life, otherwise-qualified undocumented youth are more likely to opt for the workforce than college (Hsin and Reed 2020).  It is no surprise then, that of the estimated 65,000 undocumented students that do graduate from high school annually, only about one-fourth go on to attend college (Hsin and Reed 2020).  When they do go to college, undocumented students are much more likely to enroll in a community college than a more traditional four-year institutions (Terriquez 2015). Community colleges tend to be more accessible, affordable, and offer a wider range of educational choices such as vocational training and associate degrees (Terriquez 2015). Although community colleges provide greater accessibility to higher education for undocumented students, these institutions don't usually have the resources and support systems integral to success and retention compared with the more traditional and costly four-year institutions. "Community colleges (especially public colleges) often lack the necessary resources and structures to ensure that students effectively integrate into the school, receive proper guidance and counselling, and obtain other academic support that they may need. Without a strong institutional connection, students may feel compelled to withdraw when they encounter challenge" (Terriquez 2015:1304).

As previously noted, there are unique financial strains commonly associated with undocumented status that can make retention in educational programs challenging. As unauthorized residents, undocumented residents cannot legally vote or benefit from social service programs.  This eradicates federal and state financial aid as an option for undocumented students to fund higher education (Gonzales and Ruszczyk 2021). Moreover, because they are unauthorized residents, they oftentimes do not qualify to receive in-state tuition as a bona-fide state resident (Hsin and Reed 2020). Only 21-states currently offer-instate tuition to undocumented residents (Hsin and Reed 2020).  For these reasons, higher education is generally more of an enormous financial undertaking for undocumented students than it is for their U.S. citizen or LPR counterparts. Additionally, undocumented college-aged students must still bear the stressors that come with being undocumented such as the negative stigma and the fear of deportation.

*Plyler* emphasized the importance of education if undocumented children were to have any chance in becoming fully functioning members of the wider society. While not a crucial component, higher education is considered to be important to social and economic mobility. The undocumented master status greatly affects the completion of K-12 education to which undocumented children are legally entitled. The master status presents even considerably more of a challenge in attempting to secure higher education when the legal protections of *Plyler* ends.

### The Second-Generation Advantage: Immigration as a Possible Educational Advantage

While it is important to summarize the findings in the literature that discuss immigration status as a barrier to higher education, it is also important to acknowledge those findings that claim the opposite. The prevailing literature documents a phenomenon coined "second generation advantage" that may arguably serve to place undocumented students at an academic advantage over their citizen peers. The second-generation advantage is a phenomenon among second-generation children, or children born of immigrant parents, where they tend to academically outperform their U.S. born counterparts and maintain continuous educational enrollment. This outperformance is credited to their families' high expectations for success in the U.S., or an 'immigrant optimism', in addition to the benefits of being able to draw from the strengths of both immigrant and U.S. cultures and networks to ensure academic success (Terriquez 2015). Numerous studies, mostly relying on longitudinal survey data, confirm this second-generation advantage, finding that second generation students from most immigrant groups reach or exceed the education of third-plus generation White native students (Drouhot and Nee 2019). While these studies indicate that second-generation advantage tends to reflect the class background of the first-generation immigrant parents, who transmit expectations for high relative status in the U.S. based on their social position, these studies also demonstrate that "even the children of less well-educated working-class parents appear to benefit from spillover effects of high academic achievement of [the] middle-class" (Drouhot and Nee 2019:180).

Some scholars would argue that this second-generation advantage counters the theory that legal status operates as a "master status" for undocumented students. This challenge is most poignant among college students, because they share the same challenges with other first-generation college students from low income families (lack of financial resources, lack of cultural resources, etc.) who tend to thrive nonetheless because of the second-generation advantage (Hsin and Reed 2020). For instance, a 2018 study observed that undocumented Hispanic students attending a Hispanic-serving institution considered financial hardship to be the primary source of adversity and not legal status (Hsin and Reed 2020).

