# EXHIBIT 17

# Is Birthright Citizenship Good for America?

*Margaret D. Stock*

The Declaration of Independence famously asserted that "all men are created equal," but this assertion did not become an American constitutional reality until the Fourteenth Amendment was ratified in 1868. The Fourteenth Amendment's Citizenship Clause—intended to overturn the infamous U.S. Supreme Court decision in the *Dred Scott* (1857) case—states that "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside." Traditionally, the clause has been interpreted to confer U.S. citizenship on anyone born within the United States whose parents are subject to U.S. civil and criminal laws—which has historically meant that only babies born in the United States to diplomats, invading armies, or within certain sovereign Native American tribes have been excluded from birthright American citizenship. Alarmed by the thought that unauthorized immigrants, wealthy tourists, and temporary workers are giving birth to thousands of U.S. citizens, some want to change the long-standing rule by reinterpreting or amending the Citizenship Clause. But will this proposed change be good for America? Will it benefit America to reduce substantially the number of birthright U.S. citizens—and put in place more complex rules that would provide that U.S.-born babies are not created equal?

---

*Cato Journal*, Vol. 32, No. 1 (Winter 2012). Copyright © Cato Institute. All rights reserved.

Margaret Stock is an attorney with the firm of Lane Powell LLC in Anchorage, Alaska, and a Member of the American Bar Association Commission on Immigration.

Cato Journal

## A Brief History of the U.S. Birthright Citizenship Rule

At the time of the ratification of the U.S. Constitution in 1790, the new United States recognized three different paths to American citizenship: First, a person could be born a foreigner and later apply to become a U.S. citizen through the naturalization process; this pathway fell under Congress's power to create a "uniform rule of naturalization," as stated in Article I, Section 8 of the U.S. Constitution. Second, following the international law rule, a person might inherit citizenship from his or her citizen parents; this pathway—termed the *jus sanguinis* or the citizenship by blood or descent rule—was thought to be within the naturalization power of Congress as well, and was first permitted when Congress passed the Naturalization Act of 1790, which accorded "natural born citizen" status to the foreign-born children of certain U.S. citizens.[1] Finally, however, the United States also adopted the British common-law rule of *jus soli* (law of the soil) for persons born within the territorial jurisdiction of the United States whose parents were subject to U.S. civil and criminal laws. Thus, in the 1844 New York state court case of *Lynch v. Clarke* (1844), Judge Lewis Sandford wrote,

> I can entertain no doubt, but that by the law of the United States, every person born within the dominions and allegiance of the United States, whatever were the situation of his parents, is a natural born citizen. The entire silence of the constitution in regard to it, furnishes a strong confirmation, not only that the existing law of the states was entirely uniform, but that there was no intention to abrogate or change it. The term citizen, was used in the constitution as a word, the meaning of which was already established and well understood. And the constitution itself contains a direct recognition of the subsisting common law principle . . . The only standard which then existed . . . was the rule of the common law, and no different standard has been adopted since.

---

[1]The Naturalization Act of 1790 (March 26, 1790) stated: "And the children of citizens of the United States, that may be born beyond sea, or out of the limits of the United States, shall be considered as natural born citizens: Provided, That the right of citizenship shall not descend to persons whose fathers have never been resident in the United States."

In 1857, however, in the case of *Sandford v. Scott* (commonly termed the *Dred Scott* case), the U.S. Supreme Court determined that these three pathways to U.S. citizenship were not open to persons of African descent. Moreover, said the Court, these pathways could never be open to Africans or their descendants—as a matter of constitutional law, the Court said, the original political community in America had never consented to the inclusion of Africans as full members of that community,[2] and so Africans and their descendants were forever barred from U.S. citizenship. In reaching its decision, the Supreme Court held that mere birth on U.S. soil was not enough to confer U.S. citizenship; one also had to show that the political community had consented to one's presence.

After the Civil War, the *Dred Scott* decision was explicitly reversed, first through passage of the Civil Rights Act of 1866, and then as a matter of constitutional law by the Fourteenth Amendment's Citizenship Clause. The wording of the two enactments differed; the Civil Rights Act granted U.S. citizenship to persons born in the United States who were "not subject to any foreign power;" in contrast, the Fourteenth Amendment's Citizenship Clause granted citizenship to the broader class of those "subject to the jurisdiction." During debates over passage of both measures, however, there was vigorous discussion over the coverage of the Citizenship Clause—and the fact that it applied to the children of foreigners, even if those foreigners were in the United States in violation of various laws.[3] Sen. Edgar Cowan of Pennsylvania, for example, expressed concern that

---

[2] The U.S. Supreme Court was wrong on this point—several States had recognized persons of African descent as citizens. Abraham Lincoln ([1857] 1953: 403–7) famously criticized Chief Justice Taney's underlying assumptions: "Chief Justice Taney, in delivering the opinion of the majority of the Court, insists at great length that Negroes were no part of the people who made, or for whom was made, the Declaration of Independence, or the Constitution of the United States. [In several of the original States], free Negroes were voters, and, in proportion to their numbers, had the same part in making the Constitution that the white people had."

