**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

| | | |
|---|---|---|
| NEW HAMPSHIRE INDONESIAN COMMUNITY SUPPORT, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 1:25-cv-00038-JL-TSM |
| DONALD TRUMP, President of the United States, in his official capacity, *et al.*, | ) ) ) | |
| Defendants. | ) ) ) | |

**BRIEF *AMICI CURIAE* IN OPPOSITION TO**
**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION OF**
**AMERICA'S FUTURE,**
**GUN OWNERS OF AMERICA, INC., GUN OWNERS FOUNDATION,**
**CITIZENS UNITED,**
**U.S. CONSTITUTIONAL RIGHTS LEGAL DEFENSE FUND,**
**LEADERSHIP INSTITUTE, AND**
**CONSERVATIVE LEGAL DEFENSE AND EDUCATION FUND**

WILLIAM J. OLSON
WILLIAM J. OLSON, P.C.
370 Maple Avenue West,
Suite 4
Vienna, VA 22180
(540) 450-8777
wjo@mindspring.com

PHILLIP E. MARBURY
New Hampshire Bar No. 267645
LAW OFFICES OF MARBURY & MARBURY
29 Mill Street, Unit C4
Wolfeboro, NH 03894
(603) 569-4111
pm@marblaw.com

January 31, 2025

Counsel for *Amici Curiae*
America's Future, et al.

# TABLE OF CONTENTS

Page

Table of Authorities ..................................................................................................... ii

Interest of the *Amici Curiae* ........................................................................................1

Statement of the Case ....................................................................................................1

Argument

I.      Plaintiffs' Claims Against and Prayer for Injunctive Relief Against President Trump
        Should Be Dismissed Out of Hand .................................................................2

II.     Plaintiffs Have Failed to Demonstrate a Likelihood of Success on the Merits ..................4

        A.      Plaintiffs' View of Birthright Citizenship Is Unsupported by *Wong Kim Ark* ........4

        B.      Plaintiffs' Reliance on Other Supreme Court Cases Is Unpersuasive ..................10

III.    "Birthright Citizenship" Violates the Text and the Original Intent of the Fourteenth
        Amendment .................................................................................................13

        A.      The Text and Context ...........................................................................13

        B.      Purpose and Drafting History of the Citizenship Clause .......................................15

IV.     Plaintiffs' Claim that "Birthright Citizenship" Should Be Handed Out to All
        Children of Aliens Has Bizarre Results ..............................................................17

Conclusion ...................................................................................................................21

# TABLE OF AUTHORITIES

Page

U.S. Constitution
Article III, Sect. 3.................................................................................................18
Article IV, Sect. 2, cl. 1 ......................................................................................15
Amendment XIV........................................................................................ 5, *passim*

Statutes
Civil Rights Act of 1866.................................................................................13,14
Immigration and Nationality Act .....................................................................9,10

Cases
*Brown v. Board of Education*, 347 U.S. 483 (1954).............................................7
*Carlisle v. United States*, 83 U.S. 147 (1872) ...................................................19
*Elk v. Wilkins*, 112 U.S. 94 (1884).............................................................8, 9,12
*Franklin v. Massachusetts*, 505 U.S. 788 (1992)..............................................2,3
*Inglis v. Trustees of Sailor's Snug Harbor*, 28 U.S. 99 (1830) .........................10
*INS v. Rios-Pineda*, 471 U.S. 444 (1985) .........................................................10
*Kendall v. United States*, 37 U.S. 524 (1838).....................................................3
*Marbury v. Madison*, 5 U.S. 137 (1803).........................................................3, 4
*McCreery's Lessee v. Somerville*, 22 U.S. 354 (1824) .......................................12
*Minor v. Happersett*, 88 U.S. 162 (1874) ........................................................8, 9
*Mississippi v. Johnson*, 71 U.S. 475 (1866).....................................................3, 4
*Nixon v. Fitzgerald,* 457 U.S. 731 (1982)............................................................4
*Plessy v. Ferguson*, 163 U.S. 537 (1896) ...........................................................7
*Plyler v. Doe*, 457 U.S. 202 (1982).............................................................11, 12
*Scott, v. Sandford,* 60 U.S. 393 (1857) ...............................................13, 15, 17
*Slaughter-House Cases*, 83 U.S. 36 (1873).......................................................8, 9
*United States v. Wong Kim Ark*, 169 U.S. 649 (1898)........................... 5, *passim*
*Van Ness v. Pacard*, 27 U.S. 137 (1829)............................................................6
*Youngstown Sheet & Tube v. Sawyer*, 343 U.S. 579 (1952)..................................4

Miscellaneous
H. Ardman, "World War II: German Saboteurs Invade America in 1942," *History.net*
        (June 12, 2006).............................................................................................19
R. Berger, Government by the Judiciary: The Transformation of the Fourteenth
        Amendment (Liberty Fund: 1997)...............................................................13,14
Congressional Globe, 39th Cong, 1st Sess, 2890, *et seq.* ...........................16, 17
J. Eastman, "The Significance of 'Domicile' in *Wong Kim Ark*," 22 CHAP. L. REV. 301
        (Spring 2019) ...........................................................................................6, 11
E. J. Erler, The Founders on Citizenship and Immigration (Claremont Inst: 2007).....................18
I. Egrikavuk, "Birth tourism in U.S. on the rise for Turkish parents," *Hurriyet Daily News*
        (Mar. 12, 2010)........................................................................................... 20
J. Feere, "Birthright Citizenship in the United States: A Global Comparison," *Center for
        Immigration Studies* (Aug. 31, 2010) ..............................................................20

