IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| NEW HAMPSHIRE INDONESIAN COMMUNITY SUPPORT, et al.,<br><br>*Plaintiffs*,<br><br>v.<br><br>DONALD J. TRUMP, President of the United States, in his official capacity, et al.,<br><br>*Defendants*. | Case No. 1:25-cv-38 |

**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUCTION**

Defendants' unprecedented attempt to strip citizenship from members' babies and countless other children born in this country—exposing them to arrest and deportation, denying them vital early life nutrition and healthcare, and foreclosing countless rights and opportunities as they grow up—squarely violates the Citizenship Clause and federal statute. Indeed, most of the constitutional arguments Defendants make were already rejected by the Supreme Court over one hundred years ago. And Defendants offer almost no response at all to Plaintiffs' statutory claim, which independently justifies an injunction. Nor do Defendants engage with the severe harm that this Order will impose on children, families, and communities across the country. This Court should enjoin the Order in full to ensure that Defendants cannot unilaterally break America's fundamental promise: that all children born in this country—no matter the status of their parents—begin life as full and equal members of our national community.

## I. PLAINTIFFS HAVE A CAUSE OF ACTION.

As a threshold argument, Defendants contend that Plaintiffs lack a cause of action. Defs.' Mem. in Opp. of Mot. for Prelim. Inj. 5-7, ECF No. 58-1 (Opp.). But courts have long recognized that there is a cause of action in equity to review presidential orders that violate the Constitution, statute, or the scope of presidential authority—and this radical attempt to rewrite the Constitution's and Congress's guarantees by executive fiat is no different. *See, e.g.*, *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952); *Dames & Moore v. Regan*, 453 U.S. 654 (1981); *Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935); *Trump v. Hawaii*, 585 U.S. 667, 676 (2018); *see generally Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996) (rejecting Defendants' position). This equitable tradition is grounded in the "long history

1

of judicial review of illegal executive action." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015). Defendants simply ignore this deeply entrenched principle.[1]

Instead, Defendants contest the availability of a suit under the Administrative Procedure Act ("APA"), arguing that there is no final agency action yet. But that is beside the point: The Court can review the Order in equity even without final agency action. *See, e.g.*, *Rhode Island Dep't of Envt'l Mgmt. v. United States*, 304 F.3d 31, 41 (1st Cir. 2002) (reviewing claim that was "constitutional in scope" despite lack of "final reviewable order from the agency"); *Chamber of Com. of U.S.*, 74 F.3d at 1326 (reviewing legality of presidential order and agency regulations where plaintiffs did not assert cause of action under the APA); *Dames & Moore*, 453 U.S. at 666-68 (reviewing presidential order and nonfinal agency action in equity).[2]

Defendants erroneously contend that this suit is improper because there is "an adequate alternative remedy," namely a suit for a declaratory judgment under 8 U.S.C. § 1503(a), which precludes an APA cause of action. Opp. 6-7. As noted, Plaintiffs need not rely on the APA. Moreover, nothing in § 1503 suggests that this unique suit—challenging a presidential order seeking to upend constitutional citizenship principles and directing sweeping changes across the entire federal government—was "the type Congress intended to be reviewed within [its] statutory structure." *See Axon Enter., Inc. v. Fed. Trade Comm'n*, 598 U.S. 175, 186 (2023). Section 1503 serves as a mechanism to review denials of passports or identity certificates, often based on individualized factual circumstances. *See, e.g.*, *Cambranis v. Blinken*, 994 F.3d 457, 460 (5th

---

[1] *DeVillier v. Texas*, by contrast, involved a claimed "cause of action for damages, a remedy that is legal, not equitable, in nature." 601 U.S. 285, 292 (2024).

[2] Defendants suggest that Plaintiffs challenge "hypothetical" agency decisions. Opp. 6. But there is nothing hypothetical here: The Order requires all agencies to issue implementation documentation by February 19, and specifically directs Defendants Secretaries of State and Homeland Security to "take all appropriate measures" to make their policies "consistent with this order" and ensure that none of their "officers, employees, or agents . . . act, or forbear from acting, in any manner inconsistent with this order." Exec. Order No. 14160 § 3(a)-(b).