While research does seem to indicate that the second-generation advantage is most profound amongst Chinese and Asian immigrants, those second-generation children of Hispanic immigrants are not immune to the phenomenon. "Importantly, it can also be observed among the children of immigrant parents who arrived in the United States with relatively low educational and occupational attainments. At 28 percent and 32.5 percent, respectively, second-generation Mexicans and Central Americans—the descendants of the most socially disadvantaged groups—are approximately three times more likely to be in managerial and professional positions compared with their foreign-born peers" (Drouhot and Nee 2019:180). However, contrasting findings also indicate that immigrants from Central America and Mexico tend to have a much lower educational attainment than their native born peers (Drouhot and Nee 2019). The latter finding has been attributed to these communities lacking organizational resources which would allow for information sharing and strategies for succeeding in the American school system (Drouhot and Nee 2019).

An important discrepancy noticed in reviewing the literature is that only a minimal amount of the research related to second-generation advantage distinguishes undocumented students or students with undocumented parents from those students of immigrant parents with lawful status.  The literature overwhelmingly indicates, however,  that children of immigrants whose parents remain undocumented, or who are undocumented themselves, encounter significant financial, social, and emotional hardships that limit educational attainment (Enriquez 2017). Accordingly, there is a need for more research into second-generation advantage controlling for undocumented status.

### *PLYLER* UNDER FIRE: CURRENT CHALLENGES TO PLYLER

Despite the fact that Plyler played a monumental role in cementing the rights of undocumented school children to a public-school education in America, the literature demonstrates that major barriers to education for undocumented children in America are still pervasive.  Moreover, despite the failure of *Plyler* to eradicate significant barriers to education for undocumented children and the majority opinion's repeated emphasis on the important societal interests in ensuring such access, there has been numerous efforts on a state and national level to overturn and undermine *Plyler*.

### *Plyler's Dissenting Opinion*

It has been argued that the majority opinion does not quite go far enough in denouncing the dissent's assertion and in securing education as a fundamental constitutional right.  Although *Plyler's* majority opinion confirmed undocumented students' rights to education, it reaffirmed an earlier ruling in *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1 (1973) holding that education is not a fundamental right.  Justice Brennan, who wrote the dissenting opinion in *Rodriguez*, did not have the votes needed to overturn *Rodriguez* while authoring the majority opinion in *Plyler* (Lopez 2004). Classifying education as a "non-fundamental" right, subjects a legislation denying education to a class of persons to a much lower level of review,[7] especially if the class of persons are not a "suspect class" as undocumented persons have been classified. This means that any future proposed legislation denying education to undocumented children need only demonstrate that such a legislation is "rationally related to a conceivable and legitimate state end" (*Tuan Anh Nguyen*, 533 at 77). In other words, if a future proposed legislation can demonstrate that denying education to undocumented children is rationally related to a legitimate state concern, then such a legislation has the chance of surviving judicial scrutiny.  Fortunately, *Plyler* affirmed that budget constraints, at least as they were presented by the Appellants in that case, is not a sufficient basis to justify such restriction.  This does not, however, foreclose the possibility that another state or local law seeking to deny educational access based on immigration status would not be successful should a stronger rationale be proffered.

This possibility is further buttressed by the Court's Supremacy Clause analysis. Texas' §21.031 failed partly because it did not correspond to any identifiable federal immigration law, and therefore usurped federal authority as the exclusive creator of novel immigration policy.  Accordingly, should the federal government pass a new immigration policy restricting access to public education based on immigration status, §21.031 would have a chance of legitimacy should it complement such a federal law.

---

[7] As noted above, "When considering the constitutionality of legislation that disproportionately affects a distinct group of persons, the Court applies a level of scrutiny that is dependent on the nature of the group affected, and the type of right or privileged that is potentially burdened."

The dissenting opinion agreed with the majority that such exclusionary immigration policy should be left to the federal government. The dissent took the federal preemption analysis a step further by disagreeing with the majority in imposing itself to carve out a solution to a problem that the executive branch had not spoken to. The dissent did not disagree with the majority that §21.031 would create a permanent caste of illiterate paupers, but that the issue was "one segment of a larger problem" and "for the political branches to solve" (*Plyler*, 457 U.S. at 254). However, the dissent asserted that it is up to Congress and not the Court to "assess the social costs borne by our Nation when select groups are denied the means to absorb the values and skills upon which our social order rests" (Id. at 254). For the dissent, §21.031 should have been allowed to stand and the ramifications addressed through the political process, culminating in a legislative action, if any action should be taken at all.