[3] Although the issue was not mentioned in the debates, many African slaves—whose U.S.-born children benefitted from the Fourteenth Amendment's Citizenship Clause—were in the United States in violation of law; they had been smuggled or trafficked into the United States by slave traders after the importation of slaves into the U.S. was outlawed by Congress in 1808. And although immigration enforcement was not a priority of the federal government in the first half of the nineteenth century, there were other immigrants who were in the U.S. in violation of various immigration laws, including Irish citizens who had shipped into Canada and then surreptitiously crossed the border so as to avoid paying entry taxes at U.S. ports.

the Citizenship Clause would expand the number of Chinese and Gypsies in America by granting birthright citizenship to their children, although the parents owed no "allegiance" to the United States and were committing "trespass" by being in the United States. Arguing against him, supporters of the Citizenship Clause defended the right of these children to be U.S. citizens at birth. Both sides in the debate agreed that the Clause would extend U.S. birthright citizenship to the children born in the United States to foreigners who were subject to U.S. civil and criminal laws—excluding only the children of foreign diplomats, invading armies, and sovereign Native American tribes (Ho 2006).

Following ratification of the Fourteenth Amendment, the U.S. Supreme Court consistently followed this interpretation of the Citizenship Clause (there was a passing comment in the *Slaughterhouse* cases [1873] that has caused some to argue otherwise, but *Slaughterhouse* was not a birthright citizenship or immigration case). As conflicts over Asian immigration arose in the western United States in the late 1800s, however, some government officials began to deny the rights of U.S. citizenship to U.S.-born children of Chinese descent. Thus, in 1898, the U.S. Supreme Court had occasion—in the *Wong Kim Ark* decision—to confirm unequivocally that birthright citizenship belonged to any child born within the territorial jurisdiction of the United States, as long as the child—at the time of his or her birth on U.S. soil—was subject to U.S. civil and criminal laws. The Court held that an American-born child of Chinese immigrants was entitled to citizenship because the "Fourteenth Amendment affirms the ancient and fundamental rule of citizenship by birth within the territory . . . including all children here born of resident aliens" (*Wong Kim Ark* 1898). The net result, then, was that following passage of the Fourteenth Amendment, and excepting certain Native Americans, the U.S. government recognized all non-diplomatic persons born within the territorial jurisdiction to be U.S. citizens, regardless of their parentage. The U.S. Department of State began issuing U.S. passports to all such children—unless their parents were diplomats who held immunity from U.S. civil and criminal laws. Congress also passed a number of statutes recognizing the extension of birthright citizenship to persons born within newly acquired U.S. territories, including Alaska, Hawaii, Guam, Puerto Rico, and the U.S. Virgin Islands. More recently, in *Plyler v. Doe* (1982), the U.S. Supreme Court stated that

the Fourteenth Amendment extends to anyone "who is subject to the laws of a state," including the U.S.-born children of unauthorized immigrants. Similarly, in *Immigration and Naturalization Service v. Rios-Pineda* (1985), the Court stated that a child born on U.S. soil to an unauthorized immigrant parent is a U.S. citizen from birth.

In the mid-1980s, however, as immigration laws tightened and unauthorized immigration to the United States increased to record levels, Yale scholars Peter Schuck and Rogers Smith (1985) published *Citizenship without Consent,* a book in which they argued that America should move away from its historic birthright citizenship rule. Schuck and Smith said that a rule of "citizenship by consent"—the opposite of a rule that confers citizenship automatically on children born within American territory—was a more appropriate rule for the modern American polity. Although they acknowledged that the American birthright citizenship rule was familiar, easy to apply, and more inclusive than a consensual rule, they argued that it was "anomalous as a key constitutive element of a liberal political system" because an individual's citizenship was determined by the location of his or her birth, and not by the consent of the individual and the society in which he or she sought citizenship (Schuck and Smith 1985: 90). They further argued that the Fourteenth Amendment phrase "subject to the jurisdiction" could be reinterpreted by congressional statute or by the U.S. Supreme Court to adopt the consent theory and thereby exclude the children of unauthorized immigrants from U.S. citizenship. The arguments raised by Schuck and Smith were later seized upon by others, and have today become a centerpiece in current immigration debates. Most recently, Republican presidential candidates Tim Pawlenty and Herman Cain attempted to distinguish themselves from other candidates for their party's presidential nomination by expressing support for a change in the birthright citizenship rule. They are not alone in their assessment that proposals to change the Citizenship Clause are worthy of support. Such arguments have now become commonplace in some conservative circles.