D. Iriekpen, "Citizenship Rights: American Agitations Threaten a Nigerian Practice,"
  *This Day* (Aug. 16, 2010) .................................................................................20

N. Nnorom, "Birthright citizenship: Nigerians in diaspora kick, say Trump's action
  illegal," *Vanguard* (Jan. 23, 2025) ....................................................................20

Office of the Inspector General, "A Review of the FBI's Handling of Intelligence
  Information Prior to the September 11 Attacks," ch. 5 (Nov. 2004)..................19

W. Olson, H. Titus & A. Woll, "Children Born in the United States to Aliens Should
  Not, by Constitutional Right, Be U.S. Citizens," *U.S. Border Control* (Dec. 2005)...........6

K. Richburg, "For many pregnant Chinese, a U.S. passport for baby remains a powerful
  lure," *Washington Post* (July 18, 2010) .............................................................20

U.N.'s Global Compact for Safe, Orderly and Regular Migration (GMC) ...................20

U.S. Department of Justice, "Fact Sheet: Prosecuting and Detaining Terror Suspects in
  the U.S. Criminal Justice System," (June 9, 2009)............................................20

U.S. Department of Justice, "Two sent to prison for roles in cartel-linked human
  smuggling scheme," (Oct. 30, 2024) ..................................................................20

The White House, "Protecting the Meaning and Value of American Citizenship," (Jan.
  20, 2025) .................................................................................. 1, *passim*

Charles Wood, "Losing Control of America's Future: The Census, Birthright Citizenship,
  and Illegal Aliens, " 22 Harvard Journal of Law & Public Policy 509 (1999)..........16

## INTEREST OF THE *AMICI CURIAE*[1]

The interest of these *amici* is set out in the accompanying motion for leave to file the brief *amicus curiae*.

## STATEMENT OF THE CASE

On January 20, 2025, President Trump issued an executive order entitled, "Protecting the Meaning and Value of American Citizenship"[2] ("EO").  The Order contained a narrowly defined directive that federal agencies are not to consider a person born on U.S. soil to be a citizen of the United States when, "at the time of said person's birth," the **father** "was **not** a United States citizen or lawful permanent resident..." **and**

> "when that person's **mother**" was:
> (1) "**unlawfully present** in the United States" ... or
> (2) ... when [the mother's presence] ... was **lawful but temporary** (such as, but not limited to, visiting the United States under the auspices of the Visa Waiver Program or visiting on a student, work, or tourist visa)....  [*Id.* (emphasis added).]

Although the EO would not take effect for 30 days, three groups of plaintiffs rushed to be the first to file — on the day the order was issued and the next day — in federal district courts for New Hampshire, Western Washington, and Massachusetts.[3]

---

[1]  No party's counsel authored the brief in whole or in part.  No party or party's counsel contributed money that was intended to fund preparing or submitting the brief.  No person other than these *amici curiae*, their members or their counsel contributed money that was intended to fund preparing or submitting this brief.

[2] The White House, "Protecting the Meaning and Value of American Citizenship," (Jan. 20, 2025).

[3]  The challenge brought by New Jersey, *et al.* was not filed in New Jersey, but in Massachusetts, thereby ensuring any appeal would be heard not in the Third Circuit, but in the First Circuit, where an appeal from this litigation would also be heard.  New Jersey may be aware that all of the active judges in the First Circuit were appointed by Presidents Obama or Biden, while in the Third Circuit half of the judges were appointed by Presidents G.W. Bush or Trump, and half by Presidents Obama or Biden.

# ARGUMENT

## I.    PLAINTIFFS' CLAIMS AGAINST AND PRAYER FOR INJUNCTIVE RELIEF AGAINST PRESIDENT TRUMP SHOULD BE DISMISSED OUT OF HAND.

The Plaintiffs name as the lead defendant Donald J. Trump as President of the United States, in his official capacity.   Complaint ("Compl.") Para 24.  Plaintiffs also sue the United States of America, and several departments of government.  Further, in their prayer for relief, plaintiffs ask that the Court "Preliminarily and permanently enjoin Defendants from implementing or enforcing this Order."  Compl. Para 16.  This effort to name the President of the United States as the lead defendant, with a request that this court enjoin the President, may generate good press and be good politics for the Attorneys General of the Plaintiff States, but they should know better, as this court's entry of an injunction against the President of the United States would violate the Separation of Powers.

When suits were filed against President Trump involving his immigration policies during his first term as the nation's 45th President, some of these *amici* objected to this practice of seeking to enjoin the President, and filed three *amicus* briefs urging the courts to dismiss President Trump as a party defendant.  (*See IRAP v. Trump* in the Fourth Circuit; *Hawaii v. Trump* in the Ninth Circuit; and *DHS v. Regents U. Calif.* in the U.S. Supreme Court.)  During that first term, the Justice Department did not routinely act to protect the Office of the President by seeking his dismissal, but it is encouraging that in the Washington State litigation that this argument was raised by the Justice Department in the concluding paragraph of its Opposition.[4]

In *Franklin v. Massachusetts*, 505 U.S. 788, 803 (1992), the Supreme Court explained that, while a district court could enjoin an executive branch official, it could not enjoin the

---

[4] *See* Opposition to Plaintiff States' Motion for a Temporary Restraining Order, *Washington v. Trump*, Case No. 2:25-cv-00127, Dkt. 36 (W.D. Wash. 2025) at 16.

President himself.  In striking down an injunction against a President, the Court bluntly stated that "the District Court's grant of injunctive relief against the President himself is extraordinary, and should have raised judicial eyebrows."  *Id.* at 802.  Concurring in *Franklin*, Justice Scalia went even further, asserting that "[a]t is a commentary upon the level to which judicial understanding — indeed, even judicial awareness — of the doctrine of separation of powers has fallen, that the District Court entered this order against the President without blinking an eye." *Id.* at 826.  Justice Scalia noted that, up until at least 1984, "'[n]o court has ever issued an injunction against the president himself or held him in contempt of court.'"  *Id.* at 827.