Cir. 2021) (cited by Defendants) (addressing claims based on dueling birth certificates). In fact, Defendants cite no case applying § 1503 outside of that context.[3] By contrast, the constitutional and statutory claims at issue here are "wholly collateral to [§ 1503's] review provisions" and "outside the agency's expertise." *Axon Enter, Inc.*, 598 U.S. at 186. Indeed, there would be no point in giving agency officials the first crack at deciding the questions presented here in individual cases—the President has already given them marching orders. *See* Exec. Order No. 14160 § 3.

## II. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS.

### a. The Order Violates the Fourteenth Amendment.

The Order clearly violates the terms of the Fourteenth Amendment's Citizenship Clause—that "[a]ll persons born" in this country and "subject to the jurisdiction thereof" are citizens. U.S. Const. amend. XIV, § 1; Mem. in Supp. of Mot. for Prelim. Inj. 3-8, ECF No. 24-1 (Mot.). *Wong Kim Ark* provides the definitive interpretation of that Clause, concluding that the critical language at issue—"subject to the jurisdiction"—excludes only a handful of categories, none of which is applicable here. *Id*. Defendants' brief endeavors at length to resist that conclusion, but offers no meaningful support for a contrary reading. Opp. 8-26.

1. Many of Defendants' arguments were previously rejected by the Supreme Court in *Wong Kim Ark*—a fact that Defendants strikingly fail to acknowledge.

---

[3] This case involves a much wider range of harms related to immigration enforcement, health and nutrition benefits, voting, and employment, involving a wide range of interactions with federal, state, and private entities. Nor do Defendants point to any language in § 1503 purporting to bar this suit. That is particularly notable because elsewhere in the same title, Congress has included language specifically channeling other kinds of litigation into particular procedures. *See, e.g.*, 8 U.S.C. § 1252(b)(7) (certain criminal defendants claiming U.S. nationality "may have such nationality claim decided only as provided in this subparagraph"); *id*. § 1252(a)(5) ("sole and exclusive means for judicial review of removal orders"); *see id*. §§ 1252(a)(1), (a)(2)(A), (b)(5), (b)(9).

3

For example, Defendants offer a narrow interpretation of the citizenship provision of the Civil Rights Act of 1866 and argue that the "Citizenship Clause was an effort to *constitutionalize* the Civil Rights Act," so the Clause must be narrow as well. Opp. 2, 10-11. The *dissenting* opinion in *Wong Kim Ark* offered the same flawed syllogism. *See* 169 U.S. at 721 (Fuller, J., dissenting). But the majority rejected this statutory gloss, explaining that the 1866 Act was as broad as the Constitution. *Id.* at 688. In any event, the Court went on, the 1866 Act was of dubious relevance because the text of the Act and the Citizenship Clause are different—so the Clause's wording "removed any possible doubt" about the principle of universal birthright citizenship. *Id.*[4]

Similarly, Defendants rely extensively on *Elk v. Wilkins*, 112 U.S. 94 (1884), to suggest that the Clause excludes anyone "subject to the jurisdiction of a foreign power." Opp. 10. But, again, this is precisely the argument made—*almost verbatim*—in *Wong Kim Ark*. 169 U.S. at 725 (Fuller, J., dissenting) (relying on *Elk*). The majority squarely rejected this argument, explaining that the treatment of individuals living under Tribal government was a product of the unique constitutional status of the Tribes. *See id.* at 680-83. *Elk* had, the Court conclusively held, "no tendency to deny citizenship to children born in the United States of foreign parents." *Id.* at 682; *see* Mot. at 6 n.3. And Justice Gray, the author of *Wong Kim Ark*, knew of what he spoke: He had authored *Elk* as well.

---

[4] The Court's decision thus rebuts Defendants' reliance on the legislative history of the 1866 Act. Opp. 11, 16. Moreover, the legislation and constitutional amendment had not only different wording, but also different authors and political dynamics. *See* Garrett Epps, *The Citizenship Clause: A "Legislative History*," 60 AM. UNIV. L. REV. 331, 349 (2010) (explaining that, unlike the 1866 Act, the Clause was drafted by a "considerably more radical Joint Committee . . . on Reconstruction" who "made no concessions to the President's conservative views" "because a President has no veto power over a proposed constitutional amendment").