As with any deeply divided Supreme Court case, it is likely that such a vigorous dissent, in addition to the implications of the majority opinion, contributed to *Plyler's* susceptibility to both state and federal attack (Lopez 2004). These attacks reveal a deep-seeded resentment held towards undocumented immigrants that has been exacerbated by the rising education costs borne by states who look to immigration to scapegoat the problem (Lopez 2004). Although this financial burden rationale was rejected by the Supreme Court in *Plyler* as a sufficient basis for denying educational opportunities to undocumented children, numerous challenges to *Plyler* have used this "financial burden" justification.

### Federal Challenges

Following the directives of *Plyler* in turning to Congress for any extreme immigration measures, the anti-immigration sentiments that ran high in the 1990s culminated in the implementation of the Illegal Immigration Reform and Immigration Responsibility Act of 1996 (IIRIRA). IIRIRA included sweeping restrictionist immigration policies which the law's proponents claimed to respond to the rise in the U.S.'s undocumented population. IIRIRA greatly strengthened immigration enforcement, increased penalties for unauthorized entry, and stripped federal courts of the authority to hear challenges to deportations (Fitz, Wolgin, and Garcia 2012). During the debates that lead to IIRIRA's enactment, Representative Elton Gallegly (R-CA) proposed an Amendment that would allow states to charge tuition to undocumented students or completely exclude them from public schools, effectively overturning *Plyler* (Olivas 2012). Gallegly believed that, while *Plyler* blocked the implementation of similar state legislations, *Plyler* could not stop the federal government from acting (Fitz et al. 2012). However, *Plyler's* rationale proved to be compelling and held substantial clout in the political arena. Backlash was swift and the Gallegly Amendment drew heavy opposition in Congress and the media, both of which relied heavily on the public policy arguments posited by *Plyler* (Olivas 2012). Many Congressional members mirrored *Plyler's* sentiments, such as Representative Zoe Lofgren (D-CA) who stated that "[w]hatever you think about the behavior of adults, it is immoral to punish the minor children for the sins of their parents" (Fitz et al. 2012:7). The Gallegly Amendment was not without its supporters, however, who reflected the view that educating undocumented students imposed significant burdens on states and encouraged continued immigration law violations (Lopez 2004). *Plyler* proved influential, however, after months of contentious debate when the Gallegly Amendment was excluded from the final legislation which included no provision restriction the ability of immigrant children to attend public schools (Olivas 2012). While IIRIRA did not restrict undocumented children's rights to education, it did pass provisions considered to be draconian, while restricting immigration benefits and strengthening removal measures.

### State Challenges

The Gallegly Amendment failed to become enacted, thereby failing to present an opportunity to see if federal legislation denying free public education to undocumented children would survive judicial scrutiny. *Plyler's* pronouncement that such policies from state legislations are invalid, did not stop state legislatures from trying to enact legislation similar to §21.031.  California's Proposition 187 (Prop 187) ballot initiative was one of the earliest state challenges to *Plyler*, and was a forerunner to the Gallegly Amendment in 1996. Prop 187 was the result of a wave of anti-immigrant sentiments in the state and an attempt by then Republican Governor Pete Wilson to scapegoat undocumented immigrants for a rise in state expenditures on public services such as education and healthcare, the former of which allegedly cost the state $1.5 billion annually for the education of undocumented school children (Fitz et al. 2012). Prop 187 did not only propose restricting access to education for undocumented children; it also proposed extensive restrictions on public services to undocumented immigrants denying them access to all public services except for emergency health care (Sulkowski and Wolf 2020).  Wilson was reelected and Prop 187 passed with nearly 60 percent of the vote (Olivas 2012). Prop 187 was a clear attempt to overturn *Plyler,* and to impose restrictions on immigrants' access to a wide variety of public benefits. This attempt ultimately failed, however, as Prop 187 was enjoined from enforcement and then struck down almost in its entirety by *League of United Latin American Citizens v. Wilson* (997 F. Supp. 1244 (C.D. Cal. 1997); 908 F. Supp. 755 (C.D. Cal. 1995). In regard to Section 7, the portion of Prop 187 that excluded undocumented children from public schools, the Central District Court of California relied on *Plyler's* Supremacy Clause and equal protection analysis in invalidating the provision (Lopez 2004).