## Proposed Changes to the Rule

Proponents of a change to the Citizenship Clause argue that America will benefit by abandoning its long-standing birthright citizenship rule because a rule allowing citizenship only through one's parents or by naturalization will make U.S. citizenship more valuable,

deter unauthorized migration, bring the United States into line with the most common international law rule, and reduce chain migration (which they view unfavorably). They also see a change to the Citizenship Clause as a way to punish unauthorized immigrants or certain U.S.-born children of whom they do not approve. Thus, for example, legal scholar John Eastman (2008) argued in an amicus brief filed with the U.S. Supreme Court that a change in the Court's interpretation of the Citizenship Clause could retroactively take away the U.S. citizenship of Yaser Hamdi, a U.S.-born citizen who was captured fighting against American forces on the battlefield in Afghanistan. He argued that the Court could punish Hamdi by reinterpreting the Citizenship Clause to take away Hamdi's birthright citizenship, because Hamdi was born in the United States to parents who held temporary work visas at the time of his birth (Eastman 2008: 957–58). Eastman's proposed new interpretation, however, would have taken away not only the U.S. citizenship of Yaser Hamdi, but also the citizenship of millions of other Americans born under similar circumstances (including some of the U.S. military personnel who captured Hamdi). Unsurprisingly, the U.S. Supreme Court ignored Eastman's invitation.

In the Hamdi case, Eastman urged a new U.S. Supreme Court interpretation as a means of changing the birthright citizenship rule, but others have argued for a different approach. Some have proposed congressional legislation, others have suggested a constitutional amendment, and some have introduced state legislation to bring back the concept of "state citizenship" so as to create a two-tier system that would distinguish between babies born in the United States with citizenship and babies born in the United States who do not hold U.S. citizenship.

In line with the first approach, some have argued that changing the Citizenship Clause requires no constitutional amendment because Congress can change the Fourteenth Amendment's meaning by passing a statute that "clarifies" that "subject to the jurisdiction" means "subject to the complete or full jurisdiction." Such a reinterpretation would work to deprive babies of U.S. citizenship if their parents do not hold certain specified lawful immigration statuses, on the theory that those parents are not subject to the complete jurisdiction of the United States because they hold allegiance to a foreign country. In line with this view, Representative Steve King (R-Iowa) and Senator David Vitter (R-La.) have introduced

"The Birthright Citizenship Act of 2011," to restrict citizenship under the Citizenship Clause to a child at least one of whose parents is a citizen, lawful permanent resident, or on active duty in the armed forces. It is unclear what effect, if any, the courts would give such a statutory re-interpretation of the Fourteenth Amendment, but if enacted, the law would immediately throw into confusion the citizenship of thousands of babies.

Other politicians agree that "subject to the jurisdiction" can't be reinterpreted by statute, so their solution is a constitutional amendment. Along this line, Senators Vitter and Rand Paul (R-Ky.) have introduced a proposed constitutional amendment that would change the right of citizenship under the Fourteenth Amendment. Like the Birthright Citizenship Act of 2011, the proposed Vitter-Paul constitutional amendment would not allow birthright citizenship for those born in the United States unless at least one parent is a citizen, a lawful permanent resident, or an immigrant in active military service.

A different approach is being taken by State Legislators for Legal Immigration (SLLI), a coalition of immigration restrictionist legislators from 40 states who have proposed state legislation that would resurrect the notion of state citizenship and restrict it along the lines of the King bill described above. SLLI has proposed an interstate compact strategy under which states would agree to "make a distinction in the birth certificates" of native-born persons so that Fourteenth Amendment citizenship will be denied to children born to parents who owe allegiance to any foreign sovereignty. The interstate compact would be subject to the consent of Congress under Article I, Section 10 of the Constitution. The effect of this approach would be to seek a change in the meaning of the Citizenship Clause without having to secure the approval of the president or a veto override.

The net result of all these different proposals—if they succeed—would be to create different classes of American-born babies by requiring different types of birth certificates to be issued to different groups, or by making it difficult or impossible for some to obtain proof of U.S. citizenship by birth. But would this permanent two-tiered caste system be a good thing? What would be the practical impact? Would the creation of a two-tier system of birth certificates solve our nation's pressing immigration problems, or otherwise have a salutary effect?