For most of the nation's history, it had been understood that suits against the President are improper.  In *Marbury v. Madison*, 5 U.S. 137 (1803), it was President Jefferson who made the decision not to deliver outgoing President John Adams' appointments, but it was Secretary of State James Madison who was named as the defendant in the case.  In 1838, the High Court again observed that "[t]he executive power is vested in a President; and as far as his powers are derived from the constitution, he is beyond the reach of any other department, except in the mode prescribed by the constitution through the impeaching power."  *Kendall v. United States*, 37 U.S. 524, 610 (1838).

The specific issue of an injunction against the President was considered by the U.S. Supreme Court in *Mississippi v. Johnson*, 71 U.S. 475 (1866), involving Mississippi's suit to enjoin President Andrew Johnson from enforcing the Reconstruction Acts.  Although leaving open the question of whether the President could be ordered to perform mere ministerial acts, the Court made clear that "this court has no jurisdiction ... to enjoin the President in the performance of his official duties...."  *Id.* at 501. Thus, although President Truman made the decision to seize steel mills, suit was filed not against him, but against Secretary of Commerce Sawyer, and it was

3

the Secretary, not the President, who was enjoined from enforcing that Presidential

decision. *Youngstown Sheet & Tube v. Sawyer*, 343 U.S. 579 (1952).

Clearly, President Trump's issuance and enforcement of his Executive Order was an act

in the performance of his official duties. *See Marbury v. Madison* at 170 ("The province of the

court is, solely, to decide on the rights of individuals, not to enquire how the executive, or

executive officers, perform duties in which they have a discretion. Questions, in their nature

political, or which are, by the constitution and laws, submitted to the executive, can never be

made in this court."). *See also Nixon v. Fitzgerald,* 457 U.S. 731, 749 (1982) ("The president

cannot ... be liable to arrest, imprisonment, or detention, while he is in the discharge of the duties

of his office; and for this purpose, his person must be deemed, in civil cases at least, to possess

an official inviolability.") (The President's independence from the judiciary is "[t]he essential

purpose of the separation of powers ... to allow for independent functioning of each coequal

branch of government within its assigned sphere of responsibility, free from risk of control,

interference, or intimidation by other branches." *Id.* at 760-61.

If President Trump cannot be enjoined by a federal judge, and most certainly cannot be

punished for disregarding an injunction, then no federal judge should allow him even to be

named as a party defendant. For his official acts, the President cannot be subjected to the

jurisdiction of the judiciary — which is not a superior, but coequal, branch of

government. Accordingly, at the outset of this case, this Court should dismiss forthwith

President Trump from this suit as having been improperly named as a defendant.

## II.     PLAINTIFFS HAVE FAILED TO DEMONSTRATE A LIKELIHOOD OF SUCCESS ON THE MERITS.

### A.     Plaintiffs' View of Birthright Citizenship Is Unsupported by *Wong Kim Ark*.

Plaintiffs take the extreme position that every human being born on American soil is an American citizen, acknowledging only three exceptions permitted by the Fourteenth Amendment's text "subject to the jurisdiction thereof":  "children of foreign sovereigns or their ministers, or born on foreign public ships, or of enemies within and during a hostile occupation of part of our territory." Memorandum for Preliminary Injunction (Dkt. 24-1) ("PI Memo") at 6. There is no support for this position in the text, context, or history of the Citizenship Clause.

Plaintiffs assert that "the common law rule of '*jus soli*' has an ancient pedigree and was followed in the early years of the republic" (PI Memo at 3), but that aspect of the common law is completely inapplicable, as it was developed under the British view that every person born on British soil was both a British citizen and the subject of a king, lacking even the ability to renounce citizenship — wholly unlike American citizenship.  In *United States v. Wong Kim Ark*, 169 U.S. 649 (1898), Justice Gray accurately described the English common law's presumption that everyone born on English soil (with the exceptions noted by Plaintiffs) was a subject of the King for life, whether he consented or not, and whether or not he sought to attain citizenship elsewhere.  "By the common law of England, every person born within the dominions of the Crown, no matter whether of English or of foreign parents, and, in the latter case, whether the parents were settled, or merely temporarily sojourning, in the country, was an English subject." *Wong Kim Ark* at 657.

However, Justice Gray wrongly assumed that the *jus soli* British rule of citizenship he described applied in America, when the Declaration of Independence had expressly rejected the concept of lifelong allegiance to the king, or any government, by accident of birth.  As Justice Story wrote in 1829, "The common law of England is not to be taken in all respects to be that of America.  Our ancestors brought with them its general principles, and claimed it as their

birthright; but they brought with them, and adopted only that portion which was applicable to their situation." *Van Ness v. Pacard*, 27 U.S. 137, 144 (1829).