4

Defendants likewise rely on dicta from the *Slaughter-House Cases*, 83 U.S. 36 (1873), Opp. 17, just like Justice Fuller in his dissent, *Wong Kim Ark*, 169 U.S. at 723 (Fuller, J., dissenting). The majority rejected it outright, criticizing the passage on which Defendants rely as "wholly aside from the question in judgment, . . . unsupported by any argument, . . . and not formulated with the same care and exactness" as the Court normally provides. *Id*. at 678.[5]

These are not tangential points in *Wong Kim Ark*. Each was deployed by Justice Fuller to argue that the children of noncitizens are not covered by the Citizenship Clause. And, indeed, that is the implication of Defendants' arguments. Relying on the 1866 Act, *Elk*, and so on, they argue that a child must "*not* [be] subject to the jurisdiction of a foreign power" to fall within the Citizenship Clause. Opp. 10. But following their reasoning, the children of *all* noncitizens presumptively would be subject to some foreign country's jurisdiction and thus outside the Citizenship Clause, meaning *Wong Kim Ark* would have had to come out the other way. *See id*. at 17 (Clause excludes children of "*citizens or subjects of foreign States*") (emphasis added). The rejection of these arguments in *Wong Kim Ark* is central to the Court's holding that the plaintiff there—a child of noncitizens—was himself a citizen.

---

[5] The list goes on and on. Defendants rely on Emmerich de Vattel's pre-revolution opinions on international law, Opp. 14-15, once again recycling an argument advanced by Justice Fuller in dissent, *see* 169 U.S. at 708 (Fuller, J., dissenting). And they contest that *jus soli* principles were incorporated into the Fourteenth Amendment, arguing that the United States broke with that "feudal doctrine." Opp. 25. This, again, was a central argument offered to, and rejected by, the Supreme Court. 169 U.S. at 666-75 (rejecting argument that America had broken with "the rule of the common law, depending on birth within the realm, originally founded on feudal considerations"). Defendants also contest the relevance of *Plyler v. Doe*, 457 U.S. 202 (1982), suggesting that "jurisdiction" means different things in the two clauses of the Fourteenth Amendment. Opp. 24-25. But *Wong Kim Ark* rejected that too: "It is impossible to construe the words 'subject to the jurisdiction thereof,' in the opening sentence, as less comprehensive than the words 'within its jurisdiction,' in the concluding sentence of the same section; or to hold that persons 'within the jurisdiction' of one of the states of the Union are not 'subject to the jurisdiction of the United States.'" 169 U.S. at 687; Mot. 8 & n.6.

2. Defendants attempt to inject a new requirement of "domicile" into the Citizenship Clause, suggesting that the Citizenship Clause requires that a child's parents' status be "permanent and lawful" to satisfy the supposed "domicile" requirement. Opp. 11. This assertion is foreclosed by both the plain text of the Fourteenth Amendment and the Supreme Court's decision in *Wong Kim Ark*.

The Citizenship Clause requires only that a baby be "born . . . in the United States" and "subject to the jurisdiction thereof." Nowhere does it say that the baby or their parents must be domiciled in the United States, much less lawfully present. Defendants rely on the term "reside" in the last phrase of the Citizenship Clause. Opp. 11. But that is only a requirement for *state* citizenship. *See Slaughter-House Cases*, 83 U.S. at 74 ("[A person] must reside within the State to make him a citizen of it, but it is only necessary that he should be born or naturalized in the United States to be a citizen of the Union.") (cited by Defendants).

Defendants contend, however, that the common-law rule was that the children of temporary visitors born in the United States were not citizens. Opp. 13, 17. Even if there were doubt on the common-law question, it was laid to rest when Congress adopted the term "subject to the jurisdiction." As *Wong Kim Ark* explained, that choice of language constitutionalized the "clear and powerful train of reasoning," 169 U.S. at 683, which Chief Justice Marshall articulated in *The Schooner Exchange v. McFaddon*, 11 U.S. 116 (1812). Justice Marshall could not have been clearer: Temporary visitors "owe temporary and local allegiance" to the United States and are "amenable to the jurisdiction of the country." 11 U.S. at 144. Thus, as the Court in *Wong Kim Ark* emphasized, noncitizens are "completely subject to the political jurisdiction" of the United States, even if their presence is "temporary," because a visitor "owes obedience to the laws of [the] government, and may

6

be punished for treason or other crimes" for "so long a time as he continues within the dominions" of it. 169 U.S. at 693-94. The Court's references to "domicile"—the stipulated facts included that Wong Kim Ark's parents were domiciled in San Francisco—do not change this interpretation of the Clause. *Id.* at 652; *see* Opp. 22.