California would be the last state to attempt to pass legislation directly opposing *Plyler*.  Other states would pass measures restricting educational access in more indirect ways that would test the limits of *Plyler* without directly challenging it. For instance, in 2006, Arizona undertook to regulate immigration within the state and restrict public benefits. Like California's Prop 187, education restriction was just a part of a series of proposed restrictions on benefits to undocumented immigrants that reflected rising anti-immigration frustrations within the state.  A series of proposed restrictions sought to deny undocumented immigrants the right to bail and the collection of civil damages in Arizona litigation (Olivas 2012). Specifically, Prop 300 sought to restrict enrollment in public colleges and adult education programs by denying state financial aid to undocumented students. Prop 300, and the other proposals seeking to restrict immigrant access to Arizona state services,  were approved by over 70 percent of voters, however, full implementation was stalled due to litigation (Olivas 2012).

Also in 2006, The Georgia Security and Immigration Compliance Act (S.B. 529) was signed into law and took effect in July 2007 (Olivas 2012). This act implemented sweeping crackdowns on immigration benefits including reporting, eligibility requirements, and provisions for official transactions concerning immigrants (Olivas 2012).  While the Act does not restrict access to public school education for undocumented students, it does direct the state's higher education authority to enforce immigration law and implement provisions concerning state funding for undocumented college students (Olivas 2012).

Alabama also passed comprehensive immigration reform in June of 2011. Like most post-Prop 187 state legislation, the Beason-Hammon Alabama Taxpayer and Citizen Protection Act (H.B. 56) does not violate *Plyler* by outrightly denying access to public school education to undocumented students. However, H.B 56 does push the bounds of *Plyler* by mandating that public schools check and report on the legal status of their students and parents (Sulkowski and Wolf 2020). The need for this provision is questionable considering that roughly one half of one percent of the 800,000 children attending Alabama public schools are undocumented immigrants (Fitz et al. 2012).

Nonetheless, the educational provision of H.B. 56 was validated by the first judge to hear the case brought against it. Resultantly, "[f]or two weeks—from September 28 to October 14, when the U.S. Court of Appeals for the 11th Circuit put the education provisions on hold—Alabama's public schools saw a marked drop in the number of Latino students attending" (Fitz et al. 2012:9). The DOJ intervened in the matter and sent a letter to Alabama's State Superintendent of Education citing significant concerns with H.B. 56 including the uptick of Latino absences and withdrawals since the law went into effect (Fitz et al. 2012). The DOJ reprimanded the state superintendent warning that "The legislation has had continuing effects on Alabama's schoolchildren even after it was enjoined by the court…. [and that] consistent with *Plyler*, districts cannot request information with the purpose or the result of denying students access to the public schools" (Fitz et al. 2012:9).

More recently, Texas Governor Greg Abbott stated in an interview that, like *Roe v. Wade*, *Plyler* should be revisited by the Supreme Court. Governor Abbott argued that President Joe Biden's decision to lift Title 42[8] will result in an influx of immigrants across the border, and that the federal government should pay for the education of the children of these immigrants due to its dedication to the tenets of *Plyler* (McGee 2022). Alternatively, Governor Abbott believes that *Plyler* should be overturned and that states should be given greater control in regulating their immigrant populations. Importantly, Governor Abbott asserts that the *Plyler* decision is unconstitutional because, by mandating states to educate immigrant children, *Plyler* allows the federal government to essentially commandeer state budgets to enact federal policy (McGee 2022). Governor Abbott's statements makes it clear that we have not seen the last of state challenges to *Plyler*.

### *Non-Profit and Nongovernmental Resistance to Plyler*

State and federal legislators have not been the only assailants of *Plyler*. Non-profit and non-governmental organizations have taken up the torch to challenge and eventually repeal Plyler's guarantee of educational access to undocumented children. The anti-immigration sentiments of the 90s and 2000s saw the proliferation of restrictionist immigration policies, in addition to a rise of anti-immigrant organizations. These organizations campaign for a range of nativist policies including the promotion of the English language and campaigning against the translation of official government documents (Weisberg 2010). Many couch their anti-immigration sentiments in terms of environmental and economic preservation (Weisberg 2010). Some wage legal battles against local governments and employers of undocumented immigrants, while others are dedicated to grassroots and vigilante actions against undocumented immigrants (Larsen 2007). Other restrictionist organizations operate as think tanks that are frequently called to testify as experts before Congress, publish reports, and comment on the broad immigration debate (Larsen 2007).