## Demographic Impact of the Proposed Changes

As a preliminary matter, consider the scope of the projected change. Every year, about four million babies are born in the United States. The Fourteenth Amendment says that all those babies born "subject to the jurisdiction" are U.S. citizens. As a practical matter, few babies born in the United States today are not "subject to the jurisdiction"—there are very few people present in the United States today who hold immunity from U.S. civil and criminal laws. Under the original understanding of the Fourteenth Amendment, only three groups of U.S.-born babies were not "subject to the jurisdiction"—the U.S.-born children of sovereign Native American tribes; the U.S.-born children of any occupying foreign military forces; and the U.S.-born children of diplomats who held immunity from U.S. civil and criminal laws. In 1924, however, Congress passed the Indian Citizenship Act, so today all Native Americans born in the United States—whether born in a sovereign tribe or not—have birthright citizenship as a statutory matter (but not as a matter of constitutional law).[4] No foreign military force occupies any U.S. state or territory at the moment, so there are no babies immune to U.S. laws and bereft of birthright U.S. citizenship on that basis. This leaves only the diplomats' children—and statistical data indicate that, at most, a dozen or so babies are born in the United States each year to immunized diplomats.[5]

Accordingly, almost 100 percent of the four million babies born in the United States each year are born as U.S. citizens. Yet how many of those babies would not be U.S. citizens if birthright citizenship were eliminated?

One problem with estimating the number is that proponents of changes to the Citizenship Clause all agree that the clause should be

---

[4]The Vitter-Paul Amendment would overturn the Indian Citizenship Act of 1924, which grants birthright citizenship to Native Americans born in the United States. Native Americans would henceforth be U.S. citizens only if they could prove the immigration or citizenship status of their parents at the time of their birth.

[5]These children are allowed to apply for U.S. lawful permanent residence ("green cards") if they so desire. They are not recognized as U.S. citizens by the U.S. government and cannot get U.S. passports. In 2010, thirteen them were approved for green cards. Some, presumably, did not apply for green cards, preferring to maintain their diplomatic immunity from U.S. civil and criminal laws (and thereby avoiding U.S. tax liability and other legal obligations).

changed, but they do not all agree on what the new rule should be; or in other words, they do not agree on which parental citizenship or immigration statuses should deprive a U.S.-born child of citizenship under a new rule. Some say that the clause should be changed so that a baby's parents must be U.S. citizens or lawful permanent residents (green card holders) at the time of the child's birth. Some want to allow U.S. citizenship for the U.S.-born children of active-duty military personnel (even if those parents have no legal status). Yet others would allow citizenship for the U.S.-born children of long-term legal residents such as refugees or asylees, or for children who would be stateless if they were not accorded birthright citizenship. Under some proposed rules, the children of unauthorized immigrants could still claim U.S. citizenship, but the children of lawfully present temporary workers could not; under the language of the proposed state compact, for example, the U.S.-born children of unauthorized immigrants would be U.S. citizens if their parents failed to claim any foreign citizenship for them. Others assert that one parent must be in the United States with the consent of the U.S. government, so that the children of two unauthorized immigrants should be excluded from birthright citizenship. Still others argue that the parents must owe undivided loyalty to the United States; they would deny citizenship to the children of individuals who hold any sort of foreign citizenship, including those holding dual U.S. and foreign citizenship. (Dual citizenship is held by millions of Americans, so this latter interpretation would potentially affect the largest group of American-born children, potentially causing the loss of U.S. citizenship, for example, to the children of Americans who have one Irish grandparent and therefore hold dual citizenship in Ireland and the United States.)

Without agreement on what any new rule should be, it is hard to calculate how many U.S.-born babies would be affected by a change to the Citizenship Clause, but the Migration Policy Institute recently published an estimate of the growth in the unauthorized immigrant population if birthright citizenship in the United States were discontinued for the children of unauthorized immigrants. Using standard demographic techniques, MPI projected the size of the unauthorized immigrant population under four different rules—one in which the United States retained the current birthright citizenship rule; one in which the United States denied birthright citizenship to children only if both parents were unauthorized; one in which the United

States denied birthright citizenship to children only if the mother was unauthorized; and one in which the United States denied birthright citizenship to children if one parent was unauthorized (even if the other parent was a United States citizen). Under all three of the scenarios that contemplated changes to the current birthright citizenship rule, MPI projected large increases in the unauthorized immigrant population (Van Hook and Fix 2010).