This distinction between British and American citizenship understandings was addressed in an article originally published in January 2001 by a nonprofit organization, U.S. Border Control. The authors explain historically how the legal principle of *jus soli* was based on the concept that the King of England owned the land, and thus anyone born on British soil, whether to a citizen or an alien, legal or illegal, simply by birth became a subject of the king, to whom that person now owed allegiance for life, being permanently a subject by accident of birth on the king's land.[4]

Constitutional scholar John Eastman explained when that shift occurred. By declaring their land and persons independent of the king in 1776, the Founders rejected the command of being subjects by birth: "The Declaration of Independence is not just a thorough repudiation of that old feudal idea of 'permanent allegiance' [to the king by accident of birth], but perhaps the most eloquent repudiation of it ever written.... The notion that the English common law of *jus soli* therefore continued unabated after the Declaration of Independence could not be more mistaken."[5]

Then, Plaintiffs rely on a statement submitted to the House Judiciary Committee in 1995 from the Office of Legal Counsel[6] during the Clinton Administration. PI Memo at 5. Although

---

[4] W. Olson, H. Titus & A. Woll, "Children Born in the United States to Aliens Should Not, by Constitutional Right, Be U.S. Citizens," *U.S. Border Control* (Jan. 2001; rev'd 2003; rev'd 2005; rev'd 2018).

[5] J. Eastman, "The Significance of 'Domicile' in Wong Kim Ark," 22 CHAP. L. REV. 301, 308-309 (Spring 2019).

[6] *See* 19 U.S. Op. Off. Legal Counsel 340, 1995 WL 1767990, at *1-2 (1995) (hereinafter "Legal Counsel Op").

published together with the official "Opinions of the Office of Legal Counsel," this was not such an Opinion, but rather a statement opposing passage of a House bill.  Plaintiffs assert that to: "deny citizenship to certain children born in the United States based on their parents' immigration or citizenship status would be ... unquestionably unconstitutional" (PI Memo at 5) quoting that statement (Legal Counsel Op. at 341).  However, it is clear that this statement was based on the same assumption, rejected in the Declaration of Independence, that the British and common law of citizenship applied in America.  The statement incorrectly relies on a lower court opinion for the proposition that:  "We find no warrant for the opinion that this great principle of the common law has ever been changed in the United States."  *Id.* at 340.

Plaintiffs then assert "[t]he Supreme Court applied the Clause over 125 years ago to hold that all children born in the United States, with very narrow exceptions that are inapplicable here, are U.S. citizens" in *Wong Kim Ark*.  PI Memo at 3.  In essence, plaintiffs take the position:  "It's been done for a long time, so it is constitutional," but longevity does not demonstrate constitutionality.  In 1896, two years before *Wong Kim Ark*, the Supreme Court decided *Plessy v. Ferguson*, 163 U.S. 537 (1896) by 7 to 1, holding that "separate but equal" did not violate the Fourteenth Amendment with Justice Gray, the author of *Wong Kim Ark*, in the majority.  That decision stood as "good law" for nearly 60 years, before being overturned by *Brown v. Board of Education*, 347 U.S. 483 (1954), as the Court rejected Plaintiffs' idea that longevity establishes constitutionality.

Plaintiffs claim their position is supported by the holding of *Wong Kim Ark*, but Plaintiffs fail to admit that case was an outlier that veered sharply away from all the Supreme Court cases decided closer to the time of the ratification of the Fourteenth Amendment. The Supreme Court

first interpreted the Fourteenth Amendment's Citizenship Clause just five years after its

ratification:

> That its main purpose was to establish the citizenship of the negro can admit of no
> doubt.  **The phrase, "subject to its jurisdiction" was intended to exclude** from
> its operation **children of** ministers, consuls, and **citizens or subjects of foreign**
> **States born within the United States**.  [*Slaughter-House Cases*, 83 U.S. 36, 73
> (1873) (emphasis added).]

Later, the Court again challenged the notion that has recently come to be described as "birthright

citizenship," focusing on British citizenship.

> At **common-law**, ... it was never doubted that all children born in a country of
> parents who were its citizens became themselves, upon their birth, citizens also.
> These were natives, or natural-born citizens, as distinguished from aliens or
> foreigners.  **Some authorities go further** and include as citizens children born
> within the jurisdiction without reference to the citizenship of their parents.  **As to**
> **this class there have been doubts**....  [*Minor v. Happersett*, 88 U.S. 162, 167-68
> (1874) (emphasis added).]

Just 12 years before *Wong Kim Ark*, writing for the Court, Justice Gray again reiterated

the critical difference between the children of citizens, and the children of aliens owing

allegiance to foreign powers.  The Court declared:

> [t]he main object of the opening sentence of the Fourteenth Amendment was to
> settle the question ... as to the citizenship of free negroes ... and to put it beyond
> doubt that all persons, white or black, and whether formerly slaves or not, born or
> naturalized in the United States, and **owing no allegiance to any alien power**,
> should be citizens of the United States...."  [*Elk v. Wilkins*, 112 U.S. 94, 101
> (1884) (emphasis added).]

Because the Plaintiff was a member of a Native American tribe to which he owed allegiance, and

had never been naturalized, the Court found that he was **not a citizen** despite having been  born

on U.S. soil.

   Despite some insupportably broad *dicta*, *Wong Kim Ark* **did not even address those**

**specific children covered by the Executive Order**  — those with a non-citizen father who were

born to a mother either **illegally or temporarily present** in the United States.  The question

addressed there was:

> whether a child born in the United States, of parents of [foreign] descent, who, at
> the time of his birth, are subjects of [a foreign government], but have a
> **permanent  domicil** and residence in the United States, and are there carrying on
> business, and are not employed in any diplomatic or official capacity under the
> [foreign government], becomes at the time of his birth a citizen of the United
> States." [*Wong Kim Ark* at 653 (emphasis added).]

However, if *Wong Kim Ark* is read to stand for the proposition that "subject to the

jurisdiction" of the United States simply meant to be present "within the jurisdiction" thereof,

equating (i) children born to aliens who owe allegiance to foreign governments to (ii) children of

citizens, that decision was in error, an outlier, inconsistent with the Supreme Court's decisions in

the *Slaughter House Cases*, *Minor,* and *Elk*.