In any event, Defendants are incorrect about the common law. The longstanding rule under English common law was that (with only the exceptions noted in *Wong Kim Ark*) all persons born on English soil were subjects, and that principle was carried over into the American colonies and then States. *See* Mot. 3-4 & n.2; *see generally* Michael D. Ramsey, *Originalism and Birthright Citizenship*, 109 GEO. L.J. 405, 413-16 (2020). Indeed, *Lynch v. Clarke*, a "leading judicial decision[]" on the issue, *id.* at 445, specifically held that the child of temporary visitors, who were "domiciled in Ireland," was a citizen, 1 Sand. Ch. 583, 587, 663 (N.Y. Ch. 1844); *see* Mot. 3-4; *Wong Kim Ark*, 169 U.S. at 664 (discussing *Lynch*).[6]

As for undocumented noncitizens, Defendants offer *no reason at all* to read the Clause as excluding their children from citizenship.[7] Such families plainly "owe[] obedience to the laws of [the] government, and may be punished for treason or other crimes," and thus are "subject to the jurisdiction of the United States" under *Wong Kim Ark*'s analysis. 169 U.S. at 693-94. And even if there were some additional (atextual) requirement of domicile, most undocumented families are long-term residents, and effectively all would be "domiciled" in the United States under any reasonable definition of that term. *See Plyler*, 457 U.S. at 227 n.22 ("[I]llegal entry into the

---

[6] Notably, *Lynch* was discussed during the debates on the Clause. Cong. Globe, 39th Cong., 1st Sess. 1832 (1866) (statement of Rep. Lawrence). Defendants, however, ignore *Lynch*. They cite *Benny v. O'Brien* to suggest a contrary rule, but that case (which did not involve the child of visitors) is primarily based on confusion about the meaning of *Elk* among some readers—confusion that was later dispelled by *Wong Kim Ark*. 58 N.J.L. 36 (Sup. Ct. 1895).

[7] Defendants half-heartedly invoke a supposed "invasion" at the southern border. Opp. 19. But as Plaintiffs explained, the Citizenship Clause exception applies only to occupation of territory by hostile armies. Mot. 7 & n.5. Defendants have no response.

country would not, under traditional criteria, bar a person from obtaining domicile within a State."); *see also* Note, *The Significance of Parental Domicile Under the Citizenship Clause*, 101 VA. L. REV. 455, 457 (2015) (cited by Defendants) (conceding citizenship of children of undocumented noncitizens).[8]

Defendants nevertheless contend that a noncitizen's presence must be *lawful* to satisfy the supposed "domicile" requirement. Opp. 11. Yet the only citation they can muster for that idea is an Illinois decision interpreting a different term ("inhabitant") in *that State's* Constitution. *Spragins v. Houghton*, 3 Ill. (2 Scam.) 377, 396 (1840). That is no authority at all.

U.S.-born children of undocumented people thus plainly fall within the Clause's protection. As Judge James Ho has noted, "nothing in text or history suggests that the drafters intended to draw distinctions between different categories of aliens." James C. Ho, *Defining "American" Birthright Citizenship and the Original Understanding of the 14th Amendment*, 9 GREEN BAG 2d 367, 374 (2006). To the contrary, an opponent of the Citizenship Clause warned that it would grant citizenship to "the children of aliens who 'owe [the U.S.] no allegiance [and] who pretend to owe none,' and to those who regularly commit 'trespass' within the U.S." *Id*. at 370 (quoting Cong. Globe, 39th Cong., 1st Sess. 2890-91 (1866) (statement of Sen. Edgar Cowan)). "In response, proponents of the [Clause] *endorsed* Cowan's interpretation." *Id*. at 370-71. In line with the clear language of the Clause, this exchange is totally inconsistent with Defendants' position, yet they do not even acknowledge it. *See* Mot. 4-5.[9]

---

[8] Defendants cite to *Elkins v. Moreno*, 435 U.S. 647 (1978), Opp. 13, but that case says nothing about undocumented noncitizens.