---

[8] Title 42 of the U.S. code is a rarely used clause of the 1944 Public Health Services Law aimed at preventing the spread of communicable diseases in the country. President Trump launched a public emergency health order under Title 42 as a response to the 2020 covid-19 pandemic. Title 42 was an attempt to stop the spread of covid-19 in immigrant detention centers and allowed for the expulsion of thousands of migrants without the usual due process procedures. Title 42 also allows asylum seekers to be turned away from the border

The most well-known of such organizations are the Federation for American Immigration Reform (FAIR) and the Center for Immigration Studies (CIS). As one scholar phrases it, these organization tend to "put a respectable face to bigotry" (Larsen 2007:15). FAIR is arguably the most notorious and most influential of the anti-immigration groups. FAIR engages in extensive studies that center on establishing that undocumented immigrants are a menace to society, and publishes literature making a case for immigration reform based on economic studies, environmental effects, and social effects (Larsen 2007).

Restricting access to education is one of FAIR's restrictionist missions. For instance, one FAIR report, highlighting the monumental financial burden placed on school districts due to the "explosive growth" of limited English proficiency (LEP) students, and recommends overturning *Plyler* as one of the measures to alleviate this fiscal burden (Ferris and Spencer 2016). The report explains that such a measure is necessary to remedy the declining quality of education to citizen students due to the diversion of billions of taxpayer dollars to fund increasing LEP demands. FAIR often cites *Plyler* as a reason for fiscal stress on state and local resources which, they argue, causes a negative effect on vulnerable American citizens. For instance, one FAIR report states that "the Supreme Court's holding in *Plyler v. Doe* guaranteeing illegal alien children a free public education, at taxpayer expense…have increasingly stressed federal, state and local budgets — to the detriment of Americans, particularly the poor, elderly, and disabled" (O'Brien et al 2017:5).

Emboldened by the belief that they are acting within in the best interests of American citizens, FAIR has initiated court actions with the aim of restricting educational access to undocumented immigrants. In 2007, The U.S. Court of Appeals for the 10th Circuit dismissed one such lawsuit where FAIR challenged Kansas' grant of in-state tuition for resident undocumented students, for lack of standing (FAIR 2019).

FAIR's prestige, influence, and available resources to expend in extensive litigation makes them a particularly formidable enemy of *Plyler*. Rather than relying on extreme racist and xenophobic rhetoric to push restrictionist immigration policies, FAIR instead opts for a more scholarly and 'politically correct' approach (Larsen 2007). However, despite their questionable studies and literature, these organizations typically fail to engage in discussions on how the loss of undocumented labor would affect the U.S. economy or the possible ramifications of having a caste of socio-economically deprived U.S. residents. Rather, "their economic analysis is shallow and xenophobic—they simply blame undocumented immigrants for society's ills" (Larsen 2007:18). Organizations like these provide essential support to state and local efforts in the new trend in *Plyler* attacks which is to make life as difficult as possible for undocumented immigrants, forcing them to self-deport and take their 'burdensome' children along with them (Fitz et al. 2012).

> Considering the most recent surges of anti-immigrant sentiment, it is probable that the Supreme Court may hear another case threatening to undermine *Plyler*.

## CONCLUSION: A NATION WITHOUT *PLYLER* AND IMPLICATIONS FOR THE FUTURE

The economic and social implications of a nation without *Plyler* were emphasized by the Supreme Court in 1982 when they reprimanded the systematic creation of a socially handicapped class of illiterates with severely limited chances for socio-economic advancement.  The potential for effects on crime and poverty are clear, but there is a potential for a negative economic impact as well. Full-time workers without a high school diploma earn about one-third less than those workers who do have one (Larsen 2007). Such a dramatic loss in income would potentially harm the economy as much as the individuals (Larsen 2007).  Because children raised with little or no education are likely to become tremendous burdens upon society, *Plyler* protects the nation just as much as it protects undocumented immigrant children.