The flip side of these estimations, of course, is a large decrease in the size of the U.S. citizen population: The children denied birthright citizenship—or in other words, the children who become unauthorized immigrants instead of birthright citizens in the MPI estimates—are children who would have been future U.S. citizens under the current rule. Thus, another way to think about MPI's numbers is to think of them as a rough estimate of how many potential U.S. citizens America will lose if the Citizenship Clause is changed. Under the three different changes used in its scenarios, MPI projected that America would lose somewhere between 4.7 million and 13.5 million future citizens.

Depending on what change to the rule is adopted, however, the decrease in U.S. citizens may be much larger than MPI data project: MPI did not calculate the numbers of children affected by a change to the Citizenship Clause that would exclude from citizenship the children of lawfully present parents who are dual U.S. citizens or tourists.

## Turning Citizens into Undocumented Immigrants

Underlying MPI's estimations, of course, is an overlooked fact: Current U.S. immigration law does not provide any lawful immigration status—other than U.S. citizenship—to babies born in the United States who are not diplomats' children (as mentioned above, babies born to diplomats get green cards, and can later apply to "naturalize" as U.S. citizens, although they are not U.S. citizens at birth). Proposals to change the Fourteenth Amendment do not fix this problem: Such proposals provide no alternative lawful immigration status for U.S.-born children who are not born to diplomats. Current immigration law also provides no means for them to naturalize. Thus, if these proposals become law as written, the children who are henceforth to be denied birthright citizenship would all immediately become unauthorized immigrants at the moment of their birth; they do not qualify for

green cards, and they cannot naturalize. Thus, for example, if the Citizenship Clause is changed as Senators Vitter and Paul have suggested, an Alabama college professor with a temporary work visa who gives birth to a child in Alabama would be giving birth to an unauthorized immigrant (and in Alabama, under a recent and controversial immigration law, babysitters who provide care could be arrested for harboring this unauthorized immigrant baby). Presumably Congress could fix this problem by passing laws to give some immigration status short of citizenship to these U.S.-born babies—but no one has yet made any such proposal.

So let's get back to the numbers: Will it be good for America if a few million U.S.-born babies become undocumented immigrants rather than U.S. citizens? What will be the impact on America of losing all those birthright U.S. citizens?

One can discern that the impact will be substantial if one considers the benefit to the United States from past generations of birthright citizens. While a handful of U.S.-born Americans whose parents lacked American citizenship or lawful permanent residence status have been badly behaved, millions more have contributed to American society in positive ways. Like other Americans, Americans whose parents were undocumented immigrants or in temporary immigration status have joined the U.S. military, founded prosperous businesses, served the United States as diplomats, and served in high political office. These birthright citizens have contributed to the United States in the same way as other Americans; in fact, one can fairly say that the birthright citizenship rule has been one of the factors in the rise of the United States to superpower status, as birthright citizens have been a social and economic asset. There is no evidence that they are any better or any worse, as a statistical matter, than persons who have derived U.S. citizenship because their parents were U.S. citizens. One can infer that taking away the U.S. citizenship of future babies will prevent many of them from contributing similarly in the future. But is this impact quantifiable? Can one roughly gauge the likely impact of a change to the Citizenship Clause?

The major demographic issues should be obvious: Even a change restricted only to the children of unauthorized immigrants will cause the U.S. to lose a hefty chunk of U.S. citizens in the youngest demographic groups. While some of these birthright undocumented immigrants will possibly qualify to immigrate legally through one

CATO JOURNAL

channel or another eventually, and a smaller group of those will eventually earn U.S. citizenship through naturalization channels, most will be ineligible for any legal immigration status and will likely enter the shadow economy. The change would create a large class of stateless children who are born and raised in the United States but who do not have strong ties to any other nation. Some will voluntarily leave the United States as children or perhaps upon reaching adulthood. Some will be deported (at taxpayer expense). Those of the group who stay in the United States will have the right to attend public school through the end of high school, but upon graduating, they won't be eligible to join the U.S. military, get jobs, run for political office, contribute to Social Security, purchase health insurance, or do a myriad of other mundane daily activities that young American citizens do—and which keep the U.S. economy going. If the thought of millions of undocumented young people living in the United States and being unable to participate fully in American society sounds familiar, it's because America has seen this picture before: Right now, there are more than a million U.S. resident young people in a similar situation. They are popularly called "the DREAM Act students," and their future is bleak.[6] The end of birthright citizenship will inevitably result in more than quadrupling the numbers of these young people.