Nor does *Wong Kim Ark's* actual holding support the near-unlimited rule that birth on

U.S. soil equates to citizenship.  It does state:

> The Fourteenth Amendment affirms the ancient and fundamental rule of
> citizenship by birth within the territory, **in the allegiance and under the**
> **protection of the country**, including all children here born of **resident aliens,**
> with the exceptions or qualifications (as old as the rule itself) of children of
> foreign sovereigns or their ministers, or born on foreign public ships, or of
> enemies within and during a hostile occupation of part of our territory, and with
> the single additional exception of children of members of the Indian tribes owing
> direct allegiance to their several tribes. [*Wong Kim Ark* at 693 (emphasis added).]

However, while *Wong Kim Ark* fails to make the connection, it uses the language "**in the**

**allegiance ... of the country"** in a similar way to which the Framers of the Citizenship Clause

used the phrase "subject to the jurisdiction of" the country.

Plaintiffs argue that the Immigration and Nationality Act reaffirms *Wong Kim Ark* and

Plaintiffs' expansive reading of that case.  PI Memo at 8-11.  They argue that the INA

"codif[ied] the prevailing understanding of the Fourteenth Amendment at the time — and

specifically *Wong Kim Ark*'s authoritative interpretation" — or more accurately "Plaintiff's interpretation of *Wong Kim Ark*'s interpretation." PI Memo at 8-9.  While INA was enacted after *Wong Kim Ark*, INA did not somehow incorporate that case, and certainly did not codify any rule that "it was universally understood that *Wong Kim Ark* had interpreted the term 'subject to the jurisdiction' to mean everyone ... including temporary visitors and unauthorized immigrants."  PI Memo at 9.  As Plaintiffs concede, the language "subject to the jurisdiction thereof" was "taken . . . from the fourteenth amendment to the Constitution."  *Id*.  Thus, it could be said to incorporate that Amendment, but not Plaintiffs' mistaken reading of *Wong Kim Ark*.

**B.    Plaintiffs' Reliance on Other Supreme Court Cases Is Unpersuasive.**

Plaintiffs assert that several other Supreme Court cases undercut the legality of the challenged Order.  They point to *INS v. Rios-Pineda*, 471 U.S. 444 (1985).  PI Memo at 8.  The holding of the case was that the Board of Immigration Appeals did not abuse its discretion by refusing to reopen a case ordering the deportation of the illegal alien parents.  Although the Court did state that two children born here of illegal aliens were citizens, that was purely *dicta*, tangential to the issue in the case, without thoughtful analysis, which had nothing to do with the citizenship of children of illegal aliens.

Plaintiffs likewise cite to *Inglis v. Trustees of Sailor's Snug Harbor*, 28 U.S. 99 (1830) (PI Memo at 3).  But *Inglis* assumes, but does not support the idea that the United States follows the English common law "*jus soli*" principle.  An analysis of that case reveals that *Inglis* does not does not stand for the proposition that a birth on U.S. soil creates an American Citizen.  There was  uncertainty about the timing of John Inglis's birth, leading the court to reveal more clearly why it does not support the challenge, actually admitting that birth alone does not demonstrate citizenship:

[T]he Court held: "If born after the 4th of July 1776, and before the 15th of September of the same year, when the British took possession of New York, his infancy incapacitated him from making any election for himself, and *his election and character followed that of his father*...." The italicized language is inaccurate under the pure form of *jus soli* claimed by Justice Gray, **for the status of the father is irrelevant if the child is born on the soil of the sovereign**.[7]

Plaintiffs also cite to *dicta* in *Plyler v. Doe*, 457 U.S. 202 (1982). PI Memo at 8. *Plyler* involved a Texas statute denying state funds for public education for children of illegal immigrants. Writing for a bare 5-4 majority, Justice Brennan's opinion for the Court stated that "[i]n appellants' view, persons who have entered the United States illegally are not 'within the jurisdiction' of a State even if they are present within a State's boundaries and subject to its laws. Neither our cases nor the logic of the Fourteenth Amendment supports that constricting construction of the phrase 'within its jurisdiction.'" *Id.* at 211. As shown in an accompanying footnote, for this proposition the Court relied on Justice Gray's erroneous *dicta* in *Wong Kim Ark*, that "it was 'impossible to construe the words "subject to the jurisdiction thereof," in the opening sentence [of the Fourteenth Amendment], as less comprehensive than the words "within its jurisdiction," in the concluding sentence of the same section; or to hold that persons "within the jurisdiction" of one of the States of the Union are not "subject to the jurisdiction of the United States."'" *Id.* at 211, n.10.

Justice Gray had utterly ignored the legislative history of the Citizenship Clause, in which numerous Senators, including the author of the Clause, did expressly differentiate the meaning of the phrases "within the jurisdiction" and "subject to the jurisdiction" within the Clause, in order to reach the opinion in his *dicta*.

---

[7] J. Eastman, at 312 (emphasis added).

The *Plyler* Court noted that Justice Gray's *dicta* "concluded that '[every] citizen or subject of another country, while domiciled here, is within the allegiance and the protection, and consequently subject to the jurisdiction, of the United States,'" and accordingly the *Plyler* Court stated in its own footnoted *dicta* that "no plausible distinction with respect to Fourteenth Amendment 'jurisdiction' can be drawn between resident aliens whose entry into the United States was lawful, and resident aliens whose entry was unlawful."  *Id.*

If Justice Gray's *dicta* from *Wong Kim Ark* had been the case's holding, it would have effectively overturned other cases, including Justice Gray's own opinion in *Elk*, that were decided closer to the ratification of the Fourteenth Amendment, and he had to ignore the plain statements in the legislative history.  In addition, neither the *dicta* from *Wong Kim Ark* nor that from *Plyler* controls the outcome here.  Rather, the text and history of the Citizenship Clause control, and these utterly fail to support Plaintiffs' novel proposition that children of diplomats and occupying forces are the only exceptions to their notion of birthright citizenship.  For that matter, nothing in *Plyler* would exclude even children of occupying forces from citizenship. The error in *Plyler*'s *dicta* simply follows from the error in *Wong Kim Ark*'s *dicta* upon which it rests. Neither undercuts the legality of the Order.