[9] Defendants offer snippets of the legislative history taken entirely out of context, distorting their meaning. For example, they contend that Senator Howard, who introduced the Clause, "stated that the Clause 'of course' would not include the children of 'foreigners' or 'aliens.'" Opp. 16. But the actual quote is: "This will not, of course, include persons born in the United States who are foreigners, aliens, who belong to the families of ambassadors or foreign ministers accredited to the Government of the United States, but will include every other class of

8

3. Defendants urge that their rule makes sense because "[i]llegal aliens and temporary visitors have far weaker connections to the United States than do members of Indian tribes." Opp. 14. But strength of connection is not the rule adopted in the Fourteenth Amendment. Rather, Congress framed the Clause to exclude Native Americans in view of the unique relationship the Tribes have to the National Government. Mot. 6 n.3. As Defendants themselves note, "Indian tribes form 'an intermediate category between foreign and domestic states.'" Opp. 13. It was this circumstance—not "weak[] connections" between the United States and Native Americans—that explains the line drawn in the Citizenship Clause and reflected in *Elk* and *Wong Kim Ark*. *See* Epps, *supra*, at 364-71.

Moreover, Defendants' argument ignores history. *Wong Kim Ark*'s parents were Chinese nationals living at a time of extraordinary anti-Chinese legislation. Congress had, among other things, specifically prohibited them and other Chinese nationals from naturalizing. *Wong Kim Ark*, 169 U.S. at 699-704. By contrast, undocumented and temporarily present noncitizens today may have access to multiple pathways to permanent residence and eventual citizenship. *See, e.g.*, 8 U.S.C. §§ 1158, 1229b(b), 1255, 1427. Defendants' attempt to graft a "connections" test onto the Citizenship Clause blinkers this history. Even in a moment of extraordinary exclusion and discrimination against the Chinese community, the Supreme Court recognized that Wong Kim Ark was a citizen under the clear terms of the Fourteenth Amendment. That context

---

persons." Cong. Globe, 39th Cong., 1st Sess. 2890 (statement of Sen. Howard). Thus, the reference was to foreigners *who are children of ambassadors*. As Judge Ho explains, Defendants' presentation of this quote "reads Howard's reference to 'aliens, who belong to the families of ambassadors or foreign ministers' out of the sentence" and "also renders completely meaningless the subsequent dialogue between Senators Cowan and Conness over the wisdom of extending birthright citizenship to the children of Chinese immigrants." Ho, *supra*, at 372.

9

underscores the Court's holding: With only the narrow exceptions identified by the Court, *all* children born in this country are citizens.[10]

### b. The Order Violates 8 U.S.C. § 1401(a).

As Plaintiffs previously explained, the Order violates § 1401(a) independently of the constitutional violation. Mot. 8-12. The Court may enjoin the Order on this basis alone, yet Defendants provide *no* meaningful response to it.

Defendants say there is no evidence "that Congress intended any delta between the statute and the Amendment." Opp. 26. Congress did not intend any "delta" in meaning *at the time of enactment* because at that time *Wong Kim Ark*'s principle of universal birthright citizenship was widely understood, and that principle is thus codified into the statute as well. Mot. 9. Defendants *now* argue for a revolution in the interpretation of the Citizenship Clause. But courts "interpret a statute's words based on their plain and ordinary meaning *at the time of . . . enactment*." *United States v. Abreu*, 106 F.4th 1, 12 (1st Cir. 2024) (citing *Bostock v. Clayton Cnty.*, 590 U.S. 644, 654 (2020)) (emphasis added). Thus, the *statute* remains tethered to the understanding of the Clause when the statute was enacted. *New Prime Inc. v. Oliveira*, 586 U.S. 105, 113 (2019); *see George v. McDonough*, 596 U.S. 740, 746 (2022); *Morissette v. United*

---

[10] Generations of judges, citizens, and even the Office of Legal Counsel have understood this as *Wong Kim Ark*'s holding. Mot. at 5. But even if Defendants were correct that it is dicta, this Court is "bound by the Supreme Court's considered dicta almost as firmly as by the Court's outright holdings," especially where, as here, the Court has "carefully considered" it. *McCoy v. Mass. Inst. of Tech.*, 950 F.2d 13, 19 (1st Cir. 1991). Relatedly, Defendants suggest there is a canon that "any ambiguity" in the Clause should be read "against extending citizenship." Opp. 21-22. But there is no ambiguity here. And, to the extent Defendants' cases have any relevance here, they make clear that the "heavy burden" lies with Defendants when "the Government seeks to strip a person of citizenship." *Berenyi v. Dist. Dir., INS*, 385 U.S. 630, 636 (1967) (cited by Defendants). By proposing to upend over a century of citizenship law, the Order seeks to strip thousands of children of their citizenship.