As was highlighted above, even with the protections afforded by *Plyler*, undocumented immigrant children still face enormous challenges to educational and economic achievement.  Although it is a seminal case in the protection of immigrant education rights, *Plyler* has been criticized as not having much of an impact on the education system, especially in comparison to other pivotal education rights cases like *Brown v. Board of Education* (Lopez 2004). "In fact, it may be that *Plyler* acts as a form of preserving the undocumented as a separate class, ensuring a primary and secondary education for their children, but nothing more within society" (Lopez 2004:1398).

Based on the prevailing literature and immigration policy, what is most needed in order to make a more resounding impact on the education system for immigrants is more affirmative policy securing immigrants' access to education. This can be manifested in a number of ways, the most impactful being Congressional action codifying *Plyler* rather than overturning it. Moreover, federal policy needs to go further than simply guaranteeing a right to free public K-12 education, but also to implement policies outright barring tracking, reporting, and other measures, which have been employed by state and local education systems, that have a chilling effect on immigrant access to education. As demonstrated by the DOE and DOJ's joint guidelines warning school administrators against implementing enrollment practices that chill *Plyler*, there is an undercurrent of misunderstanding regarding the tracking and reporting of student immigrant status.  This misunderstanding extends beyond school administrations to the federal administration as was demonstrated during the Trump administration when Former Education Secretary Betsy Devos testified before Congress stating that school districts are allowed to decide whether to report student immigration status to immigration authorities.  Such testimony has been called "an astounding ignorance of the law" and a flat-out wrong interpretation of federal law in accordance with *Plyler* (MALDEF 2018).

Considering the most recent surges of anti-immigrant sentiment and the composition of the Supreme Court, it is probable that the Supreme Court may hear another case threatening to undermine *Plyler*.  If such a case were heard by the Supreme Court, it would be beneficial for the Court to double down on the public policy concerns discussed in *Plyler* and to close some of the holes left open by the *Plyler* opinion in regards to immigrant and education rights. Particularly, the Courts should move away from the constitutional originalist doctrine that many legal scholars find problematic and establish education as a fundamental constitutional right due to the importance of education for social and economic advancement, and for the systematic unequal educational opportunities prevalent in the country. Such a holding could potentially hinder any congressional attempts to bar education access to undocumented children, thus foreclosing any future Supremacy clause arguments.

Further, most of the immigrant-restricting initiatives, particularly the ones that potentially threaten *Plyler*, are fueled by a drive for cultural and racial homogeneity, in addition to racist and xenophobic stereotypes (Olivas 2012). Accordingly, in order to stem the tide of these policies there needs to be increased funding to those organizations who promote awareness to refute the stereotypes of immigrants as major contributors to crime, and highlights immigrant contributions to society and economy.

Finally, there needs to be more research on the extent to which unlawful immigration status operates as a "mast status" which potentially affects the social and economic outcomes of students and their parents. Additionally, these effects should be distinguishable from factors affecting other immigrant student groups in order to resolve the conflicting data surrounding the second-generation advantage. Policy considerations should be made to address the research documenting the negative effects that a lack of immigration status plays on educational achievement.

These measures are necessary in ensuring that undocumented students have a minimum level of access to education and receive the FAPE to which they are entitled under federal law.



## REFERENCES

Baczynski, Dan. 2013. "Education Connection: The Chilling Effects of Student Immigration Tracking Systems Violate Plyler." *Children's Legal Rights Journal* 33:7.

Brenner, Christine Thurlow, Kirk A. Leach, and David Tulloch. 2014. "Plyler Children: 21st Century Challenges with Judicial-Policy Implementation Affecting Immigrant Children in New Jersey." *Journal of Public Management & Social Policy* 20(1):98–116.

Cole, David. 2022. "The Supreme Court Embraces Originalism — and All Its Flaws." *The Washington Post (Online)*. Retrieved July 19, 2022 (https://www.proquest.com/docview/2682589467/citation/ F42EB90D38D34F47PQ/1).

Driver, Justin. 2018. "How Trump Nominee Brett Kavanaugh Could Threaten Undocumented Children's Education." *Time*. Retrieved May 19, 2020 (https://time.com/5384038/brett-kavanaugh-betsy-devos-undocumented-immigrant-children-education/).