The loss of all these citizens will also have a significant long-term tax impact. The United States is one of the few countries in the world that taxes its citizens even when they do not live or work in the United States. As the warning in every U.S. passport states, "All U.S. citizens working and residing overseas are required to file and report on their worldwide income." Most noncitizens, on the other hand, are required to pay U.S. taxes only if they live and work in the United States. The loss of a large cohort of millions of U.S. citizens will cause a significant reduction in the U.S. tax base. We can't be sure exactly how large the resulting revenue reduction will be—many U.S. citizens who live overseas cheat Uncle Sam by

---

[6]The DREAM Act is the Development, Relief, and Education for Alien Minors Act, a bill to give temporary lawful immigration status to young people who were brought to the United States as young children but who have gone to school here and stayed out of trouble with the law. Although originally proposed more than a decade ago by Senators Orrin Hatch (R-Utah) and Richard Durbin (D-Ill.) the DREAM Act has repeatedly failed to pass.

failing to report their overseas income or failing to file tax returns as required—but we know it is likely to be substantial. Similar impacts will probably affect the Social Security retirement fund, which depends on younger workers contributing to fund the withdrawals of older, retired workers.

As the MPI study explained, a change to the Citizenship Clause will cause a substantial increase in the population of unauthorized immigrants. Although proponents of a change to the Citizenship Clause often argue that changing the Clause will deter undocumented immigrants from coming to the United States and having babies here, thereby reducing undocumented migration, evidence from other countries suggests that a change to the birthright citizenship rule will not be a deterrent to unauthorized migration. Countries that have changed their citizenship laws have not found that the change led to a drop in illegal migration; rather, these countries have instead ended up with several generations of undocumented immigrants. (France has recently gone back to a modified version of birthright citizenship for just this reason.) One saving grace of the U.S. system has always been that birthright U.S. citizenship cuts off illegal migration at the first generation.

## The Cost of Changing to a More Complex, Two-Tiered Rule

Apart from the demographic and tax impacts, however, there is one massive lurking problem with changing the current rule, a problem that advocates for change never discuss: changing the rule will create a huge new bureaucratic hurdle to the issuance of U.S. birth certificates and will be extremely expensive to implement.

Unlike many other countries, the United States has no national identification card and no national registry of its citizens; if the United States had such a comprehensive registry, making a change to the Citizenship Clause would presumably be easier as a bureaucratic matter. But U.S. birth certificates are not issued by the national government; instead, they are issued by state and local governments. Right now, most U.S.-born Americans demonstrate their U.S. citizenship by producing a locally issued birth certificate demonstrating that they were born within the territory of the United States—but under any change to the current interpretation of the Fourteenth Amendment's Citizenship Clause, being born in the United States

151

will no longer suffice to prove American citizenship without additional proof of one's parents' citizenship or immigration status. Once a change to the Citizenship Clause goes into effect, newborns claiming U.S. citizenship will necessarily be required to demonstrate not just the fact of their birth in the United States, but also the citizenship or immigration status of their parents at the moment of birth—and presumably, newborns will have to demonstrate this fact to some bureaucracy that has the technical and legal capacity to determine what their parents' status was at the moment of their birth.

Proving one's parents' citizenship or immigration status at the moment of one's birth can be difficult, because apart from the simple birthright citizenship rule, U.S. citizenship and immigration laws are complex, and a parent's status is often a moving target. A person can change his or her immigration status frequently over the person's lifetime, and even those who have U.S. citizenship can expatriate themselves. Today, a parent's immigration or citizenship status is not verified before a U.S. birth certificate is issued—and requiring such verification will impose significant new costs on every baby born in the United States. Parents will presumably be required to submit paperwork proving their citizenship or immigration status to a government agency tasked with determining whether a child is a citizen or not; that agency will have to review the paperwork, determine what the parents' status was at the time of the child's birth, and make a decision about the child's citizenship—and that bureaucratic decision will determine whether the child is recognized as a U.S. citizen (or not).

We can estimate the cost of a change to the Citizenship Clause because the U.S. government already does such parental status verifications for children who are born overseas to American citizen parents; to obtain proof that their child is a U.S. citizen, the parents are required to submit forms and fees to one of the two U.S. government agencies, the U.S. Department of State or U.S. Citizenship and Immigration Services (USCIS), an agency within the U.S. Department of Homeland Security. Both agencies are authorized to issue documents proving the U.S. citizenship of foreign-born children, but USCIS is a user-fee agency, so the fees that USCIS charges to issue such documents are a fair estimate of the cost of making such determinations. Currently, USCIS charges $600 to check the parents' documents and verify the citizenship status of children born overseas to U.S. citizens, and a similar bureaucratic

process will presumably be required for U.S.-born children if the Citizenship Clause is changed. Thus, we can calculate that changing the Fourteenth Amendment will be roughly equivalent to a $600 baby tax on every child born in the United States—or as an alternative way of thinking about it, we can say that changing the Citizenship Clause will cost American households about $2.4 billion per year. This estimate, of course, is just the direct bureaucratic cost—not the cost of hiring a lawyer who can help a person submit the documents to the bureaucracy, or the cost of litigation when the bureaucracy makes a mistake.