Plaintiffs also cite to *McCreery's Lessee v. Somerville,* 22 U.S. 354, 356 (1824), for the proposition that children born in the United States of an alien Irish father were citizens. The case makes no such claim.  PI Memo at 4, n.2.  Rather, the Court interpreted a Maryland statute that permitted children of aliens to inherit property, and permitted the child of the Irishman to inherit. It said nothing whatsoever about his citizenship.  The case provides no support whatsoever to Plaintiffs' position.

### III.    "BIRTHRIGHT CITIZENSHIP" VIOLATES THE TEXT AND THE ORIGINAL INTENT OF THE FOURTEENTH AMENDMENT.

As discussed *supra*, Plaintiffs' case rests almost entirely on the Supreme Court's decision in *Wong Kim Ark*.  That decision limited the category of persons not "subject to the jurisdiction" of the United States under the Fourteenth Amendment to children of diplomats, of native Americans, and of foreign invaders born within the territory of the United States.  *Wong Kim Ark* at 682.  That Court's rationale for this limitation is that children who fall into these three categories do not, and are not expected to, form an allegiance to the United States that would qualify them for citizenship merely by virtue of physical birth on U.S. territory.  While the Court's focus on allegiance was correct, it did not apply that principle thoughtfully as did the Framers of the Fourteenth Amendment.  A review of Congress's Fourteenth Amendment deliberations demonstrates that children of foreign nationals addressed in the EO are not entitled to citizenship.

### A.  The text and context.

Following the Civil War, Congress took action to overrule *Scott v. Sandford,* 60 U.S. 393 (1857) which held that slaves and their descendants, even as freedmen, were excluded from U.S. citizenship.  Congress first moved to override *Scott* by enacting the **Civil Rights Act of 1866**, which provided that "all persons born in the United States **and not subject to any foreign power**, excluding Indians not taxed, are hereby declared to be **citizens** of the United States."  14 *Stat*. 27 (emphasis added).

Due to concerns that the Supreme Court might rule the Civil Rights Act unconstitutional, or that a subsequent Congress might repeal the Act, Congress initiated the process required to amend the Constitution.  *See* Raoul Berger, Government by the Judiciary: The Transformation of

13

the Fourteenth Amendment (Liberty Fund: 1997) at 48.  The resulting Fourteenth Amendment included this language:

> Section 1.  All persons born or naturalized in the United States, and **subject to the jurisdiction thereof**, are citizens of the United States and of the State wherein they reside....  No State shall ... deny to any person **within its jurisdiction** the equal protection of the law.

The language "**subject to the jurisdiction thereof**" in the Fourteenth Amendment is most important, and it is best understood as conveying the same meaning as the language "**and not subject to any foreign power**" as used in the Civil Rights Act of 1866.  Most countries claim as citizens those children born to parents who are their citizens.  Consequently, even if born on American soil, those children are **subjects of a foreign power** and thus **not subject to the jurisdiction of the United States**.  That being the case, children born in the United States of parents who are not U.S. citizens have no lawful claim of citizenship simply because they are born in U.S. territory.

The Declaration of Independence not only freed the new country from the notion that persons born in America were British citizens with allegiance to England, it demonstrated the solemn, binding, and covenantal action undertaken on behalf of  the people, which was later confirmed by the people's ratification of the Constitution which begins "We the People."

> We, therefore, the Representatives of the united States of America, in General Congress, Assembled, **appealing to the Supreme Judge of the world for the rectitude of our intentions**, do, in the Name, and by Authority of the good People of these Colonies, solemnly publish and declare, That these United Colonies are, and of Right ought to be **Free and Independent States**; that they are **Absolved from all Allegiance to the British Crown**, and that all political connection between them and the State of Great Britain, is and ought to be totally dissolved…. [Declaration of Independence (emphasis added).

The Declaration of Independence declared that Americans were shifting from their previous "**allegiance to the British Crown**" to allegiance to the new nation formed of "**Free

14

**and Independent States**."  Likewise, the ratification history of the Fourteenth Amendment discussed *infra*,  that "**subject to the jurisdiction**" entails an obligation of allegiance to the United States and not simply an obligation of obedience to the laws of the United States.  The **obligation of allegiance** signified in the Citizenship Clause is different in kind from the **obligation** every person in the territory of the United States **to obey the laws** of the land. Citizens subject to the jurisdiction of the United States are entitled to corresponding privileges and immunities of citizenship.   Constitution, Article IV, Sect. 2, cl. 1.  On the other hand, all persons who "come within its jurisdiction" have a duty to obey the law, together with a corresponding right to the equal protection of the law.  The meaning of the phrase "subject to the jurisdiction" as used in the Fourteenth Amendment context is very different from the meaning of "within the jurisdiction."

>    B.  **Purpose and drafting history of the Citizenship Clause.**

The record of Congress's deliberations on the Fourteenth Amendment identifies the limited objective for which the Citizenship Clause was adopted — to reverse *Dred Scott* and to ensure that the citizenship of freedmen was recognized on the same basis as other Americans born in the United States.  The purpose was not to change the law regarding citizenship, but rather to affirm its proper understanding.  The deliberations specifically addressed the issue of children born in the United States to non-citizens and assumed that they did not qualify as natural born citizens.  It was understood by the Amendment's Framers that the best evidence that a person will bear true faith and allegiance to America is birth in the United States to American parents.