*States*, 342 U.S. 246, 263 (1952). Defendants' arguments that *Wong Kim Ark* was wrong are thus not only foreclosed but beside the point. Mot. 10-11.

Resisting, Defendants suggest that "essentially identical language in separate legal instruments" should not be read "to have vastly different legal results." Opp. 27. But that is precisely what can happen when legislation borrows language, and the interpretation of the original document from which Congress borrowed later changes. *See Loughrin v. United States*, 573 U.S. 351, 359 (2014) (prevailing interpretation was incorporated despite later change); *United States v. Kozminski*, 487 U.S. 931, 944-45 (1988) (statute modeled on Constitution).

Defendants weakly suggest that "Plaintiffs overstate the degree of supposed historical consensus." Opp. 27. But there has indeed been a long and robust consensus of universal birthright citizenship, including for the very categories of children targeted by the Order. Mot. 10-11. Plaintiffs pointed to, *inter alia*, writings from one of the *drafters* of the birthright legislation to that effect. *Id*. Defendants do not so much as acknowledge these sources. Instead, they cherry-pick earlier, dubious items that have no connection to the statute and were likely unknown to the drafters. Opp. 23-24.[11] That meager response speaks volumes.[12]

---

[11] The 1910 executive report on which the government relies appears to be an outlier long-since superseded by the time the 1940 and 1952 Acts were considered. *See* Mot. 10-11 (describing government understanding contemporaneous with the statute). And the 1901 and 1904 treatises it cites make no mention of *Wong Kim Ark*, and instead point to executive policies predating that decision. Opp. 23-24.

[12] Moreover, the broader context of the immigration laws bolsters Plaintiffs' reading because they share the universal assumption and understanding that people born in this country are citizens—and would make little sense if there was a substantial population of U.S.-born noncitizens. *See, e.g.*, 8 U.S.C. § 1255(a); Fontaine Decl. ¶ 18 (process for a person within the United States to obtain permanent residence presumes that person entered from abroad); *see also* Nationality Act of 1940, Pub. L. No. 76-853, § 313 *et seq.*, 54 Stat. 1137, 1145-46 (1940) (providing for derivative naturalization only of children born outside the United States, reflecting understanding that those born in this country had no need to naturalize).

### III. THE COURT SHOULD ENJOIN THE ORDER.

#### a. The Equities Overwhelmingly Favor an Injunction.

Defendants ask the Court to allow them to enforce an Order that upends a constitutional status quo stretching back to 1898. The tangible harms imposed upon thousands of families across the country if the Order goes into effect are imminent and grave. *See* Mot. 12-15. Among other things, the Order will expose members' children to immigration enforcement. *See id.* at 12. Defendants *do not contest* that these children will be subject to arrest and deportation to countries they have never seen, instead suggesting that Plaintiffs must suffer in silence until the agencies decide on "implementation and enforcement" of the President's directions. Opp. 28. But every day these babies are at risk of arrest is a grave injury. *See, e.g.* Fontaine Decl. ¶ 5 (describing fear of immigration enforcement). And of course Plaintiffs need not "expose [themselves] to actual" arrest in order to satisfy irreparable harm. *See Reddy v. Foster*, 845 F.3d 493, 500 (1st Cir. 2017) (citation omitted). Defendants suggest that forms of immigration relief from deportation may be available to these children. Opp. at 28; *but see infra* n.12 (noting that the immigration laws presume citizenship of U.S.-born children and so may be inapplicable to these U.S.-born children). That misses the point. The Order strips them of the "most precious right" of citizenship, which *automatically* protects them from immigration arrest and deportation. *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 159 (1963).

Defendants have *no* response to the litany of other harms that the Order imposes, including denying passports and critical health and nutritional benefits. *See* Mot. 13-15. Gail and Thomas, for example, live on a very limited income; denying their baby access to early-life nutritional and medical support may force them to make impossible choices among paying for

12

basic necessities like food, medical care, and shelter.  Pontoh Decl. ¶¶ 15-16.  Far from being mere "conjecture," Opp. 28 (citation omitted), these harms are devastatingly real and imminent.

Further, the Order would cause unprecedented and extraordinary harm to the very fabric of this nation.  Birthright citizenship ensures vital protections that strengthen society by supporting children's well-being and fostering better education, health, and economic outcomes for all.  Junaid Decl. Exhs. 8-11.  Thus, the public interest strongly favors an injunction.