Drouhot, Lucas G., and Victor Nee. 2019. "Assimilation and the Second Generation in Europe and America: Blending and Segregating Social Dynamics Between Immigrants and Natives." *Annual Review of Sociology* 45(1):177–99. doi: 10.1146/annurev-soc-073117-041335.

Ee, Jongyeon, and Patricia Gándara. 2019. "The Impact of Immigration Enforcement on the Nation's Schools." *American Educational Research Journal* 000283121986299. doi: 10.3102/0002831219862998.

Enriquez, Laura E. 2017. "A 'Master Status' or the 'Final Straw'? Assessing the Role of Immigration Status in Latino Undocumented Youths' Pathways out of School." *Journal of Ethnic and Migration Studies* 43(9):1526–43. doi: 10.1080/1369183X.2016.1235483.

FAIR. 2019. "In-State Tuition for Illegal Aliens | Federation for American Immigration Reform." Retrieved May 19, 2020 (https://www.fairus.org/issue/societal-impact/in-state-tuition-illegal-aliens).

Ferris, Marc, and Raley Spencer. 2016. "The Elephant in the Classroom: Mass Immigration's Impact on Public Education." Retrieved May 19, 2020 (https://www.fairus.org/issue/publications-resources/elephant-classroom-mass-immigrations-impact-public-education).

Fitz, Marshall, Philip E. Wolgin, and Ann Garcia. 2012. "Triumphs and Challenges on the 30th Anniversary of Plyler v. Doe." 22. doi: 10.1080/10714839.2007.11722307.

Goettel, Kate. 2022. "The Supreme Court Overturning Roe v. Wade Could Have Harmful Ripple Effects for Immigrants." *Immigration Impact*. Retrieved July 19, 2022 (https:// immigrationimpact.com/2022/05/13/overturning-roe-effects-immigrants/).

Gonzales, Roberto G. 2007. "Wasted Talent and Broken Dreams: The Lost Potential of Undocumented Students." *American Immigration Council*. Retrieved July 20, 2022 (https:// www.americanimmigrationcouncil.org/research/wasted-talent-and-broken-dreams-lost-potential-undocumented-students).

Gonzales, Roberto G., Luisa L. Heredia, and Genevieve Negrón-Gonzales. 2015. "Untangling Plyler's Legacy: Undocumented Students, Schools, and Citizenship." *Harvard Educational Review* 85 (3):318–41. doi: 10.17763/0017-8055.85.3.318.

Gonzales, Roberto G., and Stephen P. Ruszczyk. 2021. "The Legal Status Divide among the Children of Immigrants." *Daedalus* 150(2):135–49. doi: 10.1162/daed_a_01851.

Hess, Justin. 2010. "NOTE & COMMENT: Nonimmigrants, Equal Protection, and the Supremacy Clause." *Brigham Young University Law Review* 2277–2313.

Hsin, Amy, and Holly E. Reed. 2020. "The Academic Performance of Undocumented Students in Higher Education in the United States." *International Migration Review* 54(1):289–315. doi: 10.1177/0197918318825478.

Krogstad, Jens Manuel, Jeffrey S. Passel, and D'Vera Cohn. 2019. "5 Facts about Illegal Immigration in the U.S." *Pew Research Center*. Retrieved April 30, 2020 (https://www.pewresearch.org/fact-tank/2019/06/12/5-facts-about-illegal-immigration-in-the-u-s/).

Larsen, Solana. 2007. "The Anti-Immigration Movement: From Shovels to Suits." *NACLA Report on the Americas* 40(3):14–18. doi: 10.1080/10714839.2007.11722307.

Lopez, Maria Pabon. 2004. "Reflections on Educating Latino and Latina Undocumented Children: Beyond Plyler v. Doe Immigration." *Seton Hall Law Review* 35(4):1373–1406.

MALDEF. 2018. "Plyler v. Doe." *MALDEF in History*. Retrieved July 25, 2022 (https://www.maldef.org/2018/12/plyler-case/).

McGee, Kate. 2022. "Gov. Greg Abbott Says Federal Government Should Cover Cost of Educating Undocumented Students in Texas Public Schools." *The Texas Tribune*. Retrieved June 24, 2022 (https://www.texastribune.org/2022/05/05/greg-abbott-plyler-doe-education/).