Thus, in addition to the other unsavory side effects noted above—an increase in the population of undocumented immigrants, a large decrease in young citizens, the loss of a substantial chunk of the tax base—changing the birthright citizenship rule will increase the cost of getting a U.S. birth certificate dramatically. The effects of the change will fall disproportionately on the poor and minorities; most middle class and wealthier Americans will have access to lawyers and the documentation necessary to prove their parents' immigration status and will have the funds to pay the $600 fee necessary to get the government to give their children proof of U.S. citizenship. But the change will impose burdensome bureaucratic costs on all newborns and their parents at a time when many Americans favor less government, not more.

There is one other effect of a possible change to the Fourteenth Amendment—full employment for U.S. immigration and citizenship lawyers. U.S. immigration and citizenship law has long been known as one of the most complex legal fields in American jurisprudence. In *Lok v. Immigration and Naturalization Service* (1977), a federal judge famously termed it "King Minos's labyrinth in ancient Crete." In this highly complex and technical area of the law, the birthright citizenship rule has always been the one bright-line rule saving most Americans from the need to hire an immigration or citizenship lawyer. The proposed changes to the Citizenship Clause will inexorably alter that reality. If proponents of changing the Fourteenth Amendment have their way, every baby born in America will now face a bureaucratic hurdle before he or she gets a birth certificate—and clearing that bureaucratic hurdle will often require expert legal services.

Three years ago, the 2008 presidential election campaign gave Americans a flavor of what the future will look like if the Citizenship

Clause is changed. During that election campaign, John McCain spent large sums of money fending off lawsuits that claimed that he was not qualified to be president because he was not born in the United States but derived U.S. citizenship from his parents. As Gabriel Chin (2008) explained in an exceptionally thorough law review article, Senator McCain's eligibility for the presidency turns on the intricacies of the laws according U.S. citizenship to persons who earn it by descent, rather than by birth in U.S. territory—and due to hundreds of years of complicated congressional legislation on citizenship by descent, those intricacies are substantial. The complexity of the arguments made against Senator McCain's eligibility serves as a reminder of how difficult it can be for someone to prove U.S. citizenship through one's parents—and how a change to the Citizenship Clause will make challenges to a person's U.S. citizenship into a new sport.

John McCain's eligibility for the presidency has been repeatedly challenged, but there was a 2008 Democratic presidential contender whom the Citizenship Clause saved from similar challenges—former New Mexico governor William Blaine "Bill" Richardson III. Richardson was the son of a Mexico-based Citibank executive; Richardson's father was born in Nicaragua but had derived U.S. citizenship from his father (Richardson's grandfather), who was born in the United States. Richardson's mother was Mexican, and the Richardson family lived in Mexico, but Richardson happened to be born in the United States because his father sent Richardson's pregnant mother on a train to California just before Richardson's birth. Having been born in the United States, Richardson did not have to undergo the process of proving that he met the complex criteria for obtaining citizenship by descent.[7] As the history books show,

---

[7]Richardson was born in 1947, and his father was born (in Nicaragua) in 1891. Richardson's father had been educated in the United States but had lived most of his life outside the United States. At the time of Richardson's birth, if Richardson had been born in Mexico, where his parents resided, Richardson could have derived U.S. citizenship from his father if the family had been able to prove that Richardson's father had resided in the U.S. for 10 years prior to Richardson's birth (five of those years had to be after Richardson's father turned 16). The law is different today (and has changed repeatedly over the decades, largely because citizenship by descent laws have been statutory, not constitutional). Proving these facts would have been a complicated endeavor—but if he had been born in Mexico, Richardson's "natural born" citizenship would have turned on them.

Richardson went on to a stellar career as a U.S. diplomat, cabinet secretary, business consultant, and governor of New Mexico.

## Is It Necessary to Change the Citizenship Clause?

Those who advocate for a change to the Citizenship Clause argue that such a change will be good for America because America's generous treatment of newborn babies encourages unauthorized migration, rewards parents who have broken immigration laws, brings wealthy tourists to the United States who are only interested in providing their children with the freedoms of an American passport, and is out of step with trends in other countries. But are these good reasons to change a long-standing, simple, bright-line rule that has benefited the United States? Is a constitutional change necessary to address these concerns?