Senator Jacob Howard of Michigan, who authored the Citizenship Clause, explained its meaning:

> This … is simply declaratory of what I regard as the law of the land already, that every person born within the limits of the United States, and subject to their jurisdiction, is by virtue of natural law and national law a citizen of the United States. **This will not, of course, include persons born in the United States who are foreigners, aliens**, who belong to the families of ambassadors or foreign ministers accredited to the Government of the United States, but will include every other class of persons. [Congressional Globe, 39th Cong, 1st Sess, 2890 (emphasis added).[5]]

Senator Howard also explained what he meant by use of the term "jurisdiction":

> 'jurisdiction' as here employed, ought to be construed so as to imply a **full and complete jurisdiction** on the part of the United States ... that is to say, the **same jurisdiction in extent and quality** as applies to every **citizen** of the United States now. [*Id*. at 2895 (emphasis added).]

Senator Lyman Trumbull of Illinois, Chairman of the Senate Judiciary Committee,

concurred with Senator Howard regarding his characterization of the meaning of "jurisdiction":

> That means "subject to the complete jurisdiction thereof".... **Not owing allegiance to anybody else**. That is what it means.... It cannot be said of any [person] who owes allegiance, partial allegiance if you please, to some other Government that he is "subject to the jurisdiction of the United States…." It is only those persons who are completely within our jurisdiction, who are subject to our laws, that we think of making citizens; and there can be no objection to the proposition that such persons should be citizens. [*Id*. at 2893 (emphasis added).]

Senator George Williams of Oregon concurred.

> In one sense, all persons born within the geographical limits of the United States, are subject to the jurisdiction of the United States, but **they are not subject to the jurisdiction of the United States in every sense**.... I understand the words here, subject to the jurisdiction of the United States, to mean **fully and completely subject to the jurisdiction** of the United States (emphasis added). [*Id*. at 2897 (emphasis added).]

Senator Edgar Cowan of Pennsylvania specifically expressed concern that the

amendment should not be interpreted to grant citizenship to Chinese immigrant workers in

California and went on to discuss the rights of travelers in the United States from foreign nations:

> If a **traveler** comes here from Ethiopia, from Australia, or from Great Britain, he is entitled to a certain extent, to the protection of the laws. You cannot murder him with

---

[5] Quoted in C. Wood, "Losing Control of America's Future: The Census, Birthright Citizenship, and Illegal Aliens," 22 HARVARD JOURNAL OF LAW & PUBLIC POLICY 509 (1999).

impunity.  It is murder to kill him, the same as it is to kill another man.  You cannot commit an assault and battery on him, I apprehend.  He has a right to the protection of the laws; but he is **not a citizen** in the ordinary acceptation of the word.  [*Id*. at 2890 (emphasis added).]

Before the debate on Senator Howard's proposal to add the qualifying phrase "subject to the jurisdiction thereof," Senator Saulsbury concisely stated the Senate's object with regard to this amendment, and in so doing, removed all doubt as to the limited purpose of the amendment as drafted.

I do not presume that any one will pretend to disguise the fact that the object of this first section is simply to declare that negroes shall be citizens of the United States.  [*Id*. at 2897.]

Justice Peter Daniel, concurring in *Scott*, provided a more complete explanation of the relationship between place of birth, parentage, and allegiance.

"The natives, or natural-born citizens, are those born in the country, of parents who are citizens.  As society cannot perpetuate itself otherwise than by the children of the citizens, those children naturally follow the condition of their parents, and succeed to all their rights.  Again:  'I say, **to be of the country, it is necessary to be born of a person who is a citizen; for if he be born there of a foreigner, it will be only the place of his birth, and not his country**.  The inhabitants, as distinguished from citizens, are foreigners who are permitted to settle and stay in the country."  (Vattel, Book 1, cap. 19, p. 101.)  [*Dred Scott* at 476-77 (emphasis added).]

The legislative history of the Fourteenth Amendment clearly illuminates the Court's error in *Wong Kim Ark*, and counsels that this Court avoid repeating it, and uphold President Trump's entirely lawful and constitutional Executive Order.  The English common law, on which *Wong Kim Ark's* holding was expressly based, does not apply in the United States of America, and therefore provides no support for Plaintiffs' position.

## IV.    PLAINTIFFS' CLAIM THAT "BIRTHRIGHT CITIZENSHIP" SHOULD BE HANDED OUT TO ALL CHILDREN OF ALIENS HAS BIZARRE RESULTS.

Plaintiffs entirely miss one of the most important aspects of Citizenship — the **allegiance** that a person owes to his own country, sometimes described as loyalty or fidelity to the nation.

17

Most countries recognize citizenship based on the principle of *jus sanguinis* — that a child acquires the citizenship of the child's natural parents.  *See* E. J. Erler, <u>The Founders on Citizenship and Immigration</u> (Claremont Inst.: 2007) at 28-29.  Thus, children born anywhere in the world to citizens of most other countries acquire the citizenship of their parents at birth.  Should plaintiffs successfully advance their notion of birthright citizenship, almost all such children automatically would be citizens of multiple countries.  To which country do these children owe their allegiance?

The United States has long required naturalized citizens to swear off allegiance to all foreign sovereigns, but not so with those claiming birthright citizenship.  Because most children born in the United States to parents with foreign citizenship are recognized as foreign nationals under international law, they are not most certainly "subject to the jurisdiction" of the United States any more than the children of diplomats, Native Americans, or foreign invaders, who Plaintiffs concede cannot benefit from birthright citizenship.