On the other side of the ledger, Defendants claim that the century-old constitutional rule has "created a perverse incentive for illegal immigration."  Opp. 1.  But even if that were true—it is not, and Defendants offer no evidence—their entire argument is predicated on a grave misunderstanding.  They warn that Plaintiffs' position "would for all time deprive the political branches of the power to address the serious problems caused by near-universal birthright citizenship."  *Id.* at 20.  But that is just the point.  The Citizenship Clause was included in the Constitution *specifically* so that future Congresses and Presidents could *not* take it away absent a constitutional amendment.  *See* Epps, *supra*, at 350.  The specter of *Dred Scott*'s manipulation of citizenship rules to exclude Black Americans loomed over the framing of the Citizenship Clause, driving congressional leaders to permanently safeguard citizenship.  *See, e.g.*, Cong. Globe, 39th Cong., 1st Sess. 2768-69 (1866).  Moments like this show how wise that was.

Compounding this misunderstanding, Defendants further advance a shocking claim to *Executive* supremacy in this arena.  The *President*, they claim, "must have 'broad discretion'" to alter the nation's citizenship rules, and an injunction "would mark a severe intrusion into this core executive authority."  Opp. 29.  But the rules about citizenship of people born in this country are not subject to manipulation under any presidential authority; they are defined by the

13

Constitution and have been reinforced by Congress. Mot. 12. Simply put: President Trump cannot rewrite the nation's fundamental citizenship principles by executive dictate.

### b. The Court Should Enjoin the Order in Full.

Defendants assert that if an injunction is issued, it should go no further than Plaintiffs and their members. Opp. 29-30. That is wrong because there is no practical way to fully protect Plaintiffs without enjoining the Order in full.[13]

Courts across the country have held that a district court can and should enjoin a policy nationwide when doing so is "necessary to provide complete relief to the plaintiffs." *Georgia v. President of the U.S.*, 46 F.4th 1283, 1304 (11th Cir. 2022) (quotation marks omitted); *see also Labrador v. Poe*, 144 S. Ct. 921, 921, 923, 927 (2024) (Gorsuch, J., concurring) (Mem.) (acknowledging that such injunctions are appropriate when "necessary to provide interim relief to the parties"); *Trump v. Hawaii*, 585 U.S. 667, 717 (2018) (Thomas, J., concurring) (similar).[14]

That is the case here. Plaintiffs have hundreds of thousands of members spread across the country. Pontoh Decl. ¶¶ 2, 5; Proaño Decl. ¶¶ 2, 10; Fontaine Decl. ¶¶ 10, 12. There is no reasonable way to ensure that Plaintiffs' membership information is known to the countless entities to which a narrow injunction would be relevant, including federal, state, and local agencies and officials and private businesses. Fontaine Decl. ¶¶ 24-28; *see also* Br. of Amici Local Governments and Officials 12, ECF No. 56. Plaintiffs have no process to verify people's membership for such entities, Proaño Decl. ¶ 10; Fontaine Decl. ¶¶ 13-14, and in any event

---

[13] Defendants relatedly suggest that facial relief is inappropriate. Opp. 30. But, for all the reasons explained above, every new denial of citizenship the Order directs is unconstitutional and contrary to statute. *See City of Los Angeles v. Patel*, 576 U.S. 409, 418 (2015).

[14] *See also Pennsylvania v. President of the United States*, 930 F.3d 543, 575 (3d Cir. 2019) (same), *rev'd on other grounds sub nom. Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657 (2020); *Braidwood Mgmt., Inc. v. Becerra*, 104 F.4th 930, 955 (5th Cir. 2024) (same); *City of Chicago v. Barr*, 961 F.3d 882, 916 (7th Cir. 2020) (same); *East Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 680 (9th Cir. 2021) (same).

membership databases may not be updated in real time, Proaño Decl. ¶ 10. And creating new systems to track and verify membership would "seriously strain" Plaintiffs' resources, thus denying them complete relief. Proaño Decl. ¶ 10. Even aside from these difficulties, there are endless situations where members' children and their caretakers may not be able to prove membership at all—such as when the child is with the parent who is not a member, or a grandparent, or any other caretaker. Fontaine Decl. ¶¶ 12, 14. If the adult cannot instantly prove the relevant parent's membership in fast-moving enforcement situations, for example, then the members' children, though protected by an injunction, may nonetheless be detained. *See Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486, 1502 (9th Cir. 1996); *see also Koe v. Noggle*, 688 F. Supp. 3d 1321, 1361-62 & n.39 (N.D. Ga. 2023) (collecting cases where narrower relief was "practically unworkable").[15]

## CONCLUSION

The Order should be preliminarily enjoined.[16]

---

[15] Defendants argue that relief against the President is improper and he should be dismissed as a defendant. Opp. 30. Regardless of whether the Court enters injunctive relief against the President, it *can* enjoin agency officers from taking action to implement the Order. *See, e.g.*, *Chamber of Com. of U.S.*, 74 F.3d at 1328. And Defendant Trump should not be dismissed from the suit entirely; such action is premature at the preliminary injunction stage, and at a minimum declaratory relief is available against him. *See Knight First Amend. Inst. at Columbia Univ. v. Trump*, 302 F. Supp. 3d 541, 579 (S.D.N.Y. 2018) (addressing cases Defendants cite, issuing declaratory relief against the president, and finding injunctive relief available against subordinate official), *aff'd*, 928 F.3d 226 (2d Cir. 2019), *cert. granted, judgment vacated as moot*, 141 S. Ct. 1220 (2021).

[16] Defendants' request to consolidate the preliminary injunction with the merits, Opp. 30 n.5, is premature.

Dated: February 4, 2025

/s/ *SangYeob Kim*
SangYeob Kim (N.H. Bar No. 266657)
Gilles R. Bissonnette (N.H. Bar. No. 265393)
Henry R. Klementowicz (N.H. Bar. No. 21177)
Chelsea Eddy (N.H. Bar No. 276248)
AMERICAN CIVIL LIBERTIES UNION
OF NEW HAMPSHIRE
18 Low Avenue
Concord, New Hampshire 03301
T: 603.224.5591
sangyeob@aclu-nh.org
gilles@aclu-nh.org
henry@aclu-nh.org
chelsea@aclu-nh.org

Morenike Fajana*
Ashley Burrell*
Elizabeth Caldwell*
Morgan Humphrey*
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
40 Rector St., FL 5,
New York, NY 10006
(212) 217-1690
mfajana@naacpldf.org
aburrell@naacpldf.org
bcaldwell@naacpldf.org
mhumphrey@naacpldf.org

Mide Odunsi⸸
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
700 14th Street NW, Suite 600
Washington, DC 20005
(202) 249-2193
modunsi@naacpldf.org

Respectfully submitted,

/s/ *Cody Wofsy*
Cody Wofsy*
Hannah Steinberg*
Stephen Kang*
Spencer Amdur*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
425 California Street, Suite 700
San Francisco, CA 94104
T: (415) 343-0770
cwofsy@aclu.org
hsteinberg@aclu.org
skang@aclu.org
samdur@aclu.org

Noor Zafar*
Wafa Junaid*
Grace Choi*
Lee Gelernt*
Omar Jadwat*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad St., 18th Floor
New York, NY 10004
T: (212) 549-2660
nzafar@aclu.org
wjunaid@aclu.org
gchoi@aclu.org
lgelernt@aclu.org
ojadwat@aclu.org

Norm Eisen†*
Tianna Mays†*
STATE DEMOCRACY DEFENDERS FUND
600 Pennsylvania Avenue SE, #15180
Washington, D.C. 20003
T: (202) 594-9958
norman@statedemocracydefenders.org
tianna@statedemocracydefenders.org

16

Carol Garvan (N.H. Bar. No. 21304)
Zachary L. Heiden*
AMERICAN CIVIL LIBERTIES UNION OF MAINE
FOUNDATION
P.O. Box 7860
Portland, Maine 04112
T: (207) 619.8687
cgarvan@aclumaine.org
heiden@aclumaine.org

Adriana Lafaille*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF MASSACHUSETTS, INC.
One Center Plaza
Suite 850
Boston, MA 02108
T: (617) 482-3170
alafaille@aclum.org

Christopher M. Lapinig*
Kimberly Wei Leung*
Winifred Kao*
ASIAN LAW CAUCUS
55 Columbus Ave
San Francisco, CA 94111
T: (415) 896-1701
christopherl@asianlawcaucus.org
kimberlyl@asianlawcaucus.org
winifredk@asianlawcaucus.org

*Counsel for Plaintiffs*
†*Counsel for LULAC only*
\**Admitted Pro Hac Vice*
⚜*Application Pro Hac Vice Forthcoming*