Menjívar, Cecilia, and Leisy J. Abrego. 2012. "Legal Violence: Immigration Law and the Lives of Central American Immigrants." *American Journal of Sociology* 117(5):1380–1421. doi: 10.1086/663575.

Ofer, Udi. 2012. "Protecting Plyler: New Challenges to the Right of Immigrant Children to Access a Public School Education." doi: 10.7916/D8JT014G.

Olivas, Michael A. 2012. *No Undocumented Child Left behind: Plyler v. Doe and the Education of Undocumented Schoolchildren*. New York: New York University Press.

Punti, Gemma. 2018. "Echándole Ganas : The Academic Identities of Undocumented Latino Youth." *Journal of Latinos and Education* 17(4):314–29. doi: 10.1080/15348431.2017.1348300.

Radoff, Sara. 2011. "Crossing the Borders of *Plyler v. Doe* : Students without Documentation and Their Right to Rights." *Educational Studies* 47(5):436–50. doi: 10.1080/00131946.2011.602149.

Shamsian, Jacob. 2019. "The Trump Administration Reportedly Spent Months Trying to Make Sure Unauthorized Immigrants Couldn't Go to School." *Business Insider*. Retrieved May 19, 2020 (https://www.businessinsider.com/trump-administration-undocumented-immigrants-school-stephen -miller-2019-8).

Strauss, Marcy. 2011. "ARTICLE: Reevaluating Suspect Classifications." *Seattle University Law Review* 35:135–73.

Sulkowski, Michael L., and Jaclyn N. Wolf. 2020. "Undocumented Immigration in the United States: Historical and Legal Context and the Ethical Practice of School Psychology." *School Psychology International* 41(4):388–405. doi: 10.1177/0143034320927449.

Terriquez, Veronica. 2015. "Dreams Delayed: Barriers to Degree Completion among Undocumented Community College Students." *Journal of Ethnic and Migration Studies* 41(8):1302–23. doi: 10.1080/1369183X.2014.968534.

Weisberg, Jessica. 2010. "Guilt by Association." *The American Prospect* 21(5):25–28.

Zatz, Marjorie S., and Hilary Smith. 2012. "Immigration, Crime, and Victimization: Rhetoric and Reality." *Annual Review of Law and Social Science* 8(1):141–59. doi: 10.1146/annurev-lawsocsci-102811-173923.



Dr. James C. Witte, *Director*
Dr. Michele Waslin, *Program Coordinator*
Katharine Rupp, *Office Manager*
Fanni Farago, MA, *Graduate Research Assistant*
Marisa Mayer, *Graduate Research Assistant*
Nina Pastor, *Graduate Research Assistant*
Amanda Warner, *Graduate Research Assistant*

**About the Institute for Immigration Research**

The Institute for Immigration Research (IIR) is a multidisciplinary research institute at George Mason University. The IIR's mission is to produce valid, reliable, and objective multidisciplinary research on immigrants and immigration to the United States and to disseminate this information through peer-reviewed academic journals, as well as in print and digital formats that make this research easily accessible to policy-makers, the media, the business community, and the general public. Our faculty affiliates, graduate students, and partners are at the forefront of research examining the economic contributions of all immigrant in the United States. The IIR produces high quality, timely research and analysis intended to promote informed action.

The IIR was founded in 2012 through the generous donation of Ms. Diane Portnoy and is a joint venture with The Immigrant Learning Center, Inc. of Malden, Massachusetts.

The IIR is located on the campus of George Mason University in Fairfax, Virginia, outside the nation's capital, Washington, DC. Its strategic location allows the IIR to draw on unparalleled academic, government, and private resources to advance its mission in research, education, and professional opportunities for current and future scholars of immigration studies. Through conferences, workshops, lectures, and other events, the IIR is able to engage in community outreach with one of the most diverse populations in the United States.



| | |
|---|---|
| **Address:** | 4400 University Drive, MSN 1D7 |
| | Fairfax, VA 22030 |
| **Website:** | iir.gmu.edu |
| **Phone:** | (703) 993-5833 |
| **Email:** | iir@gmu.edu |
| **Facebook:** | facebook.com/GMUIIR |
| **Twitter:** | @IIRGMU |