In fact, most illegal migration to the United States is driven by economic factors (jobs), or a desire to reunite with family members, not the attraction of birthright citizenship. Unauthorized parents mostly don't benefit from their child's U.S. citizenship; a birthright citizen can't sponsor his or her parents for lawful immigration status until the citizen is 21 years old and has a middle-class income; if the parent entered the United States unlawfully, the parent must depart the United States to obtain an immigration visa, and the parent's departure triggers a 10-year bar from the United States—a bar that cannot be waived just because someone has a U.S. citizen child. Some parents of U.S.-born children can be granted "cancellation of removal"—but such grants are subject to a strict nationwide quota of 4,000 per year, and the parent must show "exceptional and extremely unusual hardship" to the U.S. citizen child; this is a standard that few can meet. The U.S. government regularly deports the foreign parents of U.S. citizen children, and the parents must either take their U.S. citizen children with them when they are deported, or leave the children in the United States with a guardian or state child welfare authorities.

There is some evidence that wealthy Asian women are coming to the United States to have babies so as to gain the security of a U.S. passport for their newborn children—but a constitutional change is probably not necessary to deter this behavior. The State Department could simply condition the issuance of a U.S. passport on demonstrated compliance with U.S. tax laws. Warnings about a lifetime of

filing U.S. tax returns and potential U.S. military and legal obligations as a consequence of being born in the United States have not been part of the pitch to wealthy mothers given by those in the birth tourism industry—but they probably should be. Alternatively, Congress could simply make it unlawful for a person to enter the United States solely for the purpose of having a baby here; this would be a much more direct way of punishing parents than changing the Citizenship Clause.

Lastly, proponents of change argue that "other countries don't have birthright citizenship"—and it is true that only about 28 countries have the generous birthright citizenship rule that the United States has. But the fact that "other countries don't do it" should not be convincing—there are many things that America does that other countries do not do. America is the only country that has the First and Second Amendments, too—does that mean that we should discard them?

Opponents of birthright citizenship believe that a bright-line citizenship rule for babies born in the United States is bad for America—that America's generous treatment of newborn babies encourages unauthorized immigration, encourages birthright tourism, and is out of step with trends in other countries. But the evidence indicates that birthright citizenship has been of great benefit to the United States—and the most obvious benefit has been a bright-line, easily understood rule that requires no vast bureaucracy to implement and treats almost all American-born babies equally. America has always prided itself on its unique adherence to principles of equality for all—and the birthright citizenship rule is the bedrock of that principle.

The birthright citizenship rule has not just been of benefit in a moral sense, but has been socially, economically, and politically beneficial to Americans as well. The immigration problems that proponents of a change cite can likely be solved by measures short of altering the Citizenship Clause. Changing the Fourteenth Amendment's Citizenship Clause to set up a new two-tiered American caste system may get a presidential candidate some quick applause in a debate—but thoughtful conservatives and libertarians will want to take a hard look at the future social, economic, and political consequences of implementing such a rejection of America's traditional birthright principle.

References

Chin, G. J. (2008) "Why Senator John McCain Cannot Be President: Eleven Months and a Hundred Yards Short of Citizenship." *Michigan Law Review* 107 (1). First Impressions: 1-21. Available at www.michiganlawreview.org/assets/fi/107/mccain.pdf.

Eastman, J. (2008) "Born in the U.S.A.?: Rethinking Birthright Citizenship in the Wake of 9/11." *University of Richmond Law Review* 42: 955–68.

Ho, J. C. (2006) "Defining 'American': Birthright Citizenship & the Original Understanding of the 14th Amendment." *The Green Bag* 9 (4). Available at: www.ilw.com/articles/2007,0212-ho.pdf.

*Immigration and Naturalization Service v. Rios-Pineda,* 471 U.S. 444 (1985).

Lincoln, A. ([1857] 1953) "Speeches on *Dred Scott*." In R. P. Basler (ed.) *The Collected Works of Abraham Lincoln*, Vol. 2: 403–7. New Brunswick, N.J.: Rutgers University Press.

*Lok v. Immigration and Naturalization Service,* 548 F.2d 37 2d Cir. (1977).

*Lynch v. Clarke*, 1 Sandford, 583 N.Y. (1844).

*Plyler v. Doe*, 457 U.S. 202 (1982).

Schuck, P. H., and Smith, R. M. (1985) *Citizenship without Consent*. New Haven, Conn.: Yale University Press.

*Scott v. Sandford*, 60 U.S. 393 (1857).

Slaughterhouse Cases, 83 U.S. 36 (1873).

*United States v. Wong Kim Ark*, 169 U.S. 649 (1898).

Van Hook, J., and Fix, M. (2010) "The Demographic Impacts of Repealing Birthright Citizenship." Washington: Migration Policy Institute.