The importance of allegiance is most acutely felt during time of war when the obligations of citizenship are most consequential.  An American citizen is "subject to the jurisdiction" of the United States and may be drafted into the military even if outside the country.  A foreign national is not subject to the jurisdiction of U.S. law and thus may not drafted into the U.S. military even if he is within U.S. territory when a draft is imposed.  Citizens who take up arms against the United States may be prosecuted for treason.  U.S. Const. Art. III, § 3.  Non-citizens who take up arms against the United States are prisoners of war if captured, and they are not subject to prosecution simply for waging war against the United States.  A person who is a citizen of two different countries that are at war will be placed in an untenable position.  The problems that

18

arise with dual citizenship were acutely felt by U.S. citizens who were impressed into service with the British navy leading up to the War of 1812.

Neither of the two categories of children born in the United States to aliens that are addressed by the Executive Order cannot be expected to have allegiance to our nation. First, those children born of parents who are not legally in the United States cannot be expected to be nurtured in the values of American citizenship by parents who entered the country illegally — not "subject to" but rather here "in defiance of" our nation's laws. Second are those children of parents, birth tourists, who travel to the United States for the purpose of giving birth and thereby obtaining cheap and easy birthright citizenship for their children. They too are unlikely to have any allegiance nurture their children in values of American citizenship.

Only those persons who can be expected to have a "**permanent allegiance**" to our country can become citizens, because based on that permanent allegiance, the country then owes to its citizens a reciprocal duty of protection. No such relationship exists with the two classes of persons addressed by the EO:

> By **allegiance** is meant the obligation of **fidelity** and **obedience** which the **individual owes to the government** under which he lives, or to his sovereign **in return for the protection he receives**. It may be an absolute and permanent obligation, or it may be a qualified and temporary one. **The citizen or subject owes an absolute and permanent allegiance to his government** or sovereign, or at least until, by some open and distinct act, he renounces it and becomes a citizen or subject of another government or another sovereign. **The alien, whilst domiciled in the country, owes a local and temporary allegiance**, which continues during the period of his residence. [*Carlisle v. United States*, 83 U.S. 147, 154 (1872) (emphasis added).]

The term birthright citizenship is of recent origin, not appearing in the Declaration, Constitution, or any statute, and Plaintiffs' interpretation of *Wong Kim Ark* contravenes common sense and our sense of justice. According to the Plaintiffs' theory, under *Wong Kim Ark*, a person born in the United States of alien parents is constitutionally entitled to American

citizenship, whereas a person born outside the United States to American citizens is entitled to such citizenship only by statute. Why should there be an irrebuttable legal presumption of allegiance in the former case, but not in the latter?

Under the plaintiffs' theory of the case, children of the 9/11 hijackers, WWII German saboteurs, human traffickers, and imprisoned enemy combatants born on U.S. territory would be entitled to what they call birthright citizenship.[6] Birth tourism from Turkey, China, Nigeria, and Mexico has received considerable attention.[7] The problems associated with plaintiffs' theory of citizenship are exacerbated by statutes that facilitate immigration of lawfully naturalized citizens, known as "chain migration."

Plaintiffs' advocacy to grant citizenship for children of illegal aliens and birth tourists may further the policy objectives of globalists and the United Nations which call for open migration,[8] but it undermines the nation-state and the concept of borders.

---

[6] *See e.g.*, Office of the Inspector General, "A Review of the FBI's Handling of Intelligence Information Prior to the September 11 Attacks," ch. 5 (Nov. 2004); H. Ardman, "World War II: German Saboteurs Invade America in 1942," *History.net* (June 12, 2006); U.S. Department of Justice, "Two sent to prison for roles in cartel-linked human smuggling scheme," (Oct. 30, 2024); U.S. Department of Justice, "Fact Sheet: Prosecuting and Detaining Terror Suspects in the U.S. Criminal Justice System," (June 9, 2009).

[7] *See e.g.*, J. Feere, "Birthright Citizenship in the United States: A Global Comparison," *Center for Immigration Studies* (Aug. 31, 2010); I. Egrikavuk, "Birth tourism in U.S. on the rise for Turkish parents," *Hurriyet Daily News* (Mar. 12, 2010); K. Richburg, "For many pregnant Chinese, a U.S. passport for baby remains a powerful lure," *Washington Post* (July 18, 2010); D. Iriekpen, "Citizenship Rights: American Agitations Threaten a Nigerian Practice," *This Day* (Aug. 16, 2010); N. Nnorom, "Birthright citizenship: Nigerians in diaspora kick, say Trump's action illegal," *Vanguard* (Jan. 23, 2025).

[8] *See* U.N.'s Global Compact for Safe, Orderly and Regular Migration (GMC), but even that compact is voluntary, and states that it "respects states' sovereign right to determine who enters and stays in their territory…."

**CONCLUSION**

Plaintiffs' Motion for Preliminary Injunction should be denied, and President Trump should be dismissed as a party defendant.

Respectfully submitted,

/s/ *Phillip E. Marbury*

_____

WILLIAM J. OLSON                          PHILLIP E. MARBURY
WILLIAM J. OLSON, P.C.                     New Hampshire Bar No. 267645
370 Maple Avenue West,                     LAW OFFICES OF MARBURY & MARBURY
Suite 4                                    29 Mill Street, Unit C4
Vienna, VA 22180                           Wolfeboro, NH  03894
(540) 450-8777                             (603) 569-4111
wjo@mindspring.com                         pm@marblaw.com

January 31, 2025                           Counsel for *Amici Curiae*
                                           America's Future, et al.